No. 25-5328

*In the*

# United States Court of Appeals

*for the*

# District of Columbia Circuit

———————————————————

ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

– v. –

LIBRARY OF CONGRESS, *et al.*,

*Defendants-Appellees.*

———————————————————

On appeal from a final judgment of the
United States District Court for the District of Columbia
Case No. 1:22-cv-499 (U.S. District Beryl Howell)

———————————————————

## APPELLANTS' OPENING BRIEF

———————————————————

MICHAEL ELKIN
   *Winston & Strawn LLP*
   *200 Park Avenue*
   *New York, NY 10166*
   *212) 294-6729*

THOMAS KEARNEY
   *Winston & Strawn LLP*
   *101 California Street, 21st Floor*
   *San Francisco, CA 94111*
   (415) 591-6894

MICHAEL B. KIMBERLY
   *Winston & Strawn LLP*
   *1901 L Street NW*
   *Washington, DC 20036*
   *(202) 282-5096*
   *mkimberly@winston.com*

*Counsel for Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and amici.** Plaintiffs-appellants are the Advanced Medical Technology Association and Medical Imaging & Technology Alliance. Defendants-appellees are the Library of Congress and either Todd Blanche or Robert Newlen in his official capacity as Acting Librarian of Congress.

**Rulings under review.** The ruling under review is the district court's July 21, 2025, order in No. 1:22-cv-499 at Dkt. 48, as well as the memorandum opinion at Dkt. 49 and final judgment at Dkt. 50.

**Related cases.** This case was previously before this Court, which reversed the district court's earlier dismissal. *See Medical Imaging & Technology Alliance, et al. v. Library of Congress*, 103 F.4th 830, 840 n.4 (D.C. Cir. 2024). There are no related cases pending in this Court or any other court.

/s/ *Michael B. Kimberly*

## CORPORATE DISCLOSURE STATEMENT

AdvaMed is a non-profit, membership-based trade association. It has no parent corporation and does not issue stock. MITA also is a non-profit, membership-based trade association. It is a division of the National Electrical Manufacturers Association. MITA does not issue stock.

/s/ *Michael B. Kimberly*

## TABLE OF CONTENTS

Introduction ............................................................................................... 1

Jurisdiction ............................................................................................... 7

Pertinent Statutes and Regulations ...................................................... 7

Issue Presented for Review .................................................................... 7

Statement of Facts .................................................................................. 7

    A.  Legal background ......................................................................... 7

    B.  Factual background ................................................................... 14

    C.  Procedural background ............................................................. 16

Summary of Argument ......................................................................... 23

Standing ................................................................................................. 25

Standard of Review & Burden of Proof .............................................. 26

Argument ............................................................................................... 27

I.   The Medical Devices Exemption unlawfully permits infringing uses ........ 27

    A.  First factor: The uses permitted by the Exemption are substitutive rather than transformative ............................................... 27

        1.  The permitted uses are not transformative, but rather commercially substitutive .......................................... 28

        2.  The Librarian's and district court's contrary conclusions are manifestly wrong ................................. 33

    B.  Fourth factor: Unauthorized copying directly undercuts the market in which manufacturers license the works at issue ................ 43

        1.  The purpose of the Exemption is to inflict substantial harm on the marketability of the original works .................................. 43

        2.  The Librarian and district court erred in holding that there is no market to harm ...................................... 47

    C.  Second and third factors: There is no other "compelling justification" for finding the permitted uses noninfringing ................ 52

    D.  The Exemption purports to amend, and therefore is in conflict with, the plain language of 17 U.S.C. § 117(c) .................................... 55

II.  The Court should vacate the Exemption ................................................. 57

Conclusion............................................................................................... 58

# TABLE OF AUTHORITIES

## Cases

*Advanced Computer Services v. MAI Systems Corp.*,
845 F. Supp. 356 (E.D. Va. 1994) .......................................... 32, 54

*American Society for Testing & Materials v.
Public.Resource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023) .................................................... 53

*American Society for Testing & Materials v.
Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ..................................................... 53

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
598 U.S. 508 (2023) .............................. 3, 4, 8, 10, 11, 20-23, 28,
29, 31, 34, 42-43, 52-53

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ...................................... 10, 11, 53, 54

*Authors Guild v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .......................................................... 53

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022) ..................................................... 35

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994) ................................................ 10-11, 28, 31,
43-45, 50

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) ........................................................................ 36

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
983 F.3d (9th Cir. 2020) ............................................................. 45

*Egilman v. Keller & Heckman, LLP*,
401 F. Supp. 2d 105 (D.D.C. 2005) ............................................ 12

*Environmental Defense Fund v. EPA*,
124 F.4th 1 (D.C. Cir. 2024) ...................................................... 26

*Genuine Parts v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) .............................................. 26, 41

*Google LLC v. Oracle America, Inc.*,
 593 U.S. 1 (2021) .................................................8, 31, 46, 52, 54

*Grossmont Hospital v. Burwell*,
 797 F.3d 1079 (D.C. Cir. 2015) .................................................. 26

*Gulf Restoration Network v. Haaland*,
 47 F.4th 795 (D.C. Cir. 2022) ..................................................... 36

*Harper & Row, Publishers v. Nation Enterprises*,
 471 U.S. 539 (1985) ...................................... 3, 8, 9, 31, 43, 47, 55

*MAI Systems Corp. v. Peak Computer, Inc.*,
 991 F.2d 511 (9th Cir. 1993) .........................................................13

*Medical Imaging & Technology Alliance v. Library of
 Congress*,
 103 F.4th 830 (D.C. Cir. 2024) .................................................. 19

*Motor Vehicle Manufacturers Association v.
 State Farm Mutual Auto Insurance*,
 463 U.S. 29 (1983) .............................................................. 37, 49

*Murphy v. Millennium Radio Group LLC*,
 650 F.3d 295 (3d Cir. 2011) ........................................................ 44

*Philpot v. Independent Journal Review*,
 92 F.4th 252 (4th Cir. 2024)........................................................ 44

*Romanova v. Amilus Inc*,
 138 F.4th 104 (2d Cir. 2025) (Leval, J.) ..................................... 53

*Solondz v. FAA*,
 141 F.4th 268 (D.C. Cir. 2025) .................................................. 26

*Sony Corp. of America v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984)......................................................... 9, 33, 44

*Stewart v. Abend*,
 495 U.S. 207 (1990) ............................................................. 9, 10

*U.S. ex rel. Totten v. Bombardier Corp.*,
 380 F.3d 488 (D.C. Cir. 2004) ................................................... 56

*Triad Systems v. Southeastern Express*,
 64 F.3d 1330 (9th Cir. 1995) ...................................6, 30-32, 51, 57

*United States v. Hillie*,
39 F.4th 674 (D.C. Cir. 2022) .................................................... 56

*United Steel v. Mine Safety & Health Administration*,
925 F.3d 1279 (D.C. Cir. 2019) ................................................. 57

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) .................................................... 53

*Western Coal Traffic League v. STB*,
998 F.3d 945 (D.C. Cir. 2021) ................................................... 35

*Zomba Enterprises v. Panorama Records*,
491 F.3d 574 (6th Cir. 2007) .................................................... 40

**Statutes & regulations**

21 C.F.R.
Part 801 ..................................................................................15
Part 803 ..................................................................................15
Part 814 ..................................................................................15

37 C.F.R. § 201.40(b)(15) ............................................................ 19

37 C.F.R. § 201.40(b)(17) ...........................................5, 7, 20, 39, 58

5 U.S.C. § 706 ......................................................................... 57

5 U.S.C. § 706(2) ..................................................................... 58

17 U.S.C.
§ 101 ........................................................................ 7, 39, 52
§ 102(a) ....................................................................... 7
§ 107 ...........................................................3, 8, 9, 23, 28, 53
§ 109(b)(1)(A) ................................................................ 7
§ 117 ........................................................................ 24
§ 117(c) ......................13-14, 17, 22, 25, 30, 38, 45, 50, 51, 55-57
§ 1201(a)(1) .............................................................. 5, 26
§ 1201(a)(1)(A) .............................................................4, 12
§ 1201(a)(1)(C) ......................................................... 4, 13, 18
§ 1201(a)(3) ..................................................................12
§ 1204(a) ....................................................................12
§ 1291 ........................................................................ 7
§ 1331 ........................................................................ 7

**Other authorities**

4 Nimmer on Copyright § 13F.03 (2022)..................................... 9, 47

4 Patry on Copyright § 10:138 (2025 update)................................. 54

4 Patry on Copyright § 10:150.10 (2025 update)........................... 43

EFF Reply Comments 5-6, https://perma.cc/P63H-J26Y............... 36

Jane Ginsburg, *Fair Use Factor Four Revisited: Valuing The Value of the Copyrighted Work*, 67 J. Copyright Society U.S.A. 19 (2020)......................................................................... 10

Melissa A. Bogden, *Fixing Fixation: The RAM Copy Doctrine*, 43 Ariz. St. L.J. 181 (2011) ...........................................14

SEMA Reply Comments 8, https://perma.cc/G2YU-YJYU ............. 36

## GLOSSARY

| | |
|---|---|
| APA: | Administrative Procedure Act |
| DMCA: | Digital Millennium Copyright Act |
| FDA: | Food and Drug Administration |
| ISO: | independent service operator |
| MITA: | Medical Imaging & Technology Alliance |
| NPRM: | notice of proposed rulemaking |
| OEM: | original equipment manufacturer |
| R&D: | research and development |
| TPM: | technological protective measure |

**INTRODUCTION**

Advanced medical devices play an essential and life-saving role in today's technology-driven healthcare system. Sophisticated and complex machines like computerized tomography scanners, ultrasound systems, and magnetic resonance imaging machines allow for highly accurate imaging of internal organs and biological systems, facilitating early diagnoses of serious diseases. And advanced care technologies like respiratory ventilation systems and surgery-assisting robots allow for care with fewer complications, shorter hospital stays, and better outcomes.

Plaintiffs here are the Advanced Medical Technology Association (AdvaMed) and the Medical Imaging & Technology Alliance (MITA). Their mutual members invest billions of dollars every year designing, building, and servicing the life-sustaining medical devices on which the American healthcare system has come to depend.

At the same time that these companies are manufacturers of physical machines, they also are authors of the complex software programs, tools, files, and documentation needed to maintain and repair the machines. Coupling this software with the machines, manufacturers recoup their huge R&D investments in two ways: first through sales or leases of the machines themselves, and second through maintenance and servicing and licensing agreements for the software and documents necessary for the same.

These two complementary revenue streams are well understood by the healthcare providers who acquire and use AdvaMed's and MITA's members' advanced devices. Indeed, healthcare providers almost always must agree to the express terms of the software and documentation licenses when they acquire advanced medical devices like those at issue.

Nonetheless, a market has developed for unlicensed maintenance, diagnosis, and repair services for advanced medical devices. To provide such services, third-party servicers circumvent the encryption protecting licensed field-service software programs and other materials. Once an unauthorized third-party servicer has gained access to a manufacturer's software-based maintenance tools, documents, and files, it puts them to their precise intended use: facilitating the maintenance, diagnosis, and repair of the machine. And in doing so, it substitutes for manufacturers' services.

A critical point warrants emphasis at the start: Third-party servicers do absolutely nothing "new" with the works that they appropriate to provide maintenance-and-repair services. They do not put them to some further, transformative *use*, nor do they do imbue the works with some new or different *character*. On the contrary, third-party servicers expressly disclaim that they transform or alter the software itself—because doing so would subject them to regulation by the FDA as remanufacturers. Instead (and to reiterate), all they do is put the service software tools and services-related documents and

files to their original purpose of facilitating the maintenance, diagnosis, and repair of the machines. And they do so *for a profit*, in direct competition with the authors of the works.

This kind of copy-to-compete reproduction is the very definition of infringing use. "The Copyright Act encourages creativity by granting to the author of an original work 'a bundle of exclusive rights,'" including the rights "to reproduce the copyrighted work" and "prepare derivative works." *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508, 526 (2023) (quoting *Harper & Row, Publishers v. Nation Enterprises*, 471 U.S. 539, 546 (1985)). As the Supreme Court recently explained, "copyright's bête noire" is "the problem of substitution," meaning "[t]he use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work," so that the copy stands as a "substitute" for the original and "shrink[s] the protected market opportunities of the copyrighted work." *Id.* at 528, 531 (cleaned up). That is exactly what unauthorized third-party servicing companies do when they break into advanced medical devices and copy protected works to perform maintenance, diagnosis, and repair services.

To be sure, copyright is not absolute, and Congress has provided expressly that "the fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. But a fair use is a *transformative*

one—one that "has a purpose or character different from the original," so that it "does not supersede the objects of, or supplant, the work" in the market in which the work is sold. *Warhol*, 598 U.S. at 528-29. Plainly enough, making unauthorized copies of service software tools, operating manuals, and other protected works to perform unlicensed maintenance-and-repair services for a profit is not a transformative use. Rather, it is predatory appropriation designed to supplant the author's works with the copier's.

The Digital Millenium Copyright Act (DMCA) was enacted to prevent just this kind of digital piracy. The Act thus expressly prohibits users from circumventing any "technological measure that effectively controls access to a work." 17 U.S.C. § 1201(a)(1)(A). Under this anticircumvention rule, decrypting a copyrighted work without authorization is punishable with civil and, in some cases, criminal penalties.

At the same time that Congress made it unlawful to circumvent a copyright holder's encryption tools, it recognized that the DMCA's anticircumvention rule might be used to prevent otherwise lawful access to works and information. It thus directed the Library of Congress to grant exemptions to the anticircumvention rule through recurring, triennial rulemakings, to users who are likely to be "adversely affected by the [anticircumvention rule] in their ability to make *noninfringing uses*" of the work over the ensuing three years. 17 U.S.C. § 1201(a)(1)(C) (emphasis added).

This case concerns an exemption to the anticircumvention rule adopted in the Eight Triennial Rulemaking in 2021 and renewed in the Ninth Rulemaking in 2024: the Medical Devices Exemption. It is codified at 37 C.F.R. § 201.40(b)(17), and it grants a waiver from liability for circumvention of encryption protecting copyrighted software and other digital works used for servicing advanced medical devices.

The Exemption was granted at the request, and solely for the commercial benefit, of third-party servicers that provide unauthorized maintenance-and-repair services. Now in light of the Exemption, these (and all other) third-party servicers consider themselves free to copy diagnostic modules and service software, operating manuals and machine specifications, data reports and error logs, and other copyright-protected tools necessary to sell maintenance-and-repair services for a profit—the same services that manufacturers themselves use the software to sell and thus recoup the costs of developing their innovations.

The problem with the Exemption speaks for itself: Section 1201(a)(1) authorizes the Librarian of Congress to issue exemptions to the DMCA's anticircumvention rule for "noninfringing uses" only. But to make unauthorized reproductions of copyrighted works and to use them for the same purpose as the originals, solely to compete with the authors of the originals in the market that monetizes the works, is *not* a "noninfringing" fair use.

Case law offers no support for the Librarian's or district court's contrary conclusion. Quite the opposite. For example, in *Triad Systems v. Southeastern Express*, 64 F.3d 1330 (9th Cir. 1995), the Ninth Circuit concluded that analytically identical conduct was "neither creative nor transformative," "entirely commercial in nature," and therefore infringing. *Id.* at 1336-37. There, "Triad invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers." *Id.* at 1337. The Ninth Circuit rejected the third-party servicer's fair-use defense, explaining that it "ha[d] invented nothing of its own," but instead was "getting a free ride when it use[d] that software to perform precisely the same service," in competition with Triad, without paying for a license. *Id.* at 1336.

Yet here, in granting and renewing the Exemption, the Librarian concluded that third-party servicers use the copied works in new and "transformative" ways. That is unequivocally wrong. To conclude otherwise is to ignore the facts as well as the law. The district court, for its part, agreed with the Librarian as far as she went—and also offered additional rationales not furnished by the Librarian, which is not permissible.

At the end, both the Librarian and the district court laid bare their true reasoning: They believe that manufactures charge "exorbitant" licensing fees (5-JA-1693) for access to works related to maintenance and repair, and as a consequence "providers must spend more to service their equipment than if"

manufacturers did not enjoy copyright protection (2-JA-647). That is a stunning argument for a copyright regulator to make. To declare that an unauthorized copying of computer code is a "fair use" *because* it allows a competitor to take business from the author at lower prices is to flip copyright law on its head. Reversal is manifestly warranted.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. It entered a final judgment on July 21, 2025, and appellants filed an appeal on September 12, 2025. 1-JA-8. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes are set out in an attached addendum.

## ISSUE PRESENTED FOR REVIEW

Whether the Library's adoption and renewal of a DMCA exemption permitting the circumvention of technological protective measures for copyrighted software used for servicing and repairing medical devices (37 C.F.R. § 201.40(b)(17)) violated the APA because it was arbitrary and capricious, not in accordance with law, or in excess of statutory authority or limitation.

## STATEMENT OF FACTS

### A.    Legal background

**1. The fair use doctrine.** The Copyright Act of 1976 prohibits unauthorized reproduction of "original works of authorship fixed in any tangible

medium of expression." 17 U.S.C. § 102(a). Among the works covered by the Act are "computer program[s]." *Id.* §§ 101, 109(b)(1)(A).

Copyright serves practical objectives, foremost "to encourage the production of works" that, without copyright protection, could be "reproduce[d] more cheaply" by freeriders in the marketplace. *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 16 (2021). It thus "grant[s] to the author of an original work 'a bundle of exclusive rights,'" including the right to forbid unauthorized reproduction of the work. *Warhol*, 598 U.S. at 526 (quoting *Harper & Row*, 471 U.S. at 546).

The rights granted by the Act are not absolute. They are tempered to account for the "competing claims upon the public interest" by authors (on the one hand) and users (on the other). *Warhol*, 598 U.S. at 526. The Act balances the incentive to innovate against the need for "broad public availability" of creative works in several ways. *Id.* For example, it "limits the duration of copyright" and "makes facts and ideas uncopyrightable." *Id.* And pertinent here, it "limits the scope of copyright" through the common-law "fair use" doctrine *Id.* at 526-27.

The fair-use doctrine is codified at 17 U.S.C. § 107, which specifies that "the fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." To determine whether a use is "fair" and thus

noninfringing, the statute sets out four factors for consideration:

1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2. the nature of the copyrighted work;

3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)–(4). These four fair-use factors "are all weighed in the 'equitable rule of reason' balance." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984). Yet the fourth factor is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566; *see also Stewart v. Abend*, 495 U.S. 207, 238 (1990) (referring to the fourth factor as the "most important, and indeed, central" of the § 107 factors); 4 Nimmer on Copyright § 13F.03 (2022) (similar).

The fourth factor is first among equals because of its direct link with copyright's animating principles. The fair-use doctrine tolerates appropriation only when the copy does not substitute the original in the market in which the author herself commercializes the work. As the Supreme Court has put it, "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566-67. Because some duplication is *non*-competitive,

9

*non*-substitutive, and necessary for further creativity, the fair-use doctrine acknowledges that a "rigid application of the copyright statute" may in some circumstances "stifle the very creativity which that law is designed to foster." *Warhol*, 598 U.S. at 527 (quoting *Stewart*, 495 U.S. at 236).

**2. Transformative use.** In conjunction with the fair-use factors, the Supreme Court has instructed courts to determine whether a secondary use of a copyrighted work is *transformative* of the original. The Supreme Court first introduced the concept of "transformative" use in *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994), as a consideration under the first factor. Since then, lower courts have expanded the reach of the inquiry to "engulf all of fair use." Jane Ginsburg, *Fair Use Factor Four Revisited: Valuing The Value of the Copyrighted Work*, 67 J. Copyright Society U.S.A. 19, 19-20 (2020). The question of transformative use cuts across the four factors for the same two reasons that the fourth factor predominates over the others:

*First*, "[t]he more the appropriator is using the copied material for new, transformative purposes, . . . the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work." *Warhol*, 598 U.S. at 531 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Leval, J.)). For example, because reproduction for parody or criticism "uses the work to serve a distinct end," it "ordinarily does not supersede the objects

of, or supplant, the work" in its own commercial market. *Id.* at 528. Transformative uses thus avoid "the problem of substitution—copyright's bête noire." *Id.* No one would say that *The Hunger Pains* by the Harvard Lampoon competes as a substitute for *The Hunger Games* by Suzanne Collins in the market for pleasure reading.

**Second,** "[t]he more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge." *Warhol*, 598 U.S. at 531 (quoting *Authors Guild*, 804 F.3d at 214). Turning to parody again, it "has an obvious claim to transformative value" because "it can provide social benefit, by shedding light on an earlier work, and, in the process, *creating a new one*." *Id.* at 530 (emphasis added) (quoting *Campbell*, 510 U.S. at 579). But, of course, parody "needs to mimic an original to make its point." *Id.* (quoting *Campbell*, 510 U.S. at 580-81). Thus, focusing on transformative use helps to isolate those cases in which permitting unauthorized copying fosters further creations.

For these reasons, "the sorts of copying that courts and Congress most commonly have found to be fair uses" are those listed in the statute itself: criticism, comment, news reporting, teaching, scholarship, and research. *Warhol*, 598 U.S. at 528 (citing *Campbell*, 510 U.S. at 577-78). These "easily understood" examples entail the use of a copy that will "serve a manifestly

different purpose from the [original] work itself" and are thus inherently transformative. *Id.*

**3. The DMCA.** The proliferation in the 1990s of digital copyrighted works, and the ease with which they could be copied electronically, introduced new challenges for copyright owners. Many creators began using various kinds of encryption to control access to their works and thwart copying. To support those efforts, "Congress enacted the DMCA in 1998 'to strengthen copyright protection in the digital age.'" *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 112 (D.D.C. 2005).

The DMCA protects copyright by prohibiting users of a copyrighted work from "circumvent[ing] a technological measure that effectively controls access to [the] work" (17 U.S.C. § 1201(a)(1)(A))—a prohibition that we refer to as the anticircumvention rule. To circumvent protective tools is to descramble or decrypt by bypassing, removing, or deactivating a technological protective measure "without the authority of the copyright owner." *Id.* § 1201(a)(3). Violations of the DMCA's anticircumvention rule are punishable with private civil remedies, and in the case of a willful violation "for purposes of commercial advantage," criminal penalties. *Id.* § 1204(a).

Congress recognized, however, that unchecked use of encryption might obstruct noninfringing access to works and information. Because it did not intend for the DMCA to inhibit noninfringing uses, the DMCA instructs the

Register of Copyrights and Librarian of Congress to undertake triennial rule-makings to consider petitions for three-year "exemptions" from the DMCA's prohibitions for limited purposes. 17 U.S.C. § 1201(a)(1)(C). Such exemptions are authorized only if users are likely to be "adversely affected by" the anti-circumvention rule exclusively "in their ability to make *noninfringing* uses." *Id.* (emphasis added). A DMCA exemption thus requires the Librarian to find that the proposed uses of the class of copyrightable works at issue are noninfringing, typically implicating the fair-use doctrine.

**4. Section 117(c).** Shortly before Congress began debating the DMCA, the Ninth Circuit issued its decision in *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993). There, the court held that "a 'copying' for purposes of copyright law occurs when a computer program is transferred from a permanent storage device [*i.e.*, hard drive] to a computer's RAM." *Id.* at 518. On that reasoning, the mere act of turning a computer on is an act of infringement. *Id.* at 518-519.

Congress narrowly abrogated that holding with the DMCA, enacting a limited but categorical copyright exception for copying operating software as necessary to activate machines for maintenance and repair. Section 117(c) of the Copyright Act, as amended by the DMCA, thus expressly allows owners and lessees of software-operated machines "to make or authorize the making of a copy of a computer program" in limited circumstances, when:

(1) the "copy is made solely by virtue of the activation of a machine" and "for purposes only of maintenance or repair of that machine,"

(2) the copy "is used in no other manner" than activation for maintenance and repair, and

(3) the copy "is destroyed immediately after the maintenance or repair is completed."

17 U.S.C. § 117(c). As scholars have noted, "Section 117(c) reversed *MAI*'s application of the RAM Copy Doctrine" in the limited context of activating computers for maintenance and repair. Melissa A. Bogden, *Fixing Fixation: The RAM Copy Doctrine*, 43 Ariz. St. L.J. 181, 197 (2011).

## B. Factual background

**1.** Today, advances in medical technology are driven by software every bit as much as hardware engineering and design. This software includes not only an advanced medical machine's operating system—typically Windows or Linux (3-JA-1034; 5-JA-1483)—but also "field service software and information" (5-JA-1427, 1649), including proprietary "diagnostic tools" (5-JA-1381, 1422) and other "specialized service tools" (5-JA-1409) stored on the machine and used to identify and resolve malfunctions, report equipment usage, and identify replacement needs. *See* 5-JA-1425, 1429, 1483, 1631.

Device manufacturers make enormous investments of time and money to develop and bring medical devices and their software to market. 4-JA-1377-78; 5-JA-1599-1600. They rely on copyright protections—including the anti-

circumvention rule—to recoup their investments, facilitate further innovations, and protect the integrity of their software. 4-JA-1371; 5-JA-1593.

**2.** Manufacturers use a variety of technological measures like digital certificates and encryption keys to guard against unauthorized copying of the software and other protected materials stored on the machines. These access controls limit aspects of their software that may be viewed, used, copied, and modified. 5-JA-1429, 1511. They not only safeguard manufacturers' intellectual property, but also protect the integrity of the device and the privacy of patient data while ensuring that only appropriate users operate medical device software. 5-JA-1511.

Improper use of manufacturer's proprietary software for servicing medical devices creates substantial risks to users, patients, and providers. 4-JA-1372-73; 5-JA-1594-95. Failure to repair devices properly also can cause delays and misdiagnoses. *Id.* Given these risks, the FDA strictly regulates medical device manufacturers, requiring them to obtain approvals before commercially distributing devices (21 C.F.R. Parts 801, 814) and to report serious malfunction incidents (21 C.F.R. Part 803). *See* 4-JA-1373-75; 5-JA-1595-97. FDA also has recognized the importance of allowing manufacturers to train and equip their "own service personnel with additional documentation or enhanced software programs, with privileged access codes" to provide particularly complex services and repairs. 5-JA-1408 n.2.

**3.** Third-party servicing companies—sometimes referred to as independent service operators, or ISOs—provide unregulated third-party maintenance-and-repair services for medical devices. They are not subject to the FDA regulations that apply to original equipment manufacturers (referred to as OEMs). Nor are they subject to the same training and quality control measures. Many manufacturers nevertheless provide support to third-party servicers to enable them to perform basic maintenance-and-repair services, including limited licensing of copyrighted documentation and software. *See, e.g.*, 4-JA-1061; 5-JA-1429, 1583.

Some third-party servicers gain access to and reproduce copyrighted software without obtaining a license. 5-JA-1410, 1587-89. They then use the copies to provide the same maintenance-and-repair services that manufacturers do, putting the software and other works to the same use, in direct competition with the manufacturers' service programs. *See, e.g.*, 5-JA-1429.

### C.  Procedural background

**1. The Eighth Triennial Rulemaking.** Third-party servicers Summit Imaging and Transtate Equipment Company petitioned in the Eighth Triennial Rulemaking for access to "[e]lectronic servicing materials in the form of computer programs and data files that control functions of or store data relating to the functioning of lawfully acquired medical systems and devices." 3-JA-1020; *see generally* 3-JA-1016-1034; 4-JA-1035-1353.

In seeking the exemption, the proponents explained that their need was not to copy the machines' operating system software, which typically is Linux or Windows (and is already permitted by § 117(c)). *See* 3-JA-1023-24. Rather, their need is to copy "diagnostic software and data files" (3-JA-1024) and "medical equipment servicing materials in the form of computer programs" and "databases and manuals" that "are necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems" (3-JA-1031-32). Transtate explained further that, "[w]hen performing the servicing activities, the diagnostic and testing modules are used to diagnose the operating conditions and to determine if the system or device is performing according to specifications." 4-JA-1050. And the proponents were clear why they believe third-party services are important: Without them, owners "cannot take advantage of the lower prices offered by . . . ISOs." 4-JA-1057.

Plaintiffs and one of their mutual members submitted comments opposing the proposed exemption. *See* 4-JA-1354-1380; 5-JA-1381-1430.

The Register—the official who makes exemption recommendations to the Librarian—proposed granting the exemption to allow the copying of "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." 3-JA-766.

The Register concluded that use of copyrighted software for maintenance and repair of advanced medical devices is a noninfringing "fair use." 2-JA-627-631. Concerning the first factor, she concluded "that proponents' proposed use is likely transformative and so the first factor favors fair use." 2-JA-628. The Register further opined that medical-device system software is entitled to diminished copyright protection because it is "not used for [its] expressive qualities, but rather for [its] functional and informational aspects that enable users to control and understand the operation of the equipment." 2-JA-629. She concluded, in addition, that servicers' copying of the entirety of manufacturers' works "should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." 2-JA-630. And concerning harm to the market for the copyrighted software, the Register concluded that "there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." 2-JA-631.

With respect to her discretion to consider other factors under the Section 1201(a)(1)(C) framework, the Register observed that "OEMs charge higher prices" than third-party services for maintenance and repair and therefore "medical service providers must spend more to service their equipment" if they use manufacturers' services "than if they were able to engage in self-repair or have an ISO perform repairs on their behalf." 2-JA-647.

The Register thus recommended granting the Exemption. 2-JA-650-51. The Librarian adopted the Exemption according to the Register's recommendation, the content of which we thus attribute to the Librarian. It is codified at 37 C.F.R. § 201.40(b)(15) and went into immediate effect.

**2. The lawsuit and Ninth Triennial Rulemaking.** Plaintiffs brought this suit challenging the Medical Devices Exemption as unlawful under the APA, or in the alternative, as an *ultra vires* action by the Librarian. The district court dismissed the complaint, holding that the claims were "barred by sovereign immunity because the Librarian's decisions are not subject to APA review." Dist. Ct. Dkt. 27, at 17.

This Court reversed. *See Medical Imaging & Technology Alliance v. Library of Congress*, 103 F.4th 830 (D.C. Cir. 2024). It held that "DMCA rules are subject to the APA just like other copyright rules," and it remanded for this Court "to assess the APA claims in the first instance." *Id.* at 833.

In the meantime, the Library commenced and concluded the Ninth Triennial Rulemaking. Transtate and Summit petitioned for renewal of the Medical Devices Exemption. 5-JA-1481-1509. Plaintiffs and others submitted comments opposing renewal. 5-JA-1510-1656. Apart from repeating their prior arguments, opponents argued that the fair-use determination undergirding the Exemption conflicts with the Supreme Court's intervening de-

cision in *Warhol*, which reiterated that commercial use of a copyrighted work for the same purpose as the original work is not fair use.

The Register recommended that the Librarian renew the Exemption. 3-JA-809-812. She determined that the "analysis from the 2021 cycle remains sound" notwithstanding *Warhol*. 3-JA-811-12. The Librarian agreed, and the Exemption is now codified at 37 C.F.R. § 201.40(b)(17).

Plaintiffs thereafter amended the complaint in this case to challenge both the adoption of the Medical Devices Exemption in the Eighth Triennial Rulemaking and its renewal in the Ninth. The parties then exchanged cross-motions for summary judgment.

**3. The district court's decision.** In an opinion accusing plaintiffs of "overreact[ing]" like "Chicken Little" (5-JA-1693 n.9) and aiming only to protect "an ability to charge exorbitant prices" (5-JA-1693), the district court granted summary judgment to the Library. *See* 5-JA-1657-1716.

The district court's analysis focused on the first fair use factor, and in particular whether the third-party servicers' use was transformative. It maintained that the Librarian had found that the operating software and related data files for medical devices were *not* originally invented and developed for the "primary purpose" of servicing the devices. 5-JA-1709. It thus held that third-party servicers make transformative use of the works because "repair and maintenance" has a "different character" and "employ[s] the code in a

different manner" from how the software is "originally used by the machine to operate the device." 5-JA-1679 (cleaned up and citations omitted).

Even if that were wrong, the court continued, "ISOs' use of [service] materials still may be considered transformative" because use of software tools, data, and files "requires input of [the user's] knowledge, creative and analytical thinking, and mechanical skills." 5-JA-1686. In the district court's view, this was a "secondary function" that "transform[ed] the basic knowledge conveyed in the copyrighted materials into a distinct and meaningful output, which is considered transformative." *Id.*

The district court opined that the copying at issue is transformative for the additional reason that "diagnosis, maintenance, and repair has a concrete 'transformative' effect on the *device* by changing some aspect of how it works." 5-JA-1686. The court agreed with plaintiffs that "the first fair use factor [asks] whether the use transforms the copyrighted material itself" and not a "separate related object." *Id.* And it acknowledged that "technically the hardware and software may be distinct." 5-JA-1687. But it held that "the software has no use or value apart from the device," and because maintenance of the device "facilitate[s] use of the software," servicers' use of the copied software has a "transformative effect on the *use* of the software." *Id.*

The district court rejected plaintiffs' position that it was arbitrary for the Librarian to analogize to her 2015 rulemaking, where she granted a similar

exemption for maintenance and repair of motor vehicles, despite that the exemption there expressly envisioned transformative alterations. *See* 5-JA-1687-89. And the district court finally rejected the argument that the Librarian had not taken adequate account of *Warhol*. *See* 5-JA-1689-1690.

"In sum," the district court concluded, "the Librarian's conclusion that all of the uses contemplated by the Exemption are transformative—and that the transformative quality was more significant than the commercial, for-profit nature of most diagnosis, maintenance, and repair services—was consistent with fair use law, including precedent such as *Warhol*, and supported by well-reasoned analysis." 5-JA-1692.

Having held that the Librarian's fair-use analysis was reasonable, the district court turned to a recitation of why it believed the Exemption is consistent with copyright policy. 5-JA-1704-1710. On that front, the court noted that, with § 117(c), Congress expressed an "intent to ensure that maintenance and repairs were not monopolized by copyright owners of computer programs." 5-JA-1706. And with the Exemption, the Librarian has now "go[ne] beyond the statutory provision" to provide protections that Congress did not provide itself in § 117(c). 5-JA-1707. This, the district court reasoned, means that the Exemption is consistent with congressional intent.

Finally, the district court held that the Librarian adequately addressed all the comments submitted to it. 5-JA-1710-15. Having done so, it held that the Exemption is lawful and should be upheld. 5-JA-1715-16.

## SUMMARY OF ARGUMENT

Under any reasonable application of the fair-use factors, the Medical Devices Exemption permits infringing uses and is unlawful.

Start with the first factor, "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. Where, as here, "an original work and a secondary use share the same or highly similar purposes, *and* the secondary use is of a commercial nature," the first factor almost always will weigh against fair use. *Warhol*, 598 US at 532-33 (emphasis added).

Here, the Exemption has authorized copying of field-service software tools, manuals, and other files that were created for the purpose of facilitating maintenance-and-repair services. It does so to permit third parties to use them *for exactly the same commercial purpose*. There is no dispute that third-party servicers copy these protected works in order to put them to their original, intended uses of facilitating maintenance-and-repair services in a competitive commercial market, substituting their own services for the services of the works' authors. This is the textbook definition of substitutive, commercial use—not transformative use.

The Librarian's contrary finding turned on a misimpression that the works being copied are merely operating software. The district court agreed. Both were wrong. To be crystal clear: This case is *not* about operating software, which is covered separately by 17 U.S.C. § 117. There is no support for a contrary conclusion in the administrative record.

The district court offered other rationales for upholding a finding of transformative use. But none was adopted by the Librarian, and each offends basic principles of copyright law. None is a ground for affirming.

Take next the fourth factor, which is closely related to the first factor. It asks whether the copier's use of the protected work will cause market harm to the author. Generally speaking, when the copy is commercially substitutive, the answer is perforce *yes*. That is the case here. Indeed, the record shows that market harm was the *point* of the Exemption: Proponents sought the Exemption, and the Librarian granted it, to ensure that third-party servicers would be able to offer substitutive maintenance-and-repair services at lower cost, taking market share from higher-cost manufacturers and destroying the licensing market for the protected software.

The Librarian (and district court) denied that there is a separate market for the works at issue, but the evidence—including evidence introduced by the proponents themselves—confirms that there *is* a separate market for software licenses. And the harm inflicted on that market is undeniable. The district

court assumed as much and offered another rationale not adopted by the Librarian. That post hoc explanation is both wrong and procedurally unavailable.

When the first and fourth factors weigh against fair use (as they do here), only an especially "compelling justification" under the second and third factors can save a copier's appropriation. Here there is no justification, much less a compelling one, under the second and third factors.

Finally, the Exemption impermissibly amends § 117(c), which codifies a narrow exemption for copying a limited range of digital works for machine maintenance and repair. The Court thus should remand with instructions to vacate the Exemption.

## STANDING

AdvaMed and MITA are trade associations. 4-JA-1354, 1369. Their mutual members include Philips North America, which commented on the Exemption (5-JA-1405-1430, 1510-1548), as well as almost all other major manufacturers of advanced medical devices. AdvaMed's and MITA's members—and their devices and software—are the objects regulated by the Medical Devices Exemption. By the Exemption's operation, AdvaMed's and MITA's members are denied a right under the DMCA to challenge circumvention of the technological protective measures they use to guard against unauthorized copying of software and data stored on their devices. That injury is redressable by an order setting aside the Exemption.

## STANDARD OF REVIEW & BURDEN OF PROOF

This Court "review[s] the district court's grant of summary judgment de novo" and the Librarian's decision "under the standard of the Administrative Procedure Act." *Grossmont Hospital v. Burwell*, 797 F.3d 1079, 1082 (D.C. Cir. 2015). Under the APA, review of an "agency's interpretation of its governing statute" calls for "independent judgment" without deference. *Environmental Defense Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024).

A court's review for arbitrariness calls for a determination whether "the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be . . . the product of agency expertise." *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025).

A court may not "substitute" its own reasoning for the agency's and "may only uphold a rule 'on the basis articulated by the agency' in the rule making record." *Genuine Parts v. EPA*, 890 F.3d 304, 314 (D.C. Cir. 2018).

Plaintiffs bear the burden of showing that the Exemption violates the APA. But "those who seek an exemption" under 17 U.S.C. § 1201(a)(1) "bear the burden of establishing that the requirements for granting an exemption have been satisfied" in the underlying rulemaking. 2-JA-426. Plaintiffs thus meet their burden under the APA by showing that the proponents failed to meet *their* burden under § 1201(a)(1).

# ARGUMENT

The Exemption authorizes infringing uses of copyrighted works and is unlawful. The Librarian erred in holding that copying "diagnostic software and data files" (3-JA-1024) for their intended purposes of maintenance and repair is "transformative." The Librarian's contrary conclusion is not only legally wrong, but it is based on illogical factual assumptions unsupported by evidence and irrelevant policy considerations that have no place in the fair use analysis. It cannot stand.

## I.  THE MEDICAL DEVICES EXEMPTION UNLAWFULLY PERMITS INFRINGING USES

### A.  First factor: The uses permitted by the Exemption are substitutive rather than transformative

The Librarian erred in her fair-use analysis, which turned principally on the question whether third-party servicers make transformative use of the "diagnostic software and data files" (3-JA-1024 (Summit petition)) and other "medical equipment servicing materials" that "are necessary for servicing . . . medical devices and systems" (3-JA-1031-32 (Transtate petition)) by putting them to work for maintenance and repair.

The Librarian concluded that they *do* make transformative use of those protected works, and the district court agreed. In fact, the Librarian approved (and the district court upheld) an exemption for *substitutive* uses, allowing third-party servicers to compete directly with manufacturers without paying

for licenses, thus substantially undermining the market for manufacturers' own services and licenses.

### 1. *The permitted uses are not transformative, but rather commercially substitutive*

**a.** The uses permitted by the Exemption are not transformative. A secondary use of a copyrighted work is transformative when it puts the work to "a further purpose" or imbues it with a "different character." *Warhol*, 598 U.S. at 532. But not just "any further purpose, or any different character" will do—to make a "transformative use of an original," a user "must go beyond that required to qualify as a derivative" use. *Id.* at 529. For example, an "adaptation of a book into a movie" is a "substantial" transformation, but it serves the same basic purpose (conveying a story for entertainment value) and is thus only derivative. *Id.*

Putting a work to a "transformative" use within the meaning of the fair-use doctrine requires putting the work to a new and unintended use, akin to those "listed in the preamble paragraph of § 107: criticism, comment, news reporting, teaching scholarship, or research." *Id.* at 528 (cleaned up). A parody, for example "has an obvious claim to transformative value" because it puts reproduced original material to "a distinct purpose of commenting on the original or criticizing it." *Id.* at 530 (discussing *Campbell*, 510 U.S at 579-583). By definition, the author of the original could not have criticism of her

*own work as an original purpose of her creation.*

**b.** The uses permitted by the Exemption are not transformative. It permits circumvention to copy "software, data files, and electronic service materials necessary for performing . . . servicing activities." 4-JA-1036. *Accord* 4-JA-1047-48 ("servicing computer programs and data files" and "electronic manuals"); 5-JA-1444 ("documentation and software to support planned maintenance activities and to execute common corrective maintenance activities"). Third-party servicers put those works to their exact intended uses—the same ones to which the works' authors put them.

There is nothing even remotely transformative about this. To begin with, third-party servicing companies do not imbue the works with a "new expression, meaning, or message." *Warhol*, 598 U.S. at 541. In fact, the Exemption's proponents expressly affirmed that they did not seek "an exemption to modify medical devices or systems, or their software" to avoid FDA regulation. 2-JA-627. The Librarian therefore did "not consider whether modification" of either the machines or their software "is not infringing." *Id.* She instead noted that "'modification' is not part of the proposed exemption for medical devices," and the "exemption requires the device to be restored to normal functionality and no changes be made to the firmware." 2-JA-648. Third-party servicers do not substantively modify anything.

Nor do third-party services put manufacturers' original creations to a "transformative" new *use* or *purpose*. With due respect to the Libarian and the district court, this point is not debatable. The Exemption's proponents were clear that they sought an exemption for "diagnostic software and data files" stored on, or embedded in, medical devices. 3-JA-1024. That is, they sought permission to copy "medical equipment servicing materials in the form of computer programs and data files," including manuals, "which are necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems." 3-JA-1031-32. No petitioner sought an exemption to copy general operating software, which is typically Windows or Linux. Indeed, no such exemption would have been necessary in light of 17 U.S.C. § 117(c).

The works at issue here are only software service tools and maintenance-related documentation and files. These works, by definition, were created for the sole purpose of facilitating machine maintenance, diagnosis, and repair of the machines. As Philips explained in its 2024 comment letter, third-party servicers thus "seek to use copyrighted service software authored by [manufacturers] for the exact same purpose as it was created," which is "to service medical imaging systems." 5-JA-1510.

Confronting a similar circumstance shortly before enactment of the DMCA, the Ninth Circuit explained in *Triad Systems* that a third-party servicer in a case like this "invent[s] nothing of its own," and "its use of [the

manufacturer's] software is . . . neither creative nor transformative and does not provide the marketplace with new creative works." 64 F.3d at 1336. Or, to put it in *Warhol*'s words, third-party servicers' use of manufacturers' works "share[s] substantially the same purpose" as the original intended use, thus "supplanting the original" in the marketplace for maintenance-and-repair services without adding a "further purpose or different character" of any kind. 598 U.S. at 526, 528 (citing *Campbell*, 510 U.S. at 579).

**c.** There can be no doubt that the uses to which the works are being put are purely commercial: Third-party servicers use the copied materials to provide maintenance-and-repair services, which they sell for a fee. They accordingly "stand[] to profit from exploitation of the copyrighted material without paying the customary price" (a licensing fee), which is prototypical commercial use. *Harper & Row*, 471 U.S. at 562.

When third-party servicers put the works at issue here to their original and intended use without adding any new expression or applying any creative energies to them, the commerciality of the use assumes added weight. To be sure, "the fact that a use is commercial as opposed to nonprofit . . . is not [singularly] dispositive" of the first fair-used factor. *Warhol*, 598 U.S. at 531 (quoting *Google*, 593 U.S. at 32). It is, instead, "to be weighed against the degree to which the use has a further purpose or different character." *Id.* That makes sense: The less transformative a secondary use is, the more likely it is

to "serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work"—and thus the more problematic it is that the secondary use is intended to make the user a profit at the author's expense. *Id.*

The only two courts to consider copyright infringement in this context are in accord: When a third-party servicer copies digital works and uses them to provide the very same maintenance-and-repair services that they were created to facilitate, the "use of [the] software [is] entirely commercial in nature." *Triad Systems*, 64 F.3d at 1337. *Accord Advanced Computer Services v. MAI Systems Corp.*, 845 F. Supp. 356, 365 (E.D. Va. 1994) (holding in a similar case that "the sole purpose of [the] use of [the] copyrighted software is in connection with the provision of computer maintenance services," which "is a commercial use").

It bears repeating here that third-party servicers earn their profit by taking business *from* the works' authors. Machine manufacturers "compete with ISOs for the post warranty servicing [contracts]" through which the works are monetized, but "ISOs often charge much less." 4-JA-1055. Of course, the reason that third-party servicers (ISOs) offer less expensive maintenance-and-repair services is because they are free-riding on the investments made by manufacturers. ISOs do not have to recoup the enormous R&D investments that manufacturers make to engineer their sophisticated medical

devices and author the software tools and other works necessary to keep them running. Their substitutive, commercial use of copyrighted materials is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony*, 464 U.S. at 451.

### 2. The Librarian's and district court's contrary conclusions are manifestly wrong

The Librarian disagreed on these points, concluding that third-party servicers *do* make a "transformative" use of field service software and maintenance-related documentation—by simply using those works for maintenance-and-repair services. Just to state that conclusion is to refute it.

In the Eighth Rulemaking, the Register's recommendation devoted a mere three sentences to the question of transformativeness:

> Here, the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials. The Register has previously concluded that diagnosis and repair are likely to be transformative uses. The Register accordingly concludes that proponents' proposed use is likely transformative and so the first factor favors fair use.

2-JA-628. That is an illogical *ipse dixit*. It makes no sense to say that the only purpose of the copiers' use is to provide a service (restoring the machine's functionality), and not to make money in the competitive, commercial market for the service. When software is copied to provide maintenance-and-repair services to end-users in a commercial market for a fee, it is an obviously

commercial use. In fact, the use is not only commercial, but also a direct market substitution for manufacturers' services—the precise opposite of transformative use. *Warhol*, 598 U.S. at 528. To take the Librarian's logic to its natural conclusion would mean that when someone illegally copies a motion picture and sells tickets to watch the copy in his basement, he is putting the copy to the supposedly transformative use of "entertaining his customers," and the fact that he is making money in direct competition with movie theaters by doing so is irrelevant. That is not defensible.

Nor was it sufficient for the Librarian to analogize to the 2015 rule-making, in which she "previously concluded that diagnosis and repair are likely to be transformative uses." As commenters explained, the exemption at issue in 2015 authorized uses that included "copying the work to create new applications" and "extend[ed] to modification" of the works at issue. 1-JA-247. Here, no such transformative modifications are taking place. Again, the Librarian recognized this expressly, noting that "'modification' is not part of the proposed exemption for medical devices," which requires users to provide services with "no changes . . . made" to the works at issue. 2-JA-648.

Opponents of the Exemption highlighted this distinction in the Eighth Rulemaking (*e.g.*, 4-JA-1377), but the Librarian declined to address it (*see* 2-JA-627-631). They did so again in the Ninth Rulemaking (*e.g.*, 5-JA-1533), and the Librarian again declined to address it (*see* 3-JA-809-812).

That alone is a basis for vacating the Librarian's decisions as arbitrary and capricious. It is fundamental that "an agency must respond to comments 'that can be thought to challenge a fundamental premise' underlying the proposed agency decision." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022). And "the failure to respond to significant comments . . . violates a substantive guarantee of the APA." *Western Coal Traffic League v. STB*, 998 F.3d 945, 954 (D.C. Cir. 2021).

We made this precise argument to the district court, but it waived it away, holding that "categorical" fair-use analysis required by the DMCA "requires some degree of generalization," and "[a]nalogizing . . . to another context involving . . . diagnosis, maintenance, and repair was therefore not only acceptable but showed exemplary thoroughness." 5-JA-1688. That answer likewise ignores the difference, which is that the 2015 exemption for automobile maintenance and repair expressly *included* transformative modifications, whereas the Exemption here expressly *disclaimed* them. Generalization is one thing, but ignoring a clear distinction is something else.

From there, the district court gave another response that the Librarian omitted, reasoning that the Librarian's analysis in the 2015 rulemaking didn't depend on modification. 5-JA-1689. There is no basis for that conclusion. The Library emphasized modification in the 2015 rulemaking (1-JA-247), and it did not suggest that it was irrelevant to transformativeness. Moreover,

modification was central to the transformative-use arguments presented by proponents to the Librarian in 2015. The Electronic Frontier Foundation, for instance, asserted that the 2015 record was "replete with transformative uses of vehicle software," including "modifying software to alter its functionality." EFF Reply Comments 5-6, https://perma.cc/P63H-J26Y. *Accord* SEMA Reply Comments 8, https://perma.cc/G2YU-YJYU.

Regardless, the district court's *sua sponte* reasoning was not adopted by the Librarian (or even pressed by his litigation counsel), so this is no basis for affirming. "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took action." *DHS v. Regents of the University of California*, 591 U.S. 1, 20 (2020). The Court "cannot affirm based on a post hoc litigation rationalization" that differs from the reasons given by the agency itself. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022). That is so regardless of whether the post hoc reasoning is supplied by counsel for the agency or *sua sponte* by the district court.

**b.** In the Ninth Rulemaking, the Librarian concluded that the permitted uses are transformative because "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." 3-JA-812. There are two ways to interpret this reasoning, both reflecting error.

***First,*** the Librarian can be understood to say that the original purpose of

the works at issue is *not* the facilitation of maintenance-and-repair services and instead only "to operate a device that functions as designed." From that angle, the Librarian seems to have concluded that the works at issue are the machines' operating software, and not field-service software tools or maintenance-related documentation.

That was the district court's belief, as well. It characterized the Exemption as allowing copying of "operating system software," which has as an "original use" the operation of a functioning machine. 5-JA-1683-84. That stands in contrast, according to the district court, with the "secondary use by ISOs to repair the device." 5-JA-1684. *Accord id.* n.5 (drawing "a distinction between the original purpose of getting the device to operate . . . and the secondary one of fixing the device to improve or maintain its operation"). Indeed, the district court went so far as to attribute to the Librarian a "factual finding" that "the operating software and related data files for medical devices were *not* originally invented and developed for the primary purpose of having OEMs service those devices." 5-JA-1709.

If that is what the Librarian meant, her decision was unequivocally wrong and ran "counter to the evidence before the agency." *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance*, 463 U.S. 29, 43 (1983). As we have now repeatedly shown, the Exemption was only about software tools, manuals, documentation, and similar files used in mainten-

ance and repair.

That is what makes so puzzling the district court's assertion that "substantial evidence" supports "the Librarian's factual finding" that the works at issue were not created to facilitate maintenance and repair. 5-JA-1709. Having declared as much, the district court did not then recite the supposed evidence supporting the finding, or even where the finding was made. Instead, the district court cited to the entire fair-use section of its own opinion, running from 5-JA-1675 to 5-JA-1703. But that part of the opinion also does not cite evidence to support such a finding. The closest is footnote 5 on page 5-JA-1684, which simply recites the Librarian's factual *assumptions* (points that she "noted" and "recogniz[ed]"), again without citation to evidence.

The Librarian's and district court's evident belief that the Exemption concerns "operating system software" (5-JA-1683), which is created "to operate a device that functions as designed" (3-JA-812) and not to maintain or repair it, is just wrong. There is no evidence to support it—*none, nowhere*.

At the risk of excessive repetition: An exemption for copying operating software would not be necessary in light of § 117(c). The petitioners thus were explicit that they sought the Exemption for "medical equipment servicing materials" (3-JA-1031), including "diagnostic software and data files" (3-JA-1024) and electronically stored service manuals and similar documentation. (*e.g.*, 3-JA-1031-32; 4-JA-1078-79; 5-JA-1432, n.3). Those works very

plainly *are* "originally invented and developed for the primary purpose of having OEMs service those devices." 5-JA-1709.

Of course, even if this case were about general operating software, the uses at issue would be derivative at most and thus still protected. The language of the Exemption itself makes this clear—it allows the copying of computer programs and other protected works only if their reproduction is "a *necessary* step to allow the diagnosis, maintenance, or repair" of a medical device. 37 C.F.R. § 201.40(b)(17) (emphasis added). To characterize such copying as transformative depends on the implausible notion that, although (1) complex medical devices require diagnosis, maintenance, and repair during their lifetimes, (2) manufacturers know that such services will be required because they provide them, and (3) copying the machine's operating software is *necessary* to perform such tasks, manufacturers nevertheless did not design or intend their operating software to be used for that end. That rationale finds no support in the administrative record. And either way, such a use would be at most a derivative "adapt[ation]" of the original software and files. 17 U.S.C. § 101 (defining derivative use).

**Second,** the Librarian may alternatively be understood to say that third-party servicers' use is transformative of the *machine* (i.e., it "render[s] a non-functional device functional again") rather than of the works being copied. The district court echoed that reasoning, too, explaining that "diagnosis,

maintenance, and repair has a concrete 'transformative' effect *on the device* by changing some aspect of how it works." 5-JA-1686 (emphasis added). But that also is no answer, because the first fair-use factor is concerned with whether the *copied works* are transformed by the *copier*. It is not whether their use accomplishes the transformation of some distinct physical object like a machine, allowing some "end-user's utilization of the product," which is "largely irrelevant" to the fair-use inquiry. *Zomba Enterprises v. Panorama Records*, 491 F.3d 574, 582 (6th Cir. 2007).

We made this point in proceedings below. In response, the district court seemed to agree that transformation of the machine is insufficient. 5-JA-1687. But, the court concluded, "[a]lthough technically the hardware and software may be distinct, the device is simply a vessel for, or a reader of, the copyrighted material," and "[n]either is operational or commercially valuable without the other." 5-JA-1687. The court thus held that "maintenance and repairs to device components . . . has a transformative effect on the *use* of the software" by fixing the machine and ensuring it remains "commercially valuable." *Id.*

That again is not a reason the Librarian gave, and it is candidly hard to understand. Service software tools and maintenance manuals may lack utility without the devices to which they apply, but that is true of many copyrighted works. A computer programmer who creates a new software repair tool for Android smartphones has written something innovative and useful. To be

sure, the software requires a smartphone running Android to do its work, and it would not be "commercially valuable" without smartphones to run on. But that hardly means that a competitor's appropriation of the tool for its own use to provide competing maintenance-and-repair services for smartphones is "transformative," simply because the purpose is to make a smartphone functional and thus capable of running the software. That rationale is wholly out of place in a case about copyright.

**c.** Beyond these points, the district court added substantial new lines of reasoning not introduced by the Librarian in the rulemaking. We do not dwell on the district court's *sua sponte* analyses, because, again, the Court "may only uphold a rule 'on the basis articulated by the agency' in the rule making record." *Genuine Parts*, 890 F.3d at 314.

Yet one rejoinder warrants emphasis for clarity's sake. The district court reasoned that even if manufacturers "created [the works at issue] for use in performing their own repairs" (as unquestionably they did), and assuming further that third-party servicers use the works for the precise same purpose (as unquestionably they do), the use "still may be considered transformative." 5-JA-1685-86. That is because "use of those materials by ISOs or owners to achieve a secondary purpose to carry out repairs on specific, individual machines requires input of their own knowledge, creative and analytical thinking, and mechanical skills," which "transforms the basic knowledge conveyed

in the copyrighted materials." 5-JA-1686.

Put mildly, that is legally wrong and factually unsupported. Legally, it's like saying that a singer who offers a commercial performance of the copyrighted song makes a "fair use" of the work if her rendition requires her to "input" her training and creativity into the rendition. No. When an artist sings a song in a commercial performance, she must obtain a license from the author. That is so regardless of whether her performance is a precisely duplication of the original or instead offers some "important new expression." *Warhol*, 598 U.S. at 541. Creative interpretation of a preexisting work makes the performance derivative, if even that—it does not mean the result is a noninfringing fair use. *Id.*

But in this context, the proponents could not get even that far, because there is no evidence whatsoever to suggest that machine technicians do anything creative at all. Again, they expressly disclaimed transformation or alteration to avoid FDA regulation.

Of course, even if it were otherwise, what goes for the song would go for the repairs: Mixing software tools designed for maintenance and repair with the "knowledge, creative and analytical thinking, and mechanical skills" of a service technician (5-JA-1686) is *at most* akin to a derivative performance of an original work, as to which a license still must be obtained. To make a "transformative use of an original," a user "must go beyond that required to

qualify as a derivative" use, putting the work to use in an unintended market in which the author does not participate. *Warhol*, 598 U.S. at 529. That does not describe this case.

### B. Fourth factor: Unauthorized copying directly undercuts the market in which manufacturers license the works at issue

#### 1. *The purpose of the Exemption is to inflict substantial harm on the marketability of the original works*

**a.** Under the fourth fair-use factor, the Court must consider "whether the use in question substitutes for either a purchase or license that would typically be offered by the copyright owner and falls within the exclusive rights granted" by the Copyright Act. 4 Patry on Copyright § 10:150.10 (2025 update). This consideration—long recognized as "the single most important element of fair use" (*Harper & Row*, 471 U.S. at 566)—is closely related to the first factor. *Warhol*, 598 U.S. at 536 n.12. "While the first factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Id.*

Under this factor, the Court must consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up).

Sensibly, an "inference of market harm" arises in cases "involving . . . mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591 (citing *Sony*, 464 U.S. at 451); *see also, e.g., Philpot v. Independent Journal Review*, 92 F.4th 252, 261 (4th Cir. 2024) (courts must "presume a cognizable market harm exists when a commercial use is not transformative but instead 'amounts to mere duplication of the entirety of an original'") (quoting *Campbell*, 510 U.S. at 591). Such a presumption is "common sense," because "when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it." *Campbell*, 510 U.S. at 591. "If it were possible to reproduce [an author's] unaltered work, as a whole, without compensation," it "would surely have a 'substantially adverse impact' on [the author's] ability to license [the work]." *Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 308 (3d Cir. 2011) (quoting *Campbell*, 510 U.S. at 590).

**b.** That is the case here. To start, there is plainly a market for the works at issue. Manufacturers sell licenses and subscriptions to use their maintenance-and-repair software, files, and documents. 4-JA-1067-68; 4-JA-1079; 4-JA-1361; 5-JA-1580. If third-party servicers wish to use manufacturers' software and documents to provide maintenance-and-repair services in competition with manufacturers, their technicians must therefore obtain the necessary training and pay a licensing fee. *E.g.*, 4-JA-1079-1080.

Beyond that, we have just shown that the copying of manufacturers' maintenance-related software and documents is commercially substitutive. "This is not a case where the copyist's work fills a market that the copyright owner will likely avoid, as is true for 'a lethal parody' or 'a scathing theater review.'" *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d at 443, 460 (9th Cir. 2020) (quoting *Campbell*, 510 U.S. at 591-92). Rather, third-party servicers aim to take a greater share of the market for maintenance-and-repair services *from* manufacturers. *E.g.*, 5-JA-1439 (the point of the Exemption is to allow machine owners "to get faster and more affordable services from ISOs" rather than from manufacturers); 5-JA-1707 (district court noting that the exemption codified at § 117(c) "depriv[es] OEMs of licensing fees they would otherwise receive from repair services").

Allowing third-party servicers to copy manufacturers' service-related software tools and other digital materials without paying for them, so they may use them in their for-profit maintenance-and-repair businesses, therefore will, as a matter of "common sense" (*Campbell*, 510 U.S. at 591), have an adverse effect on the market for the software. Apart from depriving manufacturers of licensing revenue from the copiers themselves, many healthcare providers will stop paying for licenses and software subscriptions if they can obtain access to the protected works from lower-cost third-party servicers instead. Likewise, many will switch away from higher-cost OEM-affiliated

technicians, who must recoup the cost of training and licensing, electing instead to use third-party technicians who freeride on OEM innovations.

These market harms were not only acknowledged, but embraced, by the Librarian and petitioners throughout both rulemakings. The petitioners complained that manufacturers' training requirements, software licenses, and service contracts are "unnecessarily expensive" (4-JA-1044) and come at "undue expense" (4-JA-1042; 5-JA-1437). The Librarian was told repeatedly that "ISOs often charge much less than OEMs." 4-JA-1055; *accord* 3-JA-1022; 4-JA-1039; 4-JA-1057; 4-JA-1079. She also was told the reason why: Manufacturers require licensing fees for the "medical equipment software required for servicing of the medical equipment." 4-JA-1062; *accord* 3-JA-1024; 4-JA-1079; 5-JA-1434.

The higher prices resulting from licensing fees was thus presented as the very reason for the Exemption. But, again, that turns copyright law upside down. Manufacturers charge more because they, unlike third-party servicers, *actually innovate*. And they are granted a statutory monopoly for just that reason, so that they can recoup their enormous R&D investments and *continue* to innovate. *See Google*, 593 U.S. at 16-17.

Anyway, the point is simply that, in the Librarian's view, higher prices from a manufacturers' statutory copyright monopoly was a problem to over-

come—meaning, in effect, that substitutive market harm is the Exemption's *raison d'être*. Thus, the fourth factor weighs decisively against fair use.

### 2. *The Librarian and district court erred in holding that there is no market to harm*

**a.** The Librarian disagreed. She concluded that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." 2-JA-631. Thus, although she acknowledged that "the record suggests that some system features on certain devices may be separately licensed through a subscription service," the Librarian determined that the copying at issue "is unlikely to harm the market for the embedded software" because "there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." *Id.*

That is a *non sequitur*. The question under the fourth factor is not whether the copyrighted material has a use, or can be sold in a market, *other than* its intended use or intended market. It is irrelevant that the materials are useful only in connection "with the medical device or system for which it was designed." The only questions under the fourth factor are (1) whether there is a market for buying or licensing the protected works, and (2) whether the author's position in that market is harmed by the copying. *Harper & Row*, 471 U.S. at 566; 4 Nimmer on Copyright § 13.05.

The evidence before the Librarian showed unequivocally that the answer to both questions here is *yes*. Transtate itself submitted a market analysis detailing the "dynamics" of the "medical equipment maintenance market." 4-JA-1132. In this market, manufacturers have a "large share" because of their "wide geographic presence and strong technical expertise." 4-JA-1133. But there has been an "emergence of ISOs dedicated to solely providing maintenance services" because they charge less. 4-JA-1135.

The evidence established further that, in the medical equipment maintenance market, manufacturers use encryption to "limit access to software and data files necessary to service [medical] equipment." 4-JA-1119. They sell "licenses to use the software," which also may be accessed by "an OEM technician" in lieu of an ISO. 4-JA-1079; *see also* 5-JA-1580 (manufacturers sell and lease certain software "functionalities" individually). As AdvaMed explained in both rulemakings, "there is a market for some medical device software modules as standalone works," which are "activated and maintained through a subscription model." 4-JA-1361; 5-JA-1580.

We made these points to the district court. But it concluded, like the Library, that "the software cannot be used without the equipment, and the equipment cannot be used without the software, so the market for the equipment and the software is one in the same." 5-JA-1697. But as we have shown, there *is* a market for the software separate from the equipment—as the Librar-

ian admitted but ignored. 2-JA-631 ("the record suggests that some system features on certain devices may be separately licensed through a subscription service"). The Library's ultimate conclusion to the contrary once again is "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

**b.** Perhaps appreciating the insufficiency of the Librarian's answer on this point, the district court went on to assume our "premises as true," meaning that the works at issue are licensed and sold in the "separate market for diagnosis, maintenance, and repairs." 5-JA-1698. From there, it offered yet another explanation not furnished by the Librarian (and thus off the table). It reasoned that "the commercial value of the copyrighted materials in the latter market comes not from the copyrighted materials alone but rather relies on the application of labor, creative analytics and expertise." *Id.* On this ground, the district court made the stunning assertion that third-party servicers "arguably are creating a market by adding their own skill and expertise to provide a service using copyrighted materials." 5-JA-1699.

That reasoning once more turns copyright principles upside down. Consider again the singer/performance analogy. It may be true that the "commercial value" of a song "comes not from the copyrighted materials alone but rather relies on the" singer's interpretation and creativity to produce a sound. Sheet music has no value without a performance of its contents. But that observation has no relevance to the fourth fair-use factor, and it nowise

indicates that the author of the song is disentitled to copyright protection against exploitative performances.

In the context of the analogy, the fourth factor asks simply: (1) Is there a market for performances of the song? And (2) would allowing singers to copy the song's lyrics and tune, in unlicensed performances, have a "substantially adverse impact on the potential market for the original?" *Campbell*, 510 U.S. at 590. The answer to both questions is (as before) an obvious *yes*. And no one seriously could contend that the singer is not exploiting the market for the original and instead "creating a market" of her own. Quite the opposite: One would say that she is freeriding on the market that the *author* has created, by performing the song for commercial entertainment, without paying for a license. That's Copyright 101.

All of that holds true here. Again, the Librarian acknowledged this. She was clear that the purpose of the Exemption was to *overcome* manufacturers' copyright protection so that third-party servicers can put the works at issue to their intended uses, in competition with manufacturers, at lower prices. 2-JA-647. Depriving manufacturers of licensing revenue in the market for maintenance and repair (and thus "help[ing] to address the broader competitive concerns" in that market (*id.*)) is the *point* of the Exemption. *Cf.* 5-JA-1707 (district court noting that the exemption codified at § 117(c) "depriv[es]

OEMs of licensing fees they would otherwise receive from repair services"). There is thus no logical ground for denying market harm.

**c.** *Triad Systems* is once again instructive. There, "Triad invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers." 64 F.3d at 1337. The Ninth Circuit recognized that the third-party servicer in that case was "getting a free ride when it use[d] that software to perform precisely the same service" in competition with Triad, but without paying a licensing fee. *Id.* The court thus had no trouble concluding that "a finding of fair use is unwarranted" given the substitutive effect. *Id.* Because the defendant's "use of Triad's software [was] entirely commercial in nature" and substituted for Triad's own services, it was an infringing use, not a fair use—period. *Id.* at 1337.

That is this case exactly. For its part, the district court dismissed the Ninth Circuit's reasoning in *Triad Systems* as "sparse and thus hardly instructive," noting that it "predate[s] not only the DMCA's § 117(c) but also several key fair use decisions from the Supreme Court." 5-JA-1708-1709. But the district court did not point to any substantive inconsistencies between the Ninth Circuit's reasoning in *Triad Systems* and the Supreme Court's subsequent decisions. And none are apparent. Indeed, the Ninth Circuit addressed all the relevant considerations under contemporary doctrine: transformativeness, substitution, commerciality, market harm, and so on. As for the length

of the Ninth Circuit's decision, its fair-use analysis spans five paragraphs and is, on its own terms, complete and sound.

### C. Second and third factors: There is no other "compelling justification" for finding the permitted uses noninfringing

Because the Exemption authorizes third-party servicers to put manufacturers' copyrighted works to commercial, non-transformative uses to compete at an unfair advantage, only "a particularly compelling justification" under the second and third fair-use factors could save the Exemption from invalidation. *Warhol*, 598 U.S. at 547. But the Librarian offered no justification, let alone a compelling one, for copying the works at issue—other than lowering prices for device maintenance and repair, which is no justification at all under settled copyright law.

**a.** Under the second factor, the Court must evaluate "the nature of the copyrighted work" (17 U.S.C. § 107(2)), including whether "it serves an artistic rather than a utilitarian function." *Google*, 593 U.S. at 20. No doubt, "computer programs differ from books, films, and many other 'literary works' in that such programs almost always serve functional purposes" rather than artistic, expressive ones. *Id.* at 21. Yet "[b]y defining computer programs in § 101, Congress chose to place this subject matter within the copyright regime." *Id.* at 23. And "unless a persuasive fair use justification is involved, authors of factual works, like authors of fiction, should be entitled to copy-

right protection of their protected expression." *Authors Guild*, 804 F.3d at 220. Put simply, "[t]he mere fact that the original is a factual work [does] not imply that others may freely copy it." *Id.*

Courts have recognized that a justification may exist where copying facilitates "a service important to the public." *Romanova v. Amilus Inc*, 138 F.4th 104, 116-17 (2d Cir. 2025) (Leval, J.) (collecting cases). But in each of those cases, the service was not substitutive or exploitative—it was instead transformative. *Id.* For example, in *Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014), the service was conversion of copyrighted works into formats readable by the blind; and in *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), the service was copying of student theses into a database to help universities detect plagiarism.

The same is true of the case on which the district court relied (5JA1682-84), *American Society for Testing & Materials v. Public.Resource.Org, Inc.*, which produced two opinions at 82 F.4th 1262 (D.C. Cir. 2023) and 896 F.3d 437 (D.C. Cir. 2018). The Court there concluded that the copiers' purpose (reporting legal standards to the public at large) was non-commercial and resembled "the purposes listed in the preamble paragraph of § 107," including "news reporting, teaching," and "research." *Warhol*, 598 U.S. at 529. As construed by the Court, those purposes were wholly different from (and not

substitutions for) the purposes of the original author, which was the creation of state-of-the-art industry standards.

These cases demonstrate that the second factor "favors fair use" only when, *because* the works are factual, "the secondary use transformatively provides valuable [new] information about the original, rather than replicating protected expression" and "substitute[ing] for the original." 4 Patry on Copyright § 10:138 (quoting *Authors Guild*, 804 F.3d at 220).

Not so here. There already is an established market for medical machine maintenance-and-repair services, independent of unauthorized copying. Copying merely permits ISOs to compete substitutively, at a lower price. In the copyright context, that is the *opposite* of justification. As the Supreme Court explained in *Google*, the purpose of copyright is "to encourage the production of works that others might reproduce more cheaply" by granting the author the right to exclude third parties from engaging in such reproduction, even though doing so generally will "raise prices." 593 U.S. at 16-17. But a manufacturer's "higher service rates cannot be said to violate the public interest" under copyright principles because a manufacturer "should be entitled to rely on [higher] service fees to recoup its investment costs in developing the software" and the machines that depend on it. *Advanced Computer Services*, 845 F. Supp. at 365.

**b.** Finally, the third factor directs courts to examine "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This is not a justificative consideration, but rather a hurdle to overcome. When a copier takes all or a substantial portion of the original, fair use is less likely because substantial copying "is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row*, 471 U.S. at 565. Here, the entire works are copied and used for commercial gain. There is thus no way in which the third factor could help to justify fair use in this case.

### D.   The Exemption purports to amend, and therefore is in conflict with, the plain language of 17 U.S.C. § 117(c)

The district court concluded its fair-use analysis with its own views on the purpose of 17 U.S.C. § 117(c)—views that, because they were not offered by the Librarian, were improper for the court to consider at all, much less base its decision on. *See* 5-JA-1704-10.

Section 117(c)'s text is explicit and narrow: It permits copying only of "a computer program," and then only when the copy "is made solely by virtue of the activation of a machine" and is "destroyed immediately after the maintenance or repair is completed." As both the Librarian and the district court acknowledged, that is "a narrower range of activities than those" covered by

the Exemption. JA1707. Service software tools are not copied by virtue of machine activation, and manuals and other written works needed for maintenance and repair are not computer programs at all. *See* JA1356.

Yet the district court, drawing on snippets of legislative history, took the position that § 117(c) reflects a broader "intent" to "ensure that maintenance and repairs [are] not monopolized by copyright owners of computer programs" and that "owners and lessees can maintain and repair their devices without being beholden to OEMs." JA1706-1707. Although the district court acknowledged that the "Exemption goes beyond" the statute by authorizing copying that § 117(c) does not, it concluded that the Exemption is "consistent with" the provision's broader "intent." JA1707.

That reasoning is misguided. "[A] broadly stated legislative purpose cannot trump more narrowly worded statutory text." *United States v. Hillie*, 39 F.4th 674, 688 (D.C. Cir. 2022). "[W]hatever degree of confidence about congressional purpose one derives from the legislative history, that purpose must find expression 'within the permissible limits of the language' before it can be given effect" by a court. *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 495 (D.C. Cir. 2004).

If § 117(c) is relevant here at all, it is only to show that Congress understood that copying to provide substitutive third-party maintenance-and-repair services is *not* fair use. Thus, when it made the policy decision to exempt copy-

ing for maintenance and repair that occurs as a consequence of activating a machine, it did so not by amending the fair use doctrine, but by adopting a simple, standalone carveout from the Act.

The district court's theory that Congress simply lacked the foresight to draft a "broader statutory exemption" because it "did not anticipate the need" for one in 1998 (5-JA-1707) is both irrelevant and wrong. Irrelevant, because it is not the district court's place to substitute its judgment for Congress's. Wrong, because use of licensed software in connection with maintenance and repairs was well known in 1998, as *Triad* demonstrates.

If Congress had wanted to draft a broader exception, it could have done so—but it did not. And even if there were ground to conclude today that § 117(c)'s scope is unduly narrow, it would be for Congress, not the Librarian or district court, to enlarge it.

## II. THE COURT SHOULD VACATE THE EXEMPTION

When an APA plaintiff succeeds in showing that an agency has undertaken a final action that is inconsistent with law, arbitrary and capricious, or unsupported by evidence, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706). That ordinary practice is warranted here.

In proceedings below, the Library proposed that the district court instead issue a declaration that the Exemption is unlawful and otherwise enjoin the Library from implementing it. That would not suffice. The injuries arising from the Exemption are worked not just by the Librarian, but also by the private third parties violating plaintiffs' members' rights under the Exemption's authorization. As long as the Exemption stands, third-party servicers may utilize it as a rationale for infringing manufacturers' copyrights. Only the relief required expressly by 5 U.S.C. § 706(2)—an order setting the Exemption aside—will accord plaintiffs the full relief to which they are entitled.

## CONCLUSION

The Court should reverse the decision below and remand with instructions to set aside the Medical Devices Exemption, 37 C.F.R. § 201.40(b)(17).

Respectfully submitted,

/s/ *Michael B. Kimberly*

MICHAEL ELKIN
    *Winston & Strawn LLP*
    *200 Park Avenue*
    *New York, NY 10166*
    *212) 294-6729*

THOMAS KEARNEY
    *Winston & Strawn LLP*
    *101 California Street, 21st Floor*
    *San Francisco, CA 94111*
    (415) 591-6894

MICHAEL B. KIMBERLY
    *Winston & Strawn LLP*
    *1901 L Street NW*
    *Washington, DC 20036*
    *(202) 282-5096*
    *mkimberly@winston.com*

Dated: November 7, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel for appellant certifies that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 12,994 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface and type style requirements of Rule 32(a) because it is typeset in Century Supra font in 14 points.

Dated: November 7, 2025 /s/ *Michael B. Kimberly*


**CERTIFICATE OF SERVICE**

Undersigned counsel for appellant certifies that on this date, the fore-going document was served electronically via the Court's CM/ECF system upon all counsel of record.

Dated: November 7, 2025 /s/ *Michael B. Kimberly*

# ADDENDUM
## OF STATUTES AND REGULATIONS

17 U.S.C. § 1201(a) .............................................................. Add. 1

17 U.S.C. § 117(c) .................................................................. Add. 3

37 C.F.R. § 201.40(b)(17) ..................................................... Add. 3

**Section 1201(a) of Title 17 of the U.S. code specifies:**

(a) Violations Regarding Circumvention of Technological Measures.

    (1) (A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title. The prohibition contained in the preceding sentence shall take effect at the end of the 2-year period beginning on the date of the enactment of this chapter.

        (B) The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

        (C) During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works. In conducting such rulemaking, the Librarian shall examine—

           (i) the availability for use of copyrighted works;

           (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;

           (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate.

(D) The Librarian shall publish any class of copyrighted works for which the Librarian has determined, pursuant to the rulemaking conducted under subparagraph (C), that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

(E) Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(3) As used in this subsection—

(A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

(B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

## Section 117(c) of Title 17 of the U.S. Code specifies:

(c) Machine Maintenance or Repair.—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—

(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

## Section 201.40(b)(17) of Title 37 of the Code of Federal Regulations specifies:

Exemptions to prohibition against circumvention.

(17) Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. For purposes of this paragraph (b)(17):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.