No. 25-5328

*In the*

# United States Court of Appeals

*for the*

# District of Columbia Circuit

_____

ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

– v. –

LIBRARY OF CONGRESS, *et al.*,

*Defendants-Appellees.*

_____

On appeal from a final judgment of the
United States District Court for the District of Columbia
Case No. 1:22-cv-499 (U.S. District Beryl Howell)

_____

**JOINT APPENDIX**

**Volume 5 of 5 (pages 1381–1717)**

_____

LAURA MYRON
  *U.S. Department of Justice*
  *Civil Division, Appellate Staff*
  *950 Pennsylvania Ave NW*
  *Washington, DC 20530*
  *(202) 514-8877*
  *laura.e.myron@usdoj.gov*

*Counsel for Appellees*

MICHAEL B. KIMBERLY
  *Winston & Strawn LLP*
  *1901 L Street NW*
  *Washington, DC 20036*
  *(202) 282-5096*
  *mkimberly@winston.com*

*Counsel for Appellants*

## TABLE OF CONTENTS

District court docket entries ............................................................ JA1

Register's recommendation from the
Sixth Triennial Rulemaking (2015) ........................................ JA10

Register's recommendation from the
Eighth Triennial Rulemaking (2021) ..................................... JA418

Register's recommendation from the
Ninth Triennial Rulemaking (2024) ...................................... JA772

Excerpts of petitions and comments (Eighth Rulemaking)

Petition of Electronic Frontier Foundation ......................... JA1010
Petition of iFixit ................................................................. JA1013
Petition of Summit Imaging .............................................. JA1016
Petition of Transtate Equipment Co.................................... JA1019
Comments of Summit Imaging ........................................ JA1023
Comments of Transtate ...................................................... JA1031
Comments of AdvaMed ...................................................... JA1354
Comments of MITA ............................................................ JA1369
Comments of Philips North America, LLC .......................... JA1405
Further comments of Transtate ........................................... JA1431

Excerpts of petitions and comments (Ninth Rulemaking)

Renewal petition of Transtate, et al. ................................... JA1481
Renewal petition of Crothall Facilities Management ............ JA1490
Renewal petition of Metropolis International....................... JA1495
Renewal petition of TriMedx Holdings ............................... JA1500
Renewal petition of TTG Imaging Solutions ....................... JA1505
Comments of Philips North America, LLC .......................... JA1510
Comments of MITA............................................................. JA1549
Comments of AdvaMed ...................................................... JA1558
Further comments of Philips ............................................... JA1567
Further comments of AdvaMed .......................................... JA1576
Further comments of MITA................................................. JA1591
Further comments of Philips  ............................................. JA1627

Memorandum opinion (Dkt. 49)............................................. JA1657

Final judgment (Dkt. 50) ....................................................... JA1717

> regarding whether a consumer owns a copy of software installed
> on a device or machine for purposes of section 117(a) when formal
> title is lacking or a license purports to impose restrictions on the
> use of the computer program.

2016 Software Report at 19. The variability and fact-specific nature of this inquiry makes a
general exemption to TPMs inappropriate. Although in some cases a court might find that the
relevant factors support ownership under the copyright laws, in many other cases a court may
find that the license is simply a license and therefore Section 117(a)(1) is unavailable.

Medical imaging device manufacturers generally license the operating software and other
materials to medical providers rather than sell copies of the software and convey ownership of
the copy. Certain diagnostic tools may be licensed together with or separately from the operating
software, or not licensed at all. Medical imaging device manufacturers impose a range of
significant use restrictions on that software and other materials. A blanket exemption pursuant to
Section 117(a)(1) would therefore not be supported because the ownership requirement is
generally not satisfied.

## IV.    An exemption is not warranted under 17 U.S.C. § 117(c)

The statutory defense to copyright infringement under Section 117(c) for "machine maintenance
and repair" provides that it is not a copyright violation for the owner of a machine to make or
authorize the making of a copy of a computer program: (1) if the copy is made "solely by virtue
of the activation of a machine" that contains an authorized copy of the program; (2) if the copy is
made "for purposes only of maintenance or repair of the machine;" (3) if the new copy is not
used in any other manner and is destroyed immediately after the maintenance or repair is
completed; and (4) with respect to any computer program or part of the program that is not
"necessary for [the] machine to be activated," the program "is not accessed or used other than to
make a new copy by virtue of the activation of the machine." 17 U.S.C. § 117(c).

This provision is principally aimed at protecting independent repair technicians from copyright
liability when they turn on a machine that results in the automatic copying of software from the
machine's hard drive onto the machine's RAM. 2016 Software Report at 37. By its plain terms,
the statute authorizes making copies only upon "activation" of a machine, and therefore would
not extend to any copying after initially turning on a machine.

The legislative history of this provision makes clear that the scope of protection is far narrower
than the petitioners argue. The full relevant provisions of the Senate report are reproduced below,
with key language emphasized.

> Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure
> that independent service organizations do not inadvertently become liable for copyright
> infringement ***merely because they have turned on a machine in order to service its***
> ***hardware components***. When a computer is activated, that is when it is turned on, certain
> software or parts thereof (generally the machine's operating system software) is
> automatically copied into the machine's random access memory, or ''RAM.' During the

(Page 3 of Total)

course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. ***This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made. This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software.*** Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. ***This title also does not relieve from liability persons who make any unauthorized copies of software other than those caused solely by activation of the machine.***

S. Rep. No. 105-190, at 21-22 (1998) (emphasis added).

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider—a person unaffiliated with either the owner or lessee of the machine—to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or ''RAM.''A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), thereby calling into question the right of an independent service provider who is not the licensee of the computer program resident on the client's machine to even activate that machine for the purpose of servicing the hardware components. This section does not in any way alter the law with respect to the scope of the term ''reproduction'' as it is used in the Copyright Act. ***Rather, this section it is narrowly crafted to achieve the objectives just described—namely, ensuring that an independent service provider may turn on a client's computer machine in order to service its hardware components, provided that such service provider complies with the provisions of this section designed to protect the rights of copyright owners of computer software.***

S. Rep. No. 105-190, at 56-57 (1998) (emphasis added).

Subsection (c)—Machine maintenance or repair.—The bill creates a new subsection (c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. This new subsection states

14

JA1382

LOC_AR_00004108

that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program must have been made *solely and automatically by virtue of turning on the machine* in order to perform repairs or maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), *the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did not need to be so loaded in order for the machine to be turned on*. A hardware manufacturer or software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products— either as freestanding programs, or pursuant to separate licensing agreements. Indeed, *a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs*. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). *This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the*

15

JA1383

LOC_AR_00004109

*copyright owner, the initial reproduction of the program shall not be deemed*
*exempt from infringement by this subsection.*

S. Rep. No. 105-190, at 57-58 (1998) (emphasis added).

The leading case that interprets the scope of Section 117(c) illustrates exactly why a categorical exemption to TPMs for medical imaging devices is not supported by the law and why its application would result in widespread copyright infringement. *Storage Tech Corp. v. Custom Hardware Engineering and Consulting*, 421 F.3d 307 (Fed. Cir., 2005) involved a company, StorageTek, that manufactures automated tape cartridge libraries that store large amounts of computer data. The tape backup and management system are controlled by a computer program. Upon computer startup, a "maintenance code" and "functional code" are automatically copied from the computer's hard drive to the computer's RAM, thereby allowing the computer to perform its programmed tasks.

Custom Hardware Engineering & Consulting, Inc. (CHE), is an independent business that repairs data tape libraries manufactured by StorageTek. In order to diagnose problems with the libraries, CHE intercepts and interprets error codes produced by the maintenance code. StorageTek protects those error codes through password protection to disallow unauthorized access to the error codes. CHE uses technologies to "crack" the password and to mimic functions of the system to generate error codes that can be intercepted.

StorageTek sued CHE, alleging that CHE committed copyright infringement when CHE rebooted and reconfigured the computer program to reveal and generate the error codes that CHE then used to repair the systems. StorageTek sought a preliminary injunction, which a federal district court granted. On appeal to the Federal Circuit, CHE defended against the copyright infringement claims by arguing that its actions are protected by 117(c) because the owners of the tape libraries authorize CHE to turn on the computer program to maintain and repair the tape libraries, and the duplication of the software into RAM is necessary for the machine to function. StorageTek responded that CHE's activities fail to satisfy 117(c) because the maintenance code is not "necessary for the machine to be activated."

The court considered whether the copying of the maintenance code—in addition to the functional code—into RAM at computer startup violated Section 117(c)'s requirement that "with respect to any computer program or part therof that is not necessary for the machine to be activated, such program or part thereof is not accessed or used." StorageTek argued that the copying of the maintenance file onto the computer system's RAM at startup was not necessary for the machine to be activated, and therefore the access and use of that program violated StorageTek's copyright and was not exempted by Section 117(c). The court disagreed, finding that "[i]n this case, however, both parties agree that the maintenance code is so entangled with the functional code that the entire code must be loaded onto RAM for the machine to function at all. That is, loading the maintenance code into RAM is necessary for [the machine] 'to be turned on.'" 421 F.3d at 1314. The court further held that an anti-circumvention claim under Section 1201 would be foreclosed because the underlying copying itself was not copyright infringement. *Id.* at 1318.

16

**JA1384**

LOC_AR_00004110

This holding does not, however, establish the general proposition that any file that is loaded from a computer system's hard drive to RAM during system startup is subject to access and copying by a third-party repair company. Quite the contrary, the court was careful to explain that its holding was grounded in the fact that the part of the system code necessary for the machine to turn on was entangled with other code that did more than simply allow the computer to turn on.

In that regard, the court noted that "separate, 'freestanding programs' that load into RAM upon startup *clearly may not be accessed* under section 117(c)(2)." *Id.* (emphasis added) Additionally, "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the computer and make that determination, *goes too far*...." *Id.* (emphasis added). The court also noted that "[i]n some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." *Id.*

As this decision makes clear, an analysis of whether copies made by reason of turning on a computer are covered by Section 117(c) is a fact-based inquiry that turns on the specific nature of the program at issue and how the programs may interrelate or not with other programs that may also be activated at system startup. This decision also makes clear, however, that Section 117(c) does not authorize access to any program or part of a program that is not required to turn on the machine.

This fact-based and case-specific inquiry is fundamentally incompatible with the blanket exemption to TPMs that the petitioners seek. A blanket exemption to allow circumvention of TPMs would only be appropriate if Section 117(c) were uniformly available to unauthorized ISOs for the vast array and diversity of medical imaging devices that they seek to repair. As the *StorageTek* court made clear, the application of Section 1201 depends on whether the underlying copying itself is infringement. That fact-dependent inquiry would be vitiated by a categorical exemption under Section 1201.

## V.    Conclusion

In conclusion, the requested exemption is not warranted because users of the copyrighted works are not adversely affected by the TPMs and the legal arguments under fair use and Sections 117(a)(1) and 117(c) are without merit.

- **Users of the copyrighted works are not, under the factors of Section 1201, adversely affected by the prohibition on circumvention and are not likely to be adversely affected.** Medical imaging device software is widely available and broadly licensed to medical service providers. Medical imaging device software and the related materials protected by TPMs do not implicate nonprofit archival, preservation, and educational purposes because such software is used in a commercial setting among commercial parties. An exemption is not necessary for criticism, comment, news reporting, teaching, scholarship, or research because medical imaging device software is unrelated to those endeavors. An exemption would also negatively impact the market value for medical imaging device software because it would undermine the intellectual property protections that lead to innovation and would lead to greater use of unregulated ISOs that are not

17

LOC_AR_00004111

required to implement the same quality, safety, and regulatory requirements as OEMs, thereby risking patient safety and contributing to a public loss of confidence in medical imaging devices. The risks to patient safety weigh against granting the exemption.

- **The proposed exemption would infringe the protected works and is not supported by the fair use doctrine.** The fair use doctrine generally allows transformational use of copyrighted works for purposes of criticism, comment, news reporting, teaching, scholarship, or research. The petitioners seek to access and copy medical imaging device software and related materials to better sell their repair services to customers. Applying the individual fair use factors also demonstrates why the exemption does not apply: the purpose and character of the use is purely commercial; medical imaging device software and related materials are protected works; the petitioners seek to access and copy the full range of medical imaging device software and materials protected by TPMs rather than a minor part; and the impact of the copying will negatively impact the market for medical imaging device software by disincentivizing innovation, risking patient safety, and undermining the public's confidence in medical imaging devices.

- **The proposed exemption is not supported by 17 U.S.C. § 117(a)(1).** Section 117(a)(1) provides simply that the owner of a computer program is not liable for a copyright violation if the owner turns on his or her computer and thereby causes a software copy to be made as certain programs are loaded from the computer hard drive to the computer's RAM to enable the computer to function. That provision does not support the proposed exemption because nearly all users of medical imaging device software license, rather than own, the software and related materials.

- **The proposed exemption is not supported by 17 U.S.C. § 117(c).** Section 117(c) protects third party repair technicians from copyright liability when they turn on a computer and thereby cause software to be automatically copied from the computer's hard drive to the computer's RAM. This provision does not apply to the proposed exemption because by its plain terms Section 117(c) does not extend beyond computer code that is automatically copied from a computer's hard drive to RAM during system startup. Moreover, the legislative history makes clear that this provision is not intended to undermine TPMs and allow copying of software beyond those aspects that are necessary to start a computer.

## DOCUMENTARY EVIDENCE

Appendix 1: Examples of Improper Servicing by Unregulated Third Parties

Hole drilled into X-Ray system
A third-party servicer drilled out the holes on an X-Ray system in order to get a replacement X-Ray tube to fit, creating a patient safety issue if the tube had fallen out.

18

JA1386

LOC_AR_00004112



19

JA1387

LOC_AR_00004113

High voltage cables wrapped in hardware store vacuum hose

These high voltage cables for an X-Ray system had been wrapped in vacuum hose from a local hardware store. Use of this kind of unqualified part created infection control issues and increased the risk that the cables could have been damaged, resulting in fire or electrocution hazards.



20

JA1388

LOC_AR_00004114

Improper venting of MR system

A third-party servicer installed an MRI ventilation system such that it ventilated into the attic above the imaging suite. If the MR magnet had quenched, liquid helium would have ventilated into the attic, creating an asphyxiation hazard and potentially resulting in structural damage to the building.



21

JA1389

LOC_AR_00004115



22

JA1390

LOC_AR_00004116

Power injector duct taped to IV pole

A third-party servicer removed a power injector from its usually support system and duct taped it to an IV pole. This jerry-rigged system could fall apart mid-procedure, delaying patient care or causing improper dosing.



23

JA1391

LOC_AR_00004117

Overhead Counterpoise System held together with zip ties. This product suspends power injectors, often over patients while they are getting scanned. If these zip ties broke, the power injector could fall onto the patient, causing serious injury.



24

JA1392

LOC_AR_00004118

Aluminum Foil Used for Shielding

A third-party servicer used aluminum foil to shield some of an MRI system's cables in the scan room. This can present safety and electrical issues when used within the MRI filter panel that contains high voltage.



25

JA1393

LOC_AR_00004119

Shoulder Coil Serviced with Tape
This MRI shoulder coil was found damaged with several attempted repairs using a white tape.
The use of tape would prevent proper cleaning of the coil and could have resulted in the coil
failing to perform as specified.



26

Improper Part in an Angiographic Power Injector System
A third-party service vendor inappropriately replaced an OEM steel pin with a simple wood
screw to hold a syringe turret in place.

Angiographic power injectors can inject fluid at pressures of up to 1200 psi. If this wood screw
were to fail during a procedure, the turret could break free, potentially causing the turret and
connected syringe to act as dangerous projectiles. Additionally, this improper part could cause
vibrations during the injection, thereby leading to issues such as delay of procedure and
diagnosis due to unexpected equipment behavior.



27

JA1395

LOC_AR_00004121

Improper Servicing of an MRI System
This 0.3T permanent magnet MRI had ghosting on multiple images as a result of improper
wiring. The healthcare provider had been experiencing machine downtime due to the inability to
properly scan patients. Poor image quality could have resulted in misdiagnosis or need for repeat
scans. Rewiring a device with non-qualified parts could have resulted in electrocution or fire.



Speaker wire
connecting power
supply to
unknown points
and terminated
with wire nuts



Example of
ghosting on
medical images

*(Continued on next page)*

28

**JA1396**

LOC_AR_00004122



The primary power supply cables lacked strain relief and protection from abrasion

**JA1397**

LOC_AR_00004123

Improper Servicing of a Nuclear Medicine Camera
This nuclear medicine camera had numerous masked adjacent pixels in the detector which could obscure any heart defects in the image. Further, the cooling unit was improperly connected to external power, bypassing the system's isolated power and grounding system, potentially compromising patient safety and device performance.

When adjacent pixels are removed, a portion of the imaging detector is lost, meaning parts of the heart might not be imaged and a defect could go undetected.

The improper power connection of the cooling system violated the manufacturer's power and grounding isolation scheme, creating risks of fire and electrocution



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals

JA1398

LOC_AR_00004124



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals



Masked pixels



Masked pixels

31

JA1399

LOC_AR_00004125

Improper Repair of an MRI Coil
In a 0.3T permanent magnet MRI RF coil, the signal cable had been pulled out of a connector housing and was repaired with zip ties and plastic tubing. This could have resulted in:
Misdiagnosis or need for additional scans due to lost signal or imaging artifacts
Electrical arcing, resulting in electrocution or burns



Coil with plastic tubing and zip ties used to cover damaged cable



Example of failed coil that was hidden using zip ties and plastic tubing

32

**JA1400**

LOC_AR_00004126

Improper Servicing of a CT Scanner

A facility reported to the OEM that it had been having issues with a CT table, workstation, and tube for approximately six months. An OEM service engineer identified table cabling connections that were modified to be non-standard, exposed wiring, non-OEM fuses installed, improperly exposed and non-OEM soldering connections, cable connections routed and repaired using electrical tape, bent table bolt, and defective transmit cable. Excessive oil was also found in the device, creating risk for fire or other kind of device failure.



1. The bank of black fuses is not connected to cables, per OEM design and manufacturing specifications
2. Cables have been field repaired with fuses taped to the cable
3. Grease identified in cabling area

*(Continued on next page)*

33

JA1401

LOC_AR_00004127



4. Non-qualified fuse, with field repair to reform connector to fit around non-qualified



5. Transmit wire connection repaired previously and taped and visible and exposed at joint of green wire

*(Continued on next page)*

34

**JA1402**

LOC_AR_00004128



6. Bent screw found, preventing table from full range of horizontal motion

7. OEM service engineer identified horizontal travel distance blocked by bent screw



*(Continued on next page)*

35

JA1403

LOC_AR_00004129



8. Excessive oil identified



9. Oil and debris identified in back corners of gantry

JA1404

LOC_AR_00004130

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced, but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**Please submit a <u>separate</u> comment for each proposed class.**

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

ITEM A.  COMMENTER INFORMATION

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

James C. Martin
David A. Bender
Daniel E. Alperstein
REED SMITH LLP
K Street, N.W.
1000, East Tower
Washington, D.C. 20005

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

(Page 27 of Total)

**JA1405**

LOC_AR_00004131

Philips is well known in the healthcare industry as a trusted provider of electronic medical imaging devices for use in in-patient and outpatient hospital care throughout the United States. Philips' high quality products include ultrasound systems, computed tomography ("CT") scanners, positron emission tomography ("PET") scanners, X-ray machines, magnetic resonance ("MR") scanners, and nuclear medicine scanners. Importantly for this process, Philips supports, maintains, repairs and services these medical imaging devices using authorized repair technicians who know the devices and are regulated by statute, through oversight provided by the Food and Drug Administration ("FDA"). Building on years of innovation, Philips' medical devices are highly sophisticated and relied upon by medical professionals for diagnosis, treatment, and life-saving support of patient lives.

Given their complexity and the necessity that they operate precisely as designed, the FDA's regulations extend to every aspect of the medical devices, including their maintenance and repair, to protect the public health and safety. Philips' supervision of its authorized repair technicians complies with and furthers these paramount regulatory goals. For purposes of device repair, access to Philips' copyrighted software on medical devices is protected so that the functionality and integrity of the devices is maintained.

The Proponents of proposed exemption Class 12 fit into two categories. The first group is comprised of multiple organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally, or types of software-enabled devices that bear no relation to medical devices. The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – that separately petition for an exemption allowing circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of *medical devices*, specifically.

While the former category of Proponents seek an overbroad exemption of almost limitless scope, the latter category of Proponents have purely commercial motivations. They seek to circumvent Philips' and other medical device manufacturers' access controls in order to obtain copyrighted materials far in excess of that which is necessary to perform basic repair or maintenance. The granting of the exemption they seek would improperly allow them to circumvent Philips' security measures to access Philips' copyright-protected software installed on its medical devices. It also would threaten the functionality, integrity, safety and security of Philips' and other OEMs' medical devices by compromising the devices and making them susceptible to hacking by cybercriminals and other threat actors (i.e., a result antithetical to the longstanding efforts of OEMs and a host of federal agencies that work aggressively to reduce the threat of cybersecurity to medical devices).

With respect to the medical devices involved here, the proposed exemptions do not build off prior exemptions in any colorable respect. No prior exemptions have involved FDA-regulated devices implicating public health and safety. No prior exemptions have been sought for commercial purposes or facilitated the copying of protected software and information unnecessary to equipment repair. None of these results, moreover, align with the purpose or goals of the exemption process.

2

JA1406

LOC_AR_00004132

Finally, there is no demonstrable non-commercial need for the proposed exemptions. Philips does not prevent access to any of its devices for purposes of basic repairs with copyright assertions. There likewise is no real, or even imagined, repair market crisis for the devices. Rather, as the FDA has concluded, the repair market, on analysis, appears to be adequately served by independent and licensed repair personnel.

Philips accordingly submits the following comments in opposition to proposed exemption Class 12.

## ITEM B. PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs – Repair

Philips' comments in opposition are specifically made with respect to the petitions for an exemption that would allow circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of medical devices.

## ITEM C. OVERVIEW

Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers. Philips medical imaging systems include Philips' proprietary hardware and software, encompassing Philips' trade secrets, which are necessary to operate, service, and repair Philips' systems. Philips' proprietary software enables certain functions on Philips medical imaging systems, which can only be modified by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace. Philips' high quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

In particular, Philips medical imaging systems include Philips' copyrighted software that Philips technicians can use to service the equipment. Philips includes access controls – described in greater detail below – on its medical imaging systems to protect its copyright-protected software and to restrict access to its proprietary software to authorized personnel. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use. The Proponents seek to circumvent these access controls.

As noted above, the Proponents fit into two categories. The first group is comprised of several organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally. Such a request is facially impermissible, as it is overly broad and fails to account for any of the unique characteristics of medical devices. The Registrar previously has declined to consider broad categories of devices grouped together, and has instead considered each class of device on an incremental, case-by-case basis.[1] Since the breadth of device categories

---

[1] *See* Section 1201 Rulemaking:  Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation Of The Register Of Copyrights (Oct. 2018) ("2018 Recommendation") 191-92.

JA1407

LOC_AR_00004133

encompassed by proposed exemption Class 12 is exceedingly broad, and the circumvention of access controls on certain devices (such as medical devices) carry significant ramifications, Philips strongly believes that the Copyright Office should decline any invitation to consider software-enabled devices as a general class.

The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – who separately seek an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices, specifically. But their motivations are commercially driven and their request should have no place in the Triennial Rulemaking Process. Summit and Transtate (and other ISOs) already have access to extensive documentation and software sufficient to perform basic servicing of Philips medical imaging systems.[2] They simply want *more* access; and they have a track record of circumventing Philips' access controls – without an exemption – for their own commercial gain. Summit and Transtate, as they admit, are defendants in ongoing litigation in which Philips has alleged DMCA violations against both companies due to their having modified files on Philips' systems to gain unauthorized access to Philips' copyrighted software and files that they cannot access with their legitimate repair and maintenance accounts.[3] Since Summit and Transtate seek to use the exemption process to achieve their purely commercial ends and facilitate their unlawful conduct, their request for an exemption should be rejected summarily.

Finally, as explained below, proponents of a petitioned exemption carry a significant evidentiary burden. To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[4] As the following sections demonstrate, Proponents have not met that burden, and their requested exemptions should be denied for this independent reason.

ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

*Describe the technological protection measure(s) that control access to the work and the relevant method(s) of circumvention. It would be most helpful to the Office if sufficient information is provided to allow the Office to understand the nature and basic operation of the relevant technologies, as well as how they are disabled or bypassed.*

---

[2] Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), https://www.fda.gov/downloads/MedicalDevices/ResourcesforYou/Industry/UCM385149.pdf ("[T]here are limits on the information that 21 CFR 1020.30(g) and 21 CFR 1020.30(h) require the manufacturer of the original system to provide. The manufacturer of the original system is not required to disclose trade secrets or confidential information. Also, the manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions.")
[3] *See, e.g., Philips Med Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, No. 3:20-cv-00021-MOC-DCK (W.D.N.C.) and *Philips N. Am. LLC et al. v. Summit Imaging Inc. et al.*, No: 2:19-cv-01745-JLR (W.D. Wash.).
[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. 54,010, 54,011 (Oct. 26, 2018).

4

JA1408

LOC_AR_00004134

Philips' Integrated Security Tool ("IST") is a suite of applications designed to secure Philips' Customer Service Intellectual Property ("CSIP"), including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products, from unauthorized access or use.[5]  Philips' IST solution provides a mechanism to manage user entitlements to access CSIP.  Individual users may register with Philips to open an IST account.  A Philips IST administrator then assigns entitlements to the user's account specifying the CSIP materials the user can access.  Users may then install Philips IST client on their personal computer and request Philips to issue an encrypted IST certificate to enable the user to access Philips' proprietary CSIP information.  Upon receiving such a request, Philips' IST system generates a user-specific and computer-specific encrypted IST certificate with information including the user's entitlements and sends the certificate to the user.[6]  The user can then use his or her IST certificate and password to access CSIP materials Philips authorizes the user to access.

In the United States, Philips provides an account with CSIP Level 0 entitlements at cost to anyone who requests such an account.  CSIP Level 0 entitlements provides access to materials that Philips makes available upon request to comply with regulatory requirements as well as other basic service documentation and software.[7]  Philips provides CSIP Level 1 entitlements to customers who have a current contract that provides CSIP Level 1 access and have received any requisite training.[8]  Philips provides CSIP Level 2 entitlements to its employees and to certain trade partners under contract.[9]

Philips' IST solution uses multi-factor authentication to confirm that only authorized users can access Philips' proprietary CSIP materials.  For example, to access Philips' proprietary CSIP materials on a medical imaging system, a user must present his or her IST certificate and password to the system.[10]  If the user has the correct password, the system will decrypt the certificate and provide the user with access to software and files according to the entitlements in the user's certificate.[11]  Thus, engineers employed by independent service providers may log into Philips' medical imaging systems with their IST certificates and have complete access to Philips' CSIP Level 0 materials.  They cannot, however, access the software and files that Philips reserves for its licensees or its own employees.  Licensees with CSIP Level 1 access can log into Philips medical imaging systems with their IST certificates and they will receive access to additional CSIP materials, but not materials that Philips reserves for only its employees or trade partners.  Philips employees and trade partners with CSIP Level 2 access receive even greater access to specialized service tools and files.[12]

Through their Philips-issued accounts, the vast majority of the thousands of ISOs in the U.S. have sufficient access to service Philips' medical imaging systems.  Philips provides ISOs with access to the CSIP Level 0 materials that allow them to setup and service Philips' medical

---

[5] Declaration of Jacqueline Dickson, attached hereto as Exhibit A, at ¶ 6.
[6] *Id.*
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶¶ 4, 8.
[9] *Id.* at ¶¶ 5, 9.
[10] *Id.* at ¶ 10.
[11] *Id.*
[12] *See id.*

LOC_AR_00004135

imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities.[13]

Nevertheless, through its policing efforts, Philips has learned of a few ISOs that use methods to circumvent Philips' IST multi-factor authentication security to gain unauthorized access to Philips' copyrighted CSIP materials. The specific methods used by those ISOs vary, but their circumvention methods achieve a common result of providing the ISOs with unlicensed access to Philips' copyrighted software. The ISOs use that unlicensed access to sell advanced services for Philips' medical imaging systems. Philips has pending lawsuits against several ISOs that circumvent Philips' access controls to gain unauthorized access to its copyrighted CSIP. For example, Robert A. Wheeler, the CEO of Transtate Equipment Company, developed exploit software that Transtate uses to modify files within Philips medical imaging systems to effectively disable their access controls and allow Transtate employees to gain access unlicensed access to Philips' copyrighted materials.[14] Summit Imaging developed a different software program designed to circumvent Philips' access controls and provide unauthorized access to Philips' proprietary copyright protected software within Philips medical imaging systems.[15]

**ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES**

**I.    No Exemption is Permissible Because The Uses Are Not Noninfringing**

**A.    Legal Standards**

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this rule." The Register will recommend granting an exemption *only when* the "preponderance of the evidence in the record shows that the conditions for granting an exemption have been met."[16] Such evidence must show that it is "*more likely than not* that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make *noninfringing uses* of a particular class of copyrighted works." *Id.* at 112 (emphasis added).

To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[17] More particularly, "[i]t is not enough that a particular use *could be* noninfringing. Rather, the Register

---

[13] *Id.* at ¶ 7.
[14] Second Amended Complaint at ¶¶ 59-65, *Philips Med. Sys. Nederland B.V.,* No. 3:20-cv-00021-MOC-DCK (May 23, 2019), ECF No. 139.
[15] Third Amended Complaint at ¶¶ 6, 40-44, *Philips N. Am. LLC,* No. 2:19-cv-01745-JLR (Dec. 28, 2020), ECF No. 99.
[16] U.S. Copyright Office, Section 1201 of Title 17 at 111 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.
[17] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.

6

JA1410

LOC_AR_00004136

will assess whether the use is ***likely to be*** noninfringing based on current law."[18] "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing." *Id.*

## B.    The Requested Uses Do Not Satisfy the "Fair Use" Test of 17 U.S.C. § 107

Proponents of proposed exemption Class 12 argue—by conclusion only—that the petitioned uses are likely to be noninfringing under 17 U.S.C. § 107 (fair use). These conclusory contentions are, however, unsubstantiated and flawed.

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. On balance, these factors weigh conclusively against the proposed Class 12 exemption for medical devices.

### i.    The Purpose and Character of the Requested Use Weighs Against an Exemption

The first factor in the fair use analysis – the purpose and character of the use – evaluates whether the use is of a commercial nature or is for nonprofit educational purposes, and examines "to what extent the new work is transformative" and does not simply "'supplant'" the original work.[19] "Commercial use of copyrighted material is '***presumptively*** an ***unfair*** exploitation of the monopoly privilege that belongs to the owner of the copyright.'"[20] This factor unquestionably weighs against Proponents.

Here, the requested uses under Class 12 with respect to medical devices are purely commercial and are thus "presumptively . . . unfair."[21] Both Transtate Equipment Company, Inc. d/b/a/ Avante Diagnostic Imaging ("Transtate") and Summit Imaging, Inc. ("Summit") are independent service providers ("ISOs") who seek to circumvent the access controls installed on Philips' medical devices for purely commercial (i.e., business) purposes. That is, Transtate's and Summit's motivations are financial, plain and simple. Their businesses stand to profit from an exemption that would allow them to circumvent Philips' and other medical device manufacturers' access controls that protect the integrity and security of their medical devices. But the Triennial Rulemaking Process is not a means of regulating competitive markets or promoting commercial outcomes. Nor should the Triennial Rulemaking Process

---

[18] U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6, https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf (last visited Feb. 5, 2021) (emphasis added).
[19] *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).
[20] *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)) (emphasis added).
[21] *See Leadsinger*, 512 F.3d at 530 (quoting *Sony Corp.*, 464 U.S. at 451).

JA1411

LOC_AR_00004137

be used as a means of promoting unlawful conduct or avoiding liability for past unlawful conduct – the other motivations underlying Transtate's and Summit's unfair use.

Transtate indicates in its comments in support of proposed exemption Class 12 "that it likely will be the only ISO or one of very few ISOs to provide comments with respect to the medical device servicing issues. However, the limited number of ISO Petitioners should not be taken as a lack of interest in this exemption or the desire of others for the requested exemption."[22] But there is more to the story of what motivated Transtate's and Summit's petitions for an exemption: both companies – along with several others – are defendants in ongoing federal litigation in which they have been accused of violating the anti-circumvention provisions of the DMCA.[23] Because the requested uses of copyrighted material are commercial – and thus, presumptively *unfair* – and because the requested uses would not transform the copyrighted material, the first "fair use" factor weighs conclusively against Proponents.[24]

### ii.    The Nature of the Original Work Weighs Against an Exemption

The second factor in the fair use analysis – the nature of the copyrighted work – evaluates the "value of the materials used."[25] In relation to the other fair use factors, some federal courts have recognized that this second factor is relatively insignificant in the overall balancing analysis.[26] In the specific context of medical devices, however, this factor weighs just as heavily against Proponents.

Philips' IST – i.e., the access controls installed on Philips' medical devices – is designed to secure Philips' CSIP, including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products from unauthorized access or use. Philips' copyrighted service software is complex, highly expressive content designed to protect the integrity and efficacy of Philips' life-saving medical devices.

Although the Copyright Office has previously found access controls on video games to be primarily functional, and some aspects of telematics software on motorized land vehicles to

---

[22] Transtate Class 12 Comments at 4.

[23] *See, e.g., Philips Med Sys. Nederland B.V.* No. 3:20-cv-00021-MOC-DCK; *Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.*, No. 3:19-cv-01488-BJM (D.P.R.); *Philips N. Am. LLC et al. v. 626 Holdings, LLC et al.*, No. 9:19-cv-81263 RS (S.D. Fla.); *Philips Med. Sys. (Cleveland), Inc., et al. v. Zetta Med. Techs. LLC, et al,* No. 1:17-cv-03425 (N.D. Ill.); *Philips N. Am. LLC v. KPI Healthcare Inc.*, No. 8:19-cv-01765-JVS-JDE (C.D. Cal.), and *Philips N. Am. LLC* No. 2:19-cv-01745-JLR.

[24] *See Campbell.*, 510 U.S. at 569, 579 (recognizing that in addressing the first factor of the "fair use" test, one considers "whether the new work merely 'supersedes the objects' of the original creation,...or instead adds something new, with a further purpose or different character . . . [;] in other words, whether and to what extent the new work is 'transformative.'" (brackets and citations omitted).

[25] *Campbell*, 510 U.S. at 586 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (C.C.D. Mass. 1841)).

[26] *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1205 (Fed. Cir. 2018) (Federal Circuit noting that the "Ninth Circuit has recognized . . . that this second factor 'typically has not been terribly significant in the overall fair use balancing.'") (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)); *see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) ("This factor 'has rarely played a significant role in the determination of a fair use dispute,' and it plays no significant role here.") (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015)).

8

JA1412

LOC_AR_00004138

be functional, the service software designed by OEMs and installed on medical devices are of comparatively much higher value and complexity and invoke patient safety and information security concerns. That is because with their medical devices, OEMs make every decision about service software – from the types to create, to the functions it will perform, to its design and implementation.

Controls restricting access to such proprietary software are essential to preserving the functionality, integrity, safety and security of those devices. Without them, the sophisticated and complex medical devices involved are unsecure, susceptible to alteration, a loss of data, or availability, and vulnerable to hacking and misuse. In the specific context of health care, in which patient lives often depend upon the safety and efficacy of medical devices – some of which are designed for implantation in the human body – the OEM developed software on a device is fundamental and inextricably tied to the value of the device itself.

### iii. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole Weighs Against an Exemption

The third factor in the fair use analysis – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – evaluates "both the quantity of the work taken and the quality and importance of the portion taken."[27] "[T]his factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."[28] This factor also weighs decidedly against Proponents.

First, Philips uses multiple layers of technological controls to protect its copyright-protected works from unauthorized access. These controls include user specific access codes and hardware keys, which enable the software access and control features for a particular user. These user-specific access controls permit access to enabled Philips tools and features based on a user's registered access authorization level. Philips provides ISOs with access to Philips' copyrighted software and information necessary for basic repair and maintenance of medical imaging systems.  By circumventing Philips' access controls, ISOs gain unauthorized access to Philips' copyrighted advanced service software.  ISOs then copy and use those *entire copyrighted* works to service Philips systems more efficiently or modify Philips systems for commercial gain.

Second, Philips' ability to control access to its copyrighted software not only provides Philips with a means of protecting its valuable intellectual property, but it also protects the public from the dangers associated with modification or alteration of Philips' medical devices by unauthorized or insufficiently trained users. Unlimited access to Philips' copyrighted software would allow untrained—and unregulated—individuals to make unauthorized changes to Philips' medical devices, potentially rendering the devices ineffective or unavailable for clinical use or dangerous when used. That is, the requested exemption not only would open attempts to repair or modify medical devices without device-specific training, but circumvention of the access controls would essentially give such ISOs unfettered access Philips' *entire copyrighted* works, as well as other proprietary information within the medical devices.

---

[27] *Disney Enters.*, 224 F.Supp.3d at 973 (citing *Campbell*, 510 U.S. at 586).
[28] *Campbell*, 510 U.S. at 587.

9

JA1413

LOC_AR_00004139

Third, as discussed more fully in Section E(I)(B)(iii) below, Philips already provides domestic ISOs with extensive documentation and software that enables them to perform basic servicing of Philips' medical imaging systems, including documentation and software required by relevant FDA regulations.[29] This information enables ISOs, including Transtate and Summit, to perform repair and maintenance on Philips' medical devices. Neither Transtate nor Summit have explained – much less provided evidence – showing why it would be necessary to circumvent Philips' security access controls in order to perform repair and maintenance on Philips' devices. By comparison, allowing them unfettered access to enhance their business objectives would defeat the lawful copyright protection properly afforded to Philips' operating software and create safety and security risks that are avoided without the exemption.

Given that the requested exemption would give ISOs access to information that goes well beyond that which would be necessary for repair and maintenance, and would effectively grant ISOs access to the medical device manufacturers' entire copyrighted works and other proprietary information and trade secrets contained in the medical devices for purely commercial use, the third "fair use" factor weighs just as heavily against an exemption as the first two.

### iv.    The Effect of the Requested Use Upon the Potential Market for or Value of the Copyrighted Work Weighs Against an Exemption

The fourth factor in the fair use analysis – the effect of the use upon the potential market for or value of the copyrighted work – requires the Office to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market….'"[30] At least one federal circuit court of appeals has held that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed."[31] Here, as to Transtate and Summit, there is no question that the requested exemption as applied to medical devices is sought for commercial purposes, and thus, market harm will result.

Circumvention of access controls on Philips' and other medical devices is of significant commercial value because it permits ISOs to modify such medical devices, and to attempt to provide maintenance and support services (without appropriate training or regulatory oversight) on such devices. Moreover, allowing untrained and unregulated third parties unfettered access to make modifications to such devices could result in improper operation, lack of reliability, or potentially even safety or hacking risks, all of which would create market harm for the medical devices, including their copyrighted software.

### v.    Fair Use Summary

On analysis, each fair use factor plainly tips against granting the proposed Class 12 exemption and, when taken together, an analysis of those factors compels that the proposed exemption should be rejected. The factorial analysis must weigh strongly in favor for an

---

[29] See, e.g., 21 C.F.R. § 1020.30.
[30] Campbell, 510 U.S. at 590 (citation omitted).
[31] Leadsinger, 512 F.3d at 531 (quoting Sony, 464 U.S. at 451).

LOC_AR_00004140

exemption to be granted. Whatever else might be said, that is not the case for proposed Class 12 as related to the medical devices addressed by these comments.

### C.    The Uses Do Not Fall Under the Exception for Essential Steps in the Utilization of a Computer Program

Proponents assert, in a conclusory manner, that their intended uses are protected by 17 U.S.C. § 117(a)(1). That provision permits "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" provided that the copy or adaptation "is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." *Id.* Proponents cannot meet the requirements set forth in this provision.

First, it is well established that Section 117(a)(1) shelters only those who *own* the copy of the computer program—not mere licensees of the copy. Federal courts have explained that one is a licensee rather than a user—and thus unprotected by Section 117(a)(1)—if the copyright owner "'(1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use' restrictions."[32] In that regard, courts have held that facts demonstrating that a customer is a licensee include (1) the copyright owner's retention of title in the software and grant of a non-exclusive license,[33] (2) the imposition of transfer restrictions on the licensed software,[34] (3) the imposition of use restrictions specifying ways in which the software must (or cannot) be used,[35] (4) the ability of the copyright owner to terminate the license,[36] and (5) the requirement that the customer destroy or relinquish copies of the software upon termination.[37] All of these factors are present here, and demonstrate that Philips' customers are licensees, not owners, of the software Proponents seek to access.

Specifically, Philips' standard terms and conditions of sale for all medical imaging products makes explicit that: (1) Philips grants only a "nonexclusive and non-transferable right and license to use the computer software" and that Philips retains "exclusive ownership" of the software;[38] (2) the Customer is restricted in its ability to transfer the software and give access to the software;[39] (3) the Customer is restricted in how it may use the software, including being prohibited from using the software on any devices other than the device it comes with or for any purposes other than the operation of that device;[40] (4) Philips retains the ability to terminate the

---

[32] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) (quoting *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)); *see also Vernor*, 621 F.3d at 1110-11; *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44-45 (2d Cir. 2019).
[33] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[34] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[35] *MDY Indus.*, 629 F.3d at 938-39; *Vernor*, 621 F.3d at 1111.
[36] *MDY Indus.*, 629 F.3d at 939; *Vernor*, 621 F.3d at 1112.
[37] *MDY Indus.*, 629 F.3d at 939; *Universal Instruments*, 924 F.3d at 45.
[38] Philips Standard Terms and Conditions of Sale (Nov. 2020), Licensed Software, §§ 1.1, 1.3, https://www.usa.philips.com/c-dam/b2bhc/us/terms-conditions/philips-standard-terms-and-conditions-of-sale-all-products-112420.pdf.
[39] *Id.* §§ 1.2, 1.4; *see also id.*, Philips Proprietary Service Materials, § 9.1.
[40] *Id.*, Licensed Software, §§ 1.2, 1.5; *see also id.* § 2.2 (requiring the Customer to maintain the configuration of the device as it was originally designed and manufactured).

LOC_AR_00004141

license if the Customer does not comply with the terms and conditions of sale;[41] and (5) the Customer must "return the Licensed Software and any authorized copies thereof to Philips immediately upon expiration or termination of this License."[42] As a result, controlling law dictates that Section 117(a)(1) is unavailable to Proponents, and their efforts to amend what Section 117 otherwise requires through this process should be rejected.

By the same token, the Registrar previously has applied these principles in rejecting proposed exemptions. For instance, the Registrar has concluded that motor vehicle telematics and entertainment system software was licensed rather than owned by the vehicle owner, thus failing to qualify for Section 117(a)(1).[43] And the Registrar has emphasized that the question of ownership is a fact-intensive one requiring consideration on a case-by-case basis—yet another reason the generalized, overbroad exemption sought by proponents like EFF should be rejected.[44]

Second, section 117(a)(1) is applicable only if the copy of the computer program "is created as an essential step in the utilization of the computer program in conjunction with a machine." Proponents cannot satisfy this requirement either. There is, of course, clinical software installed on the devices and licensed by Philips that is necessary to use the device.[45] But it is not that software that proponents seek an exemption to access. Rather, proponents seek to go *beyond* that software and instead access additional, unlicensed software—or unlicensed service functionalities—that has not been purchased by the device purchaser.[46] Because none of *that* software is necessary to use the devices in their standard configurations, section 117(a)(1) does not shelter Proponents.

### D.      The Uses Do Not Fall Under The Exception for Machine Maintenance and Repair

Proponents claim protection under 17 U.S.C. § 117(c), which provides that "it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine." The copy must be used in no other manner and destroyed immediately after the completion of the maintenance or repair, and any portion of the program not necessary for the activation of the machine cannot be accessed or used.[47] Contrary to Proponents' arguments, this exception has no application here.

Congress' purpose in passing Section 117(c) was to ensure that servicers "'do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.'"[48] And Congress was clear that this

---

[41] *Id.* § 1.1.
[42] *Id.*
[43] 2018 Recommendation at 201.
[44] 2018 Recommendation at 200, 209.
[45] Declaration of Jacqueline Dickson, Ex. A, at ¶ 11.
[46] *Id.*
[47] *Id.*
[48] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1311-12 (Fed. Cir. 2005) (quoting H.R. Rep. No. 105-551, pt. 1, at 27 (1998)).

12

JA1416

LOC_AR_00004142

exception is narrow; only software actually "necessary for the machine to be activated"—that is, software that "needs to be so loaded in order for the machine to be turned on"—qualifies for the exception.[49] For this reason, the Federal Circuit has held that "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the [machine]…, goes too far because access to those programs is not strictly necessary to verify that the [machine] is 'working in accordance with its original specifications.'"[50] Proponents, however, seek to do exactly that.

The software that Summit and Transtate seek to copy are additional, unlicensed software and unlicensed service functionalities. But as explained in Part I(C), *supra*, none of this software is necessary to activate the machine, and thus by definition cannot be copied "solely by virtue of the activation of a machine."[51] To the contrary, this software consists of "freestanding…programs, that are not needed to boot up the [machine]"—precisely the sort of software that the Federal Circuit has squarely held to be outside the scope of section 117(c).[52]

Indeed, Proponents essentially concede the point. Transtate, in making a perfunctory argument that section 117(c) applies, argues only that accessing Philips' diagnostic and testing software is necessary "[t]o perform the servicing activities."[53] Summit similarly—and also perfunctorily—argues that diagnostic software and data files must be accessed to "perform[] service."[54] But the question under section 117(c) is not whether the software is necessary *to perform servicing of the machine*; rather, the only question is whether the software "needs to be so loaded in order for the machine to be turned on." Proponents do not dispute that the answer to this question is "no." And that answer is dispositive; section 117(c) does not apply.

## II.    The Adverse Impact Factors Do Not Support An Exemption Here

The Librarian of Congress, on recommendation of the Register, must determine whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [against circumventing a TPM] in their ability ***to make noninfringing uses*** … of a particular class of copyrighted works." 17 U.S.C. § 1201(1)(C) (emphasis added). As explained above, because Proponents seek to use Philips' copyrighted works for *infringing* uses, they are barred categorically from using this Triennial Rulemaking Process to obtain an exemption for their conduct.

Apart from that, Section 1201(1)(C) sets out five factors for the Librarian to consider in determining whether to grant an exemption: (1) "the availability for use of copyrighted works"; (2) "the availability for use of works for nonprofit archival, preservation, and educational purposes;" (3) "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research"; (4) "the effect of circumvention of technological measures on the market for or

---

[49] *Id.* at 1314 (quoting H.R. Rep. No. 105-551, pt. 1, at 28) (brackets omitted).
[50] *Id.* (quoting 17 U.S.C. § 117(d)).
[51] 17 U.S.C. § 117(c).
[52] *Storage Tech.*, 421 F.3d at 1314.
[53] Transtate Class 12 Comments at 20.
[54] Summit Class 12 Comments at 8.

JA1417

LOC_AR_00004143

value of copyrighted works"; and (5) "such other factors as the Librarian considers appropriate." *Id.* All five of these factors demonstrate that the proposed exemption should be rejected.

### A.    The Availability for Use of Copyrighted Works

Proponents argue that owners of medical devices are currently unable to obtain timely repair and servicing of the devices, necessitating an exemption permitting independent repairers to access copyrighted material to service such devices. But Proponents offer no credible evidence that the market for servicing and repair of medical devices is not adequately served by existing resources. A close look at the issue shows why.

To start with, the 2018 FDA Servicing Report evaluation involving all stakeholders declined to conclude that there was a prevalent health or safety concern presented by the servicing in the medical device market.[55] That same report noted that there is a robust market for independent servicing of medical devices, with an estimated number of medical device servicing firms numbering between 16,520 and 20,830.[56] And these independent servicing firms are organized and participate in trade associations such as the International Association of Medical Equipment Remarketers and Servicers (IAMERS).[57] The COVID crisis has not generated any credible evidence that this has changed so that equipment repairs are not being made or that public health and safety is threatened with respect to lack of servicing of lifesaving or life-enhancing healthcare devices. That lack of evidence is conclusive here.[58]

Going beyond the FDA requirements, Philips provides independent servicers with extensive documentation, software, and instructions sufficient to perform basic servicing of Philips medical imaging systems.[59] Many of these instructions refer to CSIP Level 0 service software that independent servicers can access with their Philips-issued certificates. The CSIP Level 0 documentation and software—which Philips provides to independent servicers at cost—allows for basic servicing of the systems. Proponents are fully aware of this; indeed, Transtate has an account with Philips to receive and use these materials.[60] Therefore, the argument that independent servicers are cut off from the repair market is fiction.

The companion argument that the proposed exemption is necessary for independent servicers to perform repair and servicing of medical devices is just as flawed. No exemption is

---

[55] U.S. Food and Drug Administration, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), at i.

[56] *Id.* at 19.

[57] *See* International Association of Medical Equipment Remarketers and Servicers, "IAMERS Campaigning for Healthcare Providers Right to Choose," https://iamers.org/ (last visited Feb. 8, 2021).

[58] Proponents offer a few isolated and undocumented incidents where delays allegedly occurred in obtaining OEM servicing. Philips, for its part, has no record of any reduction in service capabilities or customer inability to obtain service during the COVID crisis. *See* Declaration of James Salmons, attached hereto as Exhibit B, at ¶¶ 7-8. Medical device maintenance services were not materially delayed even with customers' reporting an overall increase in volume of service. *Id.* at ¶ 8. Notably, the handful of incidents identified by Proponents does not establish any *systemic* problem of access to OEM servicing in the marketplace – the only relevant issue for the Copyright Office. Finally, unlike Proponents, the FDA has looked at the marketplace and did not find any systemic evidence of inadequate servicing or repairs for medical devices.

[59] 21 C.F.R. § 1020.30(g).

[60] Declaration of Jacqueline Dickson, Ex. A, at ¶ 7.

LOC_AR_00004144

needed to permit basic repair and servicing of Philips medical devices because Philips already provides independent servicers with all the information they need to conduct such servicing—and will continue to do so, as required by FDA regulations. In fact, Philips routinely acts as a third-party servicer in repairing and servicing non-Philips medical devices—and has always managed to do so perfectly well with the materials made available to all independent servicers, without the circumvention Proponents insist is necessary for third-party servicers to do their jobs.[61] Accordingly, what proponents really seek through this exemption is the ability to go *beyond* essential repair and servicing of the devices and to access additional, copyright-protected options and features for commercial gain.

To that end, the pending litigation against Summit and Transtate revolves around their modification of files on Philips systems to gain unauthorized access to Philips' proprietary service software and files that they cannot access with their legitimate CSIP Level 0 accounts. They exploit this heightened access for commercial gain by utilizing Philips' proprietary documents and software to provide services that only Philips and its authorized licensees are permitted to provide. Proponents' attempt to use the need for repair and servicing as a vehicle to pursue their commercial interests provides no justification for granting this exemption and should not be entertained.

In support of their position, Proponents offer a handful of declarations that existing servicing options cause increased cost and delay. But this meager showing—a handful of declarants claiming that the exemption would lower costs—cannot compete with the clear evidence described above, including FDA conclusions and regulations, that demonstrates otherwise. This is especially true given the heavy burden Proponents bear to establish the appropriateness of the exemption, *see* Part I(A), *supra*. Simply put, there is no market vacuum or crisis requiring this exemption. For these reasons, it is clear that the medical devices at issue here differ fundamentally from other categories of devices that the Registrar previously has found lack adequate servicing through manufacturer-approved channels—such as vehicle telematics systems[62] and smartphones.[63] Proponents have failed to demonstrate that Philips' copyrighted works will be unavailable to medical device owners unless proponents obtain an exemption allowing them to access Philips' protected intellectual property. In reality, the opposite is true.

Finally, Proponents press the argument that an exemption is necessary to permit servicing of older equipment that has reached the end of its commercial life and thus does not receive servicing from OEMs.[64] But Proponents misrepresent the status of this equipment and omit the substantial risks inherent in their proposed exemption.

First of all, there is no reason why "older" and "newer" equipment should be treated differently when it comes to the need to protect proprietary software contained in the devices. As discussed above and below, Philips medical devices contain proprietary software protected by copyright, and Proponents' attempts to gain access to that software for their own commercial gain (and to the detriment of public safety) through this exemption process is flatly

---

[61] Declaration of James Salmons, Ex. B, at ¶¶ 3-4.
[62] 2018 Recommendation at 213-14.
[63] 2018 Recommendation at 216.
[64] Summit Class 12 Comments at 2; Transtate Class 12 Comments at 6.

JA1419

LOC_AR_00004145

inappropriate. This remains just as true for "older" devices as it does for "newer" devices, and Proponents cannot show otherwise.

As for certain medical devices that have received an End of Service (EOS) designation from the OEMs, Proponents argue that an exemption is needed to permit independent servicers to repair and service these devices because OEMs will phase out their servicing. But Proponents fail to point out that servicing can be phased out for a variety of reasons, specifically including that the equipment is no longer safe and effective to operate. Apart from that prevalent safety concern, the Proponents' hypothesized claim of purported service inadequacies related to EOS equipment certainly does not support the categorical exemption Proponents demand for all devices under all circumstances. Finally, Proponents do not provide support for any market-wide problem as related to older equipment either. Without that substantiation, there is no basis to even consider the exemption.

B.    **The Availability for Use of Works for Nonprofit Archival, Preservation, and Educational Purposes**

Proponents advance no argument whatsoever that independent servicers must be permitted to circumvent Philips' protective measures for purposes of nonprofit archival, preservation, or educational purposes; to the contrary, they seek to use Philips' software in a commercial setting. Because Proponents bear the burden to establish the propriety of an exemption, their failure to do so here must weigh against them.

The Electronic Frontier Foundation does advance an argument on this factor, claiming that "tinkering is itself educational and is a common path for young people to become interested in studying science and engineering."[65] But the Foundation's arguments are aimed at its desired (and overbroad) exemption for virtually all software-enabled devices.[66] Whatever the persuasiveness of such arguments in the context of a "smart litterbox,"[67] they clearly have no application to Philips' FDA-regulated medical devices. It should go without saying that the "educational" benefits of tinkering with expensive, life-sustaining medical devices cannot justify the enormous accordant risks to human life. This factor therefore does not support the proposed exemption.

C.    **The Impact that the Prohibition on the Circumvention of Technological Measures Applied to Copyrighted Works Has on Criticism, Comment, News Reporting, Teaching, Scholarship, or Research**

Proponents do not argue that prohibiting unauthorized parties from obtaining the copyrighted software in medical devices such as Philips' unduly hinders free speech, criticism, news reporting, teaching, or research. Again, the Electronic Frontier Foundation advances such an argument for software-enabled devices generally.[68] But no such argument is made or can

---

[65] Electronic Frontier Foundation Class 12 Comments at 16.
[66] *Id.* at 1-2.
[67] *Id.* at 22.
[68] *Id.* at 16.

LOC_AR_00004146

seriously be made for medical devices. Therefore, this factor weighs against the proposed exemption as well.

### D.    The Effect of Circumvention of Technological Measures on the Market for or Value of Copyrighted Works

This factor does not support an exemption because the proposed exemption would severely harm the value of Philips' (and other manufacturers') copyrighted works or harm the market for those works. As explained in Part I(B)(iii), *supra*, the access requested by the Proponents is extensive. They seek to give independent servicers full access to the entire copyrighted works and other proprietary information contained within the medical devices. This wholesale invasion of intellectual property rights would destroy the value of those copyrighted works and undermine the incentive for Philips and other OEMs to produce medical devices with their related software in the first instance—an endeavor that requires substantial time and expense as OEMs develop and secure regulatory clearance for medical devices.

The fact that this access is being requested for purely commercial purposes—meaning that the likelihood of market harm "may be presumed,"[69] Part I(B)(iv), *supra*—further demonstrates that the effect (and perhaps the intention) of the exemption would be to devalue OEMs' intellectual property interests and increase the economic prospects of those seeking to exploit that intellectual property for their own gain. Once again, Proponents cannot demonstrate that this factor supports an exemption; the opposite is true.

### E.    Such Other Factors as the Librarian Considers Appropriate

Proponents argue that an exemption is warranted—indeed, required—for reasons of public and health and safety. But there is reason to pause on their unsupported assertion. As explained above, *see* Part II(A), Philips already provides enough information and resources to allow independent servicers to repair and service Philips medical devices. The proposed exemption, therefore, cannot be justified by appealing to the health and safety benefits of the servicing activities Proponents are perfectly capable of conducting. Beyond that, permitting this additional access would jeopardize, not protect, health and safety.

Philips, as a manufacturer of medical imaging equipment, is acutely aware of the impact that the proper—or improper—use of sensitive medical equipment has on public health and safety. So is the FDA, which has recognized the serious ramifications for health and safety that this area poses, and which for that reason extensively regulates the medical-device arena. Medical equipment manufacturers, like Philips, are subject to an extensive array of regulations designed to ensure that medical devices consistently meet safety and quality requirements. They are, for instance, subject to registration, listing, premarket notification and approval, quality system, labeling, and reporting requirements.[70] By comparison, independent servicers are not

---

[69] *Leadsinger*, 512 F.3d at 531.

[70] *See* 21 C.F.R. §§ 801 (labeling), 803 (incident reporting), 807 (registration, listing, and premarket notification), 814 (premarket approval), 820 (quality system regulation). These regulations also extend to the provision of information by OEMs to customers on assembly, installation and adjustment of certain devices to protect their functionality, integrity and availability. The FDA can intervene if the information provided is inadequate. *See* 21

17

JA1421

LOC_AR_00004147

registered, not obligated to make reports, and not subject to regulated quality management systems or product training. Nor are they obligated to keep up with changes in equipment specifications, to use customized diagnostic tools, or to stay up to date on device history.

In addition, approved servicers are extensively regulated and must comply with a host of requirements; independent servicers are not. Approved servicers are trained to service and repair the specific medical device at issue and possess the latest diagnostic tools and device records and histories; independent servicers are not and do not. And approved servicers have up-to-date knowledge of device specifications and compatible products and parts, while independent servicers do not. Proponents' attempts to paint approved servicers—regulated, trained, and licensed to deal with the specific machinery at issue—as equivalent to independent servicers who are not subject to reporting, quality management, or other requirements, and who do not have the latest product knowledge, training, and tools, is wrong.

Beyond that, the profound difference between approved and independent servicers relates directly to the quality of the repairs and the proper functioning of the medical equipment. These concerns are magnified as one moves from the more basic repairs and servicing that independent servicers already conduct to the more advanced modifications and alterations—possible only by using Philips' proprietary tools—that Proponents seek an exemption to conduct. Permitting unapproved servicers to perform these advanced alterations on medical devices could lead to, for example, incomplete equipment records (which OEMs are required to maintain), assembly of the device without the proper tools or parts, a lack of up-to-date product calibration, a lack of ongoing market surveillance (which OEMs conduct), and a failure to report adverse events (which OEMs are required to report). There is no guarantee that the modified medical device will function as originally intended.

Finally, these potential malfunctions have serious ramifications for public health and safety. Improperly modifying life-saving medical equipment could cost human lives. Improper repair of diagnostic and treatment devices could lead to misdiagnoses of patients' conditions, ineffective or counterproductive treatment, and a host of other problems seriously jeopardizing patient health and safety. And circumvention of the access controls that Philips and other OEMs install on their medical devices also renders the devices susceptible to cybersecurity threats that OEMs and several federal agencies already work to protect against. Indeed, the FDA already "works aggressively to reduce cybersecurity risks [to medical devices]," a responsibility it shares with "device manufacturers, hospitals, health care providers, patients, security researchers, and other government agencies, including the U.S. Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) and U.S. Department of Commerce."[71] These concerns, which threaten the safety and security of the medical devices upon which human

---

U.S.C. § 337(a); 21 C.F.R. §§ 10.30(g), (h). These regulations do not require the disclosure of trade secrets and they permit OEMs to provide their own employees with more advanced software.

[71] U.S. Food and Drug Administration, "Medical Device Cybersecurity: What You Need to Know," https://www.fda.gov/consumers/consumer-updates/medical-device-cybersecurity-what-you-need-know (last visited Feb. 5, 2021); *see also* U.S. Food and Drug Administration, "FDA Fact Sheet: The FDA's Role in Medical Device Cybersecurity," https://www.fda.gov/media/103696/download (last visited Feb. 5, 2021).

18

JA1422

LOC_AR_00004148

lives depend, cannot be justified by the exemption's alleged benefit of saving money on repairs.[72]

This is precisely why Proponents are wrong to equate the exemptions recommended in the Registrar's 2018 Recommendation with their proposed exemption here.[73] Modifying a medical imaging machine used to diagnose patients in need is not the same as repairing someone's smartphone. These devices do not exist in the "do it yourself" space, where modification and tinkering carry no collateral consequences except to the device's owner. The Registrar has emphasized the need to follow an incremental approach that considers each class of device on its own terms, precluding such a comparison between highly different classes of devices.[74] There is no reason to abandon that approach now. The FDA has considered and analyzed the servicing issues and will continue to do so.[75] Congress has taken up right-to-repair exemptions, and a comprehensive public debate can be held in that forum. The copyright exemption process should not be used to supplant either the regulatory oversight or broader public debate. There is no "lawful" right to modify the medical devices implicated in this analysis. By statute and under existing case law, the unlicensed copying of OEMs' proprietary works to perform repairs as championed by Proponents is unlawful, and absent action by Congress it should stay that way.

**DOCUMENTARY EVIDENCE**

*Commenters are encouraged to submit documentary evidence to support their arguments or illustrate pertinent points concerning the proposed exemption. Any such documentary evidence should be attached to this form and uploaded as one document through regulations.gov.*

---

[72] *See* Transtate Class 12 Comments at 9-10 (requesting the exemption because it would supposedly lower the cost of repairs and protect the income of independent servicers); Summit Class 12 Comments at 3 (urging the exemption out of concern that manufacturers may charge higher prices for servicing).

[73] *See* Transtate Class 12 Comments at 7.

[74] 2018 Recommendation at 191-92.

[75] The FDA's regulatory oversight is pervasive where medical devices are involved. This includes with respect to Proponents' rewriting of code (to bypass TPMs) that would be facilitated by the grant of the blanket exemption Proponents seek. The FDA does not directly regulate third-party servicers, which, as noted, creates its own set of security and safety risks in this context. But the FDA does regulate those who, like certain of the Proponents, would seek to rewrite code and place an adulterated system into the stream of commerce. *See* 21 C.F.R. § 820.3(o), (w) (subjecting to FDA quality-system-regulation requirements those who "significantly change[] the finished device's performance or safety specifications, or intended use"). These considerations are ignored by Proponents in urging that the exemption purportedly is needed to promote public health and safety. The FDA is unlikely to hold that view.

JA1423

LOC_AR_00004149

**EXHIBIT A**

**Declaration of Jacqueline Dickson**

LOC_AR_00004150

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## DECLARATION OF JACQUELINE DICKSON

I, Jacqueline Dickson, hereby declare as follows based on my personal knowledge:

1.      I have held the position of Program Manager for Customer Service Intellectual Property Governance with Philips North America, LLC since 2016. In that position, I work with Philips' businesses and markets to ensure that Philips operates in compliance with its customer service intellectual property ("CSIP") policies and strategies. My work also involves CSIP enforcement, including coordinating with security groups to ensure the business takes appropriate actions to secure CSIP and supporting investigations and lawsuits when third parties breach Philips' security to gain unauthorized access to Philips' restricted CSIP materials.

2.      Philips' CSIP includes service software, service documentation, training materials, and other proprietary materials that Philips creates for servicing Philips medical imaging systems. Philips assigns CSIP "levels" to these materials to specify those authorized to access the materials.

3.      Philips makes its CSIP Level 0 materials available to equipment owners, Independent Service Organizations ("ISOs"), and any other individuals in the United States who request such access. These CSIP materials include materials and service tools that Philips makes available to comply with regulatory requirements (such as 21 CFR 1020.30), as well as other documentation and software for performing basic maintenance and servicing on Philips imaging systems, including manufacturer's specifications for what planned maintenance activities need to be conducted at various intervals.

4.      Philips restricts access to its proprietary CSIP Level 1 materials to certain customers who contract for such access, subject to terms and conditions for the use of such materials. Those customers purchase a limited license to use Philips' CSIP materials to service their own Philips imaging systems. CSIP Level 1 materials include certain training materials as well as additional documentation and software to support planned maintenance activities and to execute common corrective maintenance activities.

5.      Philips reserves its proprietary CSIP Level 2 materials and tools for only its own employees and limited trade partners, such as subcontractors and manufacturing partners,

US_ACTIVE-158092444.1

**JA1425**

LOC_AR_00004151

pursuant to contractual terms. CSIP Level 2 materials include Philips' internal information about changes to medical imaging systems (some of which may be part of campaigns required by regulatory bodies), as well as advanced training materials, documents, and software for advanced troubleshooting and advanced configuration of imaging systems (such as changes that may impact x-ray dosage).

6.      Philips developed its Integrated Security Tool ("IST") solution to secure its CSIP materials. Philips' IST solution provides a mechanism to manage entitlements to access CSIP materials and tools. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns to each user entitlements that specify the CSIP Materials the user can access, based on the CSIP rules as described above and subject to any pertinent contractual terms. Philips creates an encrypted IST certificate for each user containing various information, including the user's CSIP entitlements. Philips also offers, at cost, IST smartcards that can be used to access CSIP materials on its medical imaging systems in accordance with user entitlements.

7.      The default CSIP access level for IST accounts in the United States is CSIP Level 0 access. This includes individuals employed by ISOs, like petitioners Summit Imaging, Inc. and Transtate Equipment Co., Inc. I searched our IST records and observed that individuals from Transtate in fact have created IST accounts with Philips that provide them with CSIP Level 0 entitlements. They can use their existing accounts to access Philips' CSIP Level 0 materials. Summit does not have IST accounts and it appears they have not requested Level 0 access.

8.      Philips assigns CSIP Level 1 entitlements to accounts for employees of licensed customers once those employees have satisfied the prerequisites for such access, such as entering into confidentiality agreements and completing any training necessary to safely and effectively use the materials.

9.      Philips assigns CSIP Level 2 entitlements primarily to its own employees once they complete necessary training.

10.      Philips' IST solution includes an IST client application for installation on a field service engineer's computer. The IST client application requires a user to enter his or her IST certificate password. If the password is entered correctly and the individual has a valid IST certificate on their computer, IST will allow the user to access CSIP materials according to the user's entitlements in the IST certificate. A user with CSIP Level 0 access will be able to read Philips' CSIP Level 0 documents and run Philips CSIP Level 0 software, but would be restricted from accessing any CSIP Level 1 or 2 materials. A user with CSIP Level 1 access will be able to decrypt Philips' CSIP Level 1 documents and run Philips' CSIP level 1 software as well. Both the CSIP Level 0 and 1 users would be unable to decrypt or read Philips' CSIP Level 2 documents or to execute software requiring CSIP Level 2 entitlements. A Philips employee with CSIP Level 2 access would be able to access CSIP Level 0 and 1 materials.

11.      Philips' IST solution also includes an IST application that runs on Philips medical imaging systems, including ultrasound systems, computed tomography scanners, positron emission tomography scanners, X-ray machines, magnetic resonance scanners, and nuclear medicine scanners. When started, Philips medical imaging systems load software for clinical use

- 2 -

**JA1426**

LOC_AR_00004152

of the system. To access Philips' field service software and information, a field service engineer may plug an IST smartcard charged with his or her IST certificate into a USB drive on the imaging system, provide his or her certificate password, and then choose to run field service software or access other field service information. The imaging system will then provide the user with access to software and information according to his or her entitlements. A CSIP Level 0 user, such as an ISO employee, would get access to various programs and information that allow them to set up and service Philips medical imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities. Philips' licensees and employees in turn receive higher levels of access based on their entitlements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on February 5, 2021 in Northfield, Ohio.

Jacqueline Dickson

(Page 49 of Total)

JA1427

LOC_AR_00004153

# EXHIBIT B

## Declaration of James Salmons

LOC_AR_00004154

Declaration submitted in support of Comments from:
Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

## DECLARATION OF JAMES SALMONS

I, James Salmons, hereby declare as follows based on my personal knowledge:

1.      I have held the position of Head, Global Multivendor Services at Philips North America, LLC since 2019. This includes overseeing Philips' companies AllParts Medical and AGITO Medical.

2.      Philips' multivendor services provide vendor-agnostic, multi-modality solutions for maintenance, lifecycle, and performance services for imaging systems and other biomedical assets. Philips multivendor services range from traditional maintenance services to comprehensive solutions that incorporate a portfolio of added capabilities, such as data driven tools to identify equipment usage and replacement opportunities.

3.      Philips' multivendor group services medical imaging systems from a variety of Original Equipment Manufacturers ("OEMs"), including systems from GE and Siemens.

4.      Philips' multivendor group accesses software and information on systems according to OEM specifications. OEMs typically make service specifications available to Independent Service Organizations ("ISOs"), such as Philips' multivendor group, to enable ISOs to perform authorized services. For example, Siemens makes service documentation and information available through an "Online Library." GE similarly provides a "Customer Documentation Portal" where ISOs can access service documentation and other information.

5.      If a medical imaging system that Philips' multivendor group is servicing lacks necessary system software or if there is an issue that Philips cannot resolve with its level of access to the OEM's service documentation and software, the customer or Philips will contract the appropriate OEM to acquire the necessary software or access.

6.      If Philips cannot acquire authorized access to OEM software or information necessary to perform a particular service on a medical imaging system, then the customer or Philips can contact the appropriate OEM to provide the necessary service.

7.      Philips saw no extended reduction in service capabilities or reduction in customers' ability to access maintenance services due to COVID.

US_ACTIVE-158093220.2

**JA1429**

LOC_AR_00004155

8.    From the perspective of Philips' multivendor services, medical device maintenance services were not materially delayed due to the COVID crisis.  Service companies that we materially supported reported an overall increase in volume of service in 2020.  This includes increased activity from Siemens, GE, and major ISOs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected.  Executed on February 8, 2021 in Tennessee.

James Salmons

- 2 -

JA1430

LOC_AR_00004156





UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

*Please submit a <u>separate</u> comment for each proposed class.*

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

## ITEM A. COMMENTER INFORMATION

Petitioner and Contact Information

Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

**ITEM B.  PROPOSED CLASS ADDRESSED**

Class 12: Computer Programs—Repair, and, in particular, the subset of Electronic Servicing Materials for Diagnosis, Maintenance, Repair of Medical Equipment

The Librarian of Congress is requested to exempt from the anti-circumvention provision of the Digital Millennium Copyright Act (17 U.S.C. § 1201) ("DMCA"), the circumvention of technological measures (also referred to herein as technological protective measures ("TPMs"))[1] undertaken by or on behalf of the owners or lessees of the medical systems and devices, for the purpose of accessing and using medical equipment servicing materials in the form of computer programs and data files (including databases and manuals) that are necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, thereby ensuring proper operation and compliance with manufacturer and governmental specifications; and where such circumvention does not constitute a violation of any other applicable law.

This exemption will allow owners and lessees of medical systems and medical devices, and their authorized agents, to access and use the servicing materials and perform servicing activities that are essential to the repair, diagnosis, and maintenance of their own medical equipment, without the threat of legal action should the need arise to actually or allegedly circumvent TPMs.  This exemption will also alleviate the unintended consequences of the application of copyright law enacted for developers of software applications for stand-alone computers, to specialty medical equipment integrated with software.

**ITEM C.  REPLY COMMENT**

**I.    Introduction**

The Period 2 comments by Philips, MITA, and AdvaMed (hereinafter, collectively, "OEM Commenters") are the only comments filed in direct opposition to Transtate's (and Summit Imaging's) comments in support of an exemption under the anti-circumvention provisions of the DMCA for accessing medical device electronic servicing materials.[2,3]  All three comments actually support the need for an exemption.  Critically, the comments focus not on the purpose of the DMCA, but rather underscore that (a) original equipment manufacturers ("OEMs") believe that they are entitled to be the arbiters of who, if any one at all, gets to service their medical

---

[1] In using the terms "technological protective measure" and "TPM," Petitioner does not admit or concede that the technological measures discussed herein meet the definition of a "technological measure" that "effectively controls access to a protected work," as defined in 17 USC § 1201(a)(3)(B).

[2] "Transtate" refers to Petitioner Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging. "Summit Imaging" refers to Petitioner Summit Imaging, Inc.
"Philips" refers to Opponent Philips North America LLC.
"MITA" refers to Opponent Medical Imaging & Technology Alliance.
"AdvaMed" refers to Opponent Advanced Medical Technology Association.

[3] "Electronic service materials" are defined in Transtate's Period 1 comments at 5 as "computer programs or modules thereof, electronic data files, including databases, and electronic manuals"

(Page 54 of Total)

**JA1432**

LOC_AR_00004508

devices, as well as when, and under what conditions, and (b) the purpose of the OEMs' TPMs is to allow the OEMs to be the arbiters.

There is no dispute that the electronic servicing materials embedded or stored on medical devices and hidden behind TPMs include uncopyrightable (and hence unprotected) materials and works subject to fair use.[4]  Even Philips acknowledges that it is obligated to make electronic service materials available for what it calls "basic servicing of Philips medical imaging systems,"[5] yet hides them behind TPMs, and thus, they are not available unless one obtains an Integrated Security Tool ("IST") key, at undue expense and with other burdens.[6]

To be clearer, Transtate's petition and Period 1 comments distinguish between two types of electronic servicing materials.[7]  The **necessary electronic service materials** are those necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, **thereby ensuring proper operation and compliance with manufacturer and governmental specifications**.[8]  The **unnecessary electronic service materials** are those **specialized materials OEMs include for their own benefit**.  Transtate is seeking for all lawful possessors of medical devices and third party servicers working on behalf of the lawful possessors to be relieved of the DMCA guillotine should the need arise to circumvent the TPMs to access the necessary electronic service materials.[9]  Further, no one is seeking access to remanufacture or modify the

---

[4] Petitioner does not admit that any particular work is "protected" as that term is used in the DMCA, or that any particular work enjoys enforceable rights.

[5] Philips Period 2 comments at 4.

[6] The FDA mandates that Assembly, Installation, Adjustment, and Testing ("AIAT") information be made available "at a cost not to exceed the cost of publication and distribution."  21 U.S.C. § 1020.30(g).  In its 2003 Guidance, the FDA elaborated:

> The agency has explained that manufacturers may charge for the cost of producing each additional package or unit of instructions. The charge can incorporate factors such as the cost of paper, labor, use of a copying machine, or other costs associated with each package the manufacturer provides under the performance standard. This principle should govern the calculation of the costs for all information subject to disclosure, whether printed, encoded in software, or any other format. For software, recoverable charges equivalent to printed materials would include such factors as the cost of the technical labor of producing such additional package or unit, computer disks, and packaging materials used to produce each additional unit of software. Using a reasonable set of factors should govern the calculation of the costs for any materials that are provided.  *See* Ex. 28

Despite this, there are financial burdens far greater than the cost of "publication and distribution" placed on lawful possessors and third-party assistants by OEMs in order to access even its "basic" Level 0 access keys. *See*, declarations of Michael Spencer (Ex. 3 at ¶ 8), Abigail Lane Savage (Ex. 7 at ¶7),and Jacqueline Dickson (attached in Philips Period 2 comments at ¶¶ 7-9).

[7] Transtate Period 1 comments at 1-2.

[8] Maintenance and repair are similarly defined at 17 USC §§ 117(d)(1) and (2) as follows:

> (1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and
> (2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

[9] 21 C.F.R. § 1020.30(b): "Assembler means any person engaged in the business of assembling, replacing, or installing one or more components into a diagnostic x-ray system or subsystem."

3

JA1433

LOC_AR_00004509

devices.  The exemption can be easily tailored, as proposed by Petitioner, to not exempt those situations.

The Copyright Office is not requested to determine what electronic service materials should be considered necessary electronic materials required for the purposes of servicing medical devices. However, it should concern the Copyright Office that TPMs and the DMCA are purposefully being used to restrict access to unprotected materials, fair use materials, and information the FDA mandates be made available.[10]

Philips' self-serving statement that it makes materials available for "basic service" is misleading in several respects.[11]  First, Philips alone determines what should be considered "basic service." Second, Philips alone determines what materials are needed for such "basic service."  Third, Philips alone determines who has access to even these "basic" materials.  Fourth, Philips does not explain or address the hurdles it places on non-Philips' persons and entities to obtain access, such as the short expiration times of access keys, the expense for the access keys, and the refusal to train.  Fifth, the AIAT mandate to which Philips alleges it complies, applies only to ionizing radiation emitting devices, not all medical imaging devices, much less all medical devices. Regarding this last point, at footnote 2 of its Period 2 comments, Philips misrepresents the facts and fails to completely quote the January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.  The letter concludes that (emphasis added): "The manufacturer of the original system is not required to disclose proprietary accessories or functions, additional documentation or enhanced software programs to third parties unless this information is part of the AIAT instructions specified in 21 CFR 1020.30(g) or part of the user information specified in 21 CFR 1020.30(h)."  Thus, the Deputy Director is clarifying that in fact OEMs must disclose and make available proprietary accessories or functions, additional documentation and enhanced software programs to third parties if they are covered by the AIAT disclosure requirements.  Tellingly, this is the opposite of the impression Philips attempts to make in its' footnote.

The OEM Commenters argue that providing lawful possessors and third-party assistants with CSIP Level 0 access allows for "basic servicing of the systems". This is not accurate. First, Level 0 documentation and software is not available on all medical systems and modalities. Further still, many medical systems are not properly set up to use Level 0 documentation and software without prior configuration. Even when Level 0 is available, it requires the purchase of thousands of dollars in hardware per engineer in order to properly service medical equipment. As a result, and in contradiction to the FDA mandate that certain information be made available "at a cost not to exceed the cost of publication and distribution," lawful possessors, independent

---

[10] 21 C.F.R. § 1020.30(g).  *See also*, FDA Guidance Document (attached in Transtate Period 1 comments as Exhibit 28).
[11] Philips Period 2 comments at 5.

JA1434

LOC_AR_00004510

service organizations ("ISOs"), and third-party assistants are forced to expend financial resources even before they are granted a limited amount of access and information to service medical equipment. [12] This "basic" level access also requires a tedious multistep process and certificates expire on a monthly basis, requiring lawful possessors, ISOs, and third-party assistants to endure the process at least twelve times per year and often more. Accordingly, and despite what the OEM Commenters state, Level 0 documentation and software is not sufficient.

Further, the OEM Commenters completely ignore that they do not always make keys for devices they deem to have reached end of life. This is an obvious impediment to servicing older medical devices.

OEMS could eliminate the TPMs for these materials and use TPMs only for the specialized unnecessary electronic servicing materials, but they have not done so because the threat of liability for violation of the DMCA to access the necessary electronic servicing materials gives the OEMs (undue) control over the medical device servicing market and makes lawful possessors beholden to the OEMs, as discussed below.

The concerns raised by the OEM Commenters regarding safety and cybersecurity also are not a concern in connection with this exemption seeking process, and, in any event, are based on speculation.[13] The incidences noted by AdvaMed and MITA relate to hardware issues, not use of software issues. Cybersecurity is already the subject of many other laws[14] and is an area addressed by the FDA.[15] More importantly, the OEM Commenters' self-serving concerns are unwarranted. The FDA also looked at the issues of patient safety and regulation of ISO's in 2017, and concluded in its 2018 report that there was no evidence to warrant further regulation of ISO's.[16] Again, the OEM comments are based on speculation. They provide no evidence of an ISO modifying software or otherwise committing a malicious or even reckless act via software. And, in any event, whether or not ISO's are regulated has nothing to do with the fact that TPMs are being used to hide non-protectable and necessary electronic servicing materials that are subject to non-infringing uses[17], and information the FDA has mandated be made available.

Accordingly, the requested exemption for medical devices is warranted.

## II.    The OEM Commenters Confirm That TPMs Are Not Being Used, Or At Least Used Primarily, By OEMs To Protect Copyrighted Material

### A.    All Three OEM Commenters Make Similar Arguments

---

[12] *See supra* fn. 6.
[13] Philips Period 2 comments at 2, 18; MITA Period 2 comments at 5; and AdvaMed Period 2 comments at 6.
[14] The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, is one example.
[15] 21 C.F.R. § 11.10.
[16] Ex. 22 at 25-26.
[17] Such infringing uses are Fair Use, Essential Steps, and Machine Maintenance and Repair, as discussed in Transtate's Period 1 Comments at 14-19, and infra in Sections E(1)-(2).

LOC_AR_00004511

Philips, MITA, and AdvaMed raise the specter of "unregulated" and "untrusted" ISOs servicing medical devices, insinuating that ISOs are presumed untrustworthy, and cannot be entrusted with servicing of medical devices unless they pass some approval process imposed by the OEMs and/or the FDA.[18]  The OEM Commenters also raise the specter that granting the exemption would endanger "patient safety."[19]  They also raise the specter of an exemption enabling "hacking" and compromising cybersecurity of the medical devices.[20]  But, these issues have already been addressed by the FDA, and, in any event, are irrelevant to the DMCA exemption request process.

**B.    The OEM Comments Are Not Relevant To The Purpose Of TPMs**

The anti-circumvention provision of the DMCA was enacted for the purpose of protecting digital works in the then new digital media, *e.g.*, the Internet and storage devices, given the much greater ease with which digital works could be easily reproduced and distributed.  The provision was not enacted to regulate servicing of devices, be a mechanism for the OEMs to vet the technical qualifications of device servicing entities, to address patient safety concerns, for the OEMs to protect patient privacy, or to protect trade secrets.  All of the OEMs' arguments regarding these issues are irrelevant and only serve to lay bare that the OEMs' main intent is to act as marketplace controllers and to be the sole arbiters regarding who should be allowed to service medical devices.  And if this is not telling enough, the OEM Commenters direct all of their arguments against ISOs and do not mention any of these concerns with respect to the device owners and other lawful possessors who are in the same position as ISOs.  The OEM Commenters do not explain why it is that the lawful possessors are somehow "trustworthy" but ISOs are not.  It is clear the TPMs are used primarily, if not solely, to keep lawful medical device possessors beholden to the OEMs for servicing their devices and to eliminate ISOs from assisting the lawful possessors of the medical devices.

Indeed, the market for servicing medical devices is more accurately divided into OEMs and non-OEMs.  The non-OEMs include (a) the lawful possessors such as hospitals and other medical facilities as well as refurbishers/remarketers, and (b) ISOs.  The lack of or burdensome access to necessary electronic servicing materials is foremost an issue for the lawful possessors with in house servicing departments, whether they are staffed by employees or contractors, because of the unnecessary delays and costs in needing to rely on the OEMs for servicing, as outlined by Transtate's Period 1 declarants.[21]

Further, and as noted in Transtate's Period 1 comments, although some lawful possessors of medical devices can obtain some degree of access to the embedded servicing materials, it is at an

---

[18] Philips Period 2 Comments at 2 and 9-10.
[19] Philips Period 2 comments at  7; MITA Period 2 comments at 3-4, 9-10, 18, and 30; and AdvaMed Period 2 comments at 2, 9, and 11-12.
[20] Philips Period 2 comments at 2 and 9-10.
[21] *See* declarations of Melvin (Ex. 5 at ¶ 8); Kahler Ex. 6 at ¶¶ 13-16); and Grogan (Ex. 8 at ¶ 16).

LOC_AR_00004512

undue expense, and the access is insufficient. And, the electronic servicing materials to which access is given are entirely within the discretion of the OEMs.

What the OEM Commenters fail to mention, is the fact that there are other OEMs, such as Del Medical, Cannon, and Toshiba[22] that do not use TPMs, and who do not prevent non-OEM servicing of their devices. There is no mention by the OEM Commenters that there is any, much less a significant, concern for privacy breaches, safety incidences, cybersecurity issues, or copyright infringement in connection with non-OEM servicing of such devices without TPMs. This is because these issues are overblown and unsupported in the record.

### C.    The Safety And ISO Regulation Issues Are The Purview Of The FDA Which, Already Determined Not To Regulate ISOs Because ISOs Are Not Only Trusted, But Vital.

The patient safety and regulation of non-OEM servicing of medical devices is the purview of the FDA. Even the OEM Commenters recognize this. In its May 2018 Report,[23] the FDA noted that (emphasis added):

- The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
- Rather, the objective evidence indicates that many OEMs **and third party entities provide high quality, safe, and effective servicing of medical devices**;
- A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" **and not "servicing"**; and
- **The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system**.

If the FDA, the agency responsible for patient safety and regulation of the manufacture and servicing of medical devices has determined that third party entities provide high quality, safe, and effective servicing of medical devices and that the availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system, it is to that agency that the OEM Commenters should raise their concerns. The OEM Commenters' attempt to involve the Copyright Office and the Registrar in these issues is simply inappropriate and an improper attempt to raise irrelevant issues for the sole purpose of maintaining their exclusionary behavior.

---

[22] Grogan Decl., Ex. 8 at ¶ 12.
[23] FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), Ex. 22 at pg. i.

**JA1437**

LOC_AR_00004513

Further, patient and operator safety is covered by a myriad of laws and regulations. It is in no one's interest to jeopardize patient or operator safety. The OEM comments in that regard are simply without any basis in fact. If anything, access to the necessary electronic servicing materials will enhance such safety because it will enable lawful possessors and their trusted third party assistants to address problems quickly.[24] The exemption will enable access when the need arises and the OEMs refuse or greatly hinder access.

Indeed, the OEMs have their own safety issues. The Department of Health and Human Services reviews complaints and tracks responses to complaints. Attached as **Exhibit 30**, are a sampling of issues raised by the HHS with respect to complaints against Philips. Many involve software issues. This further underscores that the OEMs' invocation of patient safety is nothing more than a smokescreen.

### D. The Cybersecurity Issues Raised By The OEM Commenters Are Covered By Other Statutes

The OEM Commenters arguments regarding the risk of malicious cybersecurity breaches or hacking to modify medical devices by exempting access to necessary electronic servicing materials is not relevant. Cybersecurity is both subject to multiple laws such as the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and various criminal statutes. The FDA also is active in this area.[25]

Aside from the fact that the OEM Commenters provide no evidence of malicious cybersecurity breaches committed by a non-OEM servicing entity, the exemption sought is for diagnosis, maintenance and repair, not remanufacture or alteration. One would still remain liable under all relevant laws for circumvention to perform acts other than servicing. Further, an exemption would not remove the TPMs, only liability for circumvention to service the medical devices under lawful conditions.

Bad actors will commit bad acts regardless of the laws meant to deter them. Circumvention of a TPM is a minimal concern for someone wishing to commit a malicious act. All the TPMs do in the present situation is make it more difficult and more expensive for lawful possessors to have

---

[24] As an example, after performing certain types of service on Philips' cath lab machines, including service permitted under Philips' "basic" access, you are required to calibrate the Interventional Work Station ("IWS"). Philips' "basic" access level does not permit access to this calibration. If IWS is not calibrated, it puts the patient's health and safety at risk. For example, without calibration, the images displayed through IWS may not be clear, necessitating taking multiple images, exposing the patient to unnecessary radiation. More significantly, lack of calibration may result in "image misregistration," where for example the location of a catheter that is being placed in a patient's body is not being accurately shown in the IWS image. This could cause major issues during surgery, resulting in injury or even death to the patient.

[25] *See* https://www.fda.gov/medical-devices/digital-health-center-excellence/cybersecurity.

**JA1438**

LOC_AR_00004514

their medical devices serviced.  It also makes the lawful possessors more reliant on the OEMs for their servicing needs.[26]

### E.    Arguments Regarding the Commercial Motive of ISOs Are Misplaced

The OEM Commenters make much ado about the commercial motivation of ISOs.  But that is easily dispensed with.

First, the petition requests an exemption for lawful possessors of the medical devices and the third party servicers performing services requested by the lawful possessors.  As set forth in the declarations provided with Petitioner's Period 1 comments, lawful possessors such as hospitals invariably have in-house staff to perform the servicing to the extent they are able to do so.[27]  This reduces cost and delays.  Lawful possessors such as hospitals and medical facilities do rely on outside parties, whether OEMs or ISOs for some servicing.  Some contract out of their in-house departments, i.e., they are staffed by contractors, not direct employees.  These lawful possessors experience the same issues with the impediments imposed by the TPMs, namely high costs to obtain keys, higher servicing costs by OEMs, and no access to needed information such as error/failure codes and the like.  Ultimately, the benefit of allowing circumvention is for the lawful possessors to get faster and more affordable services from ISOs.

To focus exclusively on ISOs, while ignoring hospitals and other lawful possessors, is a clear indication that the OEM Commenters are intent on trying to persuade the Copyright Office using unwarranted scare tactics rather than to focus on the merits of TPMs and access to protected works.

### F.    The Failure to Separate the Necessary and Unnecessary Electronic Servicing Materials is the OEM's Achilles' Heel

To the limited extent that the OEM Commenters mention a concern for protecting copyright protectable material, they conveniently fail to separate out the necessary electronic servicing materials from the unnecessary electronic service materials, which presumably are materials for the benefit of the OEMs.  Because by definition there would be no need for anyone other than an OEM to access the unnecessary electronic servicing materials materials, there would be no risk of exposure of these materials because a non-OEM would not have a need to access these materials.  At the same time, the lawful possessors and those assisting them would be able to more easily, quickly, and with less expense ensure compliance of the medical devices with governmental and manufacturer specifications.

### IV.    The Making Of Copies Of Necessary Servicing Materials In Order To Conduct Servicing Of Medical Devices Indeed Is Exempt From Infringement

---

[26] *See* declarations of Melvin (Ex. 5 at ¶ 8), Kahler (Ex. 6 at ¶¶ 13-16); and Grogan ( Ex. 8 at ¶ 16).
[27] *Id.*

A.    **The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device Is Fair Use**

i.    **The Purpose and Character of the Requested Use Supports Exemption**

OEM Commenters argue that the lawful possessors, ISOs, and third-party assistants' requested uses are purely commercial and thus presumptively unfair,[28] however, they ignore the underlying non-commercial "purpose and character" of the proposed use, *i.e.*, that Transtate, lawful possessors and other third-party assistants' require access to the necessary electronic servicing materials for the purpose of adequately servicing medical devices used in furtherance of public health. The OEM Commenters also conveniently fail to mention that other lawful possessors (*i.e.,* hospitals and medical facilities) share similar "commercial" qualities.[29]

The OEM Commenters mischaracterize the emphasis on commercial use involved in consideration of the first factor for fair use. As articulated by Nimmer on Copyright, a less stark formulation of the same principle is that "commercial motivation and fair use can exist side by side," and considerations include "whether the alleged infringing use was primarily for public benefit or for private commercial gain"—which inclines against fair use in a commercial context, but leaves wide latitude for consideration of all the other factors that may outweigh this single fact under appropriate circumstances.[30] In other words, labeling a use as "commercial," should not end the analysis.[31] Accordingly, the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." Because the fact that a given use is commercial does not necessarily negate fair use, any presumption that a commercial use is *ipso facto* unfair should be regarded as "rebutt[able] by the characteristics of a particular commercial use."[32]

---

[28] *See* Phillips Period 2 Comments at pg. 7 citing *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) and *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016), for the conclusion that commercial use is presumptively unfair. However, the facts that represent "commercial use" in each of these cases are distinguishable from the facts at hand. In *Leadsinger, Inc. v. BMG Music Pub.,* a manufacturer of karaoke devices brought an action against music publishers seeking declaratory judgment that it was authorized to display lyrics to songs, either in print or displayed on a video screen, under the fair use doctrine. The court held that plaintiff's basic purpose—to sell its karaoke device for profit—was a commercial one. Similarly, in *Disney Enters., Inc. v. VidAngel, Inc.*, the plaintiffs were companies in the business of producing and distributing motion pictures and television programs and brought an action against an unauthorized provider of companies' copyrighted movies and television programs. Neither of these cases, nor the purposes for use of copyright protected materials articulated therein, is analogous to the type of use contemplated by Petitioner, that of service and repair of medical devices that directly impact the quality of public health.

[29] *See* supra at § E.

[30] *See* 4 Nimmer on Copyright § 13.05 (2020).

[31] *See* 4 Nimmer on Copyright § 13.05 (2020); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) ("The language of the statute makes clear that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character. Section 107(1) uses the term 'including' to begin the dependent clause referring to commercial use, and the main clause speaks of a broader investigation into "purpose and character'. . .).

[32] *See* 4 Nimmer on Copyright § 13.05 (2020).

JA1440

LOC_AR_00004516

In determining the purpose and character of the use, "the crux of the profit/non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *See, e.g., Harper & Row, Publrs. v. Nation Enters.,* 471 U.S. 539, 562, 105 S. Ct. 2218, 2231, 85 L. Ed. 2d 588, 608, 1985 U.S. LEXIS 17, *43, 225 U.S.P.Q. (BNA) 1073, 1081, 53 U.S.L.W. 4562, 11 Media L. Rep. 1969; *Weissmann v. Freeman,* 868 F.2d 1313, 1315, 1989 U.S. App. LEXIS 2387, *1, 10 U.S.P.Q.2D (BNA) 1014, 1015, Copy. L. Rep. (CCH) P26,390, 101 A.L.R. Fed. 91 (one academic's use of another academic's materials was a for-profit use); *Society of Holy Transfiguration Monastery, Inc.,* 689 F.3d 29, 61 (1st Cir. 2012) ("In effect, the commercial-noncommercial distinction the law draws centers not on whether a user intends to line his own pockets, but rather on whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. Profit, in this context, is thus not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages.").

Here, the request to access fair use of the necessary electronic servicing materials would involve a commercial setting only to ensure that the medical equipment complies with OEM and regulatory specifications.[33] Petitioner is not aware of anyone in the business of selling access to such servicing materials. Moreover, remarketers, such as Petitioner, pay in full for the medical equipment at issue, and are lawful owners of the medical devices with the software integrated in them. Servicing the medical equipment owned by lawful possessors is primarily for public benefit, as access to materials required for servicing is imperative in treating patients, and is especially critical during a pandemic such as the current COVID-19 crisis.[34] Petitioner does not and is not seeking to provide, or for others to provide, the copyrighted works to third-parties, but instead seeks access to effectively service products that are lawfully owned. Accordingly, the Petitioner's proposed use of copyrighted works is not commercial in the ordinary sense.

Petitioner does not dispute that it is a for-profit entity. However, the commercial nature of Petitioner's business model does not outweigh the noncommercial nature of its servicing and repair work.

### ii.    The Nature of the Original Work Supports Exemption

OEM Commenters seek to downplay this factor precisely because it weighs in favor of exemption. The more informational or functional the work, the broader the scope of the fair use defense. *See, e.g.,* 4 Nimmer on Copyright § 13.05[A][2][a]; *Leadsinger, Inc. v. BMG Music* Pub., 512 F.3d 522, 531 (9th Cir. 2008) *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 531 (9th Cir. 2007); *Stern v. Does,* 978 F. Supp. 2d 1031, 1046 (C.D. Cal. 2012), *aff'd,* 512 Fed. Appx. 701 (9th Cir.), *cert. denied,* 134 S. Ct. 423 (2013); *Cambridge Univ. Press v. Becker,* 863

---

[33] 21 C.F.R. §§ 1020.30(g)-(h)
[34] *See* declarations of Melvin (Ex. 5 at ¶ 7), Kahler ( Ex. 6 at ¶ 16), and Lane-Savage (Ex. 7 at ¶¶ 17-19).

(Page 63 of Total)

F. Supp. 2d 1190, 1225 (N.D. Ga. 2012), *rev'd on other grounds sub nom.*, *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014); *See Diamond v. Am-Law Corp*., 745 F.2d 142 (2d Cir. 1984) ("informational works may be more freely published"); *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) ("Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater."), *cert. denied*, 469 U.S. 823, 105 S. Ct. 100, 83 L. Ed. 2d 45 (1984) (*but see later opinion*, 664 F. Supp. 753 (S.D.N.Y. 1987)).

The service software designed and blocked by OEMs is not creative nor fictional, expression; it is functional information required to safely service medical equipment. The software itself is not dictated by any creative expression, but by the specific technical needs of the machine. Indeed, because the copyrighted works held hostage by OEMs are integrated with functional medical equipment (*i.e.*, the hardware), access to this information is necessary to engage in diagnosis, repair, and lawful modification of medical device functions.[35] Petitioner seeks access and use of this functional information in order to obtain diagnostic data. Accordingly, the second factor supports fair use.

### iii.    The Amount And Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whole Weighs In Favor Of An Exemption

The amount of use of the servicing materials would not be substantial and would be limited to those instances where circumvention was essential for critical diagnoses, maintenance, and repairs.  As explained above, only the portion of the works containing necessary electronic service materials are at issue under the proposed exemption. Accordingly, granting Petitioner's proposed exemption does not require use of the entire copyrighted works.

OEM Commenters argue that granting Petitioner's exemption requires use of its entire copyrighted works, providing little evidence to support this assertion, but the OEM Commenters do not address the fact that use of its works are part and parcel of a lawful possessor's ownership of the medical equipment it services. The OEM Commenters also do not admit that in certain instances, access to proprietary information, additional documentation or enhanced software programs is required.[36] OEM Commenters also falsely state that the current access level provides

---

[35] Opponent Medical Imaging & Technology Alliance ("MITA") cites *Allen-Myland, Inc. v. IBM* as an exemplar where copying computer code was not found to be fair use despite the computer code's informational nature, however the facts and holding are distinguishable from the facts at hand. In *Allen-Myland, Inc. v. IBM,* the court declined to find a fair use of computer code because the plaintiff copied code to build a library of different versions of the microcode in order to discover how to support various configurations and learn how to use IBM's system to achieve its commercial purposes without paying IBM. In this instance, Petitioner's purpose is not to create an internal inventory, it is to repair, service, and diagnose the medical equipment it owns.
[36] *See., e.*g., January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.

12

JA1442

LOC_AR_00004518

information necessary for basic repair and maintenance, but the OEM Commenters do not define, extrapolate, or provide evidence of their interpretation of "basic."[37]

The attempt to drag safety and cybersecurity cautions into their arguments also fail, given that the FDA has weighed in and concluded ISOs like Petitioner are "critical" to a safe and functioning medical care industry. Moreover, Petitioner and other ISOs like it already receive some degree of training directly from OEMs, and are skilled and trained in repair and diagnosis of medical equipment, so long as they are empowered with the appropriate level of access needed to do so. If the OEMs cared solely about safety, they would provide even more training, not less. The OEM Commenters arguments that granting the exemption requires use of its entire copyrighted works is misleading and misses the point. The third fair use factor supports an exemption.

### iv.    The Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work Is Minimal

The OEM Commenters argue that the fourth factor weighs against Petitioner because as a third-party ISO it is inherently commercial.[38]  Instead, of responding to the valid concerns provided from lawful possessors, and those acting at their behest, the OEM Commenters attempt to focus on the potential for safety and hacking harm by allowing **third parties** access to service medical devices.  This argument ignores the plight of in-house hospital employees attempting to service their own medical equipment.[39]

Medical equipment software is effectively useless outside of the equipment it inhabits, with no separate market for reselling or distributing the software apart from the devices.  The servicing materials required are only useful for the particular medical equipment in which they are embedded.  Moreover, OEM Commenters concede that they already license some of their copyrighted materials to some ISOs,[40] which causes no harm to the secondary market.  Petitioner is seeking access for lawful possessors, and those acting at their behest, to the necessary electronic servicing materials to ensure proper operation and servicing activities on medical systems and devices.  Access to the computer programs and data files comprising the necessary electronic servicing materials is needed to replace the unprotected electrical and mechanical parts on the medical device.  Again, the TPMs do not provide a means for maintaining the device's hardware without also accessing the software.  There is no other need to otherwise copy or access the computer programs and data files.

OEMs would still be free to sell medical devices and computer programs.  Accordingly, the necessary servicing materials used by lawful possessors, ISOs, and third-party assistants does not

---

[37] *See also* supra at pg. 5.
[38] Philips Period 2 comments at10; AdvaMed Period 2 comments at 7; and MITA Period 2 comments at 8.
[39] *See* declarations of Melvin (Ex. 5 at ¶ 4), Kahler (Ex. 6 at ¶ 5), and Grogan (Ex. 8 at ¶¶ 6-7).
[40] Dickson Decl. at para. 4.

JA1443

LOC_AR_00004519

affect the market for or value of the computer programs and data files involved.  Therefore, the fourth factor weighs in favor of a finding of fair use.

**B.      The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device At The Request Of An Owner Of The Device Is An Essential Step In The Use Of The Device**

OEM Commenters raise the issue that a copy of the computer program or data base is not necessary for the activation of the medical device, but it is necessary to service or diagnose the medical device.[41]  The OEM Commenters also claim that the owners of the medical devices are not the owners of the copies of the electronic materials embedded in the devices stating the software is only licensed.  However, this ignores that the issue of ownership is a fact-based inquiry.[42]  The Copyright Act provides for two basic manners for distributing copies of works: (a) by sale or other transfer of ownership, or (b) by rental, lease, or lending.[43]  Yet the OEM Commenters nowhere describe how they are distributing their works via the rental, lease, or lending, or that the machine sale documents include these words or concepts.  Rather, they rely on "licensing" which is an intellectual property right concept, not a concept associated with the transfer of tangible property, and in this case, the copies of sofware and data files stored or embedded on a machine.

Indeed, even assuming that the software in the owned machines was only considered rented, leased, or lent, there is no sensical explanation as to how one returns the embedded copies of the works.  Presumably they could, if they knew how, delete all of the software by somehow reimaging the drives of the machines, but then the machines would cease to function.  They would no longer constitute the purchased machine.  This surely is not contemplated by anyone in the purchase of the medical devices.  Rather, the expectation is that the medical devices can be maintained and repaired thoughout their useful lives.

Philips even concedes that its "customers purchase a limited license to use Philips' CSIP materials **to service their own Philips imaging systems**."[44]  Yet, Philips fails to address why these materials, which include "documentation and software to support planned maintenance activities and to execute common corrective maintenance activities," are not essential in the use

---

[41] AdvaMed Period 2 comments at 7-8; MITA Period 2 comments at 13; and Philips Period 2 comments at 12-13.
[42] *See* Raymond Nimmer, The Law of Computer Technology § 1.18[1] p. 1–103 (1992) ("Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.")
[43] 17 U.S.C. §106(3).
[44] Dickson Decl. at para. 4.

14

JA1444

LOC_AR_00004520

of the medical device.[45]  Instead Philips misconstrues Petitioner's comments relating to use as an essential step by relying on the 2018 Recommendation regarding motor vehicle telematics and entertainment system to assert that software is licensed, not owned.[46]

Philips' arguments ignores the nature and context of the Register's concerns in its 2018 Recommendation.  First, the Recommendations noted that most of the concerns "primarily relate to accessing entertainment works through vehicle entertainment systems and related subscription services, not to repairing more functional software installed to facilitate vehicle operation."[47]  In its 2018 Recommendation, the Register also distinguished the 2015 rulemaking favoring exemption for vehicle repair "because the activities were personal, noncommercial, and would 'enhance the intended use' of the vehicle programs."[48]  Again, Philips does not address how the TPM protected necessary electronic servicing materials do not enhance the use of the medical devices.  Instead, Philips is attempting to categorize its software licenses with subscription services such as Sirius XM, which were of concern in the 2018 Recommendation.[49]  These arguments also ignore that a potential harm from medical devices that are not properly serviced and maintained is loss of human life.

To rebut Petitioner's evidence of servicing harm during the COVID-19 pandemic, Philips (the only OEM to address this issue) provides that its own records do not show a reduction in service capabilities.[50]  This over-simplification of the argument ignores the potential harm to life from medical equipment that is not properly maintained.[51]  It also avoids addressing the current effect to taxpayers and patients resulting from costs for maintaining medical devices from purchasing access keys and paying higher service charges by OEMs.[52]  By ignoring the current harms to both patient safety and medical costs, OEM Commenters are minimizing the current market harm from its broadly applied use of TPMs.

Petitioner is not seeking an exemption to access the same types of software that were of concern in the 2018 Recommendation.  Rather, Petitioner is seeking access to fairly use the necessary electronic servicing materials embedded in medical equipment as an essential step in the servicing and repair activities associated with the medical equipment.  This software cannot be separated from the medical equipment.  The medical device is rendered useless without the software.  This is distinguishable from motor vehicle telematics and entertainment system software where, as the Register notes, "diagnostic data is still available through the online

---

[45] *Id.*
[46] Philips Period 2 comments at 12.
[47] 2018 Recommendation, Ex. 29 at 215.
[48] *Id.* at 203.
[49] *Id.* at 216.
[50] Philips Period 2 comments at pg. 14.
[51] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 2018, Ex. 25; *see also* Peloso Decl., Ex. 15 at ¶¶ 11-13.
[52] Kahler Decl., Ex. 6 at ¶ 16; *see also* Lane-Savage Decl., Ex. 7 at ¶ 21.

15

JA1445

LOC_AR_00004521

diagnostics port."[53]  Here, OEMs are using TPMs to prevent both ISOs and medical device owners from accessing diagnostic data.[54]

## C.    Hardware Maintenance And Repair 17 U.S.C. § 117(C) Is Applicable To Effect Maintenance Or Repair Of A Medical Device

The necessary electronic servicing materials are not "additional"—they are an included and necessary part of the medical equipment.

In relying on *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc*,[55] the OEM Commenters mischaracterize and cherry pick their supporting arguments. In this case, the court stated that "Congress's clearest indication of what it considered to be 'necessary for the machine to be activated,' is found not in section 117(c), but in section 117(d) which defines repair and maintenance in terms of allowing the system to work "in accordance with its original specifications and any changes to those specifications authorized for that machine." The court continued, stating that "the service provider must be able to cause the machine to boot up in order to determine if it 'works in accordance with its original specifications.'"  The court concluded that "in some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." Accordingly, it found that where the maintenance code was "so entangled with the functional code that the entire code must be loaded into RAM for the machine to function at all", loading the maintenance code was necessary for the Management or Control Unit "to be turned on."[56]

The OEM Commenters conflate the concepts and incorrectly emphasize the element of turning on the device with the underlying purpose of the statute: function. The necessary electronic servicing materials on medical equipment are so entangled with the devices, that they must be accessible in order to conduct diagnosis and repair in a safe manner. In order to determine if the medical equipment functions in accordance with its original and updated specifications, use of servicing computer programs and data files comprising the necessary electronic servicing materials is required.

Indeed, attached as **Exhibits 31 and 32**, are copies of the certified registrations for two versions of the Allura software embedded in Philips x-ray machines.  Each registration is for a complete software package that includes aspects of the code for both running and maintaining the machines.  The entire package is invoked when operating and maintaining the machines.

---

[53] *Id*. at 213.
[54] *See* declarations of Spencer (Ex. 3 at ¶ 6), Melvin (Ex. 5 at ¶ 5), Kahler (Ex. 6 at ¶ 6), Lane-Savage (Ex. 7 at ¶ 22), and Grogan (Ex. 8 at ¶ 6).
[55] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1314 (Fed. Cir. 2005).
[56] Notably, the court in *Storage Tech. Corp.* held that the Defendant-Appellant service company came within the safe harbor for software copying done solely for purposes of maintenance or repair and found the district court erred in finding that it was unlikely to prevail on its defense to copyright infringement. *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.,* 421 F.3d 1307, 1317 (Fed. Cir. 2005).

16

**JA1446**

LOC_AR_00004522

Transtate is not aware of any ISO or lawful possessor that modifies the necessary servicing computer programs and data. Instead, they simply seek to access and use them for repair and servicing activities. Transtate is not aware of anyone who makes copies of the necessary electronic materials, outside of fair use loading of them into random access memory for execution purposes. Accordingly, and because the necessary electronic servicing materials are necessary to conduct servicing activities, the proposed use is exempt from infringement under Section 117.

**CONCLUSION**

The OEM Commenters' argument that granting Petitioner's exemption will expose the public to serious dangers associated with the modification of medical devices has already been dispelled by the FDA.  The OEM Commenters' further argument that the current access and use of documentation and software is sufficient to perform servicing activities is self-serving and not supported. As concluded by the many declarants supporting Petitioner's Period 1 comments and the proposed exemption, this is not the case. Finally, the OEM Commenters' argument that the Copyright Office granting the proposed exemption will threaten entire copyrighted works, proprietary information and trade secrets is not supported. The Petitioner seeks a tailored exemption, which would grant access only to the electronic service materials necessary for servicing (diagnosis, repair, and maintenance) of medical devices and systems. As a result, the OEM Commenters arguments fail.

For the aforementioned reasons, Petitioner's proposed exemption should be granted.

JA1447

LOC_AR_00004523

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

This document lists observations made by the FDA representative(s) during the inspection of your facility. They are inspectional observations, and do not represent a final Agency determination regarding your compliance. If you have an objection regarding an observation, or have implemented, or plan to implement, corrective action in response to an observation, you may discuss the objection or action with the FDA representative(s) during the inspection or submit this information to FDA at the address above. If you have any questions, please contact FDA at the phone number and address above.

*The observations noted in this Form FDA-483 are not an exhaustive listing of objectionable conditions. Under the law, your firm is responsible for conducting internal self-audits to identify and correct any and all violations of the quality system requirements.*

**DURING AN INSPECTION OF YOUR FIRM WE OBSERVED:**

## OBSERVATION 1

Complaints involving the possible failure of a device to meet any of its specifications were not reviewed, evaluated and investigated where necessary.

Specifically, you are not adequately investigating complaints. For example:

A.) Out of 133,845 complaints received from July 2016-July 2017, 129,736 complaints were closed based only on the assigned HHM (hazard/harm) symptom code and not further investigated (97%). From January 2016 to present, there were 3,623 complaints (representing 33 HHM symptom codes) that received a low HHM severity level of (b) (4) (less than moderate or no injury), but had a high RMM (risk matrix) severity level (b) (4) potential serious injury or (b) (4) potential death).

Of these 3,623 complaints, 1,792 should have been escalated based upon your "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01 and forwarded to the Complaint Handling Unit (CHU) for further investigation.

Additionally, a query of complaints from Feb 2014 to present for HMM codes related to rescan or reinjection of patients found that codes which meet the criteria for escalation are not always forwarded to the CHU. For example:

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X Benjamin J Dastoli<br>Investigator<br>Digitally signed by Benjamin J. Dastoli -S<br>Date Signed 8/18/2017 | 8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 1 OF 11 PAGES |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

- There were 104 complaints with HHM symptom code (b) (4) Only 51 of these complaints (49%) were actually escalated.

The remaining 1,831 complaints were closed with no further evaluation or investigation and no documentation explaining the reason no investigation was necessary.

The following are examples of complaints that were closed and not forwarded to the CHU:

(1) Complaint #5161859, dated 2/24/16: BrightView SPECT imaging system: Table continued to move after letting go of buttons.
(2) Complaint #5108381, dated 2/9/16: BrightView SPECT imaging system: Table is stuck and estop not working
(3) Complaint #5176332, dated 2/29/16: SPECT Skylight: unrequested motion error on table
(4) Complaint #4997407, dated 1/8/16: BR 16 Water: table is free floating
(5) Complaint #6070916, dated 11/14/16: BrightView SPECT XCT: emergency stop switch "pinged off"

Out of the 1,831 complaints that were not further evaluated or investigated, there were 1,246 complaints that were related to table problems (68%). This data was not analyzed to determine whether further investigation is necessary or if potential corrective/preventive actions are necessary.

B.) The following complaints are examples of incomplete investigations that were escalated to the CHU:

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE:<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | Benjamin J Dastoli<br>0104560307<br>Signed By Benjamin J. Dastoli -S<br>Date Signed 8/18/2017<br>X | DATE ISSUED<br>8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 2 OF 11 PAGES |

JA1449

LOC_AR_00004526

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

(b1) <u>Complaint #6772839, dated 5/30/17:</u> Ingenuity TF PET/CT imaging System: The user reported a reconstruction failure that resulted in a rescan and reinjection. The complainant stated that this is occurring monthly. The firm concluded that no MDR was required (based upon your Position Papers: "(b) (4)" dated 12/16/14 and "(b) (4)" dated 12/22/14) and is low risk, and thus no further evaluation or investigation is required and the issue will be monitored through trending. The same location reported this problem on 7/7/14 (Complaint #3139910) and on 7/8/2014 (Complaint #3141512). You stated that the defect was found to be a software defect and will be fixed internally in a future software update. You stated that this update is not planned to be released to the field until (b) (4) (estimated) as a mandatory software upgrade. This site still has not had any corrective action for this reconstruction issue. Since the RMM was deemed "*Acceptable*", the issue was not forwarded to CAPA and not assessed by your Product Safety Committee (PSC) for potential Correction or Removal. From 1/22/2013 to present, you have received 22 complaints with the same failure mode.

(b2) <u>Complaint #6700539, dated 5/11/17:</u> Brilliance iCT imaging system. The user reported saving incorrect patient images. You investigated the issue by reviewing system log files. No issue was found and the complaint was closed. However, the complaint stated that engineering should be contacted for a deeper investigation. This was never done. Complaint was closed on 5/18/17 with no further action taken.

(b3) <u>Complaint #6629122, dated 4/21/17:</u> Ingenuity CT imaging system. A customer reported on the CT viewer 2 examinations of 2 different patients are mixed and is happening 2-3 times a year. Your FSE resolved the issue by restarting the host PC. The complaint was not investigated further and was closed based only the resolution of the customer complaint. The complaint was closed on 4/26/17.

<div align="center">AMENDMENT 2</div>

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 3 OF 11 PAGES |
|---|---|---|---|

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive | 7/17/2017-8/18/2017* |
| Cincinnati, OH 45237-3097 | FEI NUMBER |
| (513)679-2700 Fax:(513)679-2772 | 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

**OBSERVATION 2**

Procedures for receiving, reviewing, and evaluating complaints by a formally designated unit have not been adequately established.

Specifically, the following are examples of how your complaint processing procedures ["Complaint Handling Standard Operating Procedure", #CNW-073103-00, and "Complaint Handling Work Instruction", #CNV-073103-05, "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01] are not complete and adequately established:

A.) Your procedures for entering complaints do not describe how and when failure codes are entered during the complaint process. You do not have any procedure that defines these failure codes. During complaint processing, you enter a HHM symptom code for all complaints, but only enter a failure code for those complaints that are escalated to the Complaint Handling Unit (CHU). Therefore, you have not entered failure codes for the 97% of complaints received since January 2016 (129,736 complaints).

- From January 1, 2016 to present you have 855 complaints that have received an "(b) (4)          " (b) (4)  failure code. The (b) (4) failure code defines the category of the complaint (i.e.: console, gantry, couch). The Tier 2 codes further defines the failure. These codes are used for data analysis and to determine if further actions are needed (i.e.: CAPA). In your recent "Complaint Trending Report June 2017", your top failure code for "Console Acquisition" was "(b) (4)          ". The "(b) (4)          " code does not provide sufficient detail on what the defect was in order to analyze this data to determine if further action is necessary.

  Additionally, there is no procedure on when to add a code or when an "(b) (4)          " code should be further defined and additional codes added.

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| | Benjamin J Dastoli, Investigator | | 8/18/2017 |
| | Teresa K Kastner, Investigator | Benjamin J Dastoli 676580130F Signed By: Benjamin J. Dastoli -S Date Signed: 8/17/2017 | |
| | Christina L Bigham, Investigator | X | |
| | Laureen M Geniusz, Investigator | | |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 4 OF 11 PAGES |
|---|---|---|---|

**JA1451**

LOC_AR_00004528

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive | 7/17/2017-8/18/2017* |
| Cincinnati, OH 45237-3097 | FEI NUMBER |
| (513)679-2700 Fax:(513)679-2772 | 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | | |
|---|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

B.) Your complaint procedures are not clear on when a complaint requires investigation and what level of investigation is needed. Section 5.1.1 of the Complaint Handling SOP states that the SRRT (Service Record Review Team) assigns symptom codes (also called HHM ID #). These codes are based on the severity of actual harm occurring, not the potential severity of the hazard. All HHM symptom codes which are assigned a severity level of "2" or greater are automatically forwarded to the CHU for further evaluation or investigation. Symptom codes assigned a severity of "1" (306 of 412 codes (74%)) are then divided into one of three categories: 1) close, no further evaluation, 2) close, no further evaluation but meets an escalation criteria (per "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01, Rev 05 dated 6/14/17 procedure) to be forwarded to the CHU, 3) forward to the CHU.

C.) Revision 04 of the SRRT Work Instructions (dated 11/12/2015) removed nine (9) HHM symptoms codes which required escalation to the CHU for further evaluation and investigation. These nine (9) codes included issues relating to: electric shock, patient leakage current, motorized movement issues or falling parts. Since 11/12/2015, there have been 4,251 complaints which were not escalated to the CHU for further evaluation or investigation because these codes were removed. You have no documented rationale why these codes were removed.

---

**OBSERVATION 3**

Procedures for corrective and preventive action have not been adequately established.

Specifically, you have not adequately established your "Corrective and Preventive Action Standard Operating Procedure", CNW-073100-00 Rev 08, dated 3/1/17. For example:

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X Benjamin J. Dastoli<br>0056562.00P<br>Signed By: Benjamin J. Dastoli -S<br>Date Signed: 8/18/2017 | 8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 5 OF 11 PAGES |
|---|---|---|---|

**JA1452**

LOC_AR_00004529

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

A.) Complaints and non-conformances (QNs & CTUDTs) are only evaluated for potential corrective/preventive actions when an escalation criteria is met. These criteria are incomplete & vague and do not ensure consistent escalation of your data sources. For example:

(a1) Item #2 of section 4.3.3 states that one reason to escalate is because of a "*violation of an applicable regulation*", e.g: 21 CFR 820. Most of your data sources would appear to meet these criteria, but have not escalated to a CAPA.

(a2) Item #4 defines another escalation criteria as: "*As a result of Product and Process Metrics Management*". This "Product and Process Metrics Management Standard Operating Procedure" does not provide triggers on when a CAPA should be considered.  For example:

Your data analyses (trending) does not contain sufficient information to allow consideration into your CAPA System. For example, your following two data analysis reports are not complete or adequate:

- Complaint Data Analysis:  You only analyze the (b) (4) symptom codes and failure codes (by number of occurrences) for the (b) (4)  for CAPA consideration per "Complaints Trending Work Instruction".  This is not based upon the risk level associated with the symptom or failure code, but only upon total numbers.

  Your analysis of these (b) (4) complaints is not based upon an appropriate statistical methodology. You have not established acceptable levels for these (b) (4) codes or symptoms.  For example, you base your decision to further evaluate issues based on a two standard deviation from the mean of occurrences over a (b) (4) period. Your statistical methodology allows for an upward trend in the mean value which may not trigger further action.

- Non-conformances (QN) Data Analysis:  Your QN Trend Report (data gathered from June 2016-June 2017) does not include meaningful data that could generate corrective actions.

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X [signature] | 8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 6 OF 11 PAGES |
|---|---|---|---|

**JA1453**

LOC_AR_00004530

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY Cleveland, OH 44143-2131 | TYPE ESTABLISHMENT INSPECTED Medical Device Manufacturer |

For example, you assign "*cause codes*" for each QN per your "Nonconforming Product Control Standard Operating Procedure", #CNW-073114-00. section 4.3.1.10. However, you do not use this data to monitor and analyze as a potential data source to CAPA.

This QN Trend Report noted an "(b) (4)" trend of "QN Closure Timeliness". The documented action planned was "*Evaluate QNs for a path forward*". There has been no further action taken. Your data analysis for the "Top System QN Descriptions" (compiled from a (b) (4)) indicated that there were "(b) (4)" trends found related to the iCT Systems and Ingenuity Systems. This was an upward trend of your (b) (4) QNs opened against these systems. You have not taken any actions to address these trends.

Additionally, you are not following your "Product and Process Metrics Management Standard Operating Procedure" section 4.1.1, in that you have not defined any "*Action/Alert limits*" for non-conformances that could trigger further action.

B.) In January 2017, you updated your "(b) (4) Quality Notification (QN) Material Review Board (MRB) Evaluation & Disposition Work Instruction, #CNV-073406-00, Rev 11 to remove a failure/occurrence metric for non-conformances which would trigger a CAPA Request. This metric was: "*Three or more similar component failures/occurrences in 30 days or six in six months*". You do not have any documented rationale why this metric was removed and why it is no longer used as a CAPA trigger.

C.) The following CAPAs reviewed were not complete and were closed before adequate corrective actions were taken:

(c1) CAPA #3668989, dated 9/2/15: This CAPA was opened as a result of a complaint that reported: "*Brain CT data exhibited ring artifact which were initially misintrepreteted as a brain hemmorage*". An MDR #1525965-2012-00122 was submitted, dated 12/5/2012. The CAPA

**AMENDMENT 2**

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | X | DATE ISSUED 8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 7 OF 11 PAGES |

**JA1454**

LOC_AR_00004531

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

concluded that this is a known issue due to embrittlement of the (b) (4) within the (b) (4) (b) (4) over time due to long-term radiation exposure. You concluded in your CAPA investigation that this was an "*acceptable*" failure (b) (4) 1) and no further product corrective actions were needed. You also concluded that the PM schedule was appropriate to detect these failures. However, your (b) (4) analysis conducted as part of the CAPA investigation found 59 similar complaints related to this issue. You have no documented rationale why these are acceptable even though you believe the PM schedule is adequate to detect this failure. After you closed the CAPA, you reran your data analysis on 8/11/17 for complaints and found from 2/4/16-8/11/17 that there were an additional 117 complaints related to this failure mode.

During the course of your CAPA investigation, you decided to open a SCAR because you found that your (b) (4) suppliers of the (b) (4) were using different control checklists for evaluating and repairing this part [SCAR, #(b) (4) , dated 1/27/16]. The CAPA was closed on 2/5/16 and the SCAR was closed on 2/29/16 with no further actions taken.

(c2) <u>CAPA #4702449, dated 10/12/2015</u>: This CAPA was opened due to "*software anomaly escapes*" relating to software versions 4.1.3 and 4.1.4. You concluded that after you implemented all your remediation corrective actions (1/2015), your complaint rate of software defects decreased by 60% and you closed the CAPA based upon "*the premise that there was a statistical difference in the pre and post test groups*". You did not investigate into the root cause why the defects were not caught during design and development or even what specifically changed in your remediation process that caused this improvement. After remediation activities were implemented in 1/2015, you reported 23 recalls related to software defects.

D.) From February 2014 to the present, you have reported to the FDA 30 recalls (all Class II) related to software defects and you concluded that the cause of these were due to "*software design controls*".

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X Benjamin J. Dastoli<br>8/18/2017 | |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 8 OF 11 PAGES |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

You have not initiated any further corrective action to identify the problem with design controls and if your (b) (4) testing is adequate and robust enough to detect defects prior to market release. You have recalled every version of the 4.1.x software (4.1.0, 4.1.1, 4.1.2, 4.1.3, 4.1.4, 4.1.5 and 4.1.6) which is used on your iCT and Ingenuity CT imaging systems.

➤ This is a repeat observation from the FDA-483 issued on 1/28/2014.

---

**OBSERVATION 4**
Risk analysis is inadequate and is incomplete.

Specifically.

A.) Your firm uses a Hazard Harm Matrix (HHM) to determine if complaints originating from service orders (SOs) are forwarded to the complaint handling unit (CHU) for potential investigation. The HHM uses "symptom codes", based on actual events occurring, and only assigns a severity level (no probability).

Per your Risk Management Periodic Review procedures (CNW-073106-03, Rev 2), you perform an annual review of the Risk Management Matrix (RMM) and the HHM to confirm the hazards are aligned.

(a1) Data extracted from the 2016 Risk Management Periodic (b) (4) reviews for the Brilliance iCT and Ingenuity systems found 56 discrepancies between the HHM and RMM regarding the assigned severity levels. Thirty three (33) of the discrepancies were assigned an HHM severity of (b) (4) (less then moderate or no injury) and the associated RMM had assigned a potential severity of (b) (4) (serious injury) or (b) (4) (death). Twenty four (24) of the thirty three (33) symptom codes are not forwarded to the CHU for further evaluation or investigation.

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X | Benjamin J. Dastoli<br>Digitally signed by Benjamin J. Dastoli -S<br>Date Signed: 8/18/2017 | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|---|

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 9 OF 11 PAGES |
|---|---|---|---|

JA1456

LOC_AR_00004533

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

(a2) According to RMM-HHM Alignment (b) (4) all RMM hazards which have a severity of (b) (4) (serious injury or death), must have at least 1 HHM entry which would require escalation to the CHU (complaint handling unit). In the report, you concluded that this criteria was met. This inspection found 11 entries which did NOT have a corresponding HHM entry which would require escalation to the CHU.

(a3) It is unclear why some of the symptom codes which are assigned a severity level of (b) (4) are forwarded to the CHU and why some are not.

B.) A review of 36 complaint records and associated MDR files found:

(b1) Not all hazards associated with the complaints were identified in the records. Out of the 36 complaint/MDR files reviewed, 21 complaint files (representing 28 different hazards) did not have all the possible associated hazards. These hazards are used as part of your data analyses in order to initiate potential corrective/preventive actions. For example, complaint 2599340 only listed hazard 0266 2.11.11 (loose set screws holding the spline hub) as part of the file where hazard 0266 2.7.1.1 (uncontrolled up/down motion due to mechanical failure) is also applicable. Both hazards are assigned a potential severity of (b) (4) or serious injury.

(b2) Per your Senior Systems Engineer and Risk Management Procedures, the same hazard risk identification for similar systems should have the same risk factors. This inspection found that not all hazards associated with the 36 complaint files were fully aligned (potential severity and or probability) with similar imaging systems. There were a total of 75 hazards which were not (b) (4) implemented" to other systems. If properly aligned, you identified twenty three (23) hazards would now be considered "unacceptable" and would require further analyses/mitigation.

(b3) Not all complaint records had an associated RMM hazard assigned. Two complaints (numbers 2637836 and 4074943) had no associated hazard documented in the complaint file. This RMM

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X  Benjamin J Dastoli<br>6309952302<br>Signed By Benjamin J Dastoli -S<br>Date Signed 8/18/2017 | 8/18/2017 |

| FORM FDA 483 (99/98) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 10 OF 18 |
|---|---|---|---|

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | | |
|---|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | DATE(S) OF INSPECTION<br>7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 | |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

assignment is used by the complaint handling unit to perform data analyses (trending) for possible corrective/preventive actions.

C.) According to your Risk Management procedure, CNW-073106-00, Rev 09, risk levels are assigned using severity and probability. To determine the residual probability in your Risk Management Matrix (RMM) documents, you (b) (4) (b) (4) Therefore, if an actual injury has never occurred, you assign your (b) (4) The implication being that the number of occurrences (P1) for hazards which have an assigned (b)(4) value of (b) (4) will always be "0". No hazards with residual (b)(4) probability ratings ((b) (4) (b) (4), would result in an unacceptable risk level.

For example, your 2016 Periodic Review of Complaints & Human factors (b) (4) , identifies 16 complaints in the past year regarding uncontrolled vertical couch motion. These complaints were identified as linked to RMM hazard number 2.7.1.1. with an assigned potential severity level of (b)(4) (serious injury: life threatening or permanent impairment). None of the complaints involved actual injury, as such, none counted towards the probability score.

➢ This is a repeat observation from the FDA-483 issued on 1/28/2014.

---

**OBSERVATION 5**
Procedures to ensure that all purchased or otherwise received product and services conform to specified requirements have not been adequately established.

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X Benjamin J Dastoli<br>838388130P<br>Signed By Benjamin J Dastoli -S<br>Date Signed 8/18/2017 | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 11 OF 18 |
|---|---|---|---|

**JA1458**

LOC_AR_00004535

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

Specifically, your procedure, "Supplier Selection, Classification and Approval Standard Operating Procedure," CNW-140100-00, Revision 11, does not ensure control of your suppliers.

Your procedure states if a supplier is on probation, the Risk Assessment form must be completed. For example, Supplier A is a Class I (highest risk) contract manufacturer of your patient supports and partial gantry for the iCT and CT product lines. This supplier has been on probation since June 1, 2015 and a Supplier Risk Mitigation Form has been completed, per your SOP "Supplier Oversight and Monitoring Process Standard Operating Procedure," CNW-140101-00, Revision 11. However, this supplier currently has been issued 12 of (b) (4) of the open SCARs, spanning January 2016 to present, and 683 of (b) (4) of non-conformances, or Quality Notices, since 2016 were created for their products. Additionally, on May 27, 2016, you reported a recall to the FDA, where the root cause was found to be supplier controls over this supplier. Prior to that, this part has been recalled 3 times since February 2014, due to supplier controls over Supplier A.

➤ This is a repeat observation from the FDA-483 issued on 1/28/2014.

---

**OBSERVATION 6**
Procedures for acceptance of incoming product have not been adequately established.

Specifically, your "Receiving Inspection Plan (RIP) for (b) (4) ," (b) (4) , Revision 02 and "Receiving Inspection Plan (RIP) for (b) (4) , Revision 02, is inadequate.

The (b) (4) is used to conduct receiving inspections for 82 of (b) (4) risk components, (b) (4) . The RIP includes only visual inspection, and verifying shipping and part numbers and the Certificate of Analysis. Additionally, at least (b) (4) of your suppliers

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X  Benjamin J. Dastoli<br>0348001002<br>Signed By Benjamin J. Dastoli -G<br>Date Signed: 8/18/2017 | |

| FORM FDA 483 (09/08) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 12 OF 18 |
|---|---|---|---|

**JA1459**

LOC_AR_00004536

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| **CITY, STATE, ZIP CODE, COUNTRY** | **TYPE ESTABLISHMENT INSPECTED** |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

of the (b) (4) risk components, including Supplier A in Observation 5, are currently on probationary status and use the (b) (4) RIP. The partial gantry, a (b)(4) risk part on the (b) (4) RIP, from Supplier A had (b) (4) non-conformances, or Quality Notices, in 2016. (b) (4) of those Quality Notices were created during production, after passing receiving inspection.

The (b) (4) RIP is used to conduct receiving inspections for 223 (b) (4) (b) (4) risk components, which is your (b) (4) risk category. The RIP includes only visual inspection, and verifying shipping and part numbers and the Certificate of Analysis. There are no requirements for performing incoming testing or measurements. Additionally, at least (b) (4) of your suppliers of the (b)(4) risk components are currently on probationary status, including Supplier B, and use the (b) (4) Risk Class RIP. The (b) (4) system, an (b)(4) risk part on the (b) (4) RIP, from Supplier B had (b)(4) non-conformances, or Quality Notices, in 2016. All of these Quality Notices were created during production, after passing receiving inspection.

During the incoming inspection, I observed a receiving technician when receiving an Ingenuity Extended Patient Support from Supplier A. Per the receiving inspection plan, the receiving technician did not use the vendor specification "(b) (4) ," (b) (4) , to check 2 of (b)(4) Critical To Quality elements (CTQs) on the Certificate of Analysis from Supplier A.

---

**OBSERVATION 7**
Process control procedures that describe any process controls necessary to ensure conformance to specifications have not been adequately established.

Specifically,

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X | Benjamin J Dastoli<br>03009030F<br>Signed By: Benjamin J. Dastoli -S<br>Date Signed: 8/31/2017 | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|---|

| FORM FDA 483 (99/98)<br>PAGES | PREVIOUS EDITION OBSOLETE | **INSPECTIONAL OBSERVATIONS** | PAGE 13 OF 18 |
|---|---|---|---|

**JA1460**

LOC_AR_00004537

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER |
| | 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

Your pFMEA work instructions, CNV-073143-01, Rev 6., describe inputs including post market data (associated defects, CAPA, complaints and service work orders) which are to be reviewed (b) (4) for potential pFMEA updates.

Your most recent annual review for the Ingenuity CT system ((b) (4) pFMEA Review (b) (4), (b) (4) ) did not include complaints/post market data as a data source for the potential updates to the pFMEA.

**OBSERVATION 8**

Procedures for design change have not been adequately established.

Specifically, your procedure "Defect Management Standard Operating Procedure," CNW-030700-01, Revision 05, has not been adequately implemented. For example,

A.) Your process for handling duplicate Anomaly Reports is not clearly defined. Section 3.4, step 1.1 of your procedure states "Check For Duplicates… If a duplicate record is found skip this entry." However, there is no further definition of updating the duplicate record to include information about the recurrence of the anomaly report. Step 2.4, 7.3, 10.4 and 12.3 all outline the closing of records, if duplicates are found, but do not further define updating the duplicate record. You were unable to provide me with a procedure that defines this process, but your Senior Manager of the Systems Group stated it routinely occurs and is one of the methods for anomaly reports that have been postponed to be reopened and reinvestigated or fixed.

B.) Your Senior Manager of the Systems Group stated your History Review Technical Review Records use a time frame (b) (4) for considering ARs for inclusion in the software updates. However, there are currently 101 ARs not closed that were submitted earlier than (b) (4), which would not be considered for inclusion in a software update.

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| | Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | X Benjamin J. Dastoli 0000000000 Signed By: Benjamin J. Dastoli -S Date Signed: 8/18/2017 | 8/18/2017 |

| FORM FDA 483 (99/98) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 14 OF 18 |
|---|---|---|---|

**JA1461**

LOC_AR_00004538

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

C.) Your firm currently uses the terms "Anomaly Report" and "Provisionally Unacceptable." However, neither of these terms are adequately defined in this procedure.

**OBSERVATION 9**

The written MDR procedure does not include an internal system which provides for a standardized review process/procedure for determining when an event meets the criteria for reporting.

Specifically, your "Adverse Event Reporting Standard Operating Procedure", #CNW-073108-00 (MDR SOP) does not clearly define when malfunction events are reportable under 21 CFR 803. Section 4.3.2 of this procedure states if the malfunction did not cause or contribute to a death or serious injury, but could possibly cause or contribute to a death of serious injury if the malfunction were to recur, you have to "*Review Risk RMM*". There are no further procedures on what you are looking for in the RMM or what data in the RMM would require an MDR submission.

Additionally, your "Hazard Harm Matrix Standard Operating Procedure" #CNW-073107-01 states that the CHU is to utilize this HHM as guidance to assist with regulatory reporting. However, your Manager of the Complaint Handling Unit stated that you do not use the HHM to determine if an MDR is required. Also, your MDR SOP does not address the HHM or how it's used for regulatory reporting.

---

**Annotations to Observations**

Observation 1:    Under consideration

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X | Benjamin J. Dastoli<br>0X4660360F<br>Signed By: Benjamin J. Dastoli -D<br>Date Signed: 8/18/2017 | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|---|

| FORM FDA 483 (99/98)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 15 OF 18 |
|---|---|---|---|

JA1462

LOC_AR_00004539

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 2:     Under consideration
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 3:     Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 4:     Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X Benjamin J Dastoli<br>6506601908<br>Signed By: Benjamin J. Dastoli -S<br>Date Signed: 8/31/2017 | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 16 OF 18 |
|---|---|---|---|

**JA1463**

LOC_AR_00004540

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

Observation 5:     Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 6:     Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~
Observation 7:     Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~
Observation 8:     Promised to correct by 12/22/2017
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X  Benjamin J Dastoli<br>6948661368<br>Signed By Benjamin J. Dastoli -S<br>Date Signed 8/31/2017 | 8/18/2017 |

| FORM FDA 483 (99/98) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 17 OF 18 |
|---|---|---|---|

JA1464

LOC_AR_00004541

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 9:        Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~

---

**\*DATES OF INSPECTION**
7/17/2017(Mon),7/18/2017(Tue),7/19/2017(Wed),7/20/2017(Thu),7/21/2017(Fri),7/24/2017(Mon),7/25/2017(Tue),7/26/2017(Wed),7/27/2017(Thu),7/28/2017(Fri),7/31/2017(Mon),8/01/2017(Tue),8/02/2017(Wed),8/03/2017(Thu),8/04/2017(Fri),8/07/2017(Mon),8/08/2017(Tue),8/09/2017(Wed),8/10/2017(Thu),8/11/2017(Fri),8/14/2017(Mon),8/15/2017(Tue),8/16/2017(Wed),8/17/2017(Thu),8/18/2017(Fri)

 

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (99/98)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 18 OF 18 |
|---|---|---|---|

JA1465

LOC_AR_00004542



August 13, 2021

Kevin R. Amer
Acting General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Sent via email: kamer@copyright.gov

Re:  Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Amer:

On May 4, 2021, Regan A. Smith, General Counsel and Associate Register of Copyrights for the United States Copyright Office, sent a letter to FDA's Acting Chief Counsel to inform FDA of a rulemaking proceeding pending before the Copyright Office that relates to, among other things, medical devices.  We understand that this proceeding pertains to 17 U.S.C. § 1201 and potential exemptions to the general prohibition on the circumvention of technological protection measures (TPMs) that control access to copyrighted works, including software.  Ms. Smith stated that participants in the rulemaking process had referenced FDA's regulatory authority in this area as relates to the safety and effectiveness of medical devices, and the Copyright Office therefore sought to make FDA aware of the rulemaking proceeding.

Ms. Smith drew FDA's attention to two proposed exemptions being considered in this proceeding.  The first of these proposed exemptions, designated the "Class 9" proposal, seeks to expand an existing exemption under 37 C.F.R. § 201.40(b)(4), pursuant to which the prohibition on circumventing TPMs does not apply to a patient who accesses compilations of data generated by the patient's own medical device or corresponding personal monitoring system, provided that the device is wholly or partially implanted in the patient's body; the circumvention is undertaken by the patient; the access is accomplished through the passive monitoring of wireless transmissions already being produced by the device or monitoring system; and the circumvention does not constitute a violation of applicable law.  The Class 9 proposal would remove these four limitations.

Under the second proposed exemption, designated the "Class 12" proposal, the prohibition on circumventing TPMs would not apply to circumvention that is conducted to access computer programs and data files that are contained in and control the functioning of medical devices (among other things) for the purpose of diagnosis, maintenance, or repair of such devices.  Ms. Smith stated that opponents of both proposals have expressed concerns regarding potential impacts to health and safety should the exemptions be granted.

FDA would like to thank the Copyright Office for informing FDA of this proceeding.  The following are

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

JA1466

LOC_AR_00006160



our views with respect to both the Class 9 and Class 12 proposals, as they relate to devices within the meaning of section 201(h) of the Federal Food, Drug, and Cosmetic Act (referred to as "medical devices" herein). We offer no opinion at this time on any existing exemptions or proposed exemptions to the general prohibition on the circumvention of TPMs that control access to copyrighted works other than as specifically discussed below.

<u>Class 9</u>

It is FDA's understanding that the proposed expansion of the current exemption under 37 C.F.R. § 201.40(b)(4) would broaden opportunities for patients to access data generated by their own medical devices without potential liability under 17 U.S.C. § 1201, but would impose no requirements on, or in any way limit the actions of, the manufacturers of those devices. FDA does not believe that further exempting patients (or those acting on their behalf) from potential liability in this fashion is likely to significantly impact the safety or effectiveness of medical devices, or to impair the ability of medical device manufacturers to comply with applicable regulatory requirements enforced by FDA. We are aware that opponents of the proposed expansion have raised concerns that the expansion may jeopardize the cybersecurity of affected devices, and may require greater effort from manufacturers to ensure that their devices remain secure. FDA believes that an exemption from liability expressly limited to circumvention conducted for the sole purpose of lawfully accessing data generated by a patient's own device or associated monitoring system, whether or not such device is implanted and/or such access is accomplished through the passive monitoring of existing wireless transmissions, is unlikely to undermine the cybersecurity of affected devices, other than as intentionally undertaken by the patient and as may impact only such patient's own device. FDA further believes that the proposed expansion of the exemption under 37 C.F.R. § 201.40(b)(4) is broadly consistent with the existing exemption for good-faith security research under 37 C.F.R. § 201.40(b)(11). FDA therefore does not view the proposed expansion of the exemption at 37 C.F.R. § 201.40(b)(4) as likely to undermine or impede efforts to ensure an appropriate degree of cybersecurity for medical devices.

FDA notes that the Class 9 proposal includes modifications to 37 C.F.R. § 201.40(b)(4) that would remove the current regulatory language expressly limiting the exemption to circumvention that "does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration." To the extent this language is removed from the regulation, FDA recommends that the final rule clarify that nothing in the rule affects the application of other federal laws and regulations, and remind interested parties that the exemption continues to apply only where circumvention is undertaken "for the sole purpose of *lawfully* accessing the data generated by [the patient's] own device or monitoring system" (emphasis added).

<u>Class 12</u>

As a preliminary matter, FDA understands that the proposed exemption would apply to circumvention that is conducted solely to obtain data access for the purpose of diagnosis,

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

2

(Page 89 of Total)

JA1467

LOC_AR_00006161



maintenance, or repair of medical devices, and not for the purpose of device modification that may significantly change the performance or safety specifications of the device or its intended use.[1] FDA further understands that opponents of the Class 12 proposal have expressed concerns that the exemption may facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers.

In May 2018, FDA issued a report that evaluated the available evidence pertaining to the quality, safety, and effectiveness of medical device servicing in the United States.[2] Based on an assessment of complaints, peer-reviewed published literature, medical device reports describing suspected device-associated deaths, serious injuries, and malfunctions, and research and analysis provided by third parties, the report concluded that many entities that perform or participate in the servicing of medical devices – including both original equipment manufacturers (OEMs) and independent service organization (ISOs) – provide high quality, safe, and effective medical device servicing.[3] The report determined that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing, and therefore concluded that the evidence did not justify imposing additional regulatory requirements on ISOs.[4] The report further concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States.[5]

With respect to cybersecurity concerns in particular, FDA recently issued a discussion paper that is intended to guide future assessment of both the challenges and opportunities related to cybersecurity and the servicing of medical devices.[6] The discussion paper acknowledges the cybersecurity challenges related to ISO servicing of medical devices, but also notes that device servicing entities may be well positioned to help identify and address security vulnerabilities, and observes that ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices. FDA therefore does not share the view that an exemption from liability under 17 U.S.C. § 1201 for circumvention conducted solely for the purpose of diagnosis, maintenance, or repair of medical devices would necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity; however, FDA has sought stakeholder input on this topic and is evaluating FDA's approach to cybersecurity and medical device servicing.

---

[1] FDA notes that if the proposed exemption were to cover device modification that may significantly change the performance or safety specifications of the device or its intended use, such exemption could raise safety and effectiveness concerns not addressed in this letter, and may have implications with respect to the application of FDA regulatory requirements pertaining to device marketing authorization, registration/listing, quality system regulations, and medical device reporting, among other requirements.
[2] "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices," available at https://www.fda.gov/media/113431/download.
[3] *See id.* at 23.
[4] *Id*.
[5] *Id*.
[6] "Strengthening Cybersecurity Practices Associated with Servicing of Medical Devices: Challenges and Opportunities," available at https://www.fda.gov/media/150144/download.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

3

JA1468

LOC_AR_00006162



Please let us know if you have any questions regarding these comments, or if FDA can be of any further assistance to the Copyright Office in connection with this rulemaking proceeding.

Sincerely,

Suzanne B. Schwartz -S

Digitally signed by Suzanne B. Schwartz -S
Date: 2021.08.13 11:12:55 -04'00'

Suzanne B. Schwartz, MD, MBA
Director, Office of Strategic Partnerships and Technology Innovation
Center for Devices and Radiological Health
U.S. Food and Drug Administration

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

4

JA1469

LOC_AR_00006163



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

May 4, 2021

Mark Raza
Acting Chief Counsel
U.S. Food and Drug Administration
Mark.Raza@fda.hhs.gov

Re:    Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Raza:

I am writing to inform you of a regulatory proceeding pending before the U.S. Copyright Office
that relates to medical devices.

Section 1201 of title 17, United States Code generally prohibits the circumvention of
technological protection measures that control access to copyrighted works, including software.
Section 1201, however, allows the Librarian of Congress, upon the recommendation of the
Register of Copyrights, to exempt certain classes of works from the prohibition, based upon a
rulemaking proceeding held every three years.  The statute requires the Copyright Office to
consult with the National Telecommunications and Information Administration of the
Department of Commerce, which represents the Administration in the rulemaking.  Because,
however, certain participants in the current rulemaking have specifically noted the FDA's
regulatory authority in this area, and because the FDA provided views to the Copyright Office in
a prior section 1201 rulemaking, we wanted to reach out to you directly to make you aware of
the pendency of this proceeding.

Under consideration in the current rulemaking are two proposed exemptions that involve medical
devices.  The first proposal seeks to expand an existing exemption under which a patient may,
under certain circumstances, access compilations of data generated by medical devices that are
wholly or partially implanted in the body or by their corresponding personal monitoring
systems.[1]  This exemption was first adopted in the 2015 rulemaking, during which the Copyright
Office advised the FDA of the proposal and the FDA provided its views (see Attachments A and
B).  The current proposal seeks to remove certain restrictions in the current regulation,

---

[1] 37 C.F.R. § 201.40(b)(4).

1

**JA1470**

LOC_AR_00006168

specifically (1) the limitation to wholly or partially implanted devices, (2) the prohibition against circumvention by persons other than the patient, (3) the requirement that access be accomplished solely through passive monitoring of wireless transmissions that are already being produced by the device or system, and (4) the requirement that circumvention not constitute a violation of other applicable laws.

The second proposed exemption would allow access to computer programs and data files that are contained in and control the functioning of medical devices for the purpose of diagnosis, maintenance, or repair of such devices. The parties seeking this exemption have indicated that covered devices would include, but not be limited to, ventilators, CT scanners, ultrasound devices, and x-ray systems.

The Office has received comments in opposition to both proposed exemptions. Opponents have noted the FDA's regulatory authority for ensuring that medical devices are safe and effective and have expressed concern over potential impacts on health and safety. Although any exemptions granted under section 1201 have no effect on the applicability of other laws or regulations, and the Copyright Office ordinarily limits its analysis to copyright-related concerns, we believe it is appropriate to make the FDA aware of this proceeding in light of opponents' specific reference to its regulatory authority and its past participation in the section 1201 rulemaking.

I have included as Attachment C the notice of proposed rulemaking, which describes the proposed exemptions in this proceeding. The two proposals at issue are identified as Class 9 and Class 12. The full record of the rulemaking to date, including public comments related to these proposed exemptions, are available at https://www.copyright.gov/1201/2021/.

Please do not hesitate to contact me if you have any questions. Please submit any responses to me at regans@copyright.gov, and to Nick Bartelt at niba@copyright.gov and Melinda Kern at mkern@copyright.gov.

Sincerely,

Regan A. Smith
General Counsel and Associate Register of Copyrights

cc:    Stacy M. Cheney, Senior Attorney Advisor, Office of the General Counsel, National
       Telecommunications and Information Administration

2

JA1471

LOC_AR_00006169

**Attachment A**

**JA1472**

LOC_AR_00006170



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

May 12, 2015

Elizabeth H. Dickinson
Chief Counsel
U.S. Food and Drug Administration
elizabeth.dickinson@fda.hhs.gov

Re:    Section 1201 Rulemaking – Proposed Exemption for Medical Devices

Dear Ms. Dickinson:

I am writing to inform you of a regulatory proceeding pending before the U.S.
Copyright Office that relates to medical devices.

Section 1201 of title 17, United States Code (added as part of the Digital
Millennium Copyright Act) generally prohibits the circumvention of
technological protection measures ("TPMs") that control access to copyrighted
works, including software. Section 1201, however, allows the Librarian of
Congress, upon the recommendation of the Register of Copyrights, to exempt
certain classes of works from that prohibition, based upon a rulemaking
proceeding held every three years. The statute requires the Copyright Office, in
formulating its recommendation to the Librarian, to consult with the National
Telecommunications & Information Administration of the Department of
Commerce, which represents the Administration in the rulemaking. Because the
Copyright Office oversees the rulemaking process, however, we thought it might
be helpful to reach out to you directly.

The Office is currently engaged in the sixth triennial rulemaking proceeding
under section 1201. One of the proposed exemptions that is under consideration
addresses access to software in "networked medical devices." This proposal, filed
by a coalition of medical device patients and researchers, would allow
circumvention of TPMs in the firmware or software of medical devices and their
corresponding monitoring systems. The proposal covers devices such as
pacemakers, implantable cardioverter defibrillators, insulin pumps, and
continuous glucose monitors. This potential exemption has been opposed by
other rulemaking participants, who have noted the FDA's regulatory authority for
ensuring that medical devices are safe and effective, and suggested that the FDA
may have views concerning this matter. This letter is to ensure that you are aware
of the pendency of the proceeding.

**JA1473**

LOC_AR_00006171

I have attached to this letter the notice of proposed rulemaking, which describes the proposed exemption.[1]  The full record of the rulemaking proceeding to date, including comments by participants and an agenda of upcoming public hearings to take place later this month, can be found at *http://copyright.gov/1201/*.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Jacqueline C. Charlesworth
General Counsel and
  Associate Register of Copyrights
jcharlesworth@loc.gov
202-707-8772


cc:    John B. Morris, Associate Administrator and Director of Internet Policy, National Telecommunications & Information Administration

---

[1] *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 79 Fed. Reg. 73,856, 73,871 (Dec. 12, 2014) ("Proposed Class 27: Software—Networked Medical Devices").

**Attachment B**

LOC_AR_00006173

DEPARTMENT OF HEALTH & HUMAN SERVICES                      Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

August 18, 2015

Ms. Jacqueline C. Charlesworth
General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Re: Section 1201 Rulemaking – Proposed Exemption for Medical Devices

Dear Ms. Charlesworth:

You sent a letter May 12, 2015, to FDA's Chief Counsel to inform FDA of a regulatory
proceeding pending before the U.S. Copyright Office that relates to, among other things, medical
devices. This is a rulemaking proceeding under 17 U.S.C. 1201 regarding potential exemptions
to the general prohibition on circumvention of technological protection measures. You
explained that one of the potential exemptions, relating to software in "networked medical
devices," had been opposed by other rulemaking participants, who noted the FDA's regulatory
authority for ensuring that medical devices are safe and effective. The potential exemption, filed
by a coalition of medical device patients and researchers, would allow circumvention of TPMs in
the firmware or software of medical devices and their corresponding monitoring systems. It
covers devices such as pacemakers, implantable cardioverter defibrillators, insulin pumps, and
continuous glucose monitors. You suggested that the FDA may have views concerning this
matter.

Because this pertains to technical considerations for devices, my office was asked to respond.
To the extent relevant to your regulatory proceeding, here are our views, which were prepared in
consultation with FDA's Office of the Chief Counsel.

We note that while allowing circumvention of TPMs will not affect FDA's jurisdiction over
products that continue to meet the device definition under 201(h) of the Federal Food, Drug, and
Cosmetic Act (the FDCA) (21 USC 321(h)), and the entities that manufacture them, granting
such an exemption for such devices could potentially create regulatory confusion for FDA,
medical device manufacturers, and third party software developers that choose to modify
medical devices.

**JA1476**

1. Modifying or adding new software/firmware to a medical device already in commercial distribution may require the submission of a new premarket notification or premarket approval application.

Under the FDCA, products that meet the 201(h) definition of a device are required to have marketing authorization from FDA before being commercially distributed.  Depending on the class of the device, which is based on risk, a person wishing to market a new device is, unless exempt, required to either submit a premarket notification under section 510(k) of the FDCA, 21 USC 360(k), or a premarket approval application (PMA) under section 515(a) of the FDCA, 21 USC 360e(a). The exemption, as we understand it, would allow third parties to circumvent the TPMs of devices that are within FDA's jurisdiction and are legally in commercial distribution.  However, under FDA's regulations, a new premarket notification is required when a change or modification is made to a legally marketed device that that could significantly affect the safety or effectiveness of the device or changes/modifies the intended use of a device.  See 21 CFR 807.81(a)(3)(i)-(ii).  Similarly, a new PMA or PMA supplement is required when, among other things, changes are made to an approved device that affect safety and effectives or change the intended uses of the device.  See 21 CFR 814.39(a).

From our discussion with Library of Congress staff, we understand the potential exemption to allow, among other things, third parties to access the software of medical devices that are currently on the market.  From the discussion, it appears that it would be very difficult for third parties to fundamentally change the source code of the existing software, but it would be possible to add or modify software that expands and/or changes the intended uses of the device in ways that would, under the regulations cited above, require a new premarket notification or PMA be submitted to FDA before the modified device could be distributed.

Circumvention in this way may put third party developers in a position where, by virtue of modifying/adding device software, they would become the person responsible for obtaining marketing authorization (or an investigational device exemption (IDE) under section 520(g) of the FDCA, 21 U.S.C. § 360j(g)) before the modified device is distributed or used on patients.  While it appears that, at least partially, the intent of exempting networked medical devices is to do lab/bench testing and research that does not involve or impact patients, the proposed rule specifically states that the exemption seeks to allow "circumvention of TPMs in the firmware or software of medical devices and their corresponding monitoring systems at *patient discretion*." 79 FR 73871 (emphasis added).

The proposed rule asks whether a third party—rather than the owner of the device—may lawfully offer or engage in the proposed circumvention activities with respect to that device pursuant to an exemption granted under 17 U.S.C. 1201(a)(1).  If FDA's understanding of the potential exemption is correct, it would appear that the answer could be no, at least in some circumstances.  For example, if a third party were to modify the software of a device in a way that expands or otherwise modifies the intended uses or significantly affects safety and effectiveness of the device, and then offers the modified software to consumers without FDA marketing authorization, the third party would be in violation of sections 501(f)(1)(B) and 502(o) of the FDCA.

JA1477

LOC_AR_00006175

From a public health perspective, modified devices in distribution will cause confusion to users (patients, health care providers and caregivers) who may not be able to tell the difference between a modified device and an original device. Additionally, the users may have a difficult time in identifying the appropriate entity when attempting to obtain support and maintenance for such devices. Lack of clarity in determining the manufacturer and the functionality of the medical device can cause delays in timely resolution of malfunctions with a device and potentially lead to patient harm.

2. If a patient is injured by a device whose software has been modified, it may be difficult for FDA to determine responsibility from a medical device reporting standpoint.

Under section 519 of the FDCA, both manufacturers and user facilities[1] are required to submit a report to FDA when they receive or become aware of information that reasonably suggests that a device may have caused or contributed to a death or serious injury, or has malfunctioned in a way that similar devices are likely to cause or contribute to a death or serious injury. If the device's software has been modified by a third party, it may be much more difficult to understand how or why the device malfunctioned, and who is responsible for submitting a report to the FDA.

Similar to concerns expressed in the first point, third party developers may not understand that by modifying the functionality of a device, they have potentially stepped into the role of a device manufacturer[2] such that they would be required to meet not only the premarket authorization requirements described above, but postmarket ones as well, including reporting (21 CFR Part 803, Subpart E), quality system regulations (21 CFR Part 820), registration/listing (21 CFR Part 807 Subpart B), unique device identification (21 CFR Part 830), etc. These regulations are intended to, for example, correct adverse events and prevent adverse impact to public health. If a third party developer is not complying with these requirements, particularly premarket authorization and registration/listing requirements, device user facilities may submit the name of the original manufacturer in a report to FDA without knowing that the device had been modified. Furthermore, if a third party is subject to and not complying with the "unique device identifier" requirements (which provide for unique identification of each new version or model of a device), adverse events associated with the third party's new version or model may be improperly assigned to the previous version or model. From FDA's perspective, if the agency becomes aware that serious injuries are occurring from the use of particular device without knowing it has been modified, it may be difficult for the agency to ascertain the cause of the problem and to take appropriate actions to protect the public health.

---

[1] Device user facility means a hospital, ambulatory surgical facility, nursing home, outpatient diagnostic facility, or outpatient treatment facility as defined in this section, which is not a physician's office, as defined in this section. School nurse offices and employee health units are not device user facilities. 21 CFR 803.3.

[2] Manufacturer means any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions. 21 CFR 820.3(o).

**JA1478**

LOC_AR_00006176

3.  The exemption for software security research can have implications on human subject protections and related regulatory requirements.

Section III(G)(1) "Proposed Class 25: Software-Security Research" does not seem to make a distinction between bench top testing of device security and testing of a device in clinical use (i.e., an implant in an actual patient, a device in a hospital, etc.). These latter situations carry greater risk to patients and public health and may present challenges to FDA with respect to devices that have been manipulated (i.e., issues related to FDA's ability to hold manufacturers responsible once their device has been manipulated).

On October 1, 2014, the FDA released a final guidance for the Content of Premarket Submissions for Management of Cybersecurity in Medical Devices. The guidance recommends that manufacturers consider cybersecurity risks as part of the design and development of a medical device, and submit documentation to the FDA about the risks identified and controls in place to mitigate those risks. Based on the discussion with Library of Congress staff, one could interpret that including controls as part of the design can be considered TPMs. Circumventing these TPMs through the exemptions raises concerns from both regulatory expectations and public health perspective. The FDA notes that there could be risks and benefits of enabling "good-faith" research for the purpose of identifying, disclosing, and fixing malfunctions, security flaws, or vulnerabilities. For example, it could better harness the power of collaboration, in that if multiple stakeholders employ a common approach to identifying and mitigating cybersecurity vulnerabilities, the community at-large might benefit from a more efficient and thorough resolution of vulnerabilities. However, a risk to opening technology in this way is the difficulty for regulators and others to distinguish "good-faith" research efforts from malevolent third-party actors. In other words, leveraging the exemptions in the proposed rule could allow persons to gain unilateral access to proprietary software/source code to achieve objectives that might cause harm to public health, harm to specific patients, or compromise the data and systems that support these products in a healthcare setting.

In addition, from a regulatory perspective, this exemption may cause confusion for stakeholders that have been advised through FDA guidance to put appropriate cybersecurity controls in place to prevent third parties from manipulating the software of the device.

4.  Other unintended public health concerns related to 3D printing, personal health information, and unlocking.

Regarding 3D Printing, manufacturers who utilize 3D printing to ultimately manufacture medical devices need to ensure that their products are safe and effective for their intended use. For example, if a 3D printed medical device is intended for insertion into the body, then the manufacturer under FDA regulations would have to demonstrate that the products are safe and effective for that intended use.

The proposed rule also refers to the term "data." If this term alludes to Patient Health Information (PHI), or Personal Identifiable Information (PII), then such information is regulated

by other Federal Institutions and Agencies. FDA strongly urges that these Institutions and Agencies are actively sought after for comment on the proposed rule.

Additionally, FDA would like to highlight Section III(c)(4) titled "Proposed Class 14: Unlocking – Wearable Computing Devices," which references the term "health monitoring devices," and Section III(c)(5) titled "Proposed Class 15: Unlocking – Consumer Machines," which references the terms "consumer machines" and "Internet of Things." Based on the information in the proposed rule, the FDA is unclear whether any of these terms include devices as defined in the FDCA (section 201(h), 21 USC 321(h)). Exemptions for such devices may have unintended public health consequences. For example, mobile phones and tablet computers appear to benefit from "unlocking" to provide consumers with access to the wireless networking marketplace. Conversely, by "unlocking" a medical device, one might actually modify the intended use of the product beyond the product's intended use, ultimately impacting the safety and effectiveness of the device.

We offer the following recommendations if the potential exemptions are finalized:

A. FDA recommends that the final rule explain that nothing in the rule will affect the regulation of products that fall within the jurisdiction of other federal agencies. As stated above, third parties that modify medical devices may become regulated manufacturers under the FDCA. As such, it may be useful for those who might circumvent TPMs to understand that other federal laws may apply and that the circumvention exemption is not an exemption from other applicable regulations.

B. We recommend that any final rule make a distinction between bench top testing of devices (where the unit tested is not in clinical use and will not be in clinical use in the future) and testing of devices during clinical use unless, for the latter, institutional review board (IRB) oversight is provided and investigational device exemptions (IDE) regulations are followed, as appropriate.

Thank you for informing FDA of this proceeding. Please let us know if you have any questions.

Sincerely yours,

Bakul Patel

Digitally signed by Bakul Patel -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=FDA, ou=People, cn=Bakul Patel -S,
0.9.2342.19200300.100.1.1=2000534643
Date: 2015.08.18 09:47:49 -04'00'

Bakul Patel
Associate Director for Digital Health
Center for Devices and
    Radiological Health

JA1480

LOC_AR_00006178



UNITED STATES COPYRIGHT OFFICE

# Petition to Renew a Current Exemption Under 17 U.S.C. § 1201
## 9th Triennial Rulemaking

Please submit a separate petition for each current exemption for which renewal is sought.

**NOTE:** Use this form if you want to renew a current exemption without modification. If you are seeking to engage in activities not currently permitted by an existing exemption, including those that would require the expansion of a current exemption, you must submit a petition for a new exemption using the form available at **copyright.gov/1201/2024/new-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit both a petition to renew the current exemption without modification using this form, and, separately, a petition for a new exemption that identifies the current exemption and addresses only those issues relevant to the proposed expansion of that exemption.

## ITEM A. PETITIONERS AND CONTACT INFORMATION

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity seeking renewal.

---

Petitioners:

Jordan Health Products, LLC (dba Avante Health Solutions)
1751 Lake Cook Road, Suite 550
Deerfield, IL 60015

Transtate Equipment Company, Inc (dba Avante Diagnositic Imaging)
1040 Denta Road, Suite A
Concord, NC 28027

Global Medical Imanging, LLC (dba Avante Ultrasound)
1040 Denta Road, Suite A
Concord, NC 28027

Representative for all three Petitioners:
James Leitl, President & CEO, Jordan Health Products, LLC (dba Avante Health Solutions)

Counsel:
David R. Metzger
Dentons US LLP
Willis Tower
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Ph. 312-876-2578
Email:  david.metzger@dentons.com

---

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## ITEM B.  IDENTIFY WHICH CURRENT EXEMPTION PETITIONERS SEEK TO RENEW

Check the appropriate box below that corresponds with the current temporary exemption (see 37 C.F.R. § 201.40) the petitioners seek to renew. Please check only one box. If renewal of more than one exemption is sought, a separate petition must be submitted for each one.

**Motion Pictures** *(including television programs and videos)***:**

○ Excerpts for use in documentary filmmaking or other films where use is in parody or for a biographical or historically significant nature

○ Excerpts for use in noncommercial videos

○ Excerpts for use in nonfiction multimedia e-books

○ Excerpts for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students

○ Excerpts for educational purposes by faculty and employees acting at the direction of faculty in massive open online courses ("MOOCs")

○ Excerpts for educational purposes in digital and literacy programs offered by libraries, museums, and other nonprofits

○ For the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities

○ For the preservation or the creation of a replacement copy of the motion picture by libraries, archives, or museums

○ For text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

**Literary Works:**

○ Literary works distributed electronically for text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

○ Literary works or previously published musical works that have been fixed in the form of text or notation whose technological protection measures interfere with assistive technologies

○ Literary works consisting of compilations of data generated by medical devices or their personal corresponding monitoring systems, to access personal data

**Computer Programs and Video Games:**

○ Computer programs that operate wireless devices, to allow connection to an alternative wireless network ("unlocking")

○ Computer programs that operate smartphones and portable all-purpose mobile computing devices to allow the device to interoperate with or to remove software applications ("jailbreaking")

○ Computer programs that operate smart televisions to allow the device to interoperate with software applications on the television for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate voice assistant devices to allow the device to interoperate with or to remove software applications for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate routers and dedicated network devices to allow the device to interoperate with software applications on the device for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data

○ Computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device or system

◉ Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system

○ Computer programs for purposes of good-faith security research

○ Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and discontinued video games that never required server support, for preservation by libraries, archives, and museums

○ Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums

○ Computer programs that operate 3D printers, to allow use of alternative material

○ Computer programs for purpose of investigating potential infringement of free and open source computer programs

○ Video games in the form of computer programs for purpose of allowing an individual with a physical disability to use alternative software or hardware input methods

## Item C.  Explanation of Need For Renewal

Provide a brief explanation summarizing the continuing need and justification for renewing the exemption. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to this petition, it is not necessary. Below is a hypothetical example of the kind of explanation that the Office would regard as sufficient to support renewal of the unlocking exemption. The Office notes, however, that explanations can take many forms and may differ significantly based on the individual making the declaration and the exemption at issue.

---

I.      Introduction

Petitioner Jordan Health Products is the parent company to, among other independent service organizations (ISOs), petitioners Transtate Equipment Company ("Transtate") and Global Medical Imaging, LLC ("GMI"). These ISOs provide post-warranty period servicing of medical systems and devices for hospitals and a variety of health care organizations throughout the United States. Transtate diagnoses, maintains, and repairs diagnostic X-ray systems (commonly referred to as cath labs);. GMI diagnoses, maintains, and repairs ultrasound systems. In order to provide these services, which the FDA has deemed "critical to the functioning of the U.S. healthcare system,"[1]  ISOs must use software tools embedded in these systems.  To prevent such use, Philips North America LLC et al. ("Philips") – an Original Equipment Manufacturer (OEM) – has filed lawsuits against both petitioners under Section 1201(a)(1)(A) of the Digital Millennium Copyright Act (DMCA).  The lawsuits are: Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al., Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.) (Count V at 48-54) and Philips North America LLC. et al. v. Global Medical Imaging, LLC et al., Case No: 1:21-cv-03615-SCS-SMF (N.D.IL) (Count I at 19-23).

As detailed in Transtate's 2020 petition for the Exemption (adopted at 37 C.F.R. §201.40(b)(15)), medical devices and systems in the past were composed of mechanical and electrical parts only (i.e., hardware).  For example, X-ray machines initially were analog devices and consisted of an X-ray tube to radiate X-rays and film for capturing an image.  Later, digital image capturing devices replaced film, which transitioned X-ray machines from analog to digital. The specifications and other information relating to the functions of these older analog medical devices and systems were provided in hard copy manuals.  The devices and systems could be serviced by technicians with access to these hard copy manuals, as well as with the relevant mechanical and electrical knowledge, experience, and tools.

However, computing processors and software have since replaced hardware components.  As a result of this technological advancement, medical equipment now operate and are maintained with computerized functions.  For example, stand-alone computers used to control the digital image capturing devices in X-ray systems.  Subsequently, devices have increasingly incorporated computers to control functions such that the devices, computers (i.e., the "hardware"), and the software are inseparable.   Now, large sophisticated systems such as MRI and catheterization and cath lab systems are completely controlled by specially programmed computers that are integrated into the systems.

Today, medical devices and systems are, for all intents and purposes, specialized computers, although some use software running in common operating system environments such as Linux or Microsoft Windows®. The devices and systems often include software specific to the medical devices.  In other words, software from one OEM for one type of device is likely incompatible with a similar device from another OEM.  Further, the devices are integrated to such a degree that the devices cannot function without the software.  Functionally, an ISO often cannot fully service a device without using the installed software and data files.  Indeed, to properly diagnose faults and errors in the operation of a device, an ISO must access error logs to decipher the causes of errors, and this requires access to use certain software.

---

1.  FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, available at https://www.fda.gov/media/113431/download ("The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.").

**ITEM C. EXPLANATION OF NEED FOR RENEWAL** *(CONT'D)*

OEMs also often provide manuals and other service information via electronic media, sometimes as data files installed on the medical systems or devices. Additionally, electronic servicing materials may be stored on other electronic media where access is prevented or hindered by technological protective measures ("TPMs") (e.g., encryption) even if they are not stored within the medical systems or devices. In order to perform servicing activities, therefore, an ISO requires access to, and use of, computer programs or modules thereof, electronic data files, including databases, and electronic manuals (collectively also referred to herein as, "electronic service materials").

To be sure, the transition to integrated software conceptually is not an issue. Issues arise, however, because OEMs overwhelmingly equip modern medical systems and devices with TPMs such as encryption, embedded software, and challenge-response mechanisms, involving access codes, passwords, keys, or digital signatures. These TPMs prevent or hinder medical equipment owners, lessees, and their agents (i.e. ISOs) from diagnosing, servicing, or maintaining the medical systems and devices they own or lease by restricting or denying access to use necessary electronic service materials installed in the medical equipment or otherwise provided via electronic media.

OEMs have been able to exploit the DMCA anti-circumvention provision against ISOs by tying mere "access" to allegedly protected works regardless of whether the works are actually used or are comingled with unprotectable works. For example, the protected works and unprotected works – such as data files, error logs, configuration files, and other unprotected works – are all comingled behind the same TPMs. This results in unprotected works being inaccessible because, in order to access the unprotected works, one must also access allegedly protected works (as defined in the DMCA) and therefore risk violating or being accused of violating the DMCA. Thus, by comingling protected and unprotected works, OEMs are able to thwart even the most basic servicing of the medical equipment by preventing ISOs from accessing and using unprotected works.

Further, OEMs have exploited the DMCA to interfere with a system or device owners' right to repair. Judge Cogburn in the Transtate litigation recognized this point, stating in his Order granting Philips summary judgment on its DMCA count: "The Court does agree with Defendants, however, that this case exemplifies the problems with the DMCA and the right to repair." DE 641 at 28. The Court explained that, "[w]hereas the DMCA was originally enacted to protect copyright owners from digital privacy," the law is being abused by "powerful corporations" who are "putting digital locks on their products as a tool to capture and retain a huge market share over the repair industry." Id. at 28–29. This practice "reduc[es] consumer choice and rais[es] repair costs" and "cannot be what Congress intended when it passed the DMCA." Id. at 29. A copy of the Order is attached as Exhibit A.[2][3]

---------------

 2. Transtate disagrees with the court's DMCA judgment because the Order ignores the appellate holdings denying DMCA applicability in situations where copyright infringement or facilitation of copyright infringement is not implicated (Chamberlain Grp. V. Skylink Techs., Inc. 381 F.3d 1178, 1196–97 (Fed. Cir. 2004), Storage Tech. Corp. v. Custom Hardware Engineering & Consulting, Inc., 421 F.3d 1307, 1318 (Fed. Cir. 2005), and Chambers v. Amazon.com Inc., 632 Fed. Appx. 742, 744 (4th Cir. 2015)), or where circumvention only enables use of a functional work without access to any expression of the work (Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 548-49 (6th Cir. 2004).
 3. Transtate disagrees with the court's CFAA judgment because the Order ignores the lack of any alleged technological harm required by Van Buren v. United States, 141 S. Ct. 1648 (2021) and district court cases discussed in Section IV, infra.

**ITEM C. EXPLANATION OF NEED FOR RENEWAL** (CONT'D)

II.     The Continuing Need for the Exemption

A.      TPMs Are Still Employed in Medical Systems and Devices

As noted in Transtate's petition for the current Exemption, the use of TPMs in medical systems and devices is widespread among the types of systems and devices and among the OEMs. There is no sign that the OEMs will discontinue the use of TPMs. Indeed, OEMs have developed new systems that further restrict access to use of necessary software tools. For example, Philips' more recent Azurion® line of cath lab systems utilize updated Microsoft platforms that make obsolete tools that were previously used to access embedded servicing software tools. Petitioners are not aware of any TPMs having been removed from existing or older systems or devices.

B.      The Exemption Has Been Impactful

The Exemption has been critical to Petitioners' defense of lawsuits filed by Philips under the DMCA. For example, Petitioners have been able to invoke the current Exemption ("Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system") to cut short liability or potential liability for servicing medical systems and devices.

Continuing the Exemption will help prevent OEMs from exploiting the DMCA to prevent Petitioners and other ISOs and owners and lessees of the medical systems and medical devices from performing critical services that may allegedly circumvent a TPM controlling access to use of the software. The Exemption also prevents OEMs from taking advantage of the unintended consequences of copyright law that was enacted for developers of software applications for stand-alone computers, and applying it to specialty medical equipment integrated with software. Further, the Exemption allows the medical systems or devices owners or lessees to exercise their right to repair their own systems and devices without fear of liability under the DMCA.

C.      The Exemption Tames Abuse of the DMCA

Numerous courts have recognized that use of a password, even an "unauthorized password", does not constitute circumvention under the DMCA. In Burroughs Payment Systems Inc. v. Symco Group, Inc., 2011 WL 13217738 (N.D. Ga. Nov. 13, 2011) the court held that an ISO's use of keys to diagnose and repair software systems without authorization was insufficient to state a claim upon which relief may be granted under the DMCA. In Navistar, Inc. v. New Balt. Garage, Inc., 2012 U.S. Dist. LEXIS 134369 *; 2012 WL 4338816 (N.D. Il. 2012) the court dismissed a DMCA count stating that "using a password to access a copyrighted work, even without authorization, does not constitute 'circumvention' under the DMCA because it does not involve descrambling, decrypting, or otherwise avoiding, bypassing, removing, deactivating, or impairing a 'technological measure.'" In I.M.S. Inquiry Management Systems, Ltd. v. Berkshire Information Systems, Inc., 307 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2004) held that use of an authorized password by an unauthorized party is not violation of the DMCA. In Egilman v. Keller & Heckman, LLP., 401 F.Supp.2d 105 (D.D.C. 2005), the court held that the 'use' of a password without the authority of the copyright owner is not a violation of the DMCA's circumvention provision. In Ground Zero Museum Workshop v. Wilson, 813 F. Supp. 2d 678 (D. Md. 2011), the court, citing Egilman and I.M.S., held that a former manager of a museum's website did not circumvent a technological measure by using an expired or unauthorized password when he accessed and deleted some of the museum's files and redirected the website to a critical New York Post article. Id. at 691-92.

**Item C. Explanation of Need For Renewal** *(cont'd)*

Despite these rulings that application of a password, key, or certificate even whether "unauthorized" or "fake" does not meet the statutory requirement for "circumvention," OEMs, such as Philips, have aggressively invoked the anti-circumvention restriction of the DMCA claiming that the use of such keys or passwords does constitute circumvention, thus subjecting the ISOs to actual or potential onerous litigation.   In addition to the lawsuits against Petitioners, Philips has filed lawsuits against other ISOs alleging such violations of the DMCA.  See, Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp., Case No: 3:19-cv-01488-CCC (D.P.R.) (Third Cause of Action at 25-26); Philips N. Am. LLC et al v. 626 Holdings, Inc. et al., Case No: 9:19-cv-81263 RS (S.D. Fla.) (Count VI at 22-25); Philips, et al. v. Zetta Med. Techs. LLC, et al, C.A. No. 17-3425 (N.D. Ill.) (Count III at 18-19); Philips N. Am. LLC v. KPI Healthcare Inc., C.A. No. 8:19-cv-1765 (C.D. Cal.) (Fourth Cause of Action at 28-30); Philips N. Am. LLC et al. v. Summit Imaging Inc. et al., Case No: 2:19-cv- 01745-JLR (W.D. Wash.) (First Cause of Action at ¶¶ 77-106); and Philips North America LLC v. Advanced Imaging Services, Inc. et al., Case No. 2:2021-cv-00876  (E. D. Cal.) (Count III at 12-13).  While the parties have settled some of these lawsuits, Petitioners are informed that other ISOs are unwilling to join this petition due to their settlement agreements.

Additionally, the DMCA specifically omits liability for circumventing a TPM that only controls a right of a copyright owner, such as use of a work, without access or exposure to the expression of the work .  Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.2d 522, 548 (6th Cir. 2004) is the leading decision to recognize and explain this distinction in the context of use of computer software.  The Court ruled that mere invocation of compiled code does not amount to access to the protected work.  As explained by the Sixth Circuit, "[t]he copyrightable expression in the Printer Engine Program, by contrast, operates on only one plane: in the literal elements of the program, its source and object code.  Unlike the code underlying video games or DVDs, "using" or executing the Printer Engine Program does not in turn create any protected expression."  The Sixth Circuit further noted that "[n]owhere in its deliberations over the DMCA did Congress express an interest in creating liability for the circumvention of technological measures designed to prevent consumers from using consumer goods while leaving the copyrightable content of a work unprotected."  Similarly, an ISO's invocation of functional service code via a menu, does not amount to access to a copyrightable expression because there is no visual or audible copyrightable expression, and does not amount to access to a protected work.

Despite this purposeful omission of liability, OEMs have threatened to file, or have filed lawsuits under the DMCA, such as those mentioned above even though the software is only used via an interface with no actual access to the underlying software.  The Exemption necessarily prevents OEMs from extending the reach of the DMCA to situations that Congress did not envision.

Thus, renewal of the Exemption will curtail these abusive assertions and the ensuing onerous litigation.

III.      The Alleged Circumventions Only Occur When Necessary

Petitioners adhere to the Exemptions' requirement that the alleged "circumvention" only occur "when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system."

For example, Transtate's use of the Exemption is occasional and on an as-needed basis.  Transtate's tool to enable use of software on certain Philips cath labs was developed as a back-up tool to use when Philips' IST certificates (on flash drives) malfunction, or cannot be renewed timely, or otherwise do not provide the full access needed to properly diagnose, repair, or maintain a system.  See excerpt of testimony of Robert A. Wheeler on April 17, 2023, 2708:18-2710:23, attached as Exhibit B.

GMI's use of a key generated by its key generator is also limited.  When a GMI customer authorizes GMI to replace a part on its Philips system, or otherwise to service its Philips system, GMI only accesses the system user interface to diagnose and service the system.  On some occasions, GMI uses the system user interface to update the system to recognize a newly installed part and/or to make a full backup of the system so that the system can be reloaded with all of its original settings.  DEFENDANT GLOBAL MEDICAL IMAGING, LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, Response to Interrogatory No. 2 (Dec. 10, 2021) (Attached as Exhibit C).

ITEM C. EXPLANATION OF NEED FOR RENEWAL *(CONT'D)*

IV.    The Alleged Circumventions Do Not Involve a Violation of Any other Law

These alleged circumventions do not violate any other law. While Philips has alleged a violation of the Computer Fraud and Abuse Act (18 U.S.C. 1030) in its various lawsuits, the U.S. Supreme Court has since explained why the CFAA is not applicable.

In Van Buren v. United States, 141 S. Ct. 1648 (2021), the Supreme Court explained why the Government's position of liability of exceeding authorized access had a structural defect, noting the CFAA provision also gives rise to civil liability. The Court explained that "the term 'loss' likewise relates to costs caused by harm to computer data, programs, systems, or information services. The statutory definitions of 'damage' and 'loss' thus focus on technological harms […] of the type unauthorized users cause." 141 S. Ct. at 1660. The Court also stated that "[l]imiting "damage" and "loss" in this way makes sense in a scheme "aimed at preventing the typical consequences of hacking." Id. The Court then stated that "t]he term's definitions are ill fitted, however, to remediating 'misuse' of sensitive information that employees may permissibly access using their computers." Id. The Court concluded "Van Buren's situation is illustrative: His run of the license plate did not impair the "integrity or availability" of data, nor did it otherwise harm the database system itself." Id.

Although no appellate court appears to have considered compensatory damages in the context of Van Buren, the Ninth Circuit has indicated that Van Buren changes how compensatory damages are determined. hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1195 n.12 (9th Cir. 2022) ("Van Buren reviewed the statutory definitions of 'damage' and 'loss' and concluded that this civil remedies provision requires a showing of 'technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data.' LinkedIn has not alleged that hiQ's scraping of public profiles caused any such technological harms.").

Further, some courts have relied on Van Buren to redefine what constitutes "loss" under the CFAA. Better Holdco, Inc. v. Beeline Loans, Inc., No. 20-CV-8686 (JPC), 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021) ("This Court agrees with these authorities and, consistent with the Supreme Court's discussion in Van Buren, and interprets 'costs of responding to an offense' as limited to situations involving damage to or impairment of the protected computer."); El Omari v. Buchanan, No. 20 CIV. 2601 (VM), 2021 WL 5889341, at *14 (S.D.N.Y. Dec. 10, 2021), aff'd, No. 22-55-CV, 2022 WL 4454536 (2d Cir. Sept. 26, 2022); see also Acrison, Inc. v. Rainone, No. CV221176KMESK, 2022 WL 16695116, at *8 (D.N.J. Nov. 3, 2022); Saffron Rewards, Inc. v. Rossie, No. 22-CV-02695-DMR, 2022 WL 2918907, at *8 (N.D. Cal. July 25, 2022); CoStar Grp., Inc. v. Leon Cap. Grp., LLC, No. 21-CV-2227 (CRC), 2022 WL 2046096, at *9 (D.D.C. June 7, 2022); Deck v. Courtney, No. 121-CV-01078, 2021 WL 3474043, at *1 (S.D. Ind. Aug. 6, 2021). Because diagnosis, repair, and maintenance of a system are the opposite of causing damage or impairment to a system, the CFAA should not apply. Simply put, there is no existence of a requisite technological harm. Philips' CFAA allegations should ultimately fail due to the absence of the requisite technological harm.

V.    The Register's Fair Use Analysis Was Correct

Petitioners are aware and have been following the action filed by Medical Imaging & Technology Alliance (MITA) and Advanced Medical Technology Association (AdvaMed) (collectively "Appellants") against The Library Congress challenging the adoption of the current Exemption. Judge Beryl Howell dismissed the action and granted summary judgment in favor of The Library of Congress. That decision is on appeal before the United States Court of Appeals for the District of Columbia, as Case No. 23-5067. In that appeal, Appellants argue that the Librarian's fair use analysis was improper because (1) the analysis improperly considered prior analyses in connection with other software enabled devices such as automobiles that Appellants contend are irrelevant to "complex medical devices," (2) improperly concluded that the use of the software embedded in the medical devices is transformative when there is no modification of or creation of new software," and (3) improperly considered "how granting the Exemption would improve competition with copyright holders and thus lower prices, even though the central purpose of copyright laws is to stimulate creativity by protecting the right of producers of copyrightable work to recoup the expense of there creative labors." Appellants' Opening Brief, pages 47-49 (June 8, 2023). A copy of that brief is

**ITEM C. EXPLANATION OF NEED FOR RENEWAL** (CONT'D)

attached as Exhibit D.

However, Appellants do not even try to explain why other software devices should not have been considered other than to dismissively state they are unrelated without analyzing why this would make a difference. Automobiles are similarly complex machines, often with many computers and much software generating much data. Automobile software is used to diagnose the state of an automobile, and parameters can be adjusted to return an automobile to its specified operational condition. Thus, the analogy and prior analysis is not only relevant, but instructive, and the Librarian properly considered the prior analysis of automobile systems.

Further, the fair use limitation to the exclusive rights of a copyright owner (17 U.S.C. §107) includes a list of non-exclusive factors to be considered. The first factor is "the purpose and character of the use." Courts have considered the transformative nature of the use as one way of analyzing the use under this factor. However, "transformative use is not absolutely necessary for a finding of fair use." See, Campbell v. Acuff Rose Music, Inc. 510 U.S. 569, 579 (1994), citing, Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 455, n. 40 (1984)(videotaping of broadcast content for time-shifted viewing deemed fair use). See also Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1203 (2021)(In determining whether a use is transformative, one considers the copying's more specifically described purposes and character).

In the medical device situation, the embedded software is being used to diagnose, repair, or maintain the specific systems for which the software was uniquely designed. The software is functional or utilitarian and runs within the system or device. Typically, no one is exposed to the software itself, only to the user interface. Modifying the software would likely lead to the system being considered remanufactured, which is not the purpose of diagnose, repair, or maintenance. Indeed, remanufacturing is to be avoided. Further, the creation of new software or derivative software is meaningless because there is no use for such derivative software; the systems already have the software that is uniquely designed for them and approved by the FDA. Thus, the Librarian correctly noted that the purpose and character of the use was to diagnose, repair, or maintain a system by making it work or restoring it to a state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

Finally, the Librarian's consideration of competition was completely acceptable. The factors listed in Section 107 are not exclusive, and the consideration of the benefits to the medical service providers is relevant. In this situation, as noted above, the software tools are invoked for diagnosis, repair, or maintenance, which enables medical service providers to provide their services and diagnose and treat patients. In doing so, it benefits the public, reduces the after warranty period control of the servicing of medical systems and devices by OEMs, and promotes a very healthy and critical third party servicing market [4] that, in turn, promotes a very healthy medical system infrastructure. Further, as noted above, the Exemption tames the unintended consequences of the DMCA's prohibition on the right to repair decried by Judge Cogburn.

For all the foregoing reasons, renewal of the Exemption is warranted and requested.

_____

4. See, fn. 1, supra.

## Item D.  Declaration and Signature

The declaration is a sworn statement made under penalty of perjury and must be signed by one of the petitioners named above.

**I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:**

1. Based on my own personal knowledge and experience, I have a good faith belief that but for the above-selected exemption's continuation during the next triennial period (October 2024–October 2027), technological measures controlling access to relevant copyrighted works are likely to diminish the ability of relevant users to make noninfringing uses of these works, and such users are likely to rely upon the above-selected exemption during the next triennial period.

2. To the best of my knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at copyright.gov/1201/2021) that originally demonstrated the need for the above-selected exemption, such that renewal of the exemption would not be justified.

3. To the best of my knowledge, the explanation provided in Item C above is true and correct and supports the above statements.

**Name/Organization:**
*If the petitioner is an entity, this declaration must be signed by an individual at the organization having appropriate personal knowledge.*

| |
|---|
| Jordan Health Products LCC (dba Avante Health Solutions)<br>Transtate Equipment Company, Inc. (dba Avante Diagnositic Imaging)<br>Global Medical Imaging, LLC (dba Avante Ultrasound) |

**Signature:**
*This declaration may be signed electronically (e.g., "/s/ John Smith").*

| |
|---|
| *[signature]* |

**Date:**

| |
|---|
| July 3, 2023 |



**UNITED STATES COPYRIGHT OFFICE**

# Petition to Renew a Current Exemption Under 17 U.S.C. § 1201
## 9th Triennial Rulemaking

Please submit a separate petition for each current exemption for which renewal is sought.

**NOTE:** Use this form if you want to renew a current exemption without modification. If you are seeking to engage in activities not currently permitted by an existing exemption, including those that would require the expansion of a current exemption, you must submit a petition for a new exemption using the form available at **copyright.gov/1201/2024/new-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit both a petition to renew the current exemption without modification using this form, and, separately, a petition for a new exemption that identifies the current exemption and addresses only those issues relevant to the proposed expansion of that exemption.

## ITEM A.  PETITIONERS AND CONTACT INFORMATION

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity seeking renewal.

---

Crothall Facilities Management, Inc.
1500 Liberty Ridge Drive
Suite 210
Wayne, PA  19807


Representative for Petitioner:
Sheila M. O'Donnell
Sr. VP, Technical Resource Group
Crothall Healthcare Technology Solutions
e-mail:  sheila.odonnell@crothall.com

---

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## Item B.  Identify Which Current Exemption Petitioners Seek to Renew

Check the appropriate box below that corresponds with the current temporary exemption (see **37 C.F.R. § 201.40**) the petitioners seek to renew. Please check only one box. If renewal of more than one exemption is sought, a separate petition must be submitted for each one.

**Motion Pictures** *(including television programs and videos)***:**

○ Excerpts for use in documentary filmmaking or other films where use is in parody or for a biographical or historically significant nature

○ Excerpts for use in noncommercial videos

○ Excerpts for use in nonfiction multimedia e-books

○ Excerpts for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students

○ Excerpts for educational purposes by faculty and employees acting at the direction of faculty in massive open online courses ("MOOCs")

○ Excerpts for educational purposes in digital and literacy programs offered by libraries, museums, and other nonprofits

○ For the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities

○ For the preservation or the creation of a replacement copy of the motion picture by libraries, archives, or museums

○ For text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

**Literary Works:**

○ Literary works distributed electronically for text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

○ Literary works or previously published musical works that have been fixed in the form of text or notation whose technological protection measures interfere with assistive technologies

○ Literary works consisting of compilations of data generated by medical devices or their personal corresponding monitoring systems, to access personal data

**Computer Programs and Video Games:**

○ Computer programs that operate wireless devices, to allow connection to an alternative wireless network ("unlocking")

○ Computer programs that operate smartphones and portable all-purpose mobile computing devices to allow the device to interoperate with or to remove software applications ("jailbreaking")

○ Computer programs that operate smart televisions to allow the device to interoperate with software applications on the television for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate voice assistant devices to allow the device to interoperate with or to remove software applications for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate routers and dedicated network devices to allow the device to interoperate with software applications on the device for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data

○ Computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device or system

◉ Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system

○ Computer programs for purposes of good-faith security research

○ Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and discontinued video games that never required server support, for preservation by libraries, archives, and museums

○ Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums

○ Computer programs that operate 3D printers, to allow use of alternative material

○ Computer programs for purpose of investigating potential infringement of free and open source computer programs

○ Video games in the form of computer programs for purpose of allowing an individual with a physical disability to use alternative software or hardware input methods

**JA1491**

## ITEM C. EXPLANATION OF NEED FOR RENEWAL

Provide a brief explanation summarizing the continuing need and justification for renewing the exemption. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to this petition, it is not necessary. Below is a hypothetical example of the kind of explanation that the Office would regard as sufficient to support renewal of the unlocking exemption. The Office notes, however, that explanations can take many forms and may differ significantly based on the individual making the declaration and the exemption at issue.

Crothall Facilities Management, Inc. and its Crothall Healthcare Technology Solutions division are leaders in healthcare clinical engineering services. Crothall maintains over one million medical devices in over 200 healthcare facilities across the United States. Crothall diagnosis, repairs and maintains and repairs medical devices.

Crothall's ability to service a device without using the installed software and data files can be impacted by software access. Access to software error logs is a critical function in the optimal diagnosis, maintenance, and repair of devices.

Crothall requests an extension of the current exemption.

**Item C.  Explanation of Need For Renewal** *(cont'd)*

## Item D. Declaration and Signature

The declaration is a sworn statement made under penalty of perjury and must be signed by one of the petitioners named above.

**I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:**

1. **Based on my own personal knowledge and experience, I have a good faith belief that but for the above-selected exemption's continuation during the next triennial period (October 2024–October 2027), technological measures controlling access to relevant copyrighted works are likely to diminish the ability of relevant users to make noninfringing uses of these works, and such users are likely to rely upon the above-selected exemption during the next triennial period.**

2. **To the best of my knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at copyright.gov/1201/2021) that originally demonstrated the need for the above-selected exemption, such that renewal of the exemption would not be justified.**

3. **To the best of my knowledge, the explanation provided in Item C above is true and correct and supports the above statements.**

**Name/Organization:**
*If the petitioner is an entity, this declaration must be signed by an individual at the organization having appropriate personal knowledge.*

Sheila M. O'Donnell/Crothall Facilities Management, Inc.

**Signature:**
*This declaration may be signed electronically (e.g., "/s/ John Smith").*

Sheila M. O'Donnell

**Date:**
July 7, 2023

JA1494



**UNITED STATES COPYRIGHT OFFICE**

# Petition to Renew a Current Exemption Under 17 U.S.C. § 1201
## 9th Triennial Rulemaking

Please submit a <u>separate</u> petition for each current exemption for which renewal is sought.

**NOTE:** Use this form if you want to renew a current exemption <u>without modification</u>. If you are seeking to engage in activities not currently permitted by an existing exemption, including those that would require the expansion of a current exemption, you must submit a petition for a new exemption using the form available at **copyright.gov/1201/2024/new-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit <u>both</u> a petition to renew the current exemption without modification using this form, <u>and</u>, separately, a petition for a new exemption that identifies the current exemption and addresses only those issues relevant to the proposed expansion of that exemption.

## Item A.  Petitioners and Contact Information

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity seeking renewal.

Leon A. Gugel
Metropolis International
38-13 10th St.
Long Island City, NY 11101
718-371-6026
info@metropolismedical.com

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## Item B.  Identify Which Current Exemption Petitioners Seek to Renew

Check the appropriate box below that corresponds with the current temporary exemption (see **37 C.F.R. § 201.40**) the petitioners seek to renew. Please check only one box. If renewal of more than one exemption is sought, a separate petition must be submitted for each one.

**Motion Pictures** *(including television programs and videos)***:**

○ Excerpts for use in documentary filmmaking or other films where use is in parody or for a biographical or historically significant nature

○ Excerpts for use in noncommercial videos

○ Excerpts for use in nonfiction multimedia e-books

○ Excerpts for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students

○ Excerpts for educational purposes by faculty and employees acting at the direction of faculty in massive open online courses ("MOOCs")

○ Excerpts for educational purposes in digital and literacy programs offered by libraries, museums, and other nonprofits

○ For the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities

○ For the preservation or the creation of a replacement copy of the motion picture by libraries, archives, or museums

○ For text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

**Literary Works:**

○ Literary works distributed electronically for text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

○ Literary works or previously published musical works that have been fixed in the form of text or notation whose technological protection measures interfere with assistive technologies

○ Literary works consisting of compilations of data generated by medical devices or their personal corresponding monitoring systems, to access personal data

**Computer Programs and Video Games:**

○ Computer programs that operate wireless devices, to allow connection to an alternative wireless network ("unlocking")

○ Computer programs that operate smartphones and portable all-purpose mobile computing devices to allow the device to interoperate with or to remove software applications ("jailbreaking")

○ Computer programs that operate smart televisions to allow the device to interoperate with software applications on the television for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate voice assistant devices to allow the device to interoperate with or to remove software applications for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate routers and dedicated network devices to allow the device to interoperate with software applications on the device for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data

○ Computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device or system

◉ Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system

○ Computer programs for purposes of good-faith security research

○ Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and discontinued video games that never required server support, for preservation by libraries, archives, and museums

○ Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums

○ Computer programs that operate 3D printers, to allow use of alternative material

○ Computer programs for purpose of investigating potential infringement of free and open source computer programs

○ Video games in the form of computer programs for purpose of allowing an individual with a physical disability to use alternative software or hardware input methods

**JA1496**

## Item C.  Explanation of Need For Renewal

Provide a brief explanation summarizing the continuing need and justification for renewing the exemption. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to this petition, it is not necessary. Below is a hypothetical example of the kind of explanation that the Office would regard as sufficient to support renewal of the unlocking exemption. The Office notes, however, that explanations can take many forms and may differ significantly based on the individual making the declaration and the exemption at issue.

Metropolis International is a dealer of pre-owned and refurbished medical imaging systems based in New York City. We have been in business for nearly 20 years and we are and have been FDA registered and we follow all applicable Federal, State and local laws and abide by all HIPAA regulations.

The current exemption that directly affects Metropolis International is 37 CFR 201.40 (b) (15):
Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system.
The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and the "repair" of said device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.
100% of the components used in the repairs made of such devices come from other systems from the same make and model that have been harvested for parts. Hence we do everything according to OEM specifications.
However many manufacturers threaten suits for merely swapping a PCB, or a cable or a hard-drive.
They know that we are using their parts, just not getting these parts from them, for exorbinant prices.

Given the continuing trend toward the use of software to perform and control medical devices and systems, and the implementation of technological measures to prevent independent repair organizations and consumers from accessing that software, Metropolis International submits that the exemption remains necessary for the next triennial period.

**JA1497**

**Item C.  Explanation of Need For Renewal** *(cont'd)*

## Item D.  Declaration and Signature

The declaration is a sworn statement made under penalty of perjury and must be signed by one of the petitioners named above.

**I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:**

1. **Based on my own personal knowledge and experience, I have a good faith belief that but for the above-selected exemption's continuation during the next triennial period (October 2024–October 2027), technological measures controlling access to relevant copyrighted works are likely to diminish the ability of relevant users to make noninfringing uses of these works, and such users are likely to rely upon the above-selected exemption during the next triennial period.**

2. **To the best of my knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at copyright.gov/1201/2021) that originally demonstrated the need for the above-selected exemption, such that renewal of the exemption would not be justified.**

3. **To the best of my knowledge, the explanation provided in Item C above is true and correct and supports the above statements.**

**Name/Organization:**

*If the petitioner is an entity, this declaration must be signed by an individual at the organization having appropriate personal knowledge.*

Metropolis International

**Signature:**

*This declaration may be signed electronically (e.g., "/s/ John Smith").*

Leon Gugel

**Date:**

6/26/2023



**UNITED STATES COPYRIGHT OFFICE**

# Petition to Renew a Current Exemption Under 17 U.S.C. § 1201
### 9th Triennial Rulemaking

Please submit a <u>separate</u> petition for each current exemption for which renewal is sought.

**NOTE:** Use this form if you want to renew a current exemption <u>without modification</u>. If you are seeking to engage in activities not currently permitted by an existing exemption, including those that would require the expansion of a current exemption, you must submit a petition for a new exemption using the form available at **copyright.gov/1201/2024/new-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit <u>both</u> a petition to renew the current exemption without modification using this form, <u>and</u>, separately, a petition for a new exemption that identifies the current exemption and addresses only those issues relevant to the proposed expansion of that exemption.

## ITEM A.  PETITIONERS AND CONTACT INFORMATION

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity seeking renewal.

TriMedx Holdings, LLC
Attn: Laura Sahm
5451 Lakeview Parkway Drive South
Indianapolis, Indaina 46268
laura.sahm@trimedx.com
317-696-1604

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## Item B. Identify Which Current Exemption Petitioners Seek to Renew

Check the appropriate box below that corresponds with the current temporary exemption (see **37 C.F.R. § 201.40**) the petitioners seek to renew. Please check only one box. If renewal of more than one exemption is sought, a separate petition must be submitted for each one.

**Motion Pictures** *(including television programs and videos)***:**

○ Excerpts for use in documentary filmmaking or other films where use is in parody or for a biographical or historically significant nature

○ Excerpts for use in noncommercial videos

○ Excerpts for use in nonfiction multimedia e-books

○ Excerpts for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students

○ Excerpts for educational purposes by faculty and employees acting at the direction of faculty in massive open online courses ("MOOCs")

○ Excerpts for educational purposes in digital and literacy programs offered by libraries, museums, and other nonprofits

○ For the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities

○ For the preservation or the creation of a replacement copy of the motion picture by libraries, archives, or museums

○ For text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

**Literary Works:**

○ Literary works distributed electronically for text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

○ Literary works or previously published musical works that have been fixed in the form of text or notation whose technological protection measures interfere with assistive technologies

○ Literary works consisting of compilations of data generated by medical devices or their personal corresponding monitoring systems, to access personal data

**Computer Programs and Video Games:**

○ Computer programs that operate wireless devices, to allow connection to an alternative wireless network ("unlocking")

○ Computer programs that operate smartphones and portable all-purpose mobile computing devices to allow the device to interoperate with or to remove software applications ("jailbreaking")

○ Computer programs that operate smart televisions to allow the device to interoperate with software applications on the television for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate voice assistant devices to allow the device to interoperate with or to remove software applications for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that operate routers and dedicated network devices to allow the device to interoperate with software applications on the device for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")

○ Computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data

○ Computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device or system

◉ Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system

○ Computer programs for purposes of good-faith security research

○ Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and discontinued video games that never required server support, for preservation by libraries, archives, and museums

○ Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums

○ Computer programs that operate 3D printers, to allow use of alternative material

○ Computer programs for purpose of investigating potential infringement of free and open source computer programs

○ Video games in the form of computer programs for purpose of allowing an individual with a physical disability to use alternative software or hardware input methods

**Item C. Explanation of Need For Renewal**

Provide a brief explanation summarizing the continuing need and justification for renewing the exemption. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to this petition, it is not necessary. Below is a hypothetical example of the kind of explanation that the Office would regard as sufficient to support renewal of the unlocking exemption. The Office notes, however, that explanations can take many forms and may differ significantly based on the individual making the declaration and the exemption at issue.

TRIMEDX is a third-party independent service organization with customers ranging from small rural hospitals to major metropolitan health systems, with a goal of providing timely and cost-efficient clinical engineering and medical device repair and maintenance that enables the continuity of patient care at our customer facilities. To provide such services, TRIMEDX must be able to access and utilize both medical devices themselves and any related service materials which includes software or computer programs that provide information on the maintenance and repair of such devices, and often enables the application of repair maintenance and repair procedures. Unfortunately, original equipment manufacturers (OEMs) often preclude and/or make such access difficult.

Restrictions by OEMs can take many forms, including denial of access to service manuals and diagnostic/calibration software, and restrictions on availability of parts, specialized tools, and training. By their very nature, these OEM restrictions are anti-competitive, intended to protect a manufacturer's revenue and not public safety or interest as some have claimed. In its 2021 "Nixing the Fix" report, the Federal Trade Commission (FTC) recognized that manufacturers across multiple industries restrict repairs on their own devices, noting there is "scant evidence to support manufacturers' justifications for repair restrictions."

The exemption to the DMCA by the Library of Congress allows TRIMEDX and other third-party servicers to overcome, and in some cases, avoid the anti-competitive tactics of the OEMs, while ensuring third-party service organizations have the necessary access to medical devices and information to repair and maintain the equipment on behalf of hospital customers. This contributes to the ultimate goal of allowing equipment owners the right to choose who services their medical devices. Not extending this exemption could directly impact that.

Perhaps nowhere is this access more important than when it comes to cybersecurity: 53% of medical devices have known critical vulnerabilities*, and for the past 12 years, health care delivery organizations (HDOs) have the highest cost per breach at +$10M with a record number of breaches in 2021.** Nearly one quarter of surveyed HDOs stated cyberattack victims experienced increased mortality rates following a data breach, and more than half reported inferior patient outcomes due to longer hospital stays and delayed procedures.*** At its core, cybersecurity in healthcare is a patient safety issue. Being able to quickly and adequately access devices and associated information about the repair and maintenance of a medical device can allow organizations like TRIMEDX to most quickly and effectively assist OEMs in decreasing the cyber-vulnerability of medical equipment and improve their safety and effectiveness.

Finally, the FDA has previously stated that it believes third-party service organizations, like TRIMEDX, can offer healthcare providers high quality, safe, and effective medical device servicing. Not only are there no concerns with the quality of TRIMEDX's work, TRIMEDX and other third-party servicers are essential to maintaining medical devices in the United States, as the OEMs do not have the bandwidth to manage it all. Unlike OEMs, who are remote and can be slow to respond to rural sites, organizations like TRIMEDX are onsite at hospitals and can repair a device immediately.

Based on the above, TRIMEDX requests the exemption under 17 U.S.C. § 1201(a)(1) that allows circumvention of technological measures applied to software programs and data files in medical device for the purpose of diagnosis, maintenance, or repair of such a device to continue.

*https://www.cynerio.com/blog/cynerio-research-finds-critical-medical-device-risks-continue-to-threaten-hospital-security-and-patient-safety

**https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ https://www.ibm.com/security/data-breach

***https://www.proofpoint.com/sites/default/files/threat-reports/pfpt-us-tr-cyber-insecurity-healthcare-ponemon-report.pdf

Iᴛᴇᴍ C.  Exᴘʟᴀɴᴀᴛɪᴏɴ ᴏꜰ Nᴇᴇᴅ Fᴏʀ Rᴇɴᴇᴡᴀʟ *(ᴄᴏɴᴛ'ᴅ)*

## Item D.  Declaration and Signature

The declaration is a sworn statement made under penalty of perjury and must be signed by one of the petitioners named above.

**I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:**

1. **Based on my own personal knowledge and experience, I have a good faith belief that but for the above-selected exemption's continuation during the next triennial period (October 2024–October 2027), technological measures controlling access to relevant copyrighted works are likely to diminish the ability of relevant users to make noninfringing uses of these works, and such users are likely to rely upon the above-selected exemption during the next triennial period.**

2. **To the best of my knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at copyright.gov/1201/2021) that originally demonstrated the need for the above-selected exemption, such that renewal of the exemption would not be justified.**

3. **To the best of my knowledge, the explanation provided in Item C above is true and correct and supports the above statements.**

**Name/Organization:**

*If the petitioner is an entity, this declaration must be signed by an individual at the organization having appropriate personal knowledge.*

Laura Sahm
TriMedx Holdings, LLC

**Signature:**

*This declaration may be signed electronically (e.g., "/s/ John Smith").*

/s/ Laura Sahm

**Date:**

July 7, 2023

JA1504



**UNITED STATES COPYRIGHT OFFICE**

# Petition to Renew a Current Exemption Under 17 U.S.C. § 1201
### 9th Triennial Rulemaking

Please submit a separate petition for each current exemption for which renewal is sought.

**NOTE:** Use this form if you want to renew a current exemption without modification. If you are seeking to engage in activities not currently permitted by an existing exemption, including those that would require the expansion of a current exemption, you must submit a petition for a new exemption using the form available at **copyright.gov/1201/2024/new-petition.pdf**.

If you are seeking to expand a current exemption, we recommend that you submit both a petition to renew the current exemption without modification using this form, and, separately, a petition for a new exemption that identifies the current exemption and addresses only those issues relevant to the proposed expansion of that exemption.

## Item A.  Petitioners and Contact Information

Please identify the petitioners and provide a means to contact the petitioners and/or their representatives, if any. The "petitioner" is the individual or entity seeking renewal.

Petitioner:
TTG Imaging Solutions, LLC
2403 Sidney St Suite 220, Pittsburgh, PA 15203
Matthew Mastarone
MMastarone@TTGimagingSolutions.com
(412) 933 5560

Petitioner may be contacted through its counsel:
Thomas Zahn
Partner
McGuireWoods, LLP
TZahn@mcguirewoods.com
(412) 667-6038


Docket (COLC-2023-0004)

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted pursuant to 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this petition.

## Item B.  Identify Which Current Exemption Petitioners Seek to Renew

Check the appropriate box below that corresponds with the current temporary exemption (see **37 C.F.R. § 201.40**) the petitioners seek to renew. Please check only one box. If renewal of more than one exemption is sought, a separate petition must be submitted for each one.

**Motion Pictures** *(including television programs and videos)***:**

- ○ Excerpts for use in documentary filmmaking or other films where use is in parody or for a biographical or historically significant nature
- ○ Excerpts for use in noncommercial videos
- ○ Excerpts for use in nonfiction multimedia e-books
- ○ Excerpts for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students
- ○ Excerpts for educational purposes by faculty and employees acting at the direction of faculty in massive open online courses ("MOOCs")
- ○ Excerpts for educational purposes in digital and literacy programs offered by libraries, museums, and other nonprofits
- ○ For the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities
- ○ For the preservation or the creation of a replacement copy of the motion picture by libraries, archives, or museums
- ○ For text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching

**Literary Works:**

- ○ Literary works distributed electronically for text and data mining by a researcher affiliated with a nonprofit institution of higher education, or by student or staff at the direction of such researcher, for the purpose of scholarly research and teaching
- ○ Literary works or previously published musical works that have been fixed in the form of text or notation whose technological protection measures interfere with assistive technologies
- ○ Literary works consisting of compilations of data generated by medical devices or their personal corresponding monitoring systems, to access personal data

**Computer Programs and Video Games:**

- ○ Computer programs that operate wireless devices, to allow connection to an alternative wireless network ("unlocking")
- ○ Computer programs that operate smartphones and portable all-purpose mobile computing devices to allow the device to interoperate with or to remove software applications ("jailbreaking")
- ○ Computer programs that operate smart televisions to allow the device to interoperate with software applications on the television for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")
- ○ Computer programs that operate voice assistant devices to allow the device to interoperate with or to remove software applications for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")
- ○ Computer programs that operate routers and dedicated network devices to allow the device to interoperate with software applications on the device for purposes other than gaining unauthorized access to copyrighted works ("jailbreaking")
- ○ Computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data
- ○ Computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device or system
- ◉ Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system
- ○ Computer programs for purposes of good-faith security research
- ○ Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and discontinued video games that never required server support, for preservation by libraries, archives, and museums
- ○ Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums
- ○ Computer programs that operate 3D printers, to allow use of alternative material
- ○ Computer programs for purpose of investigating potential infringement of free and open source computer programs
- ○ Video games in the form of computer programs for purpose of allowing an individual with a physical disability to use alternative software or hardware input methods

## Item C. Explanation of Need For Renewal

Provide a brief explanation summarizing the continuing need and justification for renewing the exemption. The Office anticipates that petitioners will provide a paragraph or two detailing this information, but there is no page limit. While it is permissible to attach supporting documentary evidence as exhibits to this petition, it is not necessary. Below is a hypothetical example of the kind of explanation that the Office would regard as sufficient to support renewal of the unlocking exemption. The Office notes, however, that explanations can take many forms and may differ significantly based on the individual making the declaration and the exemption at issue.

I am writing this petition to request an exemption to the provisions outlined in the Digital Millennium Copyright Act (DMCA) specifically for computer programs that control medical devices or systems, along with their related data files, used for the purposes of diagnosis, maintenance, or repair of the device or system. This exemption is crucial to ensure patient safety, enable efficient healthcare practices, and support advancements in medical technology.

The current restrictions imposed by the DMCA, specifically the anti-circumvention provisions, create unnecessary barriers that prevent hospitals and other owners of medical devices from repairing their equipment or engaging independent service providers without the threat of litigation. This exemption is crucial to ensure the availability, affordability, and timely repair of medical devices, which directly impacts patient care and healthcare accessibility.

Medical devices are important tools for healthcare, enabling accurate diagnoses, effective treatments, and improved patient outcomes. However, the current DMCA provisions create a significant disadvantage for hospitals and medical facilities, requiring them to rely solely on the manufacturer's authorized service providers or expensive service contracts to maintain and repair their devices. This restricts competition, drives up costs, and limits the ability of healthcare providers to exercise their autonomy in equipment management.

We understand the importance of intellectual property rights and the need to protect the innovations of medical device manufacturers. However, the exemption we propose aligns with the principles of fair competition, cost-effectiveness, and patient care. It seeks to strike a balance that allows for the repair and maintenance of medical devices while respecting copyright protections.

By granting this exemption, we can ensure that healthcare professionals and other authorized individuals can effectively diagnose, maintain, or repair medical devices without unnecessary legal barriers. The exemption would allow for activities that are imperative for identifying and resolving technical issues, enhancing device performance, and safeguarding patient health.

JA1507

**Item C. Explanation of Need For Renewal** *(cont'd)*

## Item D.  Declaration and Signature

The declaration is a sworn statement made under penalty of perjury and must be signed by one of the petitioners named above.

**I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:**

1. **Based on my own personal knowledge and experience, I have a good faith belief that but for the above-selected exemption's continuation during the next triennial period (October 2024–October 2027), technological measures controlling access to relevant copyrighted works are likely to diminish the ability of relevant users to make noninfringing uses of these works, and such users are likely to rely upon the above-selected exemption during the next triennial period.**

2. **To the best of my knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record (available at copyright.gov/1201/2021) that originally demonstrated the need for the above-selected exemption, such that renewal of the exemption would not be justified.**

3. **To the best of my knowledge, the explanation provided in Item C above is true and correct and supports the above statements.**

**Name/Organization:**

*If the petitioner is an entity, this declaration must be signed by an individual at the organization having appropriate personal knowledge.*

Matthew Mastarone / TTG Imaging Solutions, LLC

**Signature:**

*This declaration may be signed electronically (e.g., "/s/ John Smith").*

/s/Matthew J. Mastarone

**Date:**

June 29, 2023

**Comments by Philips North America, LLC In Response To**
**Petitions To Renew DMCA Exemption Relating To Medical Devices**

Commenter:

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

| | | |
|---|---|---|
| Gerard M. Donovan | William J. Overend | Gregory D. Vose |
| REED SMITH LLP | REED SMITH LLP | REED SMITH LLP |
| 1301 K Street, N.W. | 101 Second Street | 225 Fifth Avenue |
| East Tower, Suite 1000 | Suite 1800 | Pittsburgh, PA 15222 |
| Washington, D.C. 20005 | San Francisco, CA 94105 | |

## I.    INTRODUCTION

Proponents' request for renewal of the 2021 DMCA exemption regarding medical devices is based on the false premise that they are making transformative, fair and benevolent uses of other OEMs' proprietary software.  To the contrary, Proponents are engaged in purely commercial conduct that seeks an unfair advantage through widespread unauthorized use of OEMs' advanced servicing software, so they can make repairs faster and more profitably.  Recent Supreme Court jurisprudence clarifies that the activities supposedly justifying the exemption do not qualify as "fair use." Accordingly, Philips hereby opposes the petitions to renew the 2021 exemption governing "Computer programs that control medical devices or systems, and related data files, for diagnosis, maintenance, or repair of the device or system."  37 C.F.R. § 201.40(b)(15).

Specifically, the Supreme Court recently issued its ruling in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023), where it further clarified "fair use" jurisprudence under copyright law. There, the Court confirmed that commercial use of a copyrighted work for the same or highly similar purpose is non-transformative.  Here, commercial service organizations seek to use copyrighted service software authored by Original Equipment Manufacturers ("OEMs") for the *exact same* purpose as it was created by OEMs – to service medical imaging systems.  The *Warhol* decision clarifies that such use infringes; it is non-transformative and not fair use under the Copyright Act.

The non-transformative nature of Proponents' commercial conduct is underscored by the factual record in a federal lawsuit brought by Philips North America, LLC ("Philips") against one of the Proponents, Transtate Equipment Company, Inc. dba Avante Diagnostic Imaging ("Transtate").  There, after a four-week trial, the jury found that Transtate made millions of dollars in profits through its illegal and unauthorized use of Philips' copyrighted materials for servicing medical imaging devices, reinforcing the commercial nature of Proponents' use.  Numerous witnesses also testified about the serious patient safety risks caused by Proponents' unauthorized and untrained use of OEM advanced servicing software – and explained the importance of restricting access to such advanced software to prevent such risks.  Notably, the court in that case

had earlier ruled at summary judgment that the very uses at issue in Transtate's petition violate not only the DMCA[1], but also the Computer Fraud and Abuse Act ("CFAA").

Allowing service organizations to profit through unauthorized use of OEMs' proprietary software for the service organizations' own (and very same) commercial servicing activities undermines the goal of copyright. The exemption has been and will continue to be used solely for commercial and non-transformative purposes, and therefore is outside the bounds of fair use as clarified by the Supreme Court. The Librarian should therefore reject Proponents' renewal requests.

## II.    BACKGROUND

Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems. Philips' proprietary software enables certain functions on these systems that can be modified only by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace in accordance with FDA guidance. Philips' high-quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

Philips includes access controls on its medical imaging systems to protect its copyright-protected software and to restrict access to its software to authorized personnel. This includes software designed for use by Philips engineers to diagnose and service the systems. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use.

Philips restricts access to its proprietary software not only to protect its intellectual property rights, but for important patient safety reasons as well.[2] The devices at issue are life-saving medical imaging systems, such as diagnostic X-ray systems ("cath labs") used in cardiac procedures. Some of the advanced tools enable a service engineer to modify radiation settings on the devices, and thus can create severe safety risks if misused. Restricting access to such tools is not only a matter of patient safety and common sense, but comports with the FDA's own guidance for reducing cybersecurity risks and other safety concerns.

---

[1] The court ruled that Transtate violated the DMCA pre-exemption. *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 U.S. Dist. LEXIS 7319, at *38 (W.D.N.C. Jan. 17, 2023). While it found that Transtate's method of bypassing security modified the systems, *Id.* at *15-16, it did not specifically rule on whether Transtate violated the DMCA after the 2021 exemption went into effect.

[2] Proponents argue that they should be permitted to bypass the security that protects access OEMs' copyrighted software because they claim to need the software to service medical devices, and that OEMs improperly protect that software to thwart such servicing. Those arguments cannot support renewal of the exemption, because the DMCA statutorily authorizes exemptions only if users are "adversely affected by" the anticircumvention rule "in their ability to make *noninfringing* uses," 17 U.S.C. § 1201(a)(1)(C) (emphasis added), not to advance other policy considerations. Proponents' purported policy reasons for renewing the exemption are thus simply irrelevant. It is nonetheless important to point out that they are also factually incorrect, and that Philips properly restricts access to its copyrighted works for compelling safety, cybersecurity, and other reasons.

- 2 -

JA1511

LOC_AR_00002783

When two independent service organizations, including Transtate, first sought an exemption to the DMCA for access to device software and data files stored on medical devices and systems, Philips objected, arguing that the proposed exemption was for infringing, commercial purposes and not fair use and would cause risks to patient safety, among other reasons.[3] Notwithstanding Philips' and others' extensive comments, the Register of Copyrights recommended granting an exemption covering "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files."[4] On fair use, the Register stated that "[c]ommerciality is not fatal to a fair use determination" and that the petitioners' "proposed use is likely transformative and so the first factor favors fair use."[5] In reaching that conclusion, however, the Register offered no explanation and did not attempt to square her transformative-use finding with her own prior acknowledgement that the petitioners themselves had not claimed transformative use and thus did "not seek an exemption to modify medical devices or systems, or their software."[6] The recommendation also specifically excluded from the exemption uses that modify medical devices (including modifications to software).[7] The Librarian, without elaboration, adopted the Exemption "based upon the Register's Recommendation" and without further response to comments.[8] Two industry groups sued the Librarian over enactment of the exemption, and that lawsuit is currently on appeal before the U.S. Court of Appeals for the District of Columbia Circuit.[9]

The current Proponents – all profit-motivated service organizations[10] – seek renewal of the exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices. Two of the Proponents – Transtate and GMI[11] – are defendants in ongoing litigation in which Philips has alleged DMCA and CFAA violations against both companies for their modification of files on Philips medical imaging systems to gain unauthorized access to Philips' copyrighted software.[12]

In the lawsuit against Transtate, the court granted summary judgment to Philips on its claim for violation of the DMCA, holding that "[b]ecause [Transtate] ha[s] admitted to using software [it] developed to bypass [Philips'] security, there can be no dispute that [Transtate] ha[s]

---

[3] *See* Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201 by Philips North America, LLC (Feb. 8, 2021), available at
https://www.copyright.gov/1201/2021/comments/opposition/Class_12_Opp'n_Philips%20North%20America.pdf.
[4] Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention (Oct. 2021), available at
https://cdn.loc.gov/copyright/1201/2021/2021_Section_1201_Registers_Recommendation.pdf.
[5] *Id*. at 209.
[6] *Id*. at 208.
[7] *Id*. at 208, 229.
[8] *See* 86 Fed. Reg. at 59,627.
[9] *Medical Imaging & Technology Alliance, et al. v. Library of Congress, et al.*, No. 23-5067 (Fed. Cir.).
[10] The Proponents are Jordan Health Products, LLC, Transtate Equipment Co., Inc., Global Medical Imaging, LLC ("GMI"), TTG Imaging Solutions, LLC, TriMedx Holdings, LLC, Metropolis International, and Crothall Facilities Management, Inc.
[11] Transtate and GMI are portfolio companies of Jordan Health Products, LLC d/b/a Avante Health Solutions, which is backed by private investment company Jordan Industries International, LLC and billionaire Jay Jordan. *See* Exhibit A, excerpts from the Philips v. TEC Holdings Trial Transcript, ("Trial Tr.") at 3381:18-25; 3546:6-23.
[12] *See Philips Med Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, No. 3:20-cv-00021-MOC-DCK (W.D.N.C.); *Philips Med Sys. Nederland B.V. et al. v. Global Medical Imaging, LLC et al.*, No. 1:21-cv-3615 (N.D. Ill.).

JA1512

LOC_AR_00002784

circumvented [Philips'] technological measures under the plain terms of the DMCA."[13] The court specifically found that "Defendants modified files on Plaintiff's Allura systems to bypass Plaintiff's security and permit access to Level 1 and higher CSIP without a Level 1 or higher IST key and password."[14] Although Transtate's conduct falls outside of the scope of the exemption – including because Transtate accessed and used more of Philips' software than necessary for repair activities and because its hacking modified Philips' software – the court did not reach that issue, given that Transtate's conduct at issue occurred before the exemption was enacted.  The court also concluded that Transtate violated the CFAA: "By running FD_Service to bypass the security on Philips Allura system and then using Philips Level 1 and higher tools, [Transtate] intentionally accessed a protected computer and exceeded [its] authorized level of access."[15]

The jury awarded Philips $3.6 million on its DMCA claim based on the profits Transtate reaped through its modification and circumvention of Philips' security to access to Philips' copyrighted software.[16] The evidence at trial established that Transtate bypasses Philips' security for commercial access and use of Philips' software.[17,18] Testimony from Transtate showed that it uses the software for the same purpose as it was created by Philips, namely to service and modify medical imaging systems.[19]  In addition, multiple witnesses testified at trial that Transtate's access method created patient safety issues by causing reliability problems on several medical imaging systems.[20]

Notably, in both the Transtate case and the later case brought against GMI, Transtate and GMI sought to use the DMCA exemption as a defense for their illegal conduct. For example, in the Transtate litigation, Transtate repeatedly invoked the DMCA exemption, both at summary judgment and at trial, as a defense to liability on Philips' DMCA claim and as a purported mitigating factor for damages purposes.[21] In the GMI litigation, GMI moved to dismiss Philips' complaint based on the DMCA exemption.[22] The court denied GMI's motion, recognizing that the exemption did not cover modifications to Philips' medical devices, as Philips had alleged in its complaint.[23]

## III.    The Exemption Should Not Be Renewed.

---

[13] *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 U.S. Dist. LEXIS 7319, at *35 (W.D.N.C. Jan. 17, 2023).

[14] *Id.* at *35.

[15] *Id.* at *42.

[16] Dkt. 776 at 4, *Philips Med Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-cv-00021-MOC-DCK (April 28, 2023 W.D.N.C.).

[17] Trial Tr. at 723:23-724:20; 1654:22-1655:1; 1744:-4-21; 1755:9-20.

[18] Testimony also revealed that Transtate has hacked the software of other OEMs like Siemens by generating counterfeit Siemens service keys that allowed for access to higher levels of service tools than permitted to non-Siemens engineers. *See* Trial Tr. 3313:4-12; 3326:16-25.

[19] Trial Tr. at 2177:18-2180:6; 2182:24-2183:4.

[20] Trial Tr. at 1737:5-22; 3916:20-3917:7.

[21] *See, e.g., Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 U.S. Dist. LEXIS 7319, at *38 (W.D.N.C. Jan. 17, 2023).

[22] *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, 2022 U.S. Dist. LEXIS 138796, at *23-24 (N.D. Ill. Aug. 4, 2022).

[23] *Id.* at *24.

LOC_AR_00002785

## A.    Legal Standards

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this rule." The Register will recommend granting an exemption only when the "preponderance of the evidence in the record shows that the conditions for granting an exemption have been met."[24] Such evidence must show that it is "more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing *uses* of a particular class of copyrighted works." *Id.* at 112.

To establish a case for an exemption, "proponents must show at a minimum (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses."[25] More particularly, "[i]t is not enough that a particular use could be noninfringing. Rather, the Register will assess whether the use is likely to be noninfringing based on current law."[26] "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing." *Id.*

## B.    Since Enactment, Further Supreme Court Precedent and Factual Developments Show that Proponents' Use is Infringing and Not Fair Use.

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. In Philips' comment to Proponents' initial request for the DMCA exemption, Philips demonstrated why each factor weighed against granting the Proponents' exemption. That analysis holds true. In fact, further legal and factual developments have confirmed that Proponents' use of Philips' copyrighted material is not fair use. Proponents' requests for renewal largely ignore these factors and controlling precedent.

After enactment of the current exemption, the U.S. Supreme Court issued its *Warhol* ruling, which clarified that commercial use of a copyrighted work for the same purpose as the original work weighs against a finding of fair use. There, the Court held that the "purpose and character" factor of the fair use test focuses on "whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism."[27] The Court further clarified that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other

---

[24] U.S. Copyright Office, Section 1201 of Title 17 at 111 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.
[25] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.
[26] U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6, https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf.
[27] 143 S. Ct. at 1273.

**JA1514**

LOC_AR_00002786

justification for copying."[28] The Court ultimately found that the use at issue was infringing, emphasizing that the "commercial nature of the use, on the other hand, looms larger."[29] District courts have followed *Warhol* and emphasized commerciality in considering fair use.[30]

Here, like *Warhol*, the non-transformative and commercial character of Proponents' use both "point in the same direction."[31] There is no dispute that Proponents do not transform Philips' copyrighted material. Transtate expressly disclaimed transformative use, explaining in its petition that "[m]odifying the software would likely lead to the system being considered remanufactured, which is not the purpose of diagnose, repair, or maintenance. Indeed, remanufacturing is to be avoided."[32] Rather than incur the significant costs necessary to develop their own software, and risk falling within the scope of FDA regulations on remanufacturing, Proponents instead copied the software OEMs labored to create and used it as OEMs designed it to be used.[33] *Warhol* clarified that this falls far outside the bounds of fair use.[34]

As to commercialism, each Proponent seeking renewal of the exemption is a commercial entity that stands to profit from their unlicensed use of OEM copyrighted software. Evidence at trial in the Transtate litigation established that Transtate continues to bypass the security measures on Philips imaging systems for commercial use of Philips' proprietary software.[35] Indeed, the jury found that Transtate made millions of dollars from its illegal access to Philips' copyrighted materials.[36] Proponents have also attempted to use the exemption to shield activity clearly beyond the exemption's scope and that has been found to violate federal law. For example, GMI moved to dismiss the lawsuit Philips brought against it on the grounds that the exemption barred Philips' claims, even though the exemption expressly does not cover modifications to software.[37] The court denied GMI's motion on that basis.[38] Transtate too invoked the DMCA exemption as a defense at every stage in litigation, even though the court had already found that Transtate' conduct violated both the DMCA and CFAA, that Transtate modified files on medical devices to bypass their security,[39] and that the exemption did not apply retroactively to Transtate's conduct.[40]

---

[28] *Id.* at 1277.

[29] *Id.* at 1285.

[30] *See, e.g., Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 U.S. Dist. LEXIS 126766, at *259 (D. Nev. July 24, 2023) (holding that fair use did not apply where defendant's copying of software "was for a commercial purpose" "to save significant time, money, and effort").

[31] 143 S. Ct. at 1280.

[32] Transtate Petition at 8.

[33] *See* FDA Center for Devices and Radiological Health, Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff, perma.cc/M3Q9-WF8C (June 21, 2021).

[34] *Warhol*'s holding that transformativeness depends on "whether an allegedly infringing use has a further purpose or different character" also vitiates the Register's prior conclusion that the petitioners' "proposed use is likely transformative," since there is no dispute that Proponents intend to use OEM software for the same purpose as it was designed.

[35] Trial Tr. at 2444:4-16.

[36] Dkt. 776 at 4, *Philips Med Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-cv-00021-MOC-DCK (April 28, 2023 W.D.N.C.).

[37] *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, 2022 U.S. Dist. LEXIS 138796, at *23-24 (N.D. Ill. Aug. 4, 2022).

[38] *Id.* at *24.

[39] *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 U.S. Dist. LEXIS 7319, at *35 (W.D.N.C. Jan. 17, 2023).

[40] Dkt. 490, *Philips Med Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-cv-00021-MOC-DCK (April 28, 2023 W.D.N.C.); Trial Tr. at 3435:20-3436:8.

- 6 -

JA1515

LOC_AR_00002787

Transtate argues that "transformative use is not absolutely necessary for a finding of fair use."[41]  While that is true, the cases are clear that when uses are both commercial and non-transformative, they do not amount to fair use.  Indeed, the very cases Transtate cites establish that pure commercial use of OEM software – such as Proponents' admitted use of OEM software to generate revenues from Proponents' own servicing of medical systems – is not fair use.

In *Sony,* the Supreme Court analyzed whether at-home video recording constituted fair use.  It observed that if "Betamax were used to make copies for commercial or profit-making purpose, such use would presumptively be unfair," but that "time-shifting for private home use" was non-commercial.[42]  The footnote Transtate cites recognized that a fair use analysis calls for a sensitive balancing of interests and that transformative use is not always required, such as in the context of non-commercial use.  But *Sony* hardly stands for the proposition that exact copying for commercial gain could somehow constitute fair use.  It says the opposite:  the copying in that case was fair use because it was ***non-commercial***.

In *Campbell,* the Supreme Court noted that transformative use is not absolutely necessary for a finding of fair use, but in the same sentence noted that "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."[43]  The Court went on to find 2 Live Crew's song to be a parody commenting on the original or criticizing it, and therefore the type of transformative use that would traditionally have a claim to fair use protection.[44]  The Court found that the Court of Appeals erred by concluding that the commercial nature of the parody rendered it presumptively unfair and reversed.[45]  But the scenario in *Campbell* simply does not apply here, where Proponents' use is both purely commercial and non-transformative.

Proponents' explanation that they only want to make unlicensed use of OEM software to diagnose, repair, or maintain the systems for which the software was designed, and not modify it or create derivative works, further hurts their cause.[46] This distinguishes the Proponents' copying from the copying at issue in *Google*.[47]  While Google's use of Sun Microsystem's code was commercial in nature, it copied Sun's code, "which was created for use in desktop and laptop computers," "only insofar as needed to create tasks that would be useful in smartphone[s]."[48]  Google then put Sun's code to use in the "distinct and different computing environment" of its own Android platform, which the Court found to be transformative.[49]  In contrast, Proponents desire to make unlicensed use of OEM software for its intended purpose in its intended environment, on medical devices. They are simply using the software for the same purposes in their own business, without paying for it.  If this were the standard, then virtually any illegal copying could be characterized as "fair."

---

[41] Transtate Petition at 8, citing *Campbell v. Acuff Rose Music, Inc.,* 510 U.S. 569, 579 (1994), citing *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 455, n. 40 (1984).
[42] 464 U.S. at 448.
[43] 10 U.S. 579.
[44] *Id.* at 583.
[45] *Id.* at 594.
[46] Transtate Petition at 8.
[47] *Google LLC v. Oracle America, Inc.,* 141 S. Ct. 1183 (2021).
[48] *Id.* at 1203.
[49] *Id.* at 1203-1204.

- 7 -

JA1516

LOC_AR_00002788

Supreme Court precedent thus leaves no room for Proponents' attempts to twist the law to argue that its hacking of medical devices to make commercial and non-transformative use of OEM software is somehow fair use.  It is not.

In sum, Proponents' conduct following enactment of the exemption has confirmed that its use of protected software is not fair use. These for-profit service organizations have made millions of dollars hacking medical devices to sell services using unauthorized access to OEM copyrighted software.  The Librarian should follow the Supreme Court's holding in *Warhol* emphasizing that such commercial uses are not fair and decline to renew the exemption.

## C.    The DMCA Exemption Permits Conduct that Risks Patient Safety.

The Librarian need not look further than the above analysis regarding Proponents' infringing, commercial use in declining to renew the DMCA exemption.[50] But it is also important to note that Proponents' requested exemption creates patient safety risks.

As Philips demonstrated in its comment to Proponents' initial request for an exemption, permitting independent servicers, which are not subject to the same extensive FDA regulation as OEMs,[51] unauthorized access to complex, life-saving medical equipment endangers the reliability of those machines.[52] These risks are very real and have already caused safety incidents.  At trial in the Transtate litigation, the jury heard testimony regarding an incident where a medical imaging system crashed while a patient was being prepared for a procedure.[53] Philips' months-long investigation revealed that the system at issue had been modified by Transtate to bypass security and that the reliability issues plaguing the system were traced to Transtate's unauthorized access methods.[54] Such instances are likely to increase given the rise in the number of service organizations seeking renewal of the exemption.  Indeed, Philips' continues to investigate other systems that appear to have crashed due to hacking by independent servicers.  The FDA has also voiced concern over cybersecurity risks caused by hacking of medical devices.[55]

The risks to patient and clinician safety are precisely why even those advancing "right to repair" legislation exempt medical devices. For example, legislation recently passed in New York and Minnesota specifically excludes medical devices from the acts' requirements regarding repair.[56] As these states have recognized, medical devices are not the same as cell phones, for

---

[50] 17 U.S.C. § 1201(a)(1)(C).

[51] *See, e.g.*, 21 C.F.R. §§ 801 (labeling), 803 (incident reporting), 807 (registration, listing, and premarket notification), 814 (premarket approval), 820 (quality system regulation).

[52] Proponents cite to an FDA Report that addresses the availability of third-party entities to service and repair medical devices.  *See* Transtate Petition at 3.  That report does not sanction hacking of medical devices.

[53] Trial Tr. at 1737:5-22; 3916:20-3917:7.

[54] *Id.* at 1738:17-1741:1.

[55] *See* FDA, Strengthening Cybersecurity Practices Associated with Servicing of Medical Devices: Challenges and Opportunities (June 2021), available at https://www.fda.gov/media/150144/download.

[56] *See* New York Digital Fair Repair Act, S. B. S4104A ("Nothing in this section shall apply to...a medical device...or a digital electronic product found in a medical setting including diagnostic, monitoring, or control equipment[.]"); Minnesota Digital Fair Repair Act, 325E.72, Subd. 6. Exclusions ("Nothing in this section applies to manufacturers or distributors of medical devices … or a digital electronic product or software manufactured for use in a medical setting including diagnostic, monitoring, or control equipment…").

- 8 -

JA1517

LOC_AR_00002789

example, and maintenance of those medical devices should not be left to unregulated independent service organizations that hack into proprietary software.

### D.    The Grounds for Renewal in Proponents' Petitions Are Baseless.

In their petitions for renewal, Proponents' justifications for renewing the exemption are either scant or based on mischaracterizations of law. For example, Crothall's petition requests an extension merely on the basis that its ability to "service a device without using the installed software and data files can be impacted by software access." This vague assertion provides no meaningful justification for an exemption for liability for hacking copyrighted software, much less the safety risks caused by such hacking.

Transtate's petition, while more detailed, relies repeatedly on misstatements of fact and law. For example, Transtate contends that the court in the Transtate litigation was wrong to find Transtate liable for violating the CFAA because the "loss" requirement under the CFAA requires technological harm to the system at issue. But the CFAA requires no such thing. "Loss" broadly encompasses "costs incurred as a part of the response to a CFAA violation, including the investigation of an offense," *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009), and the Supreme Court's *Van Buren* holding does not say otherwise.[57] In any event, Transtate's access method caused technological harm to Philips' medical imaging systems.[58] Thus, even under its own (incorrect) view of the CFAA, Transtate's hacking of medical devices violated the CFAA, as the court ruled in the Transtate litigation.

As to the DMCA, Transtate's reliance on cases involving the unauthorized use of passwords is misguided.[59] Transtate has been found liable for *modifying files on medical devices* to bypass their security,[60] which has nothing to do with the cases analyzing whether unauthorized use of legitimate passwords violates the DMCA. Transtate's additional use of fake certificates to gain access to Philips' protected CSIP is also nothing like the DMCA cases analyzing unauthorized password use. Transtate's use of fake IST certificates is not a legitimate, but unauthorized, access method. Instead, it involves specially-developed software to create fraudulent certificates that bypass the security controls in Philips' IST solution.

Setting aside these misstatements of relevant authority, Proponents fail to analyze the factors as set forth in § 1201(a) to be weighed when considering whether to renew the DMCA

---

[57] *Van Buren v. United States*, 141 S. Ct. 1648 (2021). In *Van Buren*, the Court rejected the "improper purpose" distinction and clarified that that one "exceeds authorized access" when accessing a computer with authorization but then obtaining information located in areas of the computer that are off limits—as Transtate was found to have done. *Id.* at 1662.

[58] Trial Tr. at 1737:5-22; 3916:20-3917:7.

[59] Courts are also split as to whether such use constitutes circumvention under the DMCA. *See, e.g., Actuate Corp. v. Int'l Bus. Machines Corp.*, 2010 U.S. Dist. LEXIS 33095, *25 (N.D. Cal. Apr. 5, 2010) (holding that "unauthorized distribution of passwords and usernames avoids and bypasses a technological measure"); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) ("However, while [defendant's] software does use the authorized key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure].").

[60] *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2023 U.S. Dist. LEXIS 7319, at *35 (W.D.N.C. Jan. 17, 2023).

- 9 -

JA1518

LOC_AR_00002790

exemption. For these reasons, the Librarian should afford little weight to the arguments in Proponents' renewal petitions.

## IV.    CONCLUSION

Following enactment of the DMCA exemption, for-profit commercial entities have made millions of dollars from bypassing security and copying OEMs' copyrighted software for servicing medical imaging systems. This commercial, non-transformative use is not fair use and does not warrant an exemption for DMCA liability. Indeed, far from protecting legitimate behavior, the exemption has instead emboldened independent service organizations to engage in hacking that has compromised patient safety. Accordingly, Philips respectfully urges the Librarian to take this opportunity to rectify this situation and decline to renew the exemption.

(Page 141 of Total)

JA1519

LOC_AR_00002791

# Exhibit A

LOC_AR_00002792

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
_____
                               )
PHILIPS MEDICAL SYSTEMS         )
NEDERLAND B.V., et al.,         )
                               )
        Plaintiffs,             )
                               )
                               )   DOCKET NO. 3:20-CV-21
            vs.                 )
                               )
TEC HOLDINGS, INC., ET AL.,     )
                               )
        Defendants.             )
                               )
_____)
```

TRANSCRIPT OF JURY TRIAL VOLUME I
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MONDAY, APRIL 3, 2023 AT 9 A.M.


<u>APPEARANCES</u>:

On Behalf of the Plaintiff Philips Medical Systems Dederland:

        WILLIAM ROSS OVEREND, ESQ.
        REED SMITH, LLP
        101 Second Street, Suite 1800
        San Francisco, CA 94105

        CHRISTOPHER ROBERT BRENNAN, ESQ.
        GREGORY D. VOSE, ESQ.
        REED SMITH, LLP
        225 Fifth Avenue
        Pittsburgh, PA 15222


        KATHY CORTOPASSI, RDR, CRR, CRC
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

JA1521

LOC_AR_00002793

DIRECT OF ERIC SUIJS BY MR. DONOVAN          723

1   they have a flaw in their security design?

2   A.    No.

3   Q.    And why is that?

4   A.    If you look at the way the system is hacked, first you

5   need to bypass open profile.  And I believe in some ways you

6   can do that, but the modifications made to the system, we

7   investigated with a team how this can be done.  Our

8   conclusion is without inside design knowledge, you would not

9   be able to make these changes and know what file to modify.

10  Q.    How did you reach that conclusion?

11  A.    When you look at changes that need to be made, there are

12  2,000 remote files, and both file names contain no reference

13  to anything that's either IST [indiscernible] service.  One

14  of the files is long.  It's 68,000 lines.  It is in a

15  unireadable format also, an XML file which is very complex to

16  read for normal IT specialists.  You have to know exactly

17  what you're looking for.  And after that, you also have

18  [indiscernible] to make sure the file reads from modify file.

19  Q.    I'm sorry.  I missed a word you said.  You have to know

20  something that you're looking for?

21  A.    The key words you have to look for, yes.

22  Q.    The key words.

23        And from your investigation, do you have an

24  understanding of how defendants modified Allura systems to

25  bypass Philips' security?

JA1522

LOC_AR_00002794

DIRECT OF ERIC SUIJS BY MR. DONOVAN          724

1   A.   Yes, I do.

2   Q.   And how did they modify the systems?

3   A.   Well, we have two files that are in play here.  One file

4   is on the system that's called, the file is called

5   Celebration.  And that's a large file, contains 68,000 lines

6   with all kind of configurations testings for the system.  So

7   it will tell you where to connect to IT systems at the

8   hospital, like medical records, where you archive images.

9   But also contains a section that lists all the field service

10  tools and that are required of the [indiscernible] that

11  matches with the IST.

12       So that file, if you modify that, you can get access to

13  the tools without an IST key.  But you can't modify it in

14  place.  You have to first move that to a different directory.

15  When you move that to a different folder, the system doesn't

16  automatically open the file.  You first need to tell the

17  system to look at that folder.  And in order to do that, they

18  modified another file which contained all the file parts.

19  And that second file, it modified one file path to point to

20  the modified file itself, the regular file [indiscernible].

21            MR. OVEREND:  Your Honor, may I approach for a

22  second?

23            THE COURT:  Sidebar?

24            MR. OVEREND:  Yes.  I have a quick question.

25            THE COURT:  All right.

JA1523

LOC_AR_00002795

DIRECT OF ALESSANDRO ORSO BY MR. DONOVAN    1654

```
 1   events tab showing bypassing Philips' security?
 2   A.   It is.
 3   Q.   And how many entries are in this first tab?
 4   A.   If you can go down to the bottom of -- select everything
 5   so that we can get the number, I could give you the exact
 6   number.
 7   Q.   So it would be -- is that 202?  Because there was a --
 8   A.   Yes.  202, yeah.  Because I think there is a header.
 9   Yeah.
10   Q.   So 202 circumventions using a fake IST certificate by
11   whoever is using this; right?
12   A.   By whoever is using it.
13   Q.   Okay.  And then --
14   A.   All you can tell from this data because of the 12345 and
15   that's a fake certificate.  But, you know, that's also the
16   user.  So I cannot tell you about that, who the user is.
17   Q.   And that's because, is it right, that when you use a
18   fake certificate, that's hiding the true identity of the
19   person who's using it?
20   A.   You are using a fake ID.  And so I don't know, you know,
21   who the -- the actual person using this is.
22   Q.   And then if we go to the next tab, the Command Events
23   tab, can you explain what this shows?
24   A.   This shows, again, the entry in the log filtered by
25   12345 and further filtered so as to consider only commands.
```

JA1524

LOC_AR_00002796

DIRECT OF ALESSANDRO ORSO BY MR. DONOVAN    1655

1    Basically, execution-specific commands in the system.

2    Q.    And so back when we saw the video of the field service

3    running and you could navigate through the commands, these

4    are the instances where someone was then going and running a

5    command after using a fake certificate; is that right?

6    A.    That's correct.

7    Q.    And so would each of these circumvent Philips' security?

8    A.    Each of these will circumvent Philips' security because

9    I wouldn't be able to run those commands unless I had a fake

10    certificate on that system.

11    Q.    And how many rows are in this tab?

12    A.    Again, if you can -- if you don't mind scrolling to the

13    bottom, we can view the number.  Is 1913.  So, 1,913.

14    Q.    And then the third tab here, it says "Combined

15    Circumvention Events."  Is that just the combined data from

16    the first two tabs?

17    A.    Yeah, it's just the -- yeah, the combined data.

18    Q.    And what's the total number of events in this tab?

19    A.    And these are sum of the other two.  And again, without

20    doing the math, it would be 2,115.

21    Q.    Okay.  And so this is the total from looking at the use

22    of fake certificates on Allura systems, in your opinion,

23    2,115 circumventions occurred?

24    A.    That is correct.

25    Q.    And are -- you're not able to tell, if I understand

JA1525

LOC_AR_00002797

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND        1737

1  A.   I was.

2  Q.   And when did you first become involved in that

3  investigation?

4  A.   December 2020.

5  Q.   So you talked about, I believe, reliability and

6  crashing.  Are there -- what kind of safety issues could that

7  raise if there is a crash or reliability issues in the midst

8  of an actual procedure?

9  A.   Well, during a procedure, you lose X-ray functionality.

10  And depending upon the point in the procedure, if you have a

11  catheter in somebody's heart or a vessel and it's occluding,

12  something is going -- calcification is breaking loose that

13  you don't have visibility of, a blockage that occurs, you

14  lose that visibility during that time frame.

15       The geometry is also reset, so the brakes and motors are

16  not working, the tabletop floats.  If something goes bad and

17  you need to do CPR on the patient, it's problematic because

18  the table's floating.  And then also, you know, depending

19  upon how they're positioned, it's also a fall risk off the

20  table.

21  Q.   So it's a dangerous situation?

22  A.   Absolutely.

23  Q.   Did Philips have any initial assessment as to what might

24  be causing these crashes?

25  A.   Initially, what we saw from logging we received was that

JA1526

LOC_AR_00002798

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND       1738

1   the systems were being left on for prolonged periods of time,

2   which is outside of our recommendations.  So we asked them to

3   follow our recommendations for regular daily reboots of the

4   systems.

5   Q.   And what happened?  What happened after the customers

6   did that?

7   A.   After they did that, it was reported by the customer

8   that the crashes seemed to stop.  And the local market and

9   the customer agreed to close the escalations.

10  Q.   And did they -- did the things remain that way?  Did

11  they stay stopped?

12  A.   No.  A few weeks later, about a month later, late

13  January 2021, the sites were re-escalated with a couple extra

14  ones escalated at this point, also.

15  Q.   And so was there further investigation?

16  A.   Yes, there was.

17  Q.   What was done initially as part of this further

18  investigation?

19  A.    Initially, we had the local team, local service team,

20  save data for PR, which is very invasive.  Large mod file.

21  Takes a snapshot of everything in the system.  And collect

22  those.  Also take pictures of what was connected to the

23  network switch in the system.  And then verify the hardware

24  connections in the room.

25  Q.   And did Philips have any initial findings as a result of

JA1527

LOC_AR_00002799

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND        1739

1    those steps?

2    A.    We did.

3    Q.    Could you describe them, please.

4    A.    Yeah.  We found some interesting registry changes.

5    Whitelisting, which is software hardening tool that prevents

6    changes to the software being disabled or bypassed.  And we

7    saw programs, non-Philips, loaded onto the systems.

8    Q.    Could you tell us more about the programs that were the

9    non-Philips programs.

10   A.    Yes.  There were two programs, one was called

11   FD_Service.exe.  It was FD_temp.  They were both being

12   permissioned into the systems from a removable drive.  And

13   they had a path name of Transtate.

14   Q.    You also mentioned whitelisting being turned off and

15   that registry changes had been made.  What did that mean to

16   you?

17   A.    The systems were being modified in a way that was not

18   expected by Philips in their design.

19   Q.    Could you tell how the FDService program was being used

20   based on your investigation?

21   A.    Yes.  We saw that every time it was being commissioned

22   in, it was preceding a log-in for service.  So somebody would

23   use that to access the service tools.

24   Q.    Were there any other significant developments in the

25   course of the Banner hospital site investigation?

JA1528

LOC_AR_00002800

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND          1740

1    A.    Yes.

2          We also found evidence of very high network traffic in

3    the firewall logging, which included very strange IP address,

4    which is computer address that didn't match the IP address

5    scheme of the rest of the hospital.

6    Q.    Were you ever able to determine the origins of that

7    IP address?

8    A.    Yes.  It came from a Google Cloud server based out of

9    South Carolina.

10   Q.    And were you able to get any additional information

11   about the origins or ownership of that IP address?

12   A.    Yes.  We talked to the IT group at Banner and asked if

13   they were aware of this outside IP address getting into the

14   hospital.  They were.  And when we asked further what that

15   was for, they said that was for our support vendor who they

16   identified as Transtate for their remote access to the

17   systems.

18   Q.    And were you able to determine what was happening with

19   the server, when the server with that IP address accessed the

20   hospital's network?

21   A.    Yes.  It was being used to access the FTP, the file

22   transfer protocol, at the Windows level on the systems.

23   Q.    And what was the significance of that in terms of the

24   behavior that you were seeing on those systems?

25   A.    Well, we were able to find a lot of times it was

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND        1741

1   happening in conjunctions with the crashes.

2   Q.   So did you ever communicate with Banner about shutting

3   off the access from that particular IP address?

4   A.   We did.  We asked them to shut it off on a trial basis

5   through our investigation, and they agreed.

6   Q.   And what happened when they shut off that access?

7   A.   The system crashes stopped happening.

8   Q.   Did your analysis of the access from that IP address

9   connected to Transtate reveal anything else?

10  A.   Yes.  The nature that they were accessing the system in

11  the FTP, that they were accessing it dozens of times a day,

12  sometimes minutes apart.

13       When we access, we access once a day.  The system

14  creates a log file daily on a reboot.  So there's not a whole

15  lot of reason to going in.  But it was constantly showing up

16  in the FTP logs.

17       Additionally, the Windows security log showed when these

18  tunnels were open, we were getting -- the systems were being

19  port scanned.  Sequentially, every port, the CDP computer

20  firewall ports were being scanned.  The software was blocked

21  because it's not supposed to be open.  But it was continual

22  to the point where the log file would fill up in a manner of

23  weeks where in a normal system it takes like a year.

24  Q.   So are there any risks from accessing the system so many

25  times in the fashion that you observed?

JA1530

LOC_AR_00002802

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND        1744

1   A.   Yes.  The remote access that was being allowed was not

2   consistent with how our systems were designed and was causing

3   undue stress on the system, causing it to crash.

4   Q.   And were there any findings as to FDService?

5   A.   Yes.  We found FDService software designer, and it can

6   be used to modify registry and other settings in the system,

7   bypass whitelisting and do things that were not intended as

8   we designed the system.

9   Q.   So you talked about modifications.  In what ways had the

10  system been modified by Transtate using FDService?

11  A.   Well, we found that most of the systems in a normal use

12  mode we'll call an open profile, which is an open mode.  When

13  we deliver a system for the users to use, it's in a closed

14  profile.  The application we run in the cath lab is all they

15  have access to.

16       In these systems, with the basic key stroke, hot key,

17  it's control escape, which anyone with a computer at home --

18  the Windows menu that popped up had a lot more things in

19  there than we expect.  There was a command prompt, which is a

20  Windows tool.  There was an Internet Explorer that was

21  available.  And just things that were not normal.

22  Q.   And those things that were not normal, did those

23  create vulnerabilities for the system?

24  A.   That one could.

25  Q.   So I want to return to the issue of systems crashing.

JA1531

LOC_AR_00002803

DIRECT OF CHRISTOPHER TIERNEY BY MR. OVEREND        1755

1   Allura system's host PC.

2        Is that consistent with your findings at Banner Health?

3   A.   That is.

4   Q.   And the non-Philips software, is that FDService?

5   A.   That's correct.

6   Q.   And did you see evidence of FDService being used at

7   Prisma, as well?

8   A.   We did.

9   Q.   And then please look at the third bullet point here, it

10  talks about:  "Bypassing the Allura system's Integrated

11  Security Tool."

12       Integrated Security Tool, that's IST the jury's heard

13  about?

14  A.   Yes.

15  Q.   And then there's several subpoints here.  Is that an

16  accurate description of your findings at Banner Health?

17  A.   That's correct.

18  Q.   Had FDService enabled the bypassing of IST that's

19  described here?

20  A.   Yes.

21  Q.   And did Philips have concerns that the same bypassing of

22  IST security measures could be happening at Prisma, as well?

23  A.   We did.

24  Q.   And is that true of the different consequences that are

25  described of that bypassing that are in these three

JA1532

LOC_AR_00002804

USCA Case #25-5328    Document #2144465    Filed: 11/07/2025    Page 155 of 340

DIRECT OF BILL GRISWOLD BY MR. DONOVAN          2177

1    Q.   Do you know what level of access you had when you were
2    at Philips?
3    A.   I had Level 2.
4    Q.   And there's levels above you in Xper Editor; right?
5    A.   I believe so.
6    Q.   There were levels for the factory and for R&D; right?
7    A.   I believe so.
8    Q.   And a Level 0 key, that can't change radiation settings;
9    right?
10   A.   No.
11   Q.   You can't change the radiation dose?
12   A.   No.
13   Q.   You can't change an Xper Editor to frame rate?
14   A.   No.
15   Q.   You can't change other fluoroscopy settings?
16   A.   I think the only thing you can change is some brightness
17   and contrast settings.
18   Q.   Mr. Griswold, you've edited files for Xper Editor to
19   provide access to higher functions than you can access with
20   your IST Level 0 key; right?
21   A.   Yes.
22   Q.   The edits you make to the file Xper Editor would give
23   access to functionalities that you cannot access with your
24   Level 0 key?
25   A.   Yes.

JA1533

LOC_AR_00002805

DIRECT OF BILL GRISWOLD BY MR. DONOVAN      2178

1  Q.   The edits you make give you access to functions that you
2  wouldn't have been able to access with your Philips national
3  support specialist key; right?
4  A.   Possibly.
5  Q.   Possibly?
6  A.   Yeah.  Some of the functions that were enabled had to do
7  with editor presets and stuff like that.  I don't know that
8  that actually enabled that or not.
9  Q.   When you edited the file for Xper Editor, you gave
10  yourself access to the service tools that were reserved for
11  the EPX editor preset account; right?
12  A.   I don't know if the presetting was available or not.  I
13  don't know.
14  Q.   Did you give yourself access to everything within Xper
15  Editor when you modified that file?
16  A.   Anything for doing the doses and possibly everything.
17  Q.   Possibly you gave yourself access for everything?
18  A.   Yeah.  It was -- I was very familiar with the tool, so
19  it wasn't -- I knew what I needed to do the job for the
20  customer.
21  Q.   When you went in and modified the files for Xper Editor,
22  you went into a file on the system and you changed the access
23  levels for all of the tools to 0; right?
24  A.   I believe so.
25  Q.   And that gave you access to all of the tools in it;

JA1534

LOC_AR_00002806

DIRECT OF BILL GRISWOLD BY MR. DONOVAN          2179

1   right?

2   A.   Possibly, yes.

3   Q.   With the changes you made, you were able to modify the

4   frame rate on Allura systems; right?

5   A.   Yes.

6   Q.   And you've done that while you were employed by

7   Transtate; right?

8   A.   Many, many times.  Hundreds of times.

9   Q.   That's something you cannot do with a Level 0 --

10  A.   Not with Transtate but Philips.

11  Q.   I'm asking at Transtate.  Since you've gone to

12  Transtate, you've done that; right?

13  A.   Couple times, yes.

14  Q.   And you've done that even though you only have a Level 0

15  key; right?

16  A.   Yes.

17  Q.   You've done that even though Philips doesn't give you

18  authorization to do that; right?

19  A.   Not at the Level 0 key, no.

20  Q.   And that changes how many times per second the patient

21  is irradiated; right?

22  A.   Well, it depends on what you're actually changing or

23  working on.  Sometimes that's the case, yes.

24  Q.   And when you change the frame rates, that changes how

25  often the patient is irradiated; right?

JA1535

LOC_AR_00002807

DIRECT OF BILL GRISWOLD BY MR. DONOVAN        2180

1    A.    If you change frame rate, yes.

2    Q.    And you have changed the frame rates on Allura systems

3    while working for Transtate; right?

4    A.    Yes.  I was one of the ones who set up the default

5    settings for doses for the USA.  I was perfectly qualified to

6    do that.

7    Q.    You were perfectly qualified to do that in 2012; right?

8    A.    Yes.

9    Q.    When's the last time you received training from Philips

10   for modifying the Xper database?

11   A.    I did it for years.  I did it for -- I changed doses and

12   set doses for Philips back as far as 1995.  The physics

13   hasn't changed.  The equipment hasn't changed.  Some of the

14   newer systems have IQ changes that allow you to lower the

15   dose, but they don't change how you set it.  The physics is

16   the same.  So I have more on-hands time with Transtate than I

17   ever had with Philips.

18   Q.    Mr. Griswold, in 1995, Allura systems hadn't been

19   developed yet; right?

20   A.    No.  This was on the Integra system, the previous

21   generation.

22   Q.    Right.  That's a completely different medical imaging

23   device; right?

24   A.    The physics is not different.  It's a different system.

25   The settings were done differently.  But X-ray was still

JA1536

LOC_AR_00002808

DIRECT OF BILL GRISWOLD BY MR. DONOVAN        2182

1   Q.   How do you know it didn't change if you're not speaking

2   with the developers of the system?

3   A.   I'm using the same system that we've used for the last

4   15 years.

5   Q.   You're using it from a user perspective, not from a

6   developer's perspective; right?

7   A.   No.  The release 7.2 system has not changed in 15 years.

8   The release 8.1 system has not changed in 14 years or

9   13 years, or whatever it is.  Things that have changed are

10  the image processing.  That doesn't change the way you do

11  dose.

12  Q.   And you can't know what the R&D people are changing in

13  the system; right?

14  A.   If the software level didn't change, it didn't change.

15  Q.   And you can't know if their training changes for how the

16  things should be serviced; right?

17  A.   Like I said, what we're doing has not changed.

18  Q.   You've changed the fluoro setting on Allura systems

19  since you've gone to Transtate; right?

20  A.   A couple times, yes.

21  Q.   And those are changes you cannot make with your Level 0

22  key; right?

23  A.   That's correct.

24  Q.   And you've changed settings relating to radiation dose

25  while you've been at Transtate; right?

JA1537

LOC_AR_00002809

DIRECT OF BILL GRISWOLD BY MR. DONOVAN        2183

1    A.    Yes.

2    Q.    And those were settings you cannot change with your

3    Level 0 key; right?

4    A.    That's correct.

5    Q.    Mr. Griswold, are you familiar with the de-noising

6    algorithms that are used in the image quality processing of

7    the Allura system?

8    A.    On which release?  They are different in each one of

9    them.

10   Q.    Name one.

11   A.    There's a lot of them.  We use the function called XRES

12   on the older systems.  On the newer systems they use

13   something called Clarity.  Clarity's a new processing or a

14   higher-speed processing to reduce noise so that you can

15   reduce dose.

16   Q.    And have you received training from Philips on the

17   Clarity database?

18   A.    I have received some on that.  But I relied on Dale for

19   that because Dale had more training on that.

20   Q.    So you have secondhand training on that?

21   A.    No.  I did have some training on it initially when it

22   came out.

23   Q.    Mr. Griswold, does the FDService software have

24   functionality to provide access to the Xper Editor?

25   A.    It did have a link for the Xper Editor, yes.

JA1538

LOC_AR_00002810

DIRECT OF PATRICK KENNEDY BY MR. OVEREND          2444

1  Q.   Well, let's see.  You had issued your expert report in

2  this case in July 2021; correct?

3  A.   Correct.

4  Q.   And have defendants continued to use FDService since the

5  issuance of your report in July of 2021?

6  A.   It's my understanding from updated reports that

7  FDService is still being used.

8  Q.   And what's your basis for saying that?

9  A.   There's an updated report showing those patterns

10 produced up through -- I think it's March of this year, and

11 it shows continued observations regarding use of FDServices

12 identified by those patterns we talked about.

13 Q.   And approximately how many additional instances of

14 FDService use were shown in that later RADAR report?

15 A.   Since my June report in June '21, about

16 35,000 additional uses of FDService.

17 Q.   And so does that continued use of FDService mean that

18 you needed to update the numbers from your July 2021 report?

19 A.   Well, I had to update them anyway.  But that gives me

20 additional support for updating the numbers through trial.

21 Q.   And how did you -- could you just explain to the jury

22 how you did that.

23 A.   Sure.  So I don't have that mass of underlying

24 information that took literally hundreds of hours to comb

25 through to update the specifics like I had before.

JA1539

LOC_AR_00002811

CROSS OF STEVE KELLEY BY MR. BRENNAN          3313

1    Exactly."

2        Do you see that?

3    A.    Uh-huh.

4    Q.    And then Mr. Wheeler says:  "Why are they trying so hard

5    not to work with us?"

6    A.    Uh-huh.

7    Q.    And then he says:  "We freaking gave them keys."

8        Did Mr. Wheeler give you keys?

9    A.    Yes.

10   Q.    That's consistent with what Mr. Testa says; right?

11   Because he says:  "Yes, we did"?

12   A.    Yes.

13   Q.    And then he says:  "But not for all systems for a year."

14       And then Andy says:  "Not yet."

15           THE COURT:  Any questions?  What are questions?

16           MR. BRENNAN:  Sure.  Let's go down the bottom of

17   this.

18   BY MR. BRENNAN

19   Q.    There's a question about:  "Did you buy them yet";

20   correct?

21       Did you buy those keys?

22   A.    No, I did not.

23           MR. BRENNAN:  I'm sorry, John.  Could we go back

24   up.  To where we were.  I think we lost the page.

25

JA1540

LOC_AR_00002812

CROSS OF STEVE KELLEY BY MR. BRENNAN          3326

1   Q.   The emails we just looked at with the Siemens' keys you

2   were being provided -- that was prior to you participating in

3   this litigation; correct?

4   A.   Correct.

5   Q.   It was before you spoke with Defendants' expert,

6   Warren-Boulton; correct?

7   A.   Warren.  I don't know Warren.

8   Q.   I believe you spoke with him.

9   A.   Okay.  I may have.  I don't recall the name.

10  Q.   This was before you submitted a declaration on behalf of

11  Transtate in this case?

12  A.   Oh, yes.  Absolutely.

13  Q.   It was before you came to testify here today; correct,

14  Mr. Kelley?

15  A.   Yes.  Correct.

16  Q.   And just so we're clear, you got access to diagnostic

17  tools that Siemens doesn't provide to you; correct?  You got

18  access to tools that Siemens didn't provide to you; correct?

19  A.   I'm trying to think how to answer that.  I did have

20  access to the equipment, but I didn't go through Siemens to

21  get that access, correct.

22  Q.   Okay.  So I think the answer to my question is correct.

23  You did not get these Siemens' diagnostic materials from

24  Siemens; correct?

25  A.   That is correct.

JA1541

LOC_AR_00002813

DIRECT OF STEVE INACKER BY MR. RUTHENBERG    3381

1    Q.    And when we talk about Avante Diagnostic Imaging, that's

2    basically Transtate?

3    A.    That's correct.

4    Q.    Okay.  Now, we heard some testimony in this case about

5    Avante being a global -- a huge global conglomerate.  Could

6    you actually tell us what the size of the total Avante

7    company is.

8    A.    2022 we had net revenues of a little less than

9    $170 million.

10    Q.    Okay.  Is Transtate the largest part of that?

11        Let me state it a different way.  Is it the largest

12    company by revenue?

13    A.    It is the largest net revenue portion, yes.

14    Q.    And how does that compare with the size of Philips?

15    A.    I believe that in 2022 Philips' global net revenue was

16    over $16 billion.  So we would be approximately 1 percent of

17    their total net revenue.

18    Q.    All right.  Now, did there come a time in 2016 when

19    Avante started looking for opportunities in other medical

20    areas to expand its business?

21    A.    Yes.  When I joined Jordan Health Products/Avante Health

22    Solutions in May of 2016, there were already two companies in

23    the portfolio.  One was Global Medical Imaging, our GMI which

24    you heard referred to earlier today which Philips has also

25    filed a lawsuit against.  They were in the portfolio at the

JA1542

LOC_AR_00002814

DIRECT OF STEVE INACKER BY MR. RUTHENBERG    3382

1   time, which is an ultrasound business.  And we had a

2   medical-surgical capital equipment company which was referred

3   to as DRE Medical, and now that's Avante Medical Surgical.

4        And we were very actively looking to understand how we

5   could expand into the service side of the portfolio for the

6   Avante Health Solutions business.  So we were actively

7   looking at diagnostic imaging and X-ray and other areas for

8   service.

9   Q.   When you say "diagnostic imaging," is that basically the

10  business Jordan Health -- sorry -- that Transtate is in?

11  A.   That's correct.

12       MR. RUTHENBERG:  Okay.  Justin, let's bring up

13  DDX-388.

14       And, Your Honor, this is demonstrative.  I would

15  move to be able to use this as a demonstrative.

16       MR. HULTQUIST:  No objection as a demonstrative,

17  Your Honor.

18       THE COURT:  It may be used as demonstrative.

19  BY MR. RUTHENBERG:

20  Q.   And, Steve, if you could look at this timeline and look

21  at the very far left, June 2016.  Does that relate to what

22  you were telling us about starting to look at diagnostic

23  imaging?

24  A.   That's correct.  Our business development team had a --

25  I'm going to call it a list of companies that were in the

JA1543

LOC_AR_00002815

DIRECT OF STEVE INACKER BY MR. RUTHENBERG    3435

1    A.    It is.

2    Q.    And did you understand the distinction between

3    remanufacturing and servicing?

4    A.    Correct.  Transtate is a servicing organization, not a

5    remanufacturing organization.

6    Q.    Okay.  And the fourth bullet point says:  "The continued

7    availability of third-party entities to service and repair

8    medical devices is critical to the functioning of the

9    health-care system."

10         Is that something that you agree with?

11   A.    It is.

12   Q.    And did you review that and rely upon it at the time in

13   making your decision to continue using FDService?

14   A.    It is.

15   Q.    Now, did you, after this lawsuit was filed, become

16   familiar with the Digital Millennium Copyright Act?

17   A.    I did.

18   Q.    All right.  And that's what we refer to as the DMCA?

19   A.    Yes, it is.

20   Q.    And are you familiar with a process sometimes called the

21   triennial process for applying for exemptions under the DMCA

22   to the Copyright Office?

23   A.    Yes, I am.

24   Q.    And did you do anything on behalf of Transtate to try to

25   pursue an exemption from the DMCA?

JA1544

LOC_AR_00002816

DIRECT OF STEVE INACKER BY MR. RUTHENBERG     3436

 1   A.   We did.  In conjunction with a few other like-minded

 2   organizations, we made an appeal to the Copyright Office for

 3   an exemption to the DMCA, specifically to medical devices.

 4   Q.   All right.  And do you recall what you applied -- what

 5   was the nature of the exemption you applied for?

 6   A.   It was specific to servicing of medical devices and not

 7   being prevented from doing such that the equipment could be

 8   brought to its functioning order through the service.

 9           MR. RUTHENBERG:  All right.  Let's pull up DTX-998,

10   please.

11   BY MR. RUTHENBERG:

12   Q.   All right.  And do you recognize DTX-998?

13   A.   Yes.

14   Q.   Can you describe what it is?

15   A.   This is a component of our petition to the Copyright

16   Office for the exemption we're discussing.

17           MR. RUTHENBERG:  All right.  And I would move

18   DTX-998 into evidence, Your Honor.

19           MR. HULTQUIST:  Subject to our prior discussions,

20   Your Honor, no objection.

21           THE COURT:  Okay.  Let it be admitted.

22           (Defendants' Exhibit Number DTX-998 was received

23   into evidence.)

24   BY MR. RUTHENBERG:

25   Q.   All right.  And was this a petition filed on behalf -- I

JA1545

LOC_AR_00002817

CROSS OF STEVE INACKER BY MR. HULTQUIST          3546

1   targeted acquisitions, Avante will provide a breadth of

2   service and product offerings to a variety of customers

3   located throughout North America and the world."

4        Did I read that right?

5   A.   Yes.

6   Q.   And then finally, now, Jordan Industries is an investor

7   in Avante Health Solutions; am I correct about that?

8   A.   Yes.

9   Q.   And they do that through -- do they do that through

10  JZ Capital Partners Limited?

11  A.   I believe that they are also an owner, yes.

12  Q.   And J. Jordan, who we spoke about just a minute ago, is

13  a known billionaire; isn't he, sir?

14  A.   I don't know if that's known.

15  Q.   Well, you wouldn't dispute that he's a billionaire;

16  would you, Mr. Inacker?

17  A.   He's a billionaire.

18  Q.   And Mr. Jordan has actually -- he's heavily invested in

19  the companies that we've already talked about here this

20  morning?

21  A.   I don't know his level of investment.

22  Q.   He certainly has an interest; doesn't he?

23  A.   He has an interest.

24  Q.   In fact, during 2020, he divested -- or at least the

25  entity that he is part of, divested $65 million through the

DIRECT OF JACKIE DICKSON BY MS. DEPRIEST    3916

1    sides.

2    Q.    And when you say "beneficial for both sides," what do

3    you mean by that?

4    A.    It's a pretty symbiotic relationship.  It's a win-win.

5    You know, we are able to, for example, with a used system, we

6    are able to keep that system from going to scrap somewhere in

7    a landfill, and they are able to take the system and break it

8    down for used parts.

9    Q.    Turning to another topic.

10        The jury has heard testimony, quite a bit of testimony,

11   regarding some letters that Philips sent to certain of

12   Transtate's customers.

13        Are you familiar with these letters?

14   A.    I am.

15   Q.    Who did Philips send them to?

16   A.    We sent them to Banner Health, Lee Health in Florida,

17   Northside Hospital in Georgia, and I believe there are one or

18   two additional sites.  I don't recall the names off the top

19   of my head.

20   Q.    Did Philips send them to all of Transtate's customers?

21   A.    No.  It was just that small number of customers.

22   Q.    And why did Philips select those particular sites?

23   A.    Those particular sites were exhibiting unusual patterns

24   in the log.  And these are patterns that go beyond the

25   pattern we see in the exploit.  But unusual patterns in the

JA1547

LOC_AR_00002819

DIRECT OF JACKIE DICKSON BY MS. DEPRIEST    3917

1    log that would indicate that there was a potential for these

2    systems to crash.

3        We had seen these patterns occur at Banner Health, which

4    is a customer out in the west part of the U.S.  And we were

5    seeing those systems crash and in some cases with patients on

6    the table.  We were seeing the same sort of problem in this

7    handful of systems, and that was concerning to us.

8    Q.    Were these sites targeted because Transtate serviced

9    them?

10   A.    Not at all.

11   Q.    Did Philips choose the recipients of these letters based

12   on the size of their business to Transtate?

13   A.    No.  We chose the recipients of these letters based on

14   the patterns that we were seeing in the logs and the severity

15   of what could happen if these systems crash.

16   Q.    So Philips wasn't targeting Transtate's key customers to

17   quash its business; is that fair to say?

18   A.    No.  This was a very small number of customers.  We see

19   Transtate servicing, you know -- at my last -- the last time

20   I looked closely, it was well over 125 systems.  I know the

21   number's higher than that.  This was five customers that we

22   felt that there was a significant potential for the systems

23   to have a problem while a customer might be on the table.

24   Q.    During the trial, Transtate has identified, I believe,

25   Crothall, GE Multi-Vendor, and Renovo as some of its key

JA1548

LOC_AR_00002820



1300 North 17th Street ▪ Suite 900
Arlington, Virginia 22209
Tel: 703.841.3200
Fax: 703.841.3392
www.medicalimaging.org

Peter Weems
Senior Director, Policy & Strategy
Medical Imaging & Technology Alliance (MITA)
A Division of NEMA, the association of electrical equipment and medical imaging
manufacturers
1300 North 17th Street, Suite 900
Arlington, VA 22209
Phone: 703.841.3238
pweems@medicalimaging.org

Peter Tolsdorf
Senior Vice President, General Counsel, and Corporate Secretary
National Electrical Manufacturers Association (NEMA)
1300 North 17th Street, Suite 900
Arlington, VA 22209
Phone: 703.841.3204
peter.tolsdorf@nema.org

**COMMENTS OF THE MEDICAL IMAGING AND TECHNOLOGY ALLIANCE IN REPONSE
TO SECTION 1201 RENEWAL PETITION REGARDING MEDICAL DEVICES**

As the leading trade association representing the manufacturers of medical imaging
equipment, contrast agents, radiopharmaceuticals, and focused ultrasound devices, the Medical
Imaging & Technology Alliance (MITA) hereby opposes the petitions to renew the 2021
exemption governing "Computer programs that control medical devices or systems, and related
data files, for diagnosis, maintenance, or repair of the device or system" (the "2021 Exemption").
MITA submits these comments in response to the request for comments published by the Library
of Congress in the Federal Register at 88 FR 37,486, *Exemptions To Permit Circumvention of
Access Controls on Copyrighted Works*, Docket No. 2023-5.

Developments in the law regarding copyright fair use undermine the Librarian's earlier
(and unsupported) conclusion that fair use supports the 2021 Exemption. Legal developments
from the U.S. Supreme Court, Congress, and the FDA undermine the legal foundation for the
Librarian's 2021 Exemption and do not support exemption renewal.

1

**JA1549**

LOC_AR_00002821

Moreover, the patient safety risks remain just a serious today as they did during the earlier rulemaking. MITA's earlier comments[1] submitted during the previous rulemaking regarding patient safety risks and other concerns with the exemption are hereby incorporated by reference. In brief, medical devices are regulated by the U.S. Food and Drug Administration (FDA) *except when the device is being repaired by an independent service operator (ISO)*. These unregulated ISOs are not monitored by the FDA, nor are they required to have quality, safety, or regulatory controls in place to ensure that they return the device to safe and effective condition after servicing. The original equipment manufacturers, however, must register with the FDA, implement and maintain a quality management system to ensure consistent and controlled servicing processes, and file reports of device malfunctions involving injury or potential injury.

## I. The U.S. Supreme Court Has Foreclosed the Librarian's Fair Use Reasoning

The U.S. Supreme Court recently decided *Andy Warhol Foundation for the Visual Arts v. Goldsmith* (No. 21-869, May 18, 2023). That case undermines the Librarian's fair use analysis in the 2021 Exemption and removes any doubt that the copying of medical imaging device software by ISOs to provide commercial repair and maintenance services is not fair use.

The *Warhol* decision addressed the scope of fair use in a case involving a photograph of the late musician known as Prince. The photograph was taken by independent photographer Lynn Goldsmith. Years later, the Andy Warhol Foundation used that photograph without Goldsmith's permission to generate a colorized and stylized rendering of the photograph. The Warhol Foundation sold the rendered photograph to Vanity Fair magazine for $10,000. Vanity Fair then used the rendering as a magazine cover to memorialize Prince after his death in 2016. The original photograph is shown below left; the rendered photograph as it appeared on the magazine cover appears below right.

 

---

[1] https://www.copyright.gov/1201/2021/comments/opposition/Class_12_Opp'n_Medical%20Imaging%20&%20Technology%20Alliance.pdf

2

JA1550

LOC_AR_00002822

The Supreme Court's ruling and reasoning in the *Warhol* case eviscerates the legal foundation for the Librarian's fair use analysis in the 2021 Exemption. The Digital Millennium Copyright Act (DMCA) authorizes the Librarian to promulgate exemptions to the DMCA's general anti-circumvention restriction only when the restriction would suppress "noninfringing uses . . . of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C). Congress has delineated four factors for analyzing fair use. The first factor is the "purpose and character of the use, including whether such use is of a commercial nature." 17 U.S.C. § 107(1). In *Warhol*, the Court explained:

> This factor considers the reasons for, and nature of, the copier's use of an original work. ***The "central" question it asks is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character."*** In that way, the first factor relates to the problem of substitution—copyright's bête noire. ***The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or "'supplan[t],'" the work***.

*Warhol*, slip op. at 15 (emphasis added). The Court elaborated:

> Consider the "purposes" listed in the preamble paragraph of §107: "criticism, comment, news reporting, teaching . . . , scholarship, or research." Although the examples given are "'illustrative and not limitative,'" they reflect "the sorts of copying that courts and Congress most commonly ha[ve] found to be fair uses," and so may guide the first factor inquiry. *Campbell*, 510 U. S., at 577–578 (quoting §101). As the Court of Appeals observed, the "examples are easily understood," as they contemplate the use of an original work to "***serv[e] a manifestly different purpose from the [work] itself***." 11 F. 4th, at 37. Criticism of a work, for instance, ordinarily does not supersede the objects of, or supplant, the work. ***Rather, it uses the work to serve a distinct end***.
>
> Not every instance will be clear cut, however. Whether a use shares the purpose or character of an original work, or instead has a further purpose or different character, is a matter of degree. Most copying has some further purpose, in the sense that copying is socially useful ex post. Many secondary works add something new. That alone does not render such uses fair. ***Rather, the first factor (which is just one factor in a larger analysis) asks "whether and to what extent" the use at issue has a purpose or character different from the original***. *Campbell*, 510 U. S., at 579

3

JA1551

LOC_AR_00002823

(emphasis added). ***The larger the difference, the more likely the first factor weighs in favor of fair use. The smaller the difference, the less likely***.

*Warhol*, slip op. at 18 (emphasis added). The Court concluded with a distillation of its reasoning and an articulation of a new test for fair use:

> In sum, the first fair use factor considers ***whether the use of a copyrighted work has a further purpose or different character***, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use. ***If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use***, absent some other justification for copying.

*Warhol,* slip op. at 19-20 (emphasis added). Applying these factors, the Supreme Court concluded that the two photographs shared substantially the same commercial purpose, and that the Warhol Foundation's use of Goldsmith's photo was not fair use.

The 2021 Exemption also fails the *Warhol* test. The use of the copyrighted work (the medical device software) by third-party ISOs has exactly the same "purpose and character" as the original copyrighted work: enabling the functionality of the medical device. The "original work" (the device software before the ISO repair) and the "secondary use" (the exact same device software after the ISO repair) share the *exact same purpose*—to enable the device to function.

In support of the 2021 Exemption, the Librarian concluded that the ISOs' use of the software was "likely transformative." It was not. A transformative use of a copyrighted work is one that adds "new expression, meaning or message" by altering the content, context, or presentation of the work. *Google*, 141 S. Ct. at 1202. It asks "whether the copier's use adds something new, with a further purpose or different character," thus "altering the copyrighted work" with some new and different expression. *Id.*

The ISOs' proposed uses do not meet that definition in any conceivable respect; they "simply commandeer" the copyright holder's "software and us[e] it for the very purpose for which, and in precisely the manner in which, it was designed to be used." *Triad Systems*, 64 F.3d at 1337. In support of the 2021 Exemption, the ISOs themselves expressly disclaimed transformative use, explaining in their petitions that they did "not seek an exemption to modify medical devices or systems, or their software," in any way. *Register's Recommendation* 208. They wished only to copy the software and use it precisely as it was designed, angling to avoid FDA regulations. That is not a "fair" use.

The copyrighted work is not transformed—*at all*—during or after the maintenance or repair work. The ISOs specifically disclaimed any request for transformative use because such transformation would constitute "remanufacturing" under FDA regulations. The Librarian in the

4

2021 Exemption improperly conflated the medical device's *operational* restoration with the transformation of the copyrighted work itself. The copyrighted work is the device software. Repair or maintenance by an ISO does not transform the device software. The fact that the medical *device* was, in a loose sense, "transformed" from non-functional to functional as a result of the ISO accessing and copying the device *software* does not mean that the actual copyrighted work (the software) was transformed. It was not.

In concluding otherwise, the Librarian explained that she had "previously concluded that diagnosis and repair are likely to be transformative uses," pointing to prior rulemakings concerning exemptions for the service and repair of consumer products like cell phones and game consoles. But those rulemakings concerned uses that everyone agreed *were* transformative. In particular, the 2015 rulemaking cited in the Register's recommendation concerned "diagnosis, *modification*, and repair" of electronic control units in automobiles. The Librarian thus observed in 2015 that "copying the work" embedded in automobile ECUs would often lead to "creat[ing] new applications" and "modification of ECU computer programs" to allow new modes of "interoperation" among auto parts. She concluded, therefore, that "at least some of the proposed uses of ECU computer programs are likely to be transformative." Later, in the 2018 rulemaking, the Librarian cited to its 2015 analysis, but without acknowledging this crucial factor.

Beyond the entirely non-transformative nature of the use of the copyrighted work, the ISO's use of the medical device software is purely commercial. There is no debate that an ISO's use of device software for maintenance services is "entirely commercial in nature." *Triad Systems v. Southeastern Express*, 64 F.3d 1330, 1337 (9th Cir. 1995) (holding that using OEM software for maintenance is not fair use); *accord Advanced Computer Services of Michigan v. MAI Systems*, 845 F. Supp. 356, 364-66 (E.D. Va. 1994) (same). Such commercial use "tends to weigh against a finding of fair use" because "the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985).

In the 2021 Exemption, the Librarian brushed aside the purely commercial nature of the ISOs' intended use, stating without elaboration that their plan to compete with OEMs for maintenance contracts "is not fatal to [the] fair use determination." While true that commercial use is not singularly dispositive of a fair-use assertion, it weighs strongly against fair use when the user acts with "*the intended purpose* of supplanting the copyright holder's commercially valuable right." *Harper & Row*, 471 U.S. at 562.

The *Warhol* case strongly reinforces that conclusion. Just as a magazine publisher's commercial use of a stylized photograph of a famous musician supplants the purpose of and displaces the use of the original photograph of that musician, so too does an ISO's use of medical imaging device software to provide commercial repair and maintenance services displace the right of OEMs to use their copyrighted software for the exact same purpose. The relevant use of the copyrighted works by OEMs is *diagnosis, maintenance, and repair of medical imaging equipment*; the relevant use of the copyrighted works by the ISOs is also for *diagnosis, maintenance, and repair of the equipment*. They are precisely the same. "A use that shares the

5

JA1553

LOC_AR_00002825

purpose of a copyrighted work" like this will merely "provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright." *Warhol*, Slip. Op. at 19 (cleaned up).

## II.    Congressional and FDA Action Further Undermine the Renewal Petitions

Since the Librarian implemented the 2021 Exemption, Congress and the FDA have announced new policies on medical device cybersecurity that directly conflict with the 2021 Exemption. Specifically, FDA issued draft guidance in April 2022[2] that, when finalized, will create more stringent premarket expectations for medical device submission sponsors. Further, on December 29, 2022, the Consolidated Appropriations Act, 2023 was signed into law. Section 3305, "Ensuring Cybersecurity of Medical Devices," amended the Federal Food, Drug, and Cosmetic Act (FD&C Act) by adding section 524B, Ensuring Cybersecurity of Devices. This new law creates new cybersecurity requirements for medical device manufacturers that may be impeded by the hacking allowed under the exemption.

## III.    Conclusion

Developments in the law regarding copyright fair use undermine renewal of the 2021 Exemption. The *Warhol* case makes clear that commercial copying for the same commercial purpose fails the fair use test. That is exactly what the 2021 Exemption allows. The patient safety risks from unregulated and unmonitored ISO repairs are just as serious today as when the original exemption was proposed and issued in 2021. Moreover, actions by Congress and the FDA reinforce the importance of cybersecurity protections, which the 2021 Exemption undermines by legalizing hacking into lifesaving medical devices. For these reasons, the Librarian should not renew the 2021 Exemption.

---

[2] https://www.fda.gov/media/119933/download#page=44

6

JA1554

LOC_AR_00002826

An official website of the United States Government.

Docket (/docket/COLC-2023-0004)  /  Document (COLC-2023-0004-0002) (/document/COLC-2023-0004-0002)
 / Comment

 **PUBLIC SUBMISSION**

# Comment from American Consumer Institute

Posted by the **U.S. Copyright Office** on Aug 14, 2023

View More Comments    40    (/document/COLC-2023-0004-0002/comment)

View Related Comments    40    (/docket/COLC-2023-0004/comments)         Share ▾

Comment

The American Consumer Institute ("ACI") hereby submits this comment opposing the petition to renew the
2021 exemption governing, "Computer programs that control medical devices or systems, and related data
files, for diagnosis, maintenance, or repair of the device or system."

ACI is a nonprofit (501c3) educational and research institute with the mission to identify, analyze and
protect the interests of consumers in selected policy and rulemaking proceedings related to information
technology, health care, retail, insurance, energy, postal and other issues.

Often, rulemakings decisions, like this one, can yield more costs than benefits to consumers if not
appropriately considered. We would therefore like to the urge the Librarian to seriously consider how the
exemptions for medical devices could jeopardize patient safety during this ninth triennial rulemaking
mandated by the Digital Millennium Copyright Act.

This year, ACI established the Safe Repair Project. A new initiative to keep American consumers and
patients safe from potentially dangerously and incorrectly repaired medical equipment. Our goal aims to
educate and advocate for sensible policy solutions that ensure patient safety remains at the forefront of the
right to repair debate.

The exemption undermines the maintenance and repair standards laid out by the U.S. Food Drug
Administration (FDA) for the equipment employed in patient care. Medical devices are regulated by the FDA
because they are intricate and sensitive machines that require precision and expert training to conduct
necessary repairs. The FDA requires specific technical requirements, specifications and expertise when
manufacturing these regulated products.

However, independent servicers (ISOs) are neither regulated nor monitored, and not required to adhere to
the FDA's Quality System Regulations or report adverse repair events. We have strong federal regulations
on the manufacturers in this market, but none related to third-party servicers. This gap puts patients at

**JA1555**

LOC_AR_00002827

serious risk.

Moreover, because these unregulated repair shops have no obligation to uphold the highest repair standards or report adverse incidents, we are potentially exposing patients to poorly serviced or malfunctioning medical devices.

While our organization's mission is rooted in consumer sovereignty — the freedom for consumers to make their own choices and the importance of giving consumers better information to make those choices – there are certain industries that require oversight and accountability to maintain the public interest. A decision to continue the exemption from 2021 from the Librarian would undermine that system.

Repairs by unregulated ISOs increase patient risk and a continued exemption would only serve to undermine the quality and safety standards that patients and medical professionals rely on to ensure patient safety.

If your loved one needed an emergency diagnostic evaluation, you certainly would want that equipment to be maintained by a licensed professional with the same knowledge and training required by the FDA. Patients deserve better.

Thank you for your consideration of our comments.

Respectfully submitted,

Steve Pociask
President and CEO
American Consumer Institute Center for Citizen Research
4350 Fairfax Drive, Suite 725
Arlington, VA 22203
Steve@theamericanconsumer.org
(703) 282-9400

**Comment ID**
COLC-2023-0004-0039

 **Tracking Number**
ll7-07fg-gz13

**Comment Details**                          **Submitter Info**

**Organization Name**
American Consumer Institute

**JA1556**

LOC_AR_00002828



About   Bulk Data Download     Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

**JA1557**

LOC_AR_00002829



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

[  ] **Check here if multimedia evidence is being provided in connection with this comment.**

## ITEM A. COMMENTER INFORMATION

The Advanced Medical Technology Association (AdvaMed) is a trade association representing the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems. Together, our members manufacture much of the life-enhancing and life-saving health care technology purchased annually in the United States and globally. AdvaMed members range from the largest to the smallest medical technology producers and include hundreds of small companies with fewer than 20 employees. Our members are committed to developing new technologies and services that allow patients to lead longer, healthier, and more productive lives. The devices made by AdvaMed members help patients stay healthier longer and recover more quickly after treatment and enable clinicians to detect disease earlier and treat patients as effectively and efficiently as possible. Strong intellectual property protections, including copyright protection for source code and device outputs, are essential to developing and bringing medical technologies to market.

Christopher L. White
General Counsel & Chief Policy Officer
Advanced Medical Technology Association (AdvaMed)
1301 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004
cwhite@advamed.org
202-783-8700

## ITEM B. PROPOSED CLASS ADDRESSED

Renewal Class 12: "Computer Programs—Repair of Medical Devices and Systems."[1]

---

[1] Exemptions To Permit Circumvention of Access Controls on Copyrighted Works, 88 Fed. Reg. 72,013, 72,021–22 (Oct. 19, 2023) ("2023 NPRM").

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

**JA1558**

LOC_AR_00002830

Iᴛᴇᴍ C.  Oᴠᴇʀᴠɪᴇᴡ

The exemption from liability under 17 U.S.C. § 1201(a)(1)(A) for repair of medical devices and systems ("the Exemption") was wrongly granted and should not be renewed. The Exemption covers "Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system."[2] In other words, the exemption allows for the circumvention of technological protection measures (TPMs) to access computer programs and related data files in medical devices and systems.

Original equipment manufacturers (OEMs) include computer programs and data files with the medical devices and systems they sell. Countless medical devices and systems now include software and data files that perform operations ranging from calibrating imaging data to determining the dose of radiation that is provided in a procedure. This breadth of issues and works makes it nearly impossible for proponents (or the Office) to show the effects of the exemption, much less a "particular" class of works under the statute that are worthy of this exemption.

However, no analysis of particular works is required to see that the exemption fails on its face. The exemption only covers non-transformative uses that are entirely for commercial gain. These uses are infringing—not fair use—and therefore, circumventing TPMs to perform those infringing uses cannot be exempted under § 1201(a)(1)(C).

The key error in the Office's 2021 analysis was the finding that the first fair use factor, the purpose and character of the use, favored fair use. The finding as to the first factor led to an incorrect conclusion that the exemption would protect fair uses of copyrighted materials. The exemption, as written, only covers non-transformative uses because the exemption is explicitly limited to repair and does not protect circumvention for modifying or otherwise changing the copyrighted works. Moreover, other recent factual and legal developments undermine the Office's prior rulemaking: the Supreme Court's recent decision in *Andy Warhol Found. for the Visual Arts v. Goldsmith,* and the FDA's 2023 publication of new guidance—Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions, Guidance for Industry and Food and Drug Administration Staff ("2023 FDA Cybersecurity Guidance").[3] These changes to the legal and factual bases of the exemption warrant a reconsideration of the 2021 decision to grant the exemption.

The first fair use factor weighs the commercial nature of the work against the transformation of that work by the copier of the work.[4] Here, the uses are purely commercial uses by for-profit independent service organizations (ISOs). The exemption does not allow modification of the

---

[2] 37 C.F.R. § 201.40(b)(15) (2023).

[3] *Available at* https://www.fda.gov/media/119933/download. *See also* 88 Fed. Reg. 66,548 (Sept. 27, 2023) (announcing the availability of the Guidance document following notice and comment on same).

[4] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508, 532 (2023) ("*Warhol*").

2

JA1559

LOC_AR_00002831

underlying works, so the copiers cannot "transform" the work itself. Since the works are not transformed at all, the uses at issue here are purely commercial non-transformative uses. Those uses decisively cut against a finding of fair use. The Office, therefore, should have found that this non-transformative copying of medical device files and software in the for-profit repair context was not fair use and that a § 1201 exemption could not be granted to allow circumvention for this class of infringing uses.

Additionally, the Office wrongly considered only the public policy considerations favoring an exemption, while ignoring federal policy considerations against the exemption. In particular, the FDA has increased its efforts and guidance on cybersecurity as both a public health and national security issue. If public policy should be considered at all, the FDA's statements about the importance of limiting access to medical devices should be considered determinative. Instead, the Office only relies on public policy arguments to support the exemption.[5] The Office has previously dismissed the public policy problems created by the Exemption's conflict with the FDA's cybersecurity guidance.[6] However, the latest FDA guidance, published in September 2023 (after the present notice of proposed rulemaking), only strengthens the public policy case against the exemption.[7] In other words, if the effect on the medical device market is considered, the Office should look to the FDA—not for-profit ISOs—to decide the policy questions around device security, safety, and repair.

In sum, the Exemption denies DMCA protection to OEM device manufacturers and enables widespread commercial copying of medical device software and files. This kind of commercial non-transformative copying has never been within the scope of fair use, as confirmed by *Warhol*. At the same time, the Exemption undercuts the FDA and industry cybersecurity programs. The result for the US medical system is that thousands of lightly regulated ISOs are free to circumvent security controls on medical devices under an "honor system," so long as they claim not to modify the devices after they obtained unauthorized access. Without the ability to police device access under the DMCA, manufacturers have few options to protect their devices from unauthorized access or to even protect the intellectual property that OEMs invest in creating for their devices. In short, the sweeping 1201 exemption gives government approval to a largely unregulated grey market of commercial medical device hacking, where the effects on patient safety and the industry are impossible to measure. The exemption should not be renewed.

---

[5] See 2023 NPRM at 72021 (quoting a petitioner's assertions about the exemption's benefits to "availability" and "affordability" of medical care).

[6] See U.S. Copyright Office, Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 229 ("2021 Recommendation") ("[T]he Register generally does not consider other regulatory schemes as part of the adverse effects analysis ....").

[7] U.S. Food & Drug Administration, Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions, Guidance for Industry and FDA Staff (Sept. 27, 2023), *available at* https://www.fda.gov/media/119933/download ("2023 FDA Cybersecurity Guidance").

3

**JA1560**

LOC_AR_00002832

ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

Healthcare demands special care from policymakers and businesses to protect human life, and the TPMs at issue here are recognized as a key to that process. Over the last three years, the FDA has only strengthened its guidance to industry instructing and requiring the use of TPMs in medical devices, culminating in the 2023 FDA Cybersecurity in Medical Devices Guidance.[8]

The FDA instructs OEMs to "identify, assess, and mitigate cybersecurity vulnerabilities as they are identified throughout the supported device lifecycle."[9] OEMs can identify, assess, and mitigate such issues using TPMs. Installing TPMs on medical devices allows OEMs to *identify* the unauthorized access to those devices, *assess* the risks from the unauthorized access, and *mitigate* the risks of unauthorized access by enforcing TPMs and IP rights. The TPMs provide a first line of defense to *identify*, *assess*, and *mitigate* unauthorized access, even before the medical device has been modified, altered, or "hacked" to remove sensitive IP or patient data.

Limiting access to device files and software to only users with special training or certifications is commonly achieved using TPMs. The FDA explains that "cryptographically strong authentication" should be used "to authenticate personnel, messages, commands updates, and as applicable, all other communication pathways."[10] In fact, the 2023 FDA Cybersecurity Guidance explains that "cybersecurity is part of device safety and effectiveness."[11] That document includes 57 pages of guidance about medical device security, including examples of TPMs that should be included to comply:

- Authentication;
- Authorization;
- Cryptography;
- Code, Data, and Execution Integrity;
- Confidentiality;
- Event Detection and Logging;
- Resiliency and Recovery; and
- Updatability and Patchability.[12]

FDA guidance instructs manufacturers that they "are responsible for identifying cybersecurity risks in their devices and the systems in which they expect those devices to operate, and implementing the appropriate controls to mitigate those risks."[13] OEM equipment manufacturers

---

[8] *See* 2023 FDA Cybersecurity Guidance at 5–6 (explaining that cybersecurity is required by the FDA's quality system regulations including 21 C.F.R. § 820.30).

[9] *Id.* at 19.

[10] *Id.* at 33.

[11] *Id.* at 9.

[12] *Id.* at 22.

[13] *Id.* at 20.

4

**JA1561**

LOC_AR_00002833

(like AdvaMed's members) work to implement FDA guidance in their products to protect the public from Cybersecurity threats.

Petitioners point to an August 2021 Letter from the FDA to the Copyright Office—that the exemption would not "necessarily" harm the safety and effectiveness of medical devices "with respect to cybersecurity" as supporting their position.[14] That same August 2021 Letter concludes that the FDA "has sought stakeholder input on this topic and is evaluating FDA's approach to cybersecurity."[15] Today, the Office continues to rely on this same statement from 2021 as dispositive to whether the exemption jeopardizes healthcare by weakening cybersecurity.

However, the 2023 Guidance shows that the FDA's position on the cybersecurity of medical devices has changed over the last three years. And that change is consistent with guidance across the federal government warning of growing cybersecurity risks. For example, on February 14, 2022, the Health and Human Services Cybersecurity and Infrastructure Security Agency (HHS CISA) issued a "Shields Up" Notice warning stating:

> Every organization in the United States is at risk from cyber threats that can disrupt essential services and potentially result in impacts to public safety. … we are mindful of the potential for the Russian government to consider escalating its destabilizing actions in ways that may impact others outside of Ukraine. Based on this situation, CISA has been working closely with its critical infrastructure partners over the past several months to ensure awareness of potential threats—part of a paradigm shift from being reactive to being proactive.[16]

In sum, the August 2021 Letter cannot be read as the FDA putting its stamp on grey-market device hacking today, when current FDA guidance instructs OEMs to prevent such hacking.

### ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

At the outset, an exemption to 17 U.S.C. § 1201 is only meaningful if there is a protected (i.e., copyrighted) work that is being accessed. Section 1201 only forbids circumvention of technological measures that "control access to a protected work under this title." See

---

[14] Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office at 3 (Aug. 13, 2021).

[15] *Id.*

[16] HHS CISA Shield's Up Alert Report 202202141700 (Feb 14, 2022), *available at* https://www.hhs.gov/sites/default/files/cisa-shields-up-alert.pdf.

JA1562

LOC_AR_00002834

1201(a)(1)(A). Thus, proponents of the exemption cannot dispute that they are circumventing TPMs to access works protected by the DMCA.[17]

The exemption inherently facilitates copyright infringement because the uses at issue are purely commercial and non-transformative. First, the exemption does not cover access for modification of the copyrighted software or data files. Therefore, the plain language of the exemption prevents the kind of transformative uses of the works that could be fair use. Second, the uses protected by the exemption are purely commercial—not expressive, critical, or educational. This purely non-transformative copying for commercial purposes is copyright infringement, not fair use.

Critically, the Register incorrectly analyzes the "use" of the works at issue here. "[T]he first fair use factor considers whether the use of a copyrighted work has a further purpose or different character." *Warhol*, 598 U.S. at 532–33. Here, both the original "use" of the work (operating a medical device or system) is identical to the use of the work after the copying of the works by the ISO. The work—the software or files on the medical device—is not transformed at all by the ISOs. In fact, the work cannot be transformed under the exemption, which forbids modification. Thus, there is no transformative "use."

The Register relies on its own previous exemptions and determinations to argue that "repair" as a category is fair use.[18] But those decisions are not analogous to the present exemption. For example, the Office points to a finding that "jailbreaking" cell phones is allegedly fair use.[19] However, the Register characterized circumventing those TPMs as "noncommercial and personal" uses.[20] Here, the exemption is exactly the opposite: it covers *commercial* servicing of equipment for *public* health. As another example, the Register points to its finding that circumvention of vehicle systems to "create new applications and/or tools that can interoperate with [vehicle] software" is an allegedly fair use.[21] But here, the exemption does not protect "new" applications or tools, since it does not permit ISOs to modify the machines they work on.

---

[17] Proponents have previously suggested that the TPMs protect allegedly non-copyrightable "data files, error logs, configuration files." *See* 2021 Recommendation at 200 n.1093. But the 2021 Recommendation recognized that at least some "medical device and system data files may be protectable compilations" and therefore that a fair use analysis was required to determine if the TPMs were being circumvented for noninfringing uses. *Id.*

[18] See 2021 Recommendation at 211 n.1167 (citing 2018 Recommendation discussing vehicle repair before discussing video game consoles and 2015 Recommendation discussing phone jailbreaking and vehicle repair).

[19] U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 234-235 (2015) ("2015 Recommendation").

[20] U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyright 74 (2012).

[21] 2015 Recommendation at 234.

6

JA1563

LOC_AR_00002835

Simply put, the Register relies on prior findings about various noncommercial uses (jailbreaking) and transformative uses (creating new vehicle software) and stretches them to support the present exemption that covers *commercial* and *non-transformative* uses. Had the drafters of the DMCA or the Copyright Act wished to universally exempt repair services from copyright, they had ample opportunity to do so. But neither the DMCA nor the Copyright Act carve out such an exemption.[22]

On the contrary, a correct analysis of the fair use case law shows that these uses are not fair. To start, the Supreme Court in *Campbell* explained that the first factor is "whether the new work 'merely supersede[s] the objects' of the original creation." [23] Or whether it "adds something new, with a further purpose or a different character, altering the first with new expression, meaning or message … in other words, whether and to what extent the new work is 'transformative.'"[24] Here, the "new work" is an unmodified exact copy of a medical device software file. The use of those files is for the same purpose—operating the same medical machine—and by the terms of the exemption, the copiers add no new "expression meaning or message." Thus, a proper analysis of the "use" of the copyrighted works here shows that those uses are non-transformative.

*Warhol* only strengthens this argument. *Warhol* held that the "first fair use factor considers whether the use of a copyrighted work has a further purpose or different character." The *work* (the software subject to the exemption) is used for the same purpose and character—operating the medical devices and systems. *Warhol* confirms that when "an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use."[25] That is exactly the situation here. In short, *Warhol* confirms that the Register must look to the *use* of the copied work to determine whether the ultimate use of the infringing work is transformative. Since the "use" of the software and data files is the same before and after the repair, that "use" is not a transformative fair use.

Finally, the Supreme Court's analysis of fair use in the software field further undercuts the Register's analysis. The 2023 NPRM continues to rely on *Google LLC v. Oracle America, Inc.* as supporting the determination that repair is fair use.[26] But in *Google*, the copying at issue was a Java API created by Oracle that allowed programmers to call up other implementing programs—not the entirety of the work. The Court explained that Google's use of those APIs was "to create new products" and to "expand the use and usefulness of Android-based smartphones."[27] Google's use of Oracle APIs was based on the "very creativity that was needed to develop the

---

[22] 17 U.S.C. § 117(c) protects specific uses of copying software for repair when "such a new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed." The Register's 2021 analysis focused on the broader fair use analysis which is not as limited as 17 § USC 117.

[23] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).

[24] *Campbell*, 510 U.S. 569.

[25] *Warhol*, 598 U.S. at 532

[26] 2023 NPRM at 72022.

[27] *Google LLC v. Oracle Am.*, Inc., 141 S. Ct. 1183, 1203 (2021)

7

**JA1564**

LOC_AR_00002836

Android software for use not in laptops or desktops but in the very different context of smartphones."[28] Thus, the Supreme Court recognized that Google's use of the Oracle code was transformative because it created new products, expanded the usefulness of those products, and adapted that code to a different computing environment (smartphones) instead of desktops. None of the facts in *Google* that favored a finding of transformative use are present here. Again, the ISOs' use of copyrighted works is for exactly the same use (operating the machine) in exactly the same computing environment (the same machine) and, under the terms of the exemption, the ISOs cannot modify the code at all, much less perform the kinds of innovative improvements that Google claimed.

Cases decided both before and after *Warhol* confirm that the analysis of the use depends on how the work is being put to use. In *Oracle v. Rimini Street*, the defendant Rimini made much the same argument as the Office does here—that the context of its use (creating software tools) was different in character than the original work (Oracle's software).[29] The district court rejected the argument that Rimini's use was transformative, holding that "when Rimini made copies of PeopleSoft to develop and test its Automated Tools, Rimini 'put those [PeopleSoft] copies to the identical purpose as the original software. Such a use cannot be considered transformative.'"[30]

Rimini's argument in *Oracle* was essentially the same as the Register's argument here—that the context of the infringement can be a transformative use, even if the copy of the work is used in the same way as the original work. But the district court in *Oracle* held, citing *Warhol* and *Harper*, that the correct analysis was whether the copies were "put … to the identical purpose as the original software."[31] Here, as in *Oracle*, any copies being made by ISOs are "put … to" the identical purpose as the original software: operating the medical device or system. Thus, those uses are not transformative, whether they are in the "context" of developing other tools (as in *Oracle*) or in the context of repairing existing tools (as in the present exemption).

Pre-*Warhol* precedent came to this same conclusion. In *Wall Data Inc. v. Los Angeles County Sheriff's Department*, the Ninth Circuit explained that "a use is considered transformative only where a defendant changes a plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context *such that the plaintiff's work is transformed into a new creation*."[32] Here, the ISOs' use cannot change the copyrighted work under the exemption. And the ISOs clearly do not use the work in a "different context such that the plaintiff's work is transformed into a new creation." Instead, the "creation" of an ISO is at best a machine that works as it originally did—not a "transformed … new creation" that could be a fair use.

---

[28] *Id.* at 1202

[29] *Oracle Int'l Corp. v. Rimini St., Inc.*, No. 2:14-CV-01699-MMD-DJA, 2023 WL 4706127, at *76 (D. Nev. July 24, 2023)

[30] *Id.* (alteration in original) (quoting *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006)).

[31] *Id.*

[32] 447 F.3d 769 (9th Cir. 2006) (emphasis added).

8

JA1565

LOC_AR_00002837

The defendant in *Wall Data* also raised similar arguments to the ISO proponents of the exemption here, claiming that the commercial harm to the plaintiff was insignificant and that uses of the work saved time, effort, and money.[33] But the Ninth Circuit rejected these arguments and concluded that the use was "not transformative, did not promote an advancement of the arts, and was commercial in nature"—ultimately holding that a fair use defense did not apply.[34]

In sum, the exemption wrongly protects large-scale, non-transformative commercial use that is not protected by fair use. The adverse effect on non-infringing uses is, therefore, minimal (or nonexistent). Moreover, the cybersecurity and health implications of the exemption involve issues of national security and patient safety that deserve special consideration from the Office to avoid undercutting the executive branch's policies. The Copyright Office should not renew the exemption.

DOCUMENTARY EVIDENCE

None.

---

[33] *Id.* at 779.

[34] *Id.* at 780.

9

JA1566

LOC_AR_00002838

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

*Please submit a <u>separate</u> comment for each proposed class.*

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through Regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[ ] Check here if multimedia evidence is being provided in connection with this comment.**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at <u>copyright.gov/1201/2024</u>.*

## ITEM A. COMMENTER INFORMATION

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

Gerard Donovan
REED SMITH LLP
K Street, N.W.
1000, East Tower
Washington, D.C. 20005

William J. Overend
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 120I(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office website and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 120I(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

**JA1567**

LOC_AR_00003632

Gregory Vose
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222

**ITEM B.  PROPOSED CLASS ADDRESSED**

Class 5: Computer Programs – Repair

**ITEM C.  OVERVIEW**

Proponents have requested to dramatically expand the already broad Class 5 DMCA exemption for consumer devices to now also cover all industrial and commercial equipment.  An exemption covering such a multitude of systems would insulate infringing conduct the DMCA was enacted to prohibit and should be rejected for at least the following reasons. First, the proposed class broadly covering industrial and commercial equipment would arguably include medical devices, which are already covered by a separate exemption that is currently subject to a legal challenge.  Second, the Register cannot appropriately apply the highly contextualized, fact-specific fair use test to the vast number of systems and copyrighted works that could fall within the expansive proposed class. Finally, because users of commercial and industrial equipment are commercial actors and circumventions of technological measures on such equipment is therefore likely to be an infringing use, the proposed class is dissimilar to the existing class of users of consumer devices and would sweep illegal conduct into the safety net created by the proposed expanded exemption. Accordingly, Philips hereby opposes the petitions to expand the existing Class 5 DMCA exemption for consumer devices.  Should the Librarian further consider such a vast expansion of the consumer device class to also cover industrial and commercial equipment, Philips requests that the Librarian add clarifying language expressly stating that the proposed expansion does not cover medical devices.

**ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

Philips North America, LLC ("Philips") is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems. Philips' proprietary software enables certain functions on these systems that can be modified only by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace in accordance with FDA guidance. Philips' high-quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

Philips includes access controls on its medical imaging systems to protect its copyright-protected software and to restrict access to its software to authorized personnel. This includes software designed for use by Philips engineers to diagnose and service the systems. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use.

2

**JA1568**

LOC_AR_00003633

Through use of its Integrated Security Tool and account entitlements, Philips provides access to many software service tools on its medical devices upon request to individuals in the United States, including employees of independent service organizations. However, Philips has also learned of several individuals and service organizations who have acquired methods to bypass Philips' security measures and make unlicensed use of the copyrighted software service tools developed by Philips. Those individuals and independent service organizations have used Philips' software service tools for their original, intended purpose without modification; therefore their use was non-transformative. Those individuals and service organizations are the only entities known to Philips to have exploited mechanisms to bypass Philips' security measures, and Philips is not aware of instances of its security measures being bypassed for any purpose other than to use Philips' proprietary software for its intended purpose without modification. Further, their unlicensed use of Philips' software service tools has been to sell commercial services that compete against Philips.

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

I.      The Expanded Exemption Should Be Denied.

    A.      The Expansive Scope of the Proposed Class Could Arguably Include Medical Devices.

Proponents' comment in support of their petition calls for significant expansion of the Class 5 exemption to now include "physical devices, controlled by copyrighted software, that are designed for use in commercial or industrial settings."[1] Indeed, Proponents themselves acknowledge the "unusually broad nature of the proposed class."[2] Despite Proponents' assurances to the contrary,[3] the breadth of the proposed class could arguably encompass medical devices like those Philips manufactures because those devices are, as Proponents put it, "designed for, marketed at, sold to, and utilized by commercial actors."[4] After the initial sale, medical devices are then serviced by manufacturers or independent service organizations for additional commercial benefit. Thus, medical devices could arguably fall within the proposed class as commercial equipment.

Expanding the Class 5 exemption to a proposed class that potentially includes medical devices is unnecessary and would cause confusion in the industry because medical devices are the subject of an existing DMCA exemption.[5] Philips and others opposed enactment and renewal of that exemption, arguing that the proposed exemption was for infringing, commercial purposes and

---

[1] Public Knowledge and iFixit Comment at 9.

[2] Id. at 7.

[3] Id. at 9 ("Devices designed or marketed for medical…use should remain outside the scope of this class.").

[4] Id.

[5] 86 Fed. Reg. at 59,627; 37 C.F.R. § 201.40(b)(15).

3

JA1569

LOC_AR_00003634

not fair use and would cause risks to patient safety, among other reasons.[6,7]  While the Librarian ultimately overruled Philips' objections and the Copyright Office indicated its intent to renew the exemption, two industry groups sued the Librarian over enactment of the medical devices exemption, and that lawsuit is currently on appeal before the U.S. Court of Appeals for the District of Columbia Circuit.[8]  Accordingly, the proposed expansion of the Class 5 exemption should be rejected, or, at least, narrowed to expressly exclude medical devices.

### B.    The Register Cannot Engage in the Requisite Fair Use Analysis for a Class as Vast and Varied as the Proposed Class.

As the Copyright Office has instructed, exemptions should only be granted where the evidence shows that it is "more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing **uses** of a particular class of copyrighted works."[9]  To establish a case for an exemption, "proponents must show at a minimum (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses."[10]  More particularly, "[i]t is not enough that a particular use could be noninfringing.  Rather, the Register will assess whether the use is likely to be noninfringing based on current law."[11]  "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing."[12]

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

As the U.S. Supreme Court has stated, both the historical background of fair use and modern precedent "make[] clear that the concept [of fair use] is flexible, that courts must apply it

---

[6] *See* Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201 by Philips North America, LLC (Feb. 8, 2021), available at
https://www.copyright.gov/1201/2021/comments/opposition/Class_12_Opp'n_Philips%20North%20America.pdf.

[7] *See* Comments Regarding Petitions to Renew DMCA Exemption Relating To Medical Devices by Philips North America, LLC (Aug. 11, 2023), available at https://www.copyright.gov/1201/2024/petitions/renewal/Opp-Medical-Devices-Philips-North-America-LLC.pdf.

[8] *Medical Imaging & Technology Alliance, et al. v. Library of Congress, et al.*, No. 23-5067 (D.C. Cir.).

[9] U.S. Copyright Office, Section 1201 of Title 17 at 112 (June 2017),
https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

[10] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.

[11] U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6,
https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf.

[12] *Id.*

4

JA1570

LOC_AR_00003635

in light of the sometimes conflicting aims of copyright law, and that its applications may well vary depending upon context." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021). In other words, "the fair use analysis is highly fact-specific and must be performed on a work-by-work basis." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1261 (11th Cir. 2014); *see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 51 (2d Cir. 2021) ("[D]eterminations of fair use are highly contextual and fact specific, and are not easily reduced to rigid rules."). Indeed, courts often deny class certification in cases where fair use defenses are at issue given the context-specific inquiry required of those defenses. *See, e.g., FPX, LLC v. Google, Inc.*, 276 F.R.D. 543, 551 (E.D. Tex. 2011) (denying plaintiffs' request for class certification "because of the fact-specific inquiries the court would have to evaluate to address [defendants'] affirmative defenses [including fair use]").

Here, the Register cannot possibly engage in the requisite fact-intensive fair use analysis for the myriad products and uses that fall within the proposed class. Indeed, Proponents' comment effectively acknowledges the futility of engaging in a fair use analysis for this proposed class. For example, Proponents admit that the cost of downtime for equipment in the proposed class, offered as justification for hacking of security measures on commercial and industrial devices, "varies by device and industry" and "ranges from hundreds to millions of dollars per day."[13] Further, any infringement or fair use analysis must focus on the copyrighted work itself, as opposed to simply the device or industry, because a use of a copyrighted work for its intended purpose would be non-transformative independent of the industry or justification for hacking of security measures. Thus, contrary to Proponents' assertions, systems in the proposed class are not even similarly situated among themselves, let alone among the existing class of consumer devices. That is why courts postpone resolution of class certification, which also requires that class members be similarly situated, until fair use defenses are resolved. *See FPX, LLC*, 276 F.R.D. at 551 (E.D. Tex. 2011); *see also Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 134 (2d Cir. 2013) ("resolution of Google's fair use defense in the first instance will necessarily inform and perhaps moot our analysis of many class certification issues, including those regarding the commonality of plaintiffs' injuries, the typicality of their claims, and the predominance of common questions of law or fact").

Because the breadth of the proposed class effectively bars the Register from engaging in fair use analysis, the Librarian should deny Proponents' request for expansion of the Class 5 exemption.

### C.    The Proposed Class Is Overbroad Because It Includes Infringing Uses.

Should the Register proceed to fair use analysis, such analysis will show that users of commercial and industrial systems are not similarly situated to the users of consumer products. While consumer product users may circumvent access controls for non-commercial reasons, users of commercial and industrial systems would circumvent access controls for commercial motivations. Further, the proposed class would cover non-transformative use of copyrighted software after circumvention: namely, use of the software for its intended purpose of servicing or repairing commercial and industrial systems. Accordingly, the proposed class is overbroad because it sweeps within its protection infringing uses that the DMCA was created to prohibit.

---

[13] Public Knowledge and iFixit Comment at 8.

5

**JA1571**

LOC_AR_00003636

In *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023), the U.S. Supreme Court clarified that commercial use of a copyrighted work for the same purpose as the original work weighs against a finding of fair use. There, the Court held that the "purpose and character" factor of the fair use test focuses on "whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism."[14] The Court further clarified that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying."[15] The Court ultimately found that the use at issue was infringing, emphasizing that the "commercial nature of the use, on the other hand, looms larger."[16] District courts have followed *Warhol* and emphasized commerciality in considering fair use.[17]

Here, like *Warhol*, the non-transformative and commercial character of circumventions for the repair of commercial and industrial equipment, and specifically for medical devices, both "point in the same direction."[18] As to transformation, the commercial actors that service Philips' medical imaging systems, for example, do not transform Philips' copyrighted material. In comments in support of the medical device exemption, one service provider expressly disclaimed transformative use, explaining in its petition that "[m]odifying the software would likely lead to the system being considered remanufactured, which is not the purpose of diagnose, repair, or maintenance. Indeed, remanufacturing is to be avoided."[19] *Warhol* clarified that this falls far outside the bounds of fair use.

As to commercialism, servicers of commercial and industrial equipment are commercial entities that stand to profit from their unlicensed use of copyrighted software. Indeed, in litigation Philips brought against an independent service organization, evidence at trial established that the defendant bypassed the security measures on Philips' imaging systems for commercial use of Philips' proprietary software and the jury found that the defendant made millions of dollars from its illegal access to Philips' copyrighted materials.[20] Pure commercial use of such software for its intended purpose is not fair use.

Supreme Court precedent thus confirms that non-transformative, commercial use of copyrighted software on commercial and industrial equipment cannot constitute fair use. The Librarian should follow the Supreme Court's holding in *Warhol* emphasizing that such commercial

---

[14] 143 S. Ct. at 1273.

[15] *Id.* at 1277.

[16] *Id.* at 1285.

[17] *See, e.g., Oracle Int'l Corp. v. Rimini St., Inc.*, 2023 U.S. Dist. LEXIS 126766, at *259 (D. Nev. July 24, 2023) (holding that fair use did not apply where defendant's copying of software "was for a commercial purpose" "to save significant time, money, and effort").

[18] 143 S. Ct. at 1280.

[19] Avante Health Solutions, Avante Diagnostic Imaging, Avante Ultrasound Medical Device Repair Renewal Pet. at 8.

[20] Dkt. 776 at 4, *Philips Med Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-cv-00021-MOC-DCK (April 28, 2023 W.D.N.C.).

LOC_AR_00003637

uses are not fair and decline to expand the Class 5 exemption to cover such plainly commercial uses.

## II.    CONCLUSION

Enactment of Proponents' expansive proposed class would shield for-profit, commercial entities from liability for engaging in conduct that the DMCA was explicitly created to prohibit. The proposed class arguably encompasses medical devices that are already subject to a separate exemption that is subject to a legal challenge, and is so broad as to frustrate the Register's ability to conduct the required fair use analysis. As the Librarian has recognized, exemptions should not be enacted for "those who use it as an excuse to violate other laws and regulations."[21]  Accordingly, Philips respectfully urges the Librarian to decline the expanded Class 5 exemption.

---

[21] 2021 Recommendation at 218, citing U.S. COPYRIGHT OFFICE, SECTION 1201 OF TITLE 17: A REPORT OF THE REGISTER OF COPYRIGHTS at 126 (2017).

JA1573

LOC_AR_00003638

**U.S. FOOD & DRUG**
ADMINISTRATION

June 21, 2024

### Proposed Renewal of 17 U.S.C. 1201 Exemption
### Pertaining to Repair of Medical Devices and Systems

Suzanne V. Wilson
General Counsel and Associate Register of Copyrights
Library of Congress
Copyright Office
101 Independence Avenue, SE
Washington, DC 20559-6000

The United States Copyright Office (USCO) is conducting the ninth triennial Section 1201 rulemaking proceeding under the Digital Millennium Copyright Act ("DMCA").[1] Under that rulemaking process, several entities petitioned for the renewal of an existing exemption in 37 CFR 201.40(b)(15) from liability under DMCA for accessing "computer programs that are contained in and control the functioning of medical devices or systems, and related data files, for diagnosis, maintenance, or repair." In the Notice of Proposed Rulemaking, USCO recommends renewing this exemption (i.e., "Q—Repair of Medical Devices and Systems").[2] Subsequently, some stakeholders have inquired regarding the U.S. Food and Drug Administration's (FDA; "the agency") view on the proposed renewal of this DMCA exemption.

At this time, FDA's understanding is that the exemption in 37 CFR 201.40(b)(15) would apply to circumvention that is conducted solely to obtain data access for the purpose of diagnosis, maintenance, or repair of devices, and not for the purpose of device modification that may significantly change the performance or safety specifications of the device or its intended use. FDA supports the exemption only in that context. Further, while the cybersecurity landscape has evolved since 2021, FDA's view is that an exemption from liability under 17 U.S.C. § 1201 for circumvention conducted solely for those purposes would not necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity.[3] The ability to conduct maintenance and repair of devices to restore them or ensure they work in accordance with their original specifications and any changes to those specifications authorized for such devices or systems is critical to the continued safe and effective use of devices postmarket. In FDA's guidance "Remanufacturing of Medical Devices" published on May 10, 2024, FDA provides additional recommendations on the activities that it considers to be servicing.

---

[1] USCO, *Ninth Triennial Section 1201 Proceeding, 2024* Cycle, https://www.copyright.gov/1201/2024/.
[2] 88 Fed. Reg. 72,013 (Oct. 19, 2023).
[3] This perspective is consistent with the agency's 2021 letter to the USCO regarding proposals to expand the exemptions in 37 CFR 201.40(b)(4) and (11).

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

**JA1574**

LOC_AR_00004594

**U.S. FOOD & DRUG** ADMINISTRATION

FDA will continue to engage with stakeholders, consider challenges, and evaluate the agency's approach related to cybersecurity and medical device servicing, as appropriate. For more information, see FDA's aforementioned 2021 letter in response to USCO on this topic.

Sincerely,

# Suzanne B. Schwartz -S

Digitally signed by Suzanne
B. Schwartz -S
Date: 2024.06.21 13:46:51
-04'00'

Suzanne B. Schwartz, MD, MBA
Director, Office of Strategic Partnerships and Technology Innovation (OST)
Center for Devices and Radiological Health (CDRH)
U.S. Food and Drug Administration (FDA)

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

(Page 197 of Total)

JA1575

LOC_AR_00004595



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

[  ] Check here if multimedia evidence is being provided in connection with this comment

## ITEM A.  COMMENTER INFORMATION

The Advanced Medical Technology Association (AdvaMed) is a trade association representing the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems.  Together, our members manufacture much of the life-enhancing and life-saving health care technology purchased annually in the United States and globally. AdvaMed members range from the largest to the smallest medical technology producers and include hundreds of small companies with fewer than 20 employees. Our members are committed to developing new technologies and services that allow patients to lead longer, healthier, and more productive lives. The devices made by AdvaMed members help patients stay healthier longer and recover more quickly after treatment and enable clinicians to detect disease earlier and treat patients as effectively and efficiently as possible.  Strong intellectual property protections, including copyright protection for source code and device outputs, are essential to developing and bringing medical technologies to market.

Christopher L. White
Chief Operating Officer and General Counsel
Advanced Medical Technology Association (AdvaMed)
701 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004
cwhite@advamed.org
202-783-8700

## ITEM B.  PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair and the proposed expansion to Medical Devices

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

ITEM C.  OVERVIEW

For the reasons stated below, we respectfully request that the Copyright Office oppose the inclusion of medical devices in Proposed Class 12.

Position Summary

- Allowing unauthorized circumvention of Technological Protection Measures (TPMs) in medical devices can harm patients, compromise patient privacy, and place valuable intellectual property at risk.

- Permitting unauthorized circumvention to maintain, repair, or modify a medical device without FDA oversight and without the manufacturer's consultation will endanger patients.

    o AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

- No exemption should be granted to permit modification of a medical device

    o Under FDA regulations, modifications to a medical device, including changes to service parts and servicing instructions, must be evaluated to determine if the changes trigger a new FDA review or approval for safety and efficacy.

    o Unauthorized Independent Service Organizations (ISOs), which are commercial organizations in the business of providing maintenance and repair services, are not regulated by the FDA.  As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a medical device during servicing.  For example, it was reported that an unauthorized ISO used replacement parts from a hardware store instead of Original Equipment Manufacturer (OEM) verified parts, which are required to be tested for biocompatibility, toxicity, strength, and other specifications essential to the safety and efficacy of the device.

- No exemption should be granted for medical device diagnosis, maintenance, or repair by Unauthorized ISOs.

    o Robust service and repair offerings already exist through OEMs and *authorized* ISOs (third-party service/repair organizations that the OEM authorizes, trains, and ensures has the necessary equipment to perform maintenance and repair services on OEM devices).  These entities can ensure that the necessary protections for patient safety, patient privacy, and intellectual property are in place and maintained.

2

JA1577

LOC_AR_00005476

- These protections include obligations to adhere to FDA Quality System Regulation (QSR) requirements, which include the following (among others):

  - the obligation to develop and preserve proper records regarding servicing of each device;

  - training – including documentation of training – and maintenance of certification for service personnel;

  - calibration of equipment used to repair devices;

  - use of appropriately tested and validated replacement parts;

  - reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

  - registration of facilities to enable FDA inspection of compliance to these FDA QSR regulations.

  o Unauthorized ISOs have no obligation to follow rigorous QSR requirements.

  o 17 USC 117(c) limitations do not apply to the use of some medical device embedded diagnostic software accessed by unauthorized ISOs through TPM circumvention and utilized to diagnose maintenance and repair issues.

    - This diagnostic software embedded in the medical devices is both (1) not necessary for the activation or routine operation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device.

      - Such embedded diagnostic software is specifically excluded from what is sold, leased, or licensed to the device owner/lessee, and only authorized servicers are permitted to access it.

      - The sales/lease agreements for these medical devices also include provisions that control how and who may service the device.

  o An exemption for medical device diagnosis, maintenance, and repair has the potential to embolden piracy of accessory/add-on functionality, subscription-based functionality, and standalone software on medical devices.

- An exemption that includes medical devices may also negatively impact medical technology innovation, health care costs, and supply chain integrity.

3

JA1578

LOC_AR_00005477

ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

The following are examples of the Technical Protection Measures (TPMs) used on medical devices and/or how they may be circumvented.  This list is not exhaustive, and not all TPMs may be applicable or required for each device type.

Limit Access to Trusted Users Only

- TPMs that ensure secure communications with the device using strong encryption and authentication.

- Limit access to use or communicate with devices through the authentication of users (e.g., user ID and password, smartcard, biometric, or digital certificates).  If digital certificates used for strong authentication are not stored in a highly secure manner, it may be possible to compromise and use them to gain access to the device improperly.

- Use automatic timed methods to terminate sessions within the system where appropriate for the use environment;

- Controlling and limiting the times that the device is able to communicate to reduce the window for possible attacks. Through observation and monitoring of the device through circumvention activities, an actor could determine when or under what conditions the device is available for communications.

- Encryption data on the device. If the schema for encrypting data on the device is not sufficiently complex, or that schema has been compromised by others before, circumvention activities may be possible to "un-encrypt" and view the data.   Additionally, if the digital key that contains the encryption details is not sufficiently protected or is exposed by circumvention activities, encryption can be bypassed.

- Where appropriate, a layered authorization model is employed by differentiating privileges based on the user role (e.g., caregiver, system administrator) or device role;

- Use appropriate authentication (e.g., multi-factor authentication to permit privileged device access to system administrators, service technicians, maintenance personnel);

- Strengthen password protection by preventing the use of a "hardcoded" password or common words (i.e., passwords which are the same for each device, difficult to change, and vulnerable to public disclosure) and limit public access to passwords used for privileged device access;

- Where appropriate, providing physical locks on devices and their communication ports to minimize tampering; and

4

JA1579

LOC_AR_00005478

- Require user authentication or other appropriate controls before permitting software or firmware updates, including those affecting the operating system, applications, and anti-malware.

<u>Limit Access to Purchased or Leased Functionality/Services and Prevent Unauthorized Copies</u>

- TPMs, such as a layered authorization model, are used to limit access to only those functionalities or services that were purchased or leased.

  - Additional functionalities, analytics, and integrations are made available for purchase, lease, or subscription and are often provided for, at least in part, by copyrighted software.

  - In some medical devices, the copyrighted software code can perform certain operations on another independent computer (e.g., personal computer with a Unix operating system) that was not purchased or leased with the medical device.

  - Some copyrighted software in medical devices is owned by an entity that is not the medical device manufacturer and is licensed to certain specified entities that do not include the owner/lessee of the device.  In some of these instances, the medical device manufacturer is contractually obligated to protect the software code from unauthorized access and copying.

  - TPMs are also used to protect some diagnostic software embedded in medical devices that is both (1) <u>*not*</u> necessary for the activation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device.  Such diagnostic software is only licensed for access and use by specified authorized servicers.

<u>Ensure Trusted Content</u>

- Restrict software or firmware updates to authenticated code. One authentication method manufacturers may utilize is code signature verification;

- Use systematic procedures for authorized users to download version-identifiable software and firmware from the manufacturer; and

- Ensure capability of secure data transfer to and from the device, and when appropriate, use methods for encryption.

<u>Detect, Respond, Recover</u>

- TPMs (security software) on the device to ensure that the security and integrity of the device source code is protected.    If the security software is not configured correctly or a new vulnerability is discovered in that software, it may be possible to compromise the security software and access the device source code.

5

**JA1580**

LOC_AR_00005479

- Technical Protection Measures that protect the device from malicious code via regular software updates and/or malware protection software. If new security vulnerabilities are discovered in a particular type of device, and the device software and/or the malware software on the device has not been updated to eliminate the vulnerability, malicious actors could engage in circumvention activities that exploit the vulnerability to inject malicious code into a device, and take control of it.

- Implement features that allow for security compromises to be detected, recognized, logged, timed, and acted upon during normal use;

- Develop and provide information to the end-user concerning appropriate actions to take upon detection of a cybersecurity event;

- Implement device features that protect critical functionality, even when the device's cybersecurity has been compromised; and

- Provide methods for retention and recovery of device configuration by an authenticated privileged user.

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

*Whether the proposed class includes at least some works protected by copyright.*

1.  **The Extension of Proposed Class 12 to Cover Computer Programs that are Contained in and Control the Function of Medical Devices Includes At least Some Works Protected by Copyright**

While such determinations are fact-specific, copyright protection generally extends to computer programs on medical devices. The source code and object code in a medical device can include protectable original expressions under copyright law.[1] Copyright protection may extend beyond the literal code to the software's structure, sequence, and organization.

Outputs from a medical device can also constitute copyrightable subject matter. While such a determination is also fact-specific, copyright protection in device outputs may extend to, for example, the structure, format, and arrangement of the output data.[2]

---

[1] See *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1248-49 (3d Cir. 1983) ("[A] computer program, whether in object code or source code, is a "literary work" and is protected from unauthorized copying, whether from its object or source code version.")

[2] *See Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1345 (5th Cir. 1994) (holding that user input/output formats are protectable); *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F. Supp. 2d 531, 535 (N.D. Tex. 2003) (holding that SQL data structures meet the requisite degree of creative expression).

6

JA1581

LOC_AR_00005480

*Whether the uses at issue are noninfringing under title 17.*

**2.  Uses at Issue are Infringing Under Title 17**

   **(a) Fair Use**

   In determining whether the use made of a copyrighted work in any particular case is a
   noninfringing fair use, the following four factors are considered: (1) the purpose and
   character of the use, including whether such use is of a commercial nature or is for
   nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the
   amount and substantiality of the portion used in relation to the copyrighted work as a
   whole; and (4) the effect of the use upon the potential market for or value of the
   copyrighted work.[3]

   **(i) The Purpose and Character of the Use is Commercial in Nature**

   Repairs conducted by a company or a technician engaged in the business of
   repairing embedded software or software-enabled devices would likely be
   considered a commercial use.[4] The primary proponents are for-profit
   Independent Service Organizations (ISOs) who are in the business of
   providing maintenance and repair services for medical devices.  They seek the
   inclusion of medical devices in Proposed Class 12 to expand their commercial
   offerings to also include the diagnosis, maintenance, repair, and modification
   of medical devices without an OEM's authorization.  The commercial nature
   of this use weighs against considering this use to be fair.

   Some unauthorized ISOs have circumvented TPMs on medical devices and
   accessed copyrighted software to utilize software programs that were not
   sold/leased/licensed to the device's owner/lessee.  This includes embedded
   software that is not necessary for the activation of the device.  Examples of
   such embedded software are programs that diagnose maintenance and repair
   issues, collect and transmit certain data, perform analytics that are not
   essential to the device's operation, aid in planning medical treatments, and
   enhance or reconstruct images.

   Similar unauthorized ISOs have circumvented TPMs and cloned the software
   on a medical device they serviced for one client and copied that software onto
   another client's devices.  In one case, embedded treatment planning software,
   which is sold as an entitlement and not enabled unless separately purchased,
   was purchased by one client for a single device.  An unauthorized ISO cloned
   the software in its enabled form and copied it onto 40 devices owned by

---

[3] 17 U.S.C. §107

[4] U.S. Copyright Office, Software-Enabled Consumer Products 39 (2016),
   https://www.copyright.gov/policy/software/software-full-report.pdf

7

**JA1582**

LOC_AR_00005481

unrelated entities that did not purchase the treatment planning software.
While this use is outside the scope of Proposed Class 12, there are legitimate
concerns that granting the proposed exemption would embolden such acts of
piracy.

There is also a commercial benefit to offering maintenance and repair services
without authorization.  Unauthorized ISOs have fewer costs relative to
authorized ISOs who are contractually obligated to undergo OEM approved
training, adhere to FDA Quality System Regulation (QSR) requirements,
protect patient privacy, and protect intellectual property.  Authorized ISOs are
provided with a license and an authorized means to access copyright-protected
software on medical devices that includes software that is involved in the
function of the device (e.g., software to enter settings) and software that is not
necessary for the function of the device (e.g., software that diagnoses
maintenance and repair issues), which is not sold/leased/licensed to the device
owner/lessee.

**(ii) Some Copyright Work on Medical Devices is Unpublished in Nature.**

The use of unpublished work is less likely to be considered fair.  Some
copyright protected software on medical devices is not published.

**(iii) Diagnosis, Maintenance, Repair, and Modification of Medical Devices Often Involve Using All or Substantial Portions of the Copyrighted Work.**

Using all or substantial portions of a copyrighted work weighs against
considering this use to be fair.

**(iv) Uses at Issue Have the Potential to Harm the Value of the Copyrighted Work**

Unlike software-enabled consumer products, there is a market for some
medical device software modules as standalone works.  Some software on
medical devices is activated and maintained through a subscription model.
Other software in medical devices can also function on independent, unrelated
computers (e.g., a personal computer with a Unix operating system can run
certain analytical and image processing software installed in some diagnostic
imaging workstations).

In some instances, the medical device manufacturer is not the owner of the
copyright of certain software modules integrated into a medical device.  For
example, some medical devices are developed through a collaboration
between a medical device manufacturer and a robotics and software company.
In certain instances, some limitations in the software license are due to
constraints imposed by a third-party collaborator (in the above example, the
robotics and software company that owns the copyright to certain software
modules), which are distributed with the device via written licensing

8

**JA1583**

LOC_AR_00005482

agreements.  In such instances, there are contractually obligated limitations specifying that maintenance and repair of certain aspects of the device may only be performed by the third-party robotics and software developer (i.e., the device manufacturer itself may not perform the maintenance or repair on certain aspects of the device).

The use at issue is the diagnosis, maintenance, repair, or modification of a medical device by an ISO that is not authorized by the OEM.  Such uses can result in patient injury, compromise patient privacy, and place valuable intellectual property at risk, all of which can harm the value of the copyrighted work.  Unauthorized ISOs have no obligation to follow rigorous FDA Quality System Regulation (QSR) requirements.  These patient safety concerns are not hypothetical.  Please see the section covering the fifth statutory factor below for a more fulsome discussion with examples.

**(b) Section 117 Limitations of Exclusive Rights**

    **(i)  The section 117(a)(1) limitation on exclusive rights does not apply to a number of medical devices where the owner of the device is not an owner of a copy of one or more software modules that control certain functions of the device.**

Section 117(a) only applies to the "owner of a copy of a computer program."[5] The software on numerous medical devices is provided through a written license agreement.

Some software program modules and associated functionalities are activated and maintained through a time-based subscription service.  Where software is integrated into a device that is sold, the *Vernor* test can be used to determine whether a transaction should be characterized as a sale or a license.  Under *Vernor*, "a software user is a licensee rather than an owner of a copy where the copyright owner: (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions."[6]  For some software modules, a nontransferable license is provided, or transfer of the license requires the copyright owner's consent.  Such licenses generally prohibit modification, translation, and reverse-engineering and may impose use restrictions.  For example, the medical device discussed above in 2(a)(iv) above contractually limits maintenance and repair to the third-party robotics and software company that co-developed the medical device with the manufacturer.

---

[5] 17 U.S.C. § 117(a)

[6] *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)

9

JA1584

LOC_AR_00005483

Other software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the operation or function of the device. Examples of this include software that diagnoses maintenance and repair issues, data collection software, and data analytics software, among others.

**(ii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to the proposed use of modifying a medical device.**

One of the uses at issue for Proposed Class 12 is the modification of a medical device. The section 117(c) defense is limited to maintenance and repair as defined in section 117(d). Although the definition includes "any changes to those specifications authorized for that machine," the lessee of a medical device would generally violate a contractual obligation by modifying or authorizing a third party to modify the device without the authorization of the lessor. A similar violation occurs in analogous situations where the software is provided under a written licensing agreement, which generally prohibits modification of the device.

**(iii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to embedded diagnostics software that is not necessary for the machine to be activated.**

Some software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the activation of the medical device, which is excluded from the limitation on rights for maintenance and repair under 17 USC 117(c)(2). Examples include embedded software that diagnoses maintenance and repair issues, collects data, and performs analytics. Unauthorized ISOs circumvent TPMs to utilize embedded software programs during unauthorized servicing.

**3. Users are Not Likely to be Adversely Affected in their Ability to Make Noninfringing Uses.**

In assessing the adverse effect, the following five statutory factors in 17 USC §1201(a)(1)(C) must be balanced: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.

**(i) The availability for use of copyrighted works is not impacted**

Proponents offer that access to copyrighted works is diminished because unauthorized ISOs are deterred due to the prohibition on circumventing TPMs and claim that the situation has worsened because of the pandemic. However, there is no evidence that hospitals are having any difficulty finding properly trained servicers for their devices,

10

JA1585

LOC_AR_00005484

either from the original manufacturer or their authorized repair technicians. These authorized servicers are conducting on-site repairs, providing remote technical assistance, and delivering necessary replacement parts without interruption to patient care. Medical technology companies are successfully working hand-in-glove with hospitals, clinics, and other health care institutions to service, repair, and maintain crucial medical devices. Ultimately, to ensure patient safety, unauthorized ISOs need more than just access to a repair manual to fix and maintain these sophisticated, life-saving medical technologies properly. They need the same knowledge, training, and expertise the OEMs and authorized ISOs have. Even one minor miscalculation could lead to catastrophic injury—to the patient or the device user. Until there is evidence of an actual shortage of properly trained service technicians, the movement to lower medical device repair standards remains a solution in search of a problem. Alternatives that do not require circumvention exist to diagnose, maintain, and repair medical devices. Authorized ISOs have OEM-granted access mechanisms to diagnose, maintain, and repair devices and are a preferred alternative for patient safety. Owner or lessee users of medical devices can also have their staff become authorized to diagnose, maintain, and repair devices through training programs and undertaking certain QSR obligations.

**(ii) The availability for use of works for nonprofit archival, preservation, and educational purposes is not especially relevant to the use at issue.**

**(iii) The impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research is also not particularly relevant to the use at issue.**

**(iv) The circumvention of technological measures has the potential to affect the value of copyrighted works negatively.**

The circumvention of access controls on medical devices could result in a diminution in the value of copyrighted works if those medical devices could no longer reliably protect the computer programs, patient data, and analytics operating on and produced by the medical devices. There are also concerns about accessing and activating software modules that are purchased or licensed separately following an additional purchase or subscription model. Activating such software modules without authorization would obviously negatively affect the value of that copyrighted work.

**(v) Such other factors as the Librarian considers appropriate.**

Patient safety should be the highest priority concern and substantially outweigh other factors. Medical device manufacturers are highly regulated to ensure that devices continue to be safe and effective for patients for their intended use. OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, by regulation, design changes to a medical device, including changes to service parts and servicing instructions, must be

11

JA1586

LOC_AR_00005485

evaluated to determine if the changes trigger a new FDA review or approval before they can be implemented.

ISOs are not regulated by the FDA. As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a device during servicing. For example, in one instance, an unauthorized ISO used replacement parts from a hardware store instead of the OEM verified parts, which are required to be tested for biocompatibility, toxicity, strength, etc. The result is that unauthorized ISO serviced devices may no longer be as safe and effective as the original device, with the potential for serious patient or user injuries.

In contrast, OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, OEMs must follow other regulatory requirements, including those from the FDA Quality System Regulation (QSR), which require the following (among others):

- the development and preservation of proper records regarding servicing of each medical device;

- training – including documentation of training – and maintenance of certification for service personnel;

- calibration of equipment used to repair devices;

- use of appropriately tested and validated replacement parts;

- reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

- registration of facilities to enable FDA inspection of compliance to FDA regulations.

Under the QSR, OEMs are required to update and maintain strict revision control on servicing documentation and device software, and to ensure that their trained and authorized service representatives are utilizing the most up-to-date information. OEMs are also required to audit their service representatives to ensure they are using appropriate servicing documentation for the model of the device they are servicing. Failure to do so could have serious implications for patient safety.

ISOs authorized by OEM are contractually obligated to implement these requirements.

These patient safety concerns are not hypothetical. AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

12

JA1587

LOC_AR_00005486

***Actual or potential patient and/or operator impacts from these reports include:***

- Screwdriver tip lodged in a patient;

- Operator injury, counterpoise support system arm (80-93 pounds) struck operator;

- Potential for repeat CT scans and contrast administration with the concomitant risk of additional radiation exposure;

- Potential for burns including internal or oral 3rd-degree burns, which may not be apparent until burning tissue is sensed;

- Delayed surgery (potential for worsening patient condition);

- Prolonged surgery (may result in longer exposure to anesthesia, a greater potential for infection, and more blood loss);

- Potential for concussions and/or fractures;

- Infusion therapy - Air in System – potential harms include death, neurological changes, stroke, seizures, cardiac and/or respiratory arrest, pain, decreased oxygenation, arrhythmia, pulmonary hypertension;

- Delays in infusion therapy with the delay of pharmacological effects and/or worsening of condition including death;

- Insufficient or excessive infusion therapy or interruption of therapy and/or worsening of condition including death; and

- Temporary hearing loss; ringing in ears.

- Below are examples of unauthorized ISO "servicing" (which should actually be deemed remanufacturing under FDA regulations).



*Figure 1. The angle cover on an endoscope was replaced with a material resembling plastic wrap.*

13

JA1588

LOC_AR_00005487



*Figure 2. The shaft adapter on an endoscope was repaired using a putty-like material of questionable provenance.*

In these examples, unauthorized ISOs clearly used components that are not likely biocompatible and likely would not withstand the reprocessing and sterilization process. It is also likely that these repairs, particularly Figure 1, compromised the device's ability to perform its key function of accessing a patient's anatomy.



*Figure 3. An Olympus component was inserted into a KARL STORZ endoscope shaft.*



*Figure 4. Broken image fibers in an endoscope.*

Examples in Figure 3 and Figure 4 are equally if not more concerning than the previous examples because they show that a device can be modified such that the physician or patient cannot see the change.

14

**JA1589**

LOC_AR_00005488

Granting an exemption to allow circumventing TPMs to diagnose, maintain, or repair medical devices also raises concerns about whether the TPMs will be safely restored. Critical design details and software code could be accessed more easily by entities with malicious intent who could use the information to develop counterfeit devices, counterfeit software (for the software modules that stand alone), or who could intentionally modify devices in order to harm patients. Lastly, if an exception is granted for medical devices, there may be a negative impact on medical technology innovation, health care costs, and supply chain integrity.

**JA1590**

LOC_AR_00005489



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

## ITEM A.  COMMENTER INFORMATION

As the leading trade association representing the manufacturers of medical imaging equipment, contrast agents, radiopharmaceuticals, and focused ultrasound devices, the Medical Imaging & Technology Alliance (MITA) is writing in response to the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act. Commenter may be reached through the following individuals:

Holly Grosholz
Senior Manager, Government Relations, MITA
Office Phone: 703.841.3228
Email: hgrosholz@medicalimaging.org

Peter Weems
Senior Director, Policy & Strategic Operations, MITA
Office Phone: 703.841.3283
Email: pweems@medicalimaging.org

Peter Tolsdorf
General Counsel and Secretary
National Electrical Manufacturers Association (NEMA)
Office Phone: 703.841.3204
Email: peter.tolsdorf@nema.org

## ITEM B.  PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair.

## ITEM C.  OVERVIEW

Petitioners Transtate Equipment Company and Summit Imaging, Inc., seek an exemption under 17 U.S.C. § 1201 to allow the circumvention of technological protective measures (TPMs) for purposes of diagnosis, modification, and repair of medical imaging devices. These petitions come within Proposed Class 12: Computer Programs—Repair. The below comments submitted by MITA address the proposed exemption regarding medical imaging devices, including magnetic resonance imaging (MRI) scanners, computed tomography (CT) scanners, and X-Ray machines.

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (PL, 93-579).
This authority for requesting this information is 17 U.S.C. §§ 120(1)(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 120(1)(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

Medical imaging device manufacturers (OEMs) use a range of TPMs to protect copyrighted material from being accessed and copied without authorization from the copyright holder. These TPMs include passwords, encryption, access codes, physical access keys with embedded authorization codes, and digital signatures. The methods currently used to circumvent TPMs include copying or cloning physical access keys, "brute force" password cracking, improperly accessing passwords or access keys from authorized users, and the use of passcode-generating algorithms.

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

**I.    The users of the copyrighted works are not adversely affected by the prohibition in their ability to make noninfringing uses of the copyrighted works**

Under 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress and Register of Copyrights shall consider whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works." In conducting such rulemaking, the Librarian shall examine—

(i)    the availability for use of copyrighted works;

(ii)   the availability for use of works for nonprofit archival, preservation, and educational purposes;

(iii)  the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv)   the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v)    such other factors as the Librarian considers appropriate.

These criteria apply only with respect to "noninfringing uses." For the reasons discussed below, the intended uses are broadly infringing. Even assuming such uses were non-infringing, the petitioners fail to establish any of these elements, and several of these elements weigh strongly against the petitioners.

In applying these factors, the Register "balances '[t]he harm identified by a proponent of an exemption . . . with the harm that would result from an exemption.'" Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018, at 15. The rulemaking should consider the positive as well as the adverse effects of TPMs on the availability of copyrighted materials. *Id.*

As a threshold matter, MITA encourages the Register to construe the phrase "users of a copyrighted work" in its appropriate breadth. Medical service providers operate medical imaging equipment, but the ultimate "users" are the patients themselves undergoing the medical imaging

2

JA1592

LOC_AR_00005491

procedures. This consideration is appropriate because considering "adverse effects" solely with regard to the operator of a medical imaging device but without regard to the actual user of that device—the patient—would fail to take full and appropriate account of the adverse effects of granting the petition.

The petitioners fail to establish the first factor of adverse harm because the availability for use of the copyrighted works is not impacted by the TPMs. The medical imaging device software is broadly licensed and available to medical service providers. A TPM does not restrict medical service providers from using the medical imaging device software, it simply limits what aspects of the device software may be viewed and copied. If a hardware component needs maintenance or repair, an unregulated independent service operator (unregulated ISO) may have an interest in accessing that software to more readily determine how to repair the device hardware, but that interest extends beyond "the availability for use" of the copyrighted work. The copyrighted work itself remains usable even though a physical component of the medical imaging device needs maintenance or repair.

The petitioners cannot establish the second factor of adverse harm because the copyrighted works do not implicate nonprofit archival, preservation, and educational purposes. Similarly, with respect to the third factor, the proposed exemption would not impact criticism, comment, news reporting, teaching, scholarship or research. These factors highlight the degree of incompatibility between the statutory factors and the commercial nature of the interest of the petitioners in seeking this exemption.

Regarding the fourth statutory factor of adverse harm, an exemption would damage the market for or value of medical imaging device software and materials. Disabling of TPMs would expose intellectual property, including valuable know-how in addition to the copyrighted information, to competitors and the general public. That itself would severely harm OEMs by allowing competitors to view and replicate valuable innovations. Although patented innovations could be defended, replication of uncovered intellectual property protected by copyright would be extremely difficult to detect in copycat products. Such exposure would also chill future innovation because the innovations themselves would be unprotected. There is a massive cost to develop and secure premarket clearance from the U.S. Food and Drug Administration (FDA) for medical imaging devices. If innovators are not able to recoup those costs by protecting their valuable intellectual property embodied in software and related materials, the incentives for future innovations will be weakened.

The value of medical imaging device software and materials would also be harmed because the disabling of TPMs would lead to an increase in medical imaging device repairs by unregulated ISOs, thereby increasing patient risk and contributing to a loss of public confidence in the safety and reliability of medical imaging devices and the constituent software. As discussed in more depth below, unregulated ISOs are not subject to the FDA regulations that apply to OEMs, and they are not subject to the same training and quality control measures. Together, this disparate level of FDA regulation, training, and quality control will risk patient safety and public confidence in medical imaging procedures. A representative sample of faulty repairs appears in

3

JA1593

LOC_AR_00005492

Appendix 1. These negative impacts will extend to medical imaging devices and the market for the embedded device software and related materials that allow those devices to function.

The fact that there is no independent market for the medical imaging device software beyond the devices themselves undermines the basis for the requested exemption. In considering whether to grant a Section 1201 exemption for motor vehicles in 2015, the Register concluded that the lack of an independent market for the vehicle's software weighed in favor of granting the exemption. Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation to the Register of Copyrights, October 2015 (2015 Register Report) at 236. That reasoning does not extend to medical imaging devices because harm to patients and loss of public confidence in the safety and efficacy of medical imaging harms the market for the integrated software to the same extent as the market for the device itself.

The fifth statutory factor provides for consideration of "such other factors as the Librarian considers appropriate." MITA asks the Register to consider the patient safety aspects of unregulated ISO repair that this exemption would implicate. MITA also asks the Register to consider the regulatory implications to this proposed exemption. MITA recommends that the Register communicate with the FDA Center for Devices and Radiological Health on the relevant regulatory and policy issues governing medical devices, particularly medical imaging device software.

Improper repair or servicing of a medical imaging device presents a wide range of risks for patients and medical service providers. These risks would be exacerbated by granting the petitions and allowing unregulated ISOs and the general public to access medical device software and related materials protected by TPMs. There are numerous risks associated with improper servicing of medical imaging devices, depending on the imaging modality in question.

- **Electrical shock.** All medical imaging devices require electricity to function. If, after servicing, the device has not been properly rewired or has unvalidated parts installed, there is an increased risk of shock to patients and those operating the device.

- **Overexposure to ionizing radiation.** Some imaging devices, including X-Ray and CT scanners, emit ionizing radiation, resulting in potential over-exposure if not properly calibrated or maintained. Improper servicing can inadvertently bypass internal safeguards and severely harm or kill patients.

- **Mechanical failure.** If a medical imaging device suffers a mechanical failure due to improper servicing, significant and irreversible harm to the patient or user can occur, including pinching or crushing.

- **Air embolism.** In the case of injection devices (such as imaging contrast agent power injectors), if the device has undergone improper servicing, the patient could experience a potentially fatal air embolism.

4

**JA1594**

LOC_AR_00005493

- **Improper dosing.** For injection devices, if the device has undergone improper servicing, a patient could experience a potentially fatal underdose or overdose of medication.

- **Infection.** For ultrasound probes and other patient contact devices, if the device has not been properly sterilized or disinfected as specified by the OEM requirements and instructions, transfer of infection or disease between patients could result.

- **Burns.** Incorrect replacement materials or parts in an MRI system may disrupt the path of radiofrequency energy, causing excessive heating and potentially resulting in significant and irreversible patient burns.

- **Interference with other equipment.** If a device's electromagnetic interference shielding has undergone improper servicing, operation of the device could potentially interfere or degrade the proper operation of other equipment in the surrounding area.

- **Cybersecurity.** Whenever software is installed or adjusted for a medical imaging device, or if software tools are used to access a device for diagnostic and maintenance purposes, the integrity of the software may be compromised. Unvalidated software without confirmed authenticity or system integration may present significant potential security vulnerabilities and operational issues. Expanded and uncontrolled access to medical imaging device operating systems and software applications creates the potential for increased cybersecurity risks, as the opportunity to intentionally or unintentionally introduce security vulnerabilities to the device and to any networks to which the device is connected (e.g. hospital) also expands.

- **Delay in patient care.** Any failure in a device to perform when needed as a result of improper servicing, or to provide accurate results, may result in a delay of care, including incorrect diagnosis, resulting in delayed or incorrect treatment of a patient's condition.

- **Misdiagnosis.** Improper servicing could cause a medical imaging device to perform in a manner that does not produce diagnostic-quality images. This could lead to a missed diagnosis or a misdiagnosis.

OEMs have difficulty upgrading medical imaging devices if the service history is unknown, improper parts have been used, or if the device has otherwise been altered. The lack of required regulatory reporting by unregulated ISOs can impair the tracking of significant events for the device and can complicate root cause investigations of device malfunctions. Unauthorized repair can also void electrical safety certifications.

Because of these patient risks, the FDA requires OEMs to comply with a range of regulatory requirements. ***These requirements do not, however, extend to unregulated ISOs***. The regulatory requirements that apply to OEMs include the following.

- Establishment Registration (21 CFR Part 807)

**JA1595**

LOC_AR_00005494

- o   Manufacturers (both domestic and foreign), remanufacturers, and initial
  distributors (importers) of medical imaging devices must register their
  establishments with the FDA.

- Medical Device Listing (21 CFR Part 807)

  - o   Manufacturers must list their devices with the FDA. Establishments required to
    list their devices include: manufacturers; contract manufacturers that
    commercially distribute the device; contract sterilizers that commercially
    distribute the device; repackagers and relabelers; specification developers;
    reprocessors of single-use devices; remanufacturers; manufacturers of accessories
    and components sold directly to the end user; and U.S. manufacturers of "export
    only" devices.

- Premarket Notification (21 CFR Part 807 Subpart E) or Premarket Approval (21 CFR
  Part 814)

  - o   Devices requiring the submission of a Premarket Notification 510(k) cannot be
    commercially distributed until the manufacturer receives a letter of substantial
    equivalence from FDA authorizing it to do so. A 510(k) must demonstrate that the
    device is substantially equivalent to one legally in commercial distribution in the
    United States: (1) before May 28, 1976; or (2) to a device that has been
    determined by FDA to be substantially equivalent.

  - o   Devices requiring Premarket Approval (PMA) are high risk devices that pose a
    significant risk of illness or injury, or devices found not substantially equivalent
    to Class I and II predicate through the 510(k) process.

  - o   Modifications to devices that impact the safety or performance specifications of
    the device require the manufacturer to file a 510(k) or PMA.

  - o   Servicing activities that significantly change the safety or performance of the
    device cross over into remanufacturing require submission of a 510(k) or PMA.
    As noted in the FDA May 2018 report
    (https://www.fda.gov/media/113431/download) on device servicing, many
    instances of improper servicing appear to cross the line into remanufacturing.

- Quality System Regulation (21 CFR Part 820)

  - o   Includes requirements related to designing, purchasing, manufacturing,
    packaging, labeling, storing, installing and servicing of medical imaging devices.

  - o   Manufacturing facilities undergo periodic FDA inspections to assure compliance
    with the quality system requirements.

  - o   Manufacturers develop training curricula for employees to then implement and
    maintain training records subject to internal audits by qualified auditors.

LOC_AR_00005495

    o   The entire quality system is audited periodically, and the results are reviewed by the Management Review process in a predetermined interval.

- Labeling (21 CFR Part 801)

    o   Labeling includes labels on the device as well as descriptive and informational literature that accompanies the device.

- Medical Device Reporting (21 CFR Part 803)

    o   Incidents in which a device malfunction has caused or may have caused or contributed to a death or serious injury must to be reported to FDA under the Medical Device Reporting program. The MDR regulation is a mechanism for FDA and manufacturers to identify and monitor significant adverse events involving medical imaging devices. The goals of the regulation are to detect and correct problems in a timely manner.

The application of these requirements to OEMs but not to unregulated ISOs leads to greater regulatory control, oversight, and accountability for OEMs as compared to unregulated ISOs. This in turn leads to a higher degree of quality in the repair and maintenance activity and a corresponding risk to patients and the public in the use of unregulated ISOs.

## II.   The intended uses broadly infringe the copyrights of OEMs

To obtain the requested exemption, the petitioners must demonstrate that users of a copyrighted work are adversely affected by the prohibition on circumvention in their ability to make *noninfringing* uses of a class of copyrighted works or are likely to be so adversely affected in the next three years. The intended uses that the granting of this petition would allow would nearly uniformly infringe. The petitioners have a high burden of proof to establish noninfringing uses:

> The Register will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing. The statutory language requires that the use is or is likely to be noninfringing, not merely that the use might plausibly be considered noninfringing. As the Register has indicated previously, there is no "rule of doubt" favoring an exemption when it is unclear that a particular use is a fair or otherwise noninfringing use. Thus, [the record] must show more than that a particular use could be noninfringing. Rather, the [record] must establish that the proposed use is *likely to qualify* as noninfringing under relevant law.

Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018 (2018 Register Report), at 15 (emphasis added).

7

JA1597

LOC_AR_00005496

The petitioners argue that the fair use doctrine, codified at 17 U.S.C. § 107, would allow unauthorized ISOs to access and copy the full range of medical imaging device software and materials currently protected by TPMs. For the reasons described below, fair use will almost never permit such copying and use.

As a threshold matter, however, a fair use determination is a richly fact-specific inquiry and is therefore fundamentally incompatible with a categorical application. The plain text of the statute requires its application in a "particular case." 17 U.S.C. § 107. In litigation, fair use claims can prevail or fall based on slender contextual nuances. The factors that courts apply in individual cases before them do not lend themselves to categorical application, especially considering the complexity and varied applications of medical imaging devices. "[F]air use analysis must always be tailored to the individual case. The nature of the interest at stake is highly relevant to whether a given use is fair. *Harper & Row v. Nation Enterprises, Inc.*, 471 U.S. 539, 553 (1985) (internal citations omitted). The U.S. Copyright Office itself has recognized that "fair use is a fact-intensive inquiry, and [] the outcome of a particular lawsuit does not guarantee a similar outcome in cases involving other types of products." United States Copyright Office, Software-Enabled Consumer Products, A Report of the Register of Copyrights (December 2016) (2016 Software Report) at 39 (available at https://www.copyright.gov/policy/software/software-full-report.pdf).

It would therefore not be appropriate to base the requested exemption on fair use grounds in these circumstances. Even if, however, it were appropriate to apply a fair use analysis to the access and copying of medical imaging device software and materials, nearly all cases would fail the test. The statute provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. Critically, the fair use must be "for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research." That provision, standing alone, is fatal to the fair

8

**JA1598**

LOC_AR_00005497

use argument for these petitions. The petitioners are not political or social critics, news reporters, teachers, scholars, or researchers. They are for-profit companies seeking to use the copyright laws to promote their commercial interests.

Because the petitioners do not satisfy the purposes of the fair use exception, the remaining four statutory factors are inapposite. Nonetheless, even if those factors were to apply, they do not support a fair use determination. First, the "purpose and character of the use" is clearly of a commercial nature rather than for a nonprofit educational purpose. The purpose of disabling the TPMs and copying the information protected by the TPMs is to further the business interests of unregulated ISOs. The "character of the use" is inherently commercial. Petitioner Summit Imaging, for example, advertises on its website homepage: "Lowering healthcare facilities' total cost of ownership." https://www.mysummitimaging.com/. Transtate asserts that it is making it "more affordable for every hospital, clinic and medical practice to have the very best equipment, supplies and service." https://avantehs.com/.

In examining fair use arguments in this very context, the U.S. Copyright Office itself has recognized that "[r]epairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use." 2016 Software Report at 40.

In considering the "purpose and character of the use," courts in individual cases consider whether the use of the copyrighted work is transformative in some manner. There is nothing transformative about an unregulated ISO accessing and copying medical imaging device software and materials for a commercial purpose. No new intellectual property is created. For this reason, the Register's prior finding of fair use for "transformative" changes to motor vehicle computer programs does not extend to medical imaging devices. The 2015 recommendations for motor vehicle computer programs noted: "These uses include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair. Such uses may also extend to modification of ECU computer programs to "interoperate" with different auto parts." 2015 Register Report at 234. Such tinkering would be dangerous with respect to medical imaging devices. Given the nature of medical imaging devices, the repair must *not* be transformative because it would remove the device from its FDA-approved function and performance and would risk patient safety. Crowd-sourced coding, while innovative and useful in some contexts, has no place in medical imaging device repair and maintenance.

The nature of the copyrighted work as a whole is also protected as a creative expression. Courts consider "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1154 (9th Cir. 1986). The petitioners take an unreasonably narrow view of "creative expression." Such a concept is not limited to musical or artistic works. It extends to the creativity inherent in animating and controlling devices that create medical images and other diagnostic information to support human life and health. Each developer of medical imaging device software approaches the challenges of aiding the diagnoses of patients in its own way, based on its unique set of institutional learnings, preferences,

9

JA1599

LOC_AR_00005498

inventiveness, and look-and-feel elements. Even if, for the sake of argument, the medical imaging device software and related materials fall closer to the informational-side of the spectrum rather than the expressive side, such software and materials reflect a substantial investment of time and labor in anticipation of a final return. *See Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 534 (E.D. Pa. 1990) (reversed on other grounds) (finding that copying of computer code, including portions that were purely informational in nature, was not fair use because the code overall was the product of the substantial creative effort of the copyright holder in anticipation of financial returns).

The third factor—the amount and substantiality of the portion used in relation to the copyrighted work—also weighs against the petition because granting a TPM exemption would expose the full range of programs, manuals, computer code, logs, and other intellectual property to public view. Under this third factor, courts in individual cases consider both the quantity and quality of the copyrighted material used. If the use includes a large portion of the copyrighted work, fair use is less likely to be found; if the use employs only a small amount of copyrighted material, fair use is more likely when the other factors also support fair use. Here, allowing unauthorized third parties to bypass TPMs would expose medical imaging device software and the related materials to public view.

The fourth fair use factor considers the impact of the use upon the potential market for or value of the copyrighted work. This captures "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market.'" 2018 Register Report at 198 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)). By disabling TPMs on medical imaging devices, the valuable intellectual property of medical imaging device innovators will be exposed to the general public and to competitors. Once certain intellectual property is exposed to the market and to competitors, the value that intellectual property will be compromised.

Moreover, given the breadth of the requested exemption, there could also be confidential patient information within the materials accessed by the unregulated ISO. The legal and reputational risk that the disclosure of such information could produce would harm the market for medical imaging devices and erode public trust and confidence in medical imaging procedures.

Although there is no separate market for the medical imaging device software beyond the medical imaging devices containing that software, disabling of TPMs would damage the market for the medical imaging devices *and* the software contained therein. That is because, as the petitioners themselves recognize, the hardware and software are an integrated whole. One cannot function without the other. If the petition is granted, repair and maintenance by regulated ISOs would likely increase. That would risk patient safety and undermine public confidence in the safety and efficacy of medical imaging procedures. The resulting harm to the medical imaging device market would impact the embedded software in equal measure.

In manner and degree, this risk differs from the disabling of TPMs for motor vehicle operating software. The 2015 Register Report noted: "Vehicle owners have long repaired and modified

10

LOC_AR_00005499

their automobiles and farm equipment— adjusting brakes and enhancing suspensions, for example—including before the advent of computerized vehicle systems. It is thus not readily apparent these activities would cause unusual or undue harm." 2015 Register Report at 236. The long history of vehicular self-repair does not translate to medical imaging device self-repair, and the risks of faulty repair are far graver in the medical imaging device context. A faulty vehicle repair usually only risks the safety of the vehicle owner and any passengers (and, to a lesser degree, other motorists and pedestrians). By contrast, a faulty repair of an CT scanner or X-ray machine by an unregulated ISO poses far greater risk to the general public. A botched repair may expose hundreds or even thousands of patients to excessive levels of radiation. Other faulty repairs may instead compromise the visual or other informational outputs from the scan. That misinformation could contribute to missed diagnoses or incorrect diagnoses, leading to unnecessary medical procedures and even death.

## III.    An exemption is not warranted under 17 U.S.C. § 117(a)(1)

Section 117(a)(1) does not support an exemption allowing the circumvention of TPMs for medical imaging devices. Under 17 U.SC. § 117(a)(1), "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of any other copy or adaptation that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." A categorical exemption under this provision is not available because OEMs generally license the operating systems and related materials to medical service providers rather than convey ownership of the software and materials. The licensing agreements also generally impose substantial restrictions on the allowed uses for such programs and materials.

The legislative history makes clear that Section 117(a)(1) is intended simply to allow the owner of a computer program to activate the computer program on a computer—and thereby cause a copy of the program to be made between the computer's hard drive and the computer's RAM—without triggering a copyright infringement. See Final Report on the National Commission on New Technological Uses of Copyrighted Works, National Commission on New Technological Uses of Copyrighted Works (1981) at 13 (available at https://repository.law.uic.edu/cgi/viewcontent.cgi?article=1573&context=jitpl).[1] Under this provision, it would not be an act of copyright infringement for the owner of a computer program contained within a medical imaging device to simply activate the medical imaging device, whereby the activation of the device causes copyrighted software to be copied within the device itself from the hard drive to the RAM.

---

[1] Congress established the National Commission on New Technological Uses of Copyright Works (CONTU) in 1974 to consider and make recommendations concerning, among other matters, the extent to which computer programs should be protected by copyright law. Because Congress adopted the recommendations of the majority of CONTU virtually unchanged, courts look to the CONTU final report as the legislative history of provisions recommended by CONTU. *Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 532 n.8 (E.D. Pa. 1990).

11

**JA1601**

LOC_AR_00005500

Critically, this exemption extends only to owners of copies of the copyrighted material. In considering the application of Section 117(a)(1), courts scrutinize whether the entity copying the computer program is in fact the "owner" of the copyright program. In the Ninth Circuit, "a software user is a licensee rather than an owner of a copy [under Section 117(a)(1)] where the copyright owner (1) specified that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010); *see also MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir., 2010) (applying the *Vernor* factors to conclude that software users were licensees rather than owners because the copyright owner held title, provided a non-exclusive and limited license to the licensee, imposed transfer restrictions, and imposed a variety of use restrictions).

In *Krause v. Titleserv, Inc.,* 402 F.3d 119 (2d Cir. 2005), the Second Circuit, in determining whether a software user was a licensee or owner under Section 117(a)(1), considered: (1) whether substantial consideration was paid for the copy; (2) whether the copy was created for the sole benefit of the purchaser; (3) whether the copy was customized to serve the purchaser's use; (4) whether the copy was stored on property owned by the purchaser; (5) whether the creator reserved the right to repossess the copy; (6) whether the creator agreed that the purchaser had the right to possess and use the programs forever regardless of whether the relationship between the parties terminated; and (7) whether the purchaser was free to discard or destroy the copy anytime it wished. *Id.* at 124.

In *DSC Communications Corporation v. Pulse Communications*, 170 F.3d 1354 (Fed. Cir., 1999), the Federal Circuit scrutinized the legal relationship between a copyright holder and a licensee under Section 117(a)(1). The court concluded that ownership was not established—and therefore the defense to infringement under Section 117(a)(1) was unavailable—because of the restrictions on the software user's rights in the program, which included restrictions on disclosing or making the software available to any third parties and using the software on hardware other than that provided by the copyright holder. *Id.* at 1362. Because the license "substantially limit[ed] the rights" of the licensee, the court did not consider the licensee an "owner" for purposes of Section 117(a)(1). *Id.*

The U.S. Copyright Office itself has recognized the "ownership" requirement under Section 117(a):

> In section 117, the Copyright Act provides a number of limitations on exclusive rights for computer programs. Section 117(a) allows copies or adaptations of computer programs to be made either "as an essential step in the utilization of the computer program in conjunction with a machine" or for archival purposes. It also allows for the transfer of any copies prepared in accordance with the exceptions, though adaptations may only be transferred with the authorization of the copyright owner. Section 117(a), like the provision regarding first sale, may only be invoked by "the owner of a copy of a computer program." This raises complex questions

12

JA1602

LOC_AR_00005501

> regarding whether a consumer owns a copy of software installed
> on a device or machine for purposes of section 117(a) when formal
> title is lacking or a license purports to impose restrictions on the
> use of the computer program.

2016 Software Report at 19. The variability and fact-specific nature of this inquiry makes a
general exemption to TPMs inappropriate. Although in some cases a court might find that the
relevant factors support ownership under the copyright laws, in many other cases a court may
find that the license is simply a license and therefore Section 117(a)(1) is unavailable.

Medical imaging device manufacturers generally license the operating software and other
materials to medical providers rather than sell copies of the software and convey ownership of
the copy. Certain diagnostic tools may be licensed together with or separately from the operating
software, or not licensed at all. Medical imaging device manufacturers impose a range of
significant use restrictions on that software and other materials. A blanket exemption pursuant to
Section 117(a)(1) would therefore not be supported because the ownership requirement is
generally not satisfied.

## IV.    An exemption is not warranted under 17 U.S.C. § 117(c)

The statutory defense to copyright infringement under Section 117(c) for "machine maintenance
and repair" provides that it is not a copyright violation for the owner of a machine to make or
authorize the making of a copy of a computer program: (1) if the copy is made "solely by virtue
of the activation of a machine" that contains an authorized copy of the program; (2) if the copy is
made "for purposes only of maintenance or repair of the machine;" (3) if the new copy is not
used in any other manner and is destroyed immediately after the maintenance or repair is
completed; and (4) with respect to any computer program or part of the program that is not
"necessary for [the] machine to be activated," the program "is not accessed or used other than to
make a new copy by virtue of the activation of the machine." 17 U.S.C. § 117(c).

This provision is principally aimed at protecting independent repair technicians from copyright
liability when they turn on a machine that results in the automatic copying of software from the
machine's hard drive onto the machine's RAM. 2016 Software Report at 37. By its plain terms,
the statute authorizes making copies only upon "activation" of a machine, and therefore would
not extend to any copying after initially turning on a machine.

The legislative history of this provision makes clear that the scope of protection is far narrower
than the petitioners argue. The full relevant provisions of the Senate report are reproduced below,
with key language emphasized.

> Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure
> that independent service organizations do not inadvertently become liable for copyright
> infringement *merely because they have turned on a machine in order to service its
> hardware components*. When a computer is activated, that is when it is turned on, certain
> software or parts thereof (generally the machine's operating system software) is
> automatically copied into the machine's random access memory, or ''RAM.' During the

13

**JA1603**

LOC_AR_00005502

course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. ***This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made. This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software***. Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. ***This title also does not relieve from liability persons who make any unauthorized copies of software other than those caused solely by activation of the machine***.

S. Rep. No. 105-190, at 21-22 (1998) (emphasis added).

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider—a person unaffiliated with either the owner or lessee of the machine—to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or ''RAM.''A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), thereby calling into question the right of an independent service provider who is not the licensee of the computer program resident on the client's machine to even activate that machine for the purpose of servicing the hardware components. This section does not in any way alter the law with respect to the scope of the term ''reproduction'' as it is used in the Copyright Act. ***Rather, this section it is narrowly crafted to achieve the objectives just described—namely, ensuring that an independent service provider may turn on a client's computer machine in order to service its hardware components, provided that such service provider complies with the provisions of this section designed to protect the rights of copyright owners of computer software***.

S. Rep. No. 105-190, at 56-57 (1998) (emphasis added).

Subsection (c)—Machine maintenance or repair.—The bill creates a new subsection (c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. This new subsection states

14

that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program must have been made ***solely and automatically by virtue of turning on the machine*** in order to perform repairs or maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), ***the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did not need to be so loaded in order for the machine to be turned on***. A hardware manufacturer or software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products—either as freestanding programs, or pursuant to separate licensing agreements. Indeed, ***<u>a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs</u>***. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). ***<u>This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the</u>***

15

JA1605

LOC_AR_00005504

> ***copyright owner, the initial reproduction of the program shall not be deemed
> exempt from infringement by this subsection.***

S. Rep. No. 105-190, at 57-58 (1998) (emphasis added).

The leading case that interprets the scope of Section 117(c) illustrates exactly why a categorical
exemption to TPMs for medical imaging devices is not supported by the law and why its
application would result in widespread copyright infringement. *Storage Tech Corp. v. Custom
Hardware Engineering and Consulting*, 421 F.3d 307 (Fed. Cir., 2005) involved a company,
StorageTek, that manufactures automated tape cartridge libraries that store large amounts of
computer data. The tape backup and management system are controlled by a computer program.
Upon computer startup, a "maintenance code" and "functional code" are automatically copied
from the computer's hard drive to the computer's RAM, thereby allowing the computer to
perform its programmed tasks.

Custom Hardware Engineering & Consulting, Inc. (CHE), is an independent business that repairs
data tape libraries manufactured by StorageTek. In order to diagnose problems with the libraries,
CHE intercepts and interprets error codes produced by the maintenance code. StorageTek
protects those error codes through password protection to disallow unauthorized access to the
error codes. CHE uses technologies to "crack" the password and to mimic functions of the
system to generate error codes that can be intercepted.

StorageTek sued CHE, alleging that CHE committed copyright infringement when CHE
rebooted and reconfigured the computer program to reveal and generate the error codes that CHE
then used to repair the systems. StorageTek sought a preliminary injunction, which a federal
district court granted. On appeal to the Federal Circuit, CHE defended against the copyright
infringement claims by arguing that its actions are protected by 117(c) because the owners of the
tape libraries authorize CHE to turn on the computer program to maintain and repair the tape
libraries, and the duplication of the software into RAM is necessary for the machine to function.
StorageTek responded that CHE's activities fail to satisfy 117(c) because the maintenance code
is not "necessary for the machine to be activated."

The court considered whether the copying of the maintenance code—in addition to the functional
code—into RAM at computer startup violated Section 117(c)'s requirement that "with respect to
any computer program or part therof that is not necessary for the machine to be activated, such
program or part thereof is not accessed or used." StorageTek argued that the copying of the
maintenance file onto the computer system's RAM at startup was not necessary for the machine
to be activated, and therefore the access and use of that program violated StorageTek's copyright
and was not exempted by Section 117(c). The court disagreed, finding that "[i]n this case,
however, both parties agree that the maintenance code is so entangled with the functional code
that the entire code must be loaded onto RAM for the machine to function at all. That is, loading
the maintenance code into RAM is necessary for [the machine] 'to be turned on.'" 421 F.3d at
1314. The court further held that an anti-circumvention claim under Section 1201 would be
foreclosed because the underlying copying itself was not copyright infringement. *Id.* at 1318.

16

JA1606

LOC_AR_00005505

This holding does not, however, establish the general proposition that any file that is loaded from a computer system's hard drive to RAM during system startup is subject to access and copying by a third-party repair company. Quite the contrary, the court was careful to explain that its holding was grounded in the fact that the part of the system code necessary for the machine to turn on was entangled with other code that did more than simply allow the computer to turn on.

In that regard, the court noted that "separate, 'freestanding programs' that load into RAM upon startup *clearly may not be accessed* under section 117(c)(2)." *Id.* (emphasis added) Additionally, "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the computer and make that determination, *goes too far*…." *Id.* (emphasis added). The court also noted that "[i]n some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." *Id.*

As this decision makes clear, an analysis of whether copies made by reason of turning on a computer are covered by Section 117(c) is a fact-based inquiry that turns on the specific nature of the program at issue and how the programs may interrelate or not with other programs that may also be activated at system startup. This decision also makes clear, however, that Section 117(c) does not authorize access to any program or part of a program that is not required to turn on the machine.

This fact-based and case-specific inquiry is fundamentally incompatible with the blanket exemption to TPMs that the petitioners seek. A blanket exemption to allow circumvention of TPMs would only be appropriate if Section 117(c) were uniformly available to unauthorized ISOs for the vast array and diversity of medical imaging devices that they seek to repair. As the *StorageTek* court made clear, the application of Section 1201 depends on whether the underlying copying itself is infringement. That fact-dependent inquiry would be vitiated by a categorical exemption under Section 1201.

## V.   Conclusion

In conclusion, the requested exemption is not warranted because users of the copyrighted works are not adversely affected by the TPMs and the legal arguments under fair use and Sections 117(a)(1) and 117(c) are without merit.

- **Users of the copyrighted works are not, under the factors of Section 1201, adversely affected by the prohibition on circumvention and are not likely to be adversely affected.** Medical imaging device software is widely available and broadly licensed to medical service providers. Medical imaging device software and the related materials protected by TPMs do not implicate nonprofit archival, preservation, and educational purposes because such software is used in a commercial setting among commercial parties. An exemption is not necessary for criticism, comment, news reporting, teaching, scholarship, or research because medical imaging device software is unrelated to those endeavors. An exemption would also negatively impact the market value for medical imaging device software because it would undermine the intellectual property protections that lead to innovation and would lead to greater use of unregulated ISOs that are not

17

**JA1607**

LOC_AR_00005506

required to implement the same quality, safety, and regulatory requirements as OEMs, thereby risking patient safety and contributing to a public loss of confidence in medical imaging devices. The risks to patient safety weigh against granting the exemption.

- **The proposed exemption would infringe the protected works and is not supported by the fair use doctrine.** The fair use doctrine generally allows transformational use of copyrighted works for purposes of criticism, comment, news reporting, teaching, scholarship, or research. The petitioners seek to access and copy medical imaging device software and related materials to better sell their repair services to customers. Applying the individual fair use factors also demonstrates why the exemption does not apply: the purpose and character of the use is purely commercial; medical imaging device software and related materials are protected works; the petitioners seek to access and copy the full range of medical imaging device software and materials protected by TPMs rather than a minor part; and the impact of the copying will negatively impact the market for medical imaging device software by disincentivizing innovation, risking patient safety, and undermining the public's confidence in medical imaging devices.

- **The proposed exemption is not supported by 17 U.S.C. § 117(a)(1).** Section 117(a)(1) provides simply that the owner of a computer program is not liable for a copyright violation if the owner turns on his or her computer and thereby causes a software copy to be made as certain programs are loaded from the computer hard drive to the computer's RAM to enable the computer to function. That provision does not support the proposed exemption because nearly all users of medical imaging device software license, rather than own, the software and related materials.

- **The proposed exemption is not supported by 17 U.S.C. § 117(c).** Section 117(c) protects third party repair technicians from copyright liability when they turn on a computer and thereby cause software to be automatically copied from the computer's hard drive to the computer's RAM. This provision does not apply to the proposed exemption because by its plain terms Section 117(c) does not extend beyond computer code that is automatically copied from a computer's hard drive to RAM during system startup. Moreover, the legislative history makes clear that this provision is not intended to undermine TPMs and allow copying of software beyond those aspects that are necessary to start a computer.

DOCUMENTARY EVIDENCE

Appendix 1: Examples of Improper Servicing by Unregulated Third Parties

Hole drilled into X-Ray system
A third-party servicer drilled out the holes on an X-Ray system in order to get a replacement X-Ray tube to fit, creating a patient safety issue if the tube had fallen out.

18

JA1608

LOC_AR_00005507



19

JA1609

LOC_AR_00005508

High voltage cables wrapped in hardware store vacuum hose
These high voltage cables for an X-Ray system had been wrapped in vacuum hose from a local
hardware store. Use of this kind of unqualified part created infection control issues and increased
the risk that the cables could have been damaged, resulting in fire or electrocution hazards.



20

**JA1610**

LOC_AR_00005509

Improper venting of MR system
A third-party servicer installed an MRI ventilation system such that it ventilated into the attic above the imaging suite. If the MR magnet had quenched, liquid helium would have ventilated into the attic, creating an asphyxiation hazard and potentially resulting in structural damage to the building.



21

JA1611

LOC_AR_00005510



22

JA1612

LOC_AR_00005511

Power injector duct taped to IV pole
A third-party servicer removed a power injector from its usually support system and duct taped it
to an IV pole. This jerry-rigged system could fall apart mid-procedure, delaying patient care or
causing improper dosing.



JA1613

LOC_AR_00005512

Overhead Counterpoise System held together with zip ties. This product suspends power injectors, often over patients while they are getting scanned. If these zip ties broke, the power injector could fall onto the patient, causing serious injury.



24

**JA1614**

LOC_AR_00005513

Aluminum Foil Used for Shielding

A third-party servicer used aluminum foil to shield some of an MRI system's cables in the scan room. This can present safety and electrical issues when used within the MRI filter panel that contains high voltage.



25

**JA1615**

LOC_AR_00005514

Shoulder Coil Serviced with Tape
This MRI shoulder coil was found damaged with several attempted repairs using a white tape.
The use of tape would prevent proper cleaning of the coil and could have resulted in the coil
failing to perform as specified.



26

**JA1616**

LOC_AR_00005515

Improper Part in an Angiographic Power Injector System
A third-party service vendor inappropriately replaced an OEM steel pin with a simple wood
screw to hold a syringe turret in place.

Angiographic power injectors can inject fluid at pressures of up to 1200 psi. If this wood screw
were to fail during a procedure, the turret could break free, potentially causing the turret and
connected syringe to act as dangerous projectiles. Additionally, this improper part could cause
vibrations during the injection, thereby leading to issues such as delay of procedure and
diagnosis due to unexpected equipment behavior.



27

JA1617

LOC_AR_00005516

Improper Servicing of an MRI System
This 0.3T permanent magnet MRI had ghosting on multiple images as a result of improper wiring. The healthcare provider had been experiencing machine downtime due to the inability to properly scan patients. Poor image quality could have resulted in misdiagnosis or need for repeat scans. Rewiring a device with non-qualified parts could have resulted in electrocution or fire.



Speaker wire connecting power supply to unknown points and terminated with wire nuts



Example of ghosting on medical images

*(Continued on next page)*

28

JA1618

LOC_AR_00005517



The primary power supply cables lacked strain relief and protection from abrasion

29

**JA1619**

LOC_AR_00005518

Improper Servicing of a Nuclear Medicine Camera
This nuclear medicine camera had numerous masked adjacent pixels in the detector which could obscure any heart defects in the image. Further, the cooling unit was improperly connected to external power, bypassing the system's isolated power and grounding system, potentially compromising patient safety and device performance.

When adjacent pixels are removed, a portion of the imaging detector is lost, meaning parts of the heart might not be imaged and a defect could go undetected.

The improper power connection of the cooling system violated the manufacturer's power and grounding isolation scheme, creating risks of fire and electrocution



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals

(Page 242 of Total)

**JA1620**

LOC_AR_00005519



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals



Masked pixels

Masked pixels

31

JA1621

LOC_AR_00005520

Improper Repair of an MRI Coil

In a 0.3T permanent magnet MRI RF coil, the signal cable had been pulled out of a connector housing and was repaired with zip ties and plastic tubing. This could have resulted in:

Misdiagnosis or need for additional scans due to lost signal or imaging artifacts

Electrical arcing, resulting in electrocution or burns



Coil with plastic tubing and zip ties used to cover damaged cable



Example of failed coil that was hidden using zip ties and plastic tubing

32

JA1622

LOC_AR_00005521

Improper Servicing of a CT Scanner

A facility reported to the OEM that it had been having issues with a CT table, workstation, and tube for approximately six months. An OEM service engineer identified table cabling connections that were modified to be non-standard, exposed wiring, non-OEM fuses installed, improperly exposed and non-OEM soldering connections, cable connections routed and repaired using electrical tape, bent table bolt, and defective transmit cable. Excessive oil was also found in the device, creating risk for fire or other kind of device failure.



1. The bank of black fuses is not connected to cables, per OEM design and manufacturing specifications
2. Cables have been field repaired with fuses taped to the cable
3. Grease identified in cabling area

*(Continued on next page)*

33

JA1623

LOC_AR_00005522



4. Non-qualified fuse, with field repair to reform connector to fit around non-qualified



5. Transmit wire connection repaired previously and taped and visible and exposed at joint of green wire

*(Continued on next page)*

34

JA1624

LOC_AR_00005523



6. Bent screw found, preventing table from full range of horizontal motion

7. OEM service engineer identified horizontal travel distance blocked by bent screw



*(Continued on next page)*

35

JA1625

LOC_AR_00005524



8. Excessive oil identified



9. Oil and debris identified in back corners of gantry

36

JA1626

LOC_AR_00005525

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced, but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**Please submit a _separate_ comment for each proposed class.**

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

ITEM A. COMMENTER INFORMATION

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

James C. Martin
David A. Bender
Daniel E. Alperstein
REED SMITH LLP
K Street, N.W.
1000, East Tower
Washington, D.C. 20005

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

**JA1627**

LOC_AR_00005526

Philips is well known in the healthcare industry as a trusted provider of electronic medical imaging devices for use in in-patient and outpatient hospital care throughout the United States. Philips' high quality products include ultrasound systems, computed tomography ("CT") scanners, positron emission tomography ("PET") scanners, X-ray machines, magnetic resonance ("MR") scanners, and nuclear medicine scanners. Importantly for this process, Philips supports, maintains, repairs and services these medical imaging devices using authorized repair technicians who know the devices and are regulated by statute, through oversight provided by the Food and Drug Administration ("FDA"). Building on years of innovation, Philips' medical devices are highly sophisticated and relied upon by medical professionals for diagnosis, treatment, and life-saving support of patient lives.

Given their complexity and the necessity that they operate precisely as designed, the FDA's regulations extend to every aspect of the medical devices, including their maintenance and repair, to protect the public health and safety. Philips' supervision of its authorized repair technicians complies with and furthers these paramount regulatory goals. For purposes of device repair, access to Philips' copyrighted software on medical devices is protected so that the functionality and integrity of the devices is maintained.

The Proponents of proposed exemption Class 12 fit into two categories. The first group is comprised of multiple organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally, or types of software-enabled devices that bear no relation to medical devices. The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – that separately petition for an exemption allowing circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of *medical devices*, specifically.

While the former category of Proponents seek an overbroad exemption of almost limitless scope, the latter category of Proponents have purely commercial motivations. They seek to circumvent Philips' and other medical device manufacturers' access controls in order to obtain copyrighted materials far in excess of that which is necessary to perform basic repair or maintenance. The granting of the exemption they seek would improperly allow them to circumvent Philips' security measures to access Philips' copyright-protected software installed on its medical devices. It also would threaten the functionality, integrity, safety and security of Philips' and other OEMs' medical devices by compromising the devices and making them susceptible to hacking by cybercriminals and other threat actors (i.e., a result antithetical to the longstanding efforts of OEMs and a host of federal agencies that work aggressively to reduce the threat of cybersecurity to medical devices).

With respect to the medical devices involved here, the proposed exemptions do not build off prior exemptions in any colorable respect. No prior exemptions have involved FDA-regulated devices implicating public health and safety. No prior exemptions have been sought for commercial purposes or facilitated the copying of protected software and information unnecessary to equipment repair. None of these results, moreover, align with the purpose or goals of the exemption process.

2

JA1628

LOC_AR_00005527

Finally, there is no demonstrable non-commercial need for the proposed exemptions. Philips does not prevent access to any of its devices for purposes of basic repairs with copyright assertions. There likewise is no real, or even imagined, repair market crisis for the devices. Rather, as the FDA has concluded, the repair market, on analysis, appears to be adequately served by independent and licensed repair personnel.

Philips accordingly submits the following comments in opposition to proposed exemption Class 12.

**ITEM B.  PROPOSED CLASS ADDRESSED**

Proposed Class 12: Computer Programs – Repair

Philips' comments in opposition are specifically made with respect to the petitions for an exemption that would allow circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of medical devices.

**ITEM C.  OVERVIEW**

Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers. Philips medical imaging systems include Philips' proprietary hardware and software, encompassing Philips' trade secrets, which are necessary to operate, service, and repair Philips' systems. Philips' proprietary software enables certain functions on Philips medical imaging systems, which can only be modified by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace. Philips' high quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

In particular, Philips medical imaging systems include Philips' copyrighted software that Philips technicians can use to service the equipment. Philips includes access controls – described in greater detail below – on its medical imaging systems to protect its copyright-protected software and to restrict access to its proprietary software to authorized personnel. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use. The Proponents seek to circumvent these access controls.

As noted above, the Proponents fit into two categories. The first group is comprised of several organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally. Such a request is facially impermissible, as it is overly broad and fails to account for any of the unique characteristics of medical devices. The Registrar previously has declined to consider broad categories of devices grouped together, and has instead considered each class of device on an incremental, case-by-case basis.[1] Since the breadth of device categories

---

[1] *See* Section 1201 Rulemaking:  Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation Of The Register Of Copyrights (Oct. 2018) ("2018 Recommendation") 191-92.

3

**JA1629**

LOC_AR_00005528

encompassed by proposed exemption Class 12 is exceedingly broad, and the circumvention of access controls on certain devices (such as medical devices) carry significant ramifications, Philips strongly believes that the Copyright Office should decline any invitation to consider software-enabled devices as a general class.

The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – who separately seek an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices, specifically. But their motivations are commercially driven and their request should have no place in the Triennial Rulemaking Process. Summit and Transtate (and other ISOs) already have access to extensive documentation and software sufficient to perform basic servicing of Philips medical imaging systems.[2] They simply want *more* access; and they have a track record of circumventing Philips' access controls – without an exemption – for their own commercial gain. Summit and Transtate, as they admit, are defendants in ongoing litigation in which Philips has alleged DMCA violations against both companies due to their having modified files on Philips' systems to gain unauthorized access to Philips' copyrighted software and files that they cannot access with their legitimate repair and maintenance accounts.[3] Since Summit and Transtate seek to use the exemption process to achieve their purely commercial ends and facilitate their unlawful conduct, their request for an exemption should be rejected summarily.

Finally, as explained below, proponents of a petitioned exemption carry a significant evidentiary burden. To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[4] As the following sections demonstrate, Proponents have not met that burden, and their requested exemptions should be denied for this independent reason.

ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

*Describe the technological protection measure(s) that control access to the work and the relevant method(s) of circumvention. It would be most helpful to the Office if sufficient information is provided to allow the Office to understand the nature and basic operation of the relevant technologies, as well as how they are disabled or bypassed.*

---

[2] Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), https://www.fda.gov/downloads/MedicalDevices/ResourcesforYou/Industry/UCM385149.pdf ("[T]here are limits on the information that 21 CFR 1020.30(g) and 21 CFR 1020.30(h) require the manufacturer of the original system to provide. The manufacturer of the original system is not required to disclose trade secrets or confidential information. Also, the manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions.")
[3] *See, e.g., Philips Med Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, No. 3:20-cv-00021-MOC-DCK (W.D.N.C.) and *Philips N. Am. LLC et al. v. Summit Imaging Inc. et al.*, No: 2:19-cv-01745-JLR (W.D. Wash.).
[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. 54,010, 54,011 (Oct. 26, 2018).

4

JA1630

LOC_AR_00005529

Philips' Integrated Security Tool ("IST") is a suite of applications designed to secure Philips' Customer Service Intellectual Property ("CSIP"), including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products, from unauthorized access or use.[5]  Philips' IST solution provides a mechanism to manage user entitlements to access CSIP.  Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns entitlements to the user's account specifying the CSIP materials the user can access.  Users may then install Philips IST client on their personal computer and request Philips to issue an encrypted IST certificate to enable the user to access Philips' proprietary CSIP information.  Upon receiving such a request, Philips' IST system generates a user-specific and computer-specific encrypted IST certificate with information including the user's entitlements and sends the certificate to the user.[6]  The user can then use his or her IST certificate and password to access CSIP materials Philips authorizes the user to access.

In the United States, Philips provides an account with CSIP Level 0 entitlements at cost to anyone who requests such an account.  CSIP Level 0 entitlements provides access to materials that Philips makes available upon request to comply with regulatory requirements as well as other basic service documentation and software.[7]  Philips provides CSIP Level 1 entitlements to customers who have a current contract that provides CSIP Level 1 access and have received any requisite training.[8]  Philips provides CSIP Level 2 entitlements to its employees and to certain trade partners under contract.[9]

Philips' IST solution uses multi-factor authentication to confirm that only authorized users can access Philips' proprietary CSIP materials.  For example, to access Philips' proprietary CSIP materials on a medical imaging system, a user must present his or her IST certificate and password to the system.[10]  If the user has the correct password, the system will decrypt the certificate and provide the user with access to software and files according to the entitlements in the user's certificate.[11]  Thus, engineers employed by independent service providers may log into Philips' medical imaging systems with their IST certificates and have complete access to Philips' CSIP Level 0 materials.  They cannot, however, access the software and files that Philips reserves for its licensees or its own employees.  Licensees with CSIP Level 1 access can log into Philips medical imaging systems with their IST certificates and they will receive access to additional CSIP materials, but not materials that Philips reserves for only its employees or trade partners.  Philips employees and trade partners with CSIP Level 2 access receive even greater access to specialized service tools and files.[12]

Through their Philips-issued accounts, the vast majority of the thousands of ISOs in the U.S. have sufficient access to service Philips' medical imaging systems.  Philips provides ISOs with access to the CSIP Level 0 materials that allow them to setup and service Philips' medical

---

[5] Declaration of Jacqueline Dickson, attached hereto as Exhibit A, at ¶ 6.
[6] *Id.*
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶¶ 4, 8.
[9] *Id.* at ¶¶ 5, 9.
[10] *Id.* at ¶ 10.
[11] *Id.*
[12] *See id.*

JA1631

LOC_AR_00005530

imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities.[13]

Nevertheless, through its policing efforts, Philips has learned of a few ISOs that use methods to circumvent Philips' IST multi-factor authentication security to gain unauthorized access to Philips' copyrighted CSIP materials. The specific methods used by those ISOs vary, but their circumvention methods achieve a common result of providing the ISOs with unlicensed access to Philips' copyrighted software. The ISOs use that unlicensed access to sell advanced services for Philips' medical imaging systems. Philips has pending lawsuits against several ISOs that circumvent Philips' access controls to gain unauthorized access to its copyrighted CSIP. For example, Robert A. Wheeler, the CEO of Transtate Equipment Company, developed exploit software that Transtate uses to modify files within Philips medical imaging systems to effectively disable their access controls and allow Transtate employees to gain access unlicensed access to Philips' copyrighted materials.[14] Summit Imaging developed a different software program designed to circumvent Philips' access controls and provide unauthorized access to Philips' proprietary copyright protected software within Philips medical imaging systems.[15]

**ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES**

**I.     No Exemption is Permissible Because The Uses Are Not Noninfringing**

**A.     Legal Standards**

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this rule." The Register will recommend granting an exemption ***only when*** the "preponderance of the evidence in the record shows that the conditions for granting an exemption have been met."[16] Such evidence must show that it is "***more likely than not*** that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make ***noninfringing uses*** of a particular class of copyrighted works." *Id.* at 112 (emphasis added).

To establish a case for an exemption, "proponents must show ***at a minimum*** (1) that uses affected by the prohibition on circumvention ***are or are likely to be noninfringing***; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an ***adverse impact*** on those uses."[17] More particularly, "[i]t is not enough that a particular use ***could be*** noninfringing. Rather, the Register

---

[13] *Id.* at ¶ 7.

[14] Second Amended Complaint at ¶¶ 59-65, *Philips Med. Sys. Nederland B.V.,* No. 3:20-cv-00021-MOC-DCK (May 23, 2019), ECF No. 139.

[15] Third Amended Complaint at ¶¶ 6, 40-44, *Philips N. Am. LLC,* No. 2:19-cv-01745-JLR (Dec. 28, 2020), ECF No. 99.

[16] U.S. Copyright Office, Section 1201 of Title 17 at 111 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

[17] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.

JA1632

LOC_AR_00005531

will assess whether the use is *likely to be* noninfringing based on current law."[18] "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing." *Id.*

### B.    The Requested Uses Do Not Satisfy the "Fair Use" Test of 17 U.S.C. § 107

Proponents of proposed exemption Class 12 argue—by conclusion only—that the petitioned uses are likely to be noninfringing under 17 U.S.C. § 107 (fair use). These conclusory contentions are, however, unsubstantiated and flawed.

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. On balance, these factors weigh conclusively against the proposed Class 12 exemption for medical devices.

#### i.    The Purpose and Character of the Requested Use Weighs Against an Exemption

The first factor in the fair use analysis – the purpose and character of the use – evaluates whether the use is of a commercial nature or is for nonprofit educational purposes, and examines "to what extent the new work is transformative" and does not simply "'supplant'" the original work.[19] "Commercial use of copyrighted material is '*presumptively* an *unfair* exploitation of the monopoly privilege that belongs to the owner of the copyright.'"[20] This factor unquestionably weighs against Proponents.

Here, the requested uses under Class 12 with respect to medical devices are purely commercial and are thus "presumptively . . . unfair."[21] Both Transtate Equipment Company, Inc. d/b/a/ Avante Diagnostic Imaging ("Transtate") and Summit Imaging, Inc. ("Summit") are independent service providers ("ISOs") who seek to circumvent the access controls installed on Philips' medical devices for purely commercial (i.e., business) purposes. That is, Transtate's and Summit's motivations are financial, plain and simple. Their businesses stand to profit from an exemption that would allow them to circumvent Philips' and other medical device manufacturers' access controls that protect the integrity and security of their medical devices. But the Triennial Rulemaking Process is not a means of regulating competitive markets or promoting commercial outcomes. Nor should the Triennial Rulemaking Process

---

[18]    U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6, https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf (last visited Feb. 5, 2021) (emphasis added).
[19] *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).
[20] *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)) (emphasis added).
[21] *See Leadsinger*, 512 F.3d at 530 (quoting *Sony Corp.*, 464 U.S. at 451).

JA1633

LOC_AR_00005532

be used as a means of promoting unlawful conduct or avoiding liability for past unlawful conduct – the other motivations underlying Transtate's and Summit's unfair use.

Transtate indicates in its comments in support of proposed exemption Class 12 "that it likely will be the only ISO or one of very few ISOs to provide comments with respect to the medical device servicing issues. However, the limited number of ISO Petitioners should not be taken as a lack of interest in this exemption or the desire of others for the requested exemption."[22] But there is more to the story of what motivated Transtate's and Summit's petitions for an exemption: both companies – along with several others – are defendants in ongoing federal litigation in which they have been accused of violating the anti-circumvention provisions of the DMCA.[23] Because the requested uses of copyrighted material are commercial – and thus, presumptively *unfair* – and because the requested uses would not transform the copyrighted material, the first "fair use" factor weighs conclusively against Proponents.[24]

### ii.    The Nature of the Original Work Weighs Against an Exemption

The second factor in the fair use analysis – the nature of the copyrighted work – evaluates the "value of the materials used."[25] In relation to the other fair use factors, some federal courts have recognized that this second factor is relatively insignificant in the overall balancing analysis.[26] In the specific context of medical devices, however, this factor weighs just as heavily against Proponents.

Philips' IST – i.e., the access controls installed on Philips' medical devices – is designed to secure Philips' CSIP, including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products from unauthorized access or use. Philips' copyrighted service software is complex, highly expressive content designed to protect the integrity and efficacy of Philips' life-saving medical devices.

Although the Copyright Office has previously found access controls on video games to be primarily functional, and some aspects of telematics software on motorized land vehicles to

---

[22] Transtate Class 12 Comments at 4.
[23] *See, e.g., Philips Med Sys. Nederland B.V.* No. 3:20-cv-00021-MOC-DCK; *Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.*, No. 3:19-cv-01488-BJM (D.P.R.); *Philips N. Am. LLC et al. v. 626 Holdings, LLC et al.*, No. 9:19-cv-81263 RS (S.D. Fla.); *Philips Med. Sys. (Cleveland), Inc., et al. v. Zetta Med. Techs. LLC, et al*, No. 1:17-cv-03425 (N.D. Ill.); *Philips N. Am. LLC v. KPI Healthcare Inc.*, No. 8:19-cv-01765-JVS-JDE (C.D. Cal.), and *Philips N. Am. LLC* No. 2:19-cv-01745-JLR.
[24] *See Campbell.*, 510 U.S. at 569, 579 (recognizing that in addressing the first factor of the "fair use" test, one considers "whether the new work merely 'supersedes the objects' of the original creation,…or instead adds something new, with a further purpose or different character . . . [;] in other words, whether and to what extent the new work is 'transformative.'" (brackets and citations omitted).
[25] *Campbell*, 510 U.S. at 586 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (C.C.D. Mass. 1841)).
[26] *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1205 (Fed. Cir. 2018) (Federal Circuit noting that the "Ninth Circuit has recognized . . . that this second factor 'typically has not been terribly significant in the overall fair use balancing.'") (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997); *see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) ("This factor 'has rarely played a significant role in the determination of a fair use dispute,' and it plays no significant role here.") (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015)).

8

**JA1634**

LOC_AR_00005533

be functional, the service software designed by OEMs and installed on medical devices are of comparatively much higher value and complexity and invoke patient safety and information security concerns. That is because with their medical devices, OEMs make every decision about service software – from the types to create, to the functions it will perform, to its design and implementation.

Controls restricting access to such proprietary software are essential to preserving the functionality, integrity, safety and security of those devices. Without them, the sophisticated and complex medical devices involved are unsecure, susceptible to alteration, a loss of data, or availability, and vulnerable to hacking and misuse. In the specific context of health care, in which patient lives often depend upon the safety and efficacy of medical devices – some of which are designed for implantation in the human body – the OEM developed software on a device is fundamental and inextricably tied to the value of the device itself.

### iii.    The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole Weighs Against an Exemption

The third factor in the fair use analysis – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – evaluates "both the quantity of the work taken and the quality and importance of the portion taken."[27] "[T]his factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."[28] This factor also weighs decidedly against Proponents.

First, Philips uses multiple layers of technological controls to protect its copyright-protected works from unauthorized access. These controls include user specific access codes and hardware keys, which enable the software access and control features for a particular user. These user-specific access controls permit access to enabled Philips tools and features based on a user's registered access authorization level. Philips provides ISOs with access to Philips' copyrighted software and information necessary for basic repair and maintenance of medical imaging systems. By circumventing Philips' access controls, ISOs gain unauthorized access to Philips' copyrighted advanced service software. ISOs then copy and use those *entire copyrighted* works to service Philips systems more efficiently or modify Philips systems for commercial gain.

Second, Philips' ability to control access to its copyrighted software not only provides Philips with a means of protecting its valuable intellectual property, but it also protects the public from the dangers associated with modification or alteration of Philips' medical devices by unauthorized or insufficiently trained users. Unlimited access to Philips' copyrighted software would allow untrained—and unregulated—individuals to make unauthorized changes to Philips' medical devices, potentially rendering the devices ineffective or unavailable for clinical use or dangerous when used. That is, the requested exemption not only would open attempts to repair or modify medical devices without device-specific training, but circumvention of the access controls would essentially give such ISOs unfettered access Philips' *entire copyrighted* works, as well as other proprietary information within the medical devices.

---

[27] *Disney Enters.*, 224 F.Supp.3d at 973 (citing *Campbell*, 510 U.S. at 586).
[28] *Campbell*, 510 U.S. at 587.

9

JA1635

LOC_AR_00005534

Third, as discussed more fully in Section E(I)(B)(iii) below, Philips already provides domestic ISOs with extensive documentation and software that enables them to perform basic servicing of Philips' medical imaging systems, including documentation and software required by relevant FDA regulations.[29] This information enables ISOs, including Transtate and Summit, to perform repair and maintenance on Philips' medical devices. Neither Transtate nor Summit have explained – much less provided evidence – showing why it would be necessary to circumvent Philips' security access controls in order to perform repair and maintenance on Philips' devices. By comparison, allowing them unfettered access to enhance their business objectives would defeat the lawful copyright protection properly afforded to Philips' operating software and create safety and security risks that are avoided without the exemption.

Given that the requested exemption would give ISOs access to information that goes well beyond that which would be necessary for repair and maintenance, and would effectively grant ISOs access to the medical device manufacturers' entire copyrighted works and other proprietary information and trade secrets contained in the medical devices for purely commercial use, the third "fair use" factor weighs just as heavily against an exemption as the first two.

### iv.    The Effect of the Requested Use Upon the Potential Market for or Value of the Copyrighted Work Weighs Against an Exemption

The fourth factor in the fair use analysis – the effect of the use upon the potential market for or value of the copyrighted work – requires the Office to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market....'"[30] At least one federal circuit court of appeals has held that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed."[31] Here, as to Transtate and Summit, there is no question that the requested exemption as applied to medical devices is sought for commercial purposes, and thus, market harm will result.

Circumvention of access controls on Philips' and other medical devices is of significant commercial value because it permits ISOs to modify such medical devices, and to attempt to provide maintenance and support services (without appropriate training or regulatory oversight) on such devices. Moreover, allowing untrained and unregulated third parties unfettered access to make modifications to such devices could result in improper operation, lack of reliability, or potentially even safety or hacking risks, all of which would create market harm for the medical devices, including their copyrighted software.

### v.    Fair Use Summary

On analysis, each fair use factor plainly tips against granting the proposed Class 12 exemption and, when taken together, an analysis of those factors compels that the proposed exemption should be rejected. The factorial analysis must weigh strongly in favor for an

---

[29] *See, e.g.,* 21 C.F.R. § 1020.30.
[30] *Campbell,* 510 U.S. at 590 (citation omitted).
[31] *Leadsinger,* 512 F.3d at 531 (quoting *Sony,* 464 U.S. at 451).

10

JA1636

LOC_AR_00005535

exemption to be granted. Whatever else might be said, that is not the case for proposed Class 12 as related to the medical devices addressed by these comments.

### C.   The Uses Do Not Fall Under the Exception for Essential Steps in the Utilization of a Computer Program

Proponents assert, in a conclusory manner, that their intended uses are protected by 17 U.S.C. § 117(a)(1). That provision permits "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" provided that the copy or adaptation "is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." *Id.* Proponents cannot meet the requirements set forth in this provision.

First, it is well established that Section 117(a)(1) shelters only those who *own* the copy of the computer program—not mere licensees of the copy. Federal courts have explained that one is a licensee rather than a user—and thus unprotected by Section 117(a)(1)—if the copyright owner "'(1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use' restrictions."[32] In that regard, courts have held that facts demonstrating that a customer is a licensee include (1) the copyright owner's retention of title in the software and grant of a non-exclusive license,[33] (2) the imposition of transfer restrictions on the licensed software,[34] (3) the imposition of use restrictions specifying ways in which the software must (or cannot) be used,[35] (4) the ability of the copyright owner to terminate the license,[36] and (5) the requirement that the customer destroy or relinquish copies of the software upon termination.[37] All of these factors are present here, and demonstrate that Philips' customers are licensees, not owners, of the software Proponents seek to access.

Specifically, Philips' standard terms and conditions of sale for all medical imaging products makes explicit that: (1) Philips grants only a "nonexclusive and non-transferable right and license to use the computer software" and that Philips retains "exclusive ownership" of the software;[38] (2) the Customer is restricted in its ability to transfer the software and give access to the software;[39] (3) the Customer is restricted in how it may use the software, including being prohibited from using the software on any devices other than the device it comes with or for any purposes other than the operation of that device;[40] (4) Philips retains the ability to terminate the

---

[32] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) (quoting *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)); *see also Vernor*, 621 F.3d at 1110-11; *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44-45 (2d Cir. 2019).
[33] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[34] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.
[35] *MDY Indus.*, 629 F.3d at 938-39; *Vernor*, 621 F.3d at 1111.
[36] *MDY Indus.*, 629 F.3d at 939; *Vernor*, 621 F.3d at 1112.
[37] *MDY Indus.*, 629 F.3d at 939; *Universal Instruments*, 924 F.3d at 45.
[38] Philips Standard Terms and Conditions of Sale (Nov. 2020), Licensed Software, §§ 1.1, 1.3, https://www.usa.philips.com/c-dam/b2bhc/us/terms-conditions/philips-standard-terms-and-conditions-of-sale-all-products-112420.pdf.
[39] *Id.* §§ 1.2, 1.4; *see also id.*, Philips Proprietary Service Materials, § 9.1.
[40] *Id.*, Licensed Software, §§ 1.2, 1.5; *see also id.* § 2.2 (requiring the Customer to maintain the configuration of the device as it was originally designed and manufactured).

LOC_AR_00005536

license if the Customer does not comply with the terms and conditions of sale;[41] and (5) the Customer must "return the Licensed Software and any authorized copies thereof to Philips immediately upon expiration or termination of this License."[42] As a result, controlling law dictates that Section 117(a)(1) is unavailable to Proponents, and their efforts to amend what Section 117 otherwise requires through this process should be rejected.

By the same token, the Registrar previously has applied these principles in rejecting proposed exemptions. For instance, the Registrar has concluded that motor vehicle telematics and entertainment system software was licensed rather than owned by the vehicle owner, thus failing to qualify for Section 117(a)(1).[43] And the Registrar has emphasized that the question of ownership is a fact-intensive one requiring consideration on a case-by-case basis—yet another reason the generalized, overbroad exemption sought by proponents like EFF should be rejected.[44]

Second, section 117(a)(1) is applicable only if the copy of the computer program "is created as an essential step in the utilization of the computer program in conjunction with a machine." Proponents cannot satisfy this requirement either. There is, of course, clinical software installed on the devices and licensed by Philips that is necessary to use the device.[45] But it is not that software that proponents seek an exemption to access. Rather, proponents seek to go *beyond* that software and instead access additional, unlicensed software—or unlicensed service functionalities—that has not been purchased by the device purchaser.[46] Because none of *that* software is necessary to use the devices in their standard configurations, section 117(a)(1) does not shelter Proponents.

### D.    The Uses Do Not Fall Under The Exception for Machine Maintenance and Repair

Proponents claim protection under 17 U.S.C. § 117(c), which provides that "it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine." The copy must be used in no other manner and destroyed immediately after the completion of the maintenance or repair, and any portion of the program not necessary for the activation of the machine cannot be accessed or used.[47] Contrary to Proponents' arguments, this exception has no application here.

Congress' purpose in passing Section 117(c) was to ensure that servicers "'do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.'"[48] And Congress was clear that this

---

[41] *Id.* § 1.1.
[42] *Id.*
[43] 2018 Recommendation at 201.
[44] 2018 Recommendation at 200, 209.
[45] Declaration of Jacqueline Dickson, Ex. A, at ¶ 11.
[46] *Id.*
[47] *Id.*
[48] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1311-12 (Fed. Cir. 2005) (quoting H.R. Rep. No. 105-551, pt. 1, at 27 (1998)).

12

JA1638

LOC_AR_00005537

exception is narrow; only software actually "necessary for the machine to be activated"—that is, software that "needs to be so loaded in order for the machine to be turned on"—qualifies for the exception.[49] For this reason, the Federal Circuit has held that "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the [machine]…, goes too far because access to those programs is not strictly necessary to verify that the [machine] is 'working in accordance with its original specifications.'"[50] Proponents, however, seek to do exactly that.

The software that Summit and Transtate seek to copy are additional, unlicensed software and unlicensed service functionalities. But as explained in Part I(C), *supra*, none of this software is necessary to activate the machine, and thus by definition cannot be copied "solely by virtue of the activation of a machine."[51] To the contrary, this software consists of "freestanding…programs, that are not needed to boot up the [machine]"—precisely the sort of software that the Federal Circuit has squarely held to be outside the scope of section 117(c).[52]

Indeed, Proponents essentially concede the point. Transtate, in making a perfunctory argument that section 117(c) applies, argues only that accessing Philips' diagnostic and testing software is necessary "[t]o perform the servicing activities."[53] Summit similarly—and also perfunctorily—argues that diagnostic software and data files must be accessed to "perform[] service."[54] But the question under section 117(c) is not whether the software is necessary *to perform servicing of the machine*; rather, the only question is whether the software "needs to be so loaded in order for the machine to be turned on." Proponents do not dispute that the answer to this question is "no." And that answer is dispositive; section 117(c) does not apply.

## II.   The Adverse Impact Factors Do Not Support An Exemption Here

The Librarian of Congress, on recommendation of the Register, must determine whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [against circumventing a TPM] in their ability ***to make noninfringing uses*** … of a particular class of copyrighted works." 17 U.S.C. § 1201(1)(C) (emphasis added). As explained above, because Proponents seek to use Philips' copyrighted works for *infringing* uses, they are barred categorically from using this Triennial Rulemaking Process to obtain an exemption for their conduct.

Apart from that, Section 1201(1)(C) sets out five factors for the Librarian to consider in determining whether to grant an exemption: (1) "the availability for use of copyrighted works"; (2) "the availability for use of works for nonprofit archival, preservation, and educational purposes;" (3) "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research"; (4) "the effect of circumvention of technological measures on the market for or

---

[49] *Id.* at 1314 (quoting H.R. Rep. No. 105-551, pt. 1, at 28) (brackets omitted).
[50] *Id.* (quoting 17 U.S.C. § 117(d)).
[51] 17 U.S.C. § 117(c).
[52] *Storage Tech.*, 421 F.3d at 1314.
[53] Transtate Class 12 Comments at 20.
[54] Summit Class 12 Comments at 8.

13

JA1639

LOC_AR_00005538

value of copyrighted works"; and (5) "such other factors as the Librarian considers appropriate."
*Id.* All five of these factors demonstrate that the proposed exemption should be rejected.

### A.    The Availability for Use of Copyrighted Works

Proponents argue that owners of medical devices are currently unable to obtain timely repair and servicing of the devices, necessitating an exemption permitting independent repairers to access copyrighted material to service such devices. But Proponents offer no credible evidence that the market for servicing and repair of medical devices is not adequately served by existing resources. A close look at the issue shows why.

To start with, the 2018 FDA Servicing Report evaluation involving all stakeholders declined to conclude that there was a prevalent health or safety concern presented by the servicing in the medical device market.[55] That same report noted that there is a robust market for independent servicing of medical devices, with an estimated number of medical device servicing firms numbering between 16,520 and 20,830.[56] And these independent servicing firms are organized and participate in trade associations such as the International Association of Medical Equipment Remarketers and Servicers (IAMERS).[57] The COVID crisis has not generated any credible evidence that this has changed so that equipment repairs are not being made or that public health and safety is threatened with respect to lack of servicing of lifesaving or life-enhancing healthcare devices. That lack of evidence is conclusive here.[58]

Going beyond the FDA requirements, Philips provides independent servicers with extensive documentation, software, and instructions sufficient to perform basic servicing of Philips medical imaging systems.[59] Many of these instructions refer to CSIP Level 0 service software that independent servicers can access with their Philips-issued certificates. The CSIP Level 0 documentation and software—which Philips provides to independent servicers at cost—allows for basic servicing of the systems. Proponents are fully aware of this; indeed, Transtate has an account with Philips to receive and use these materials.[60] Therefore, the argument that independent servicers are cut off from the repair market is fiction.

The companion argument that the proposed exemption is necessary for independent servicers to perform repair and servicing of medical devices is just as flawed. No exemption is

---

[55] U.S. Food and Drug Administration, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), at i.

[56] *Id.* at 19.

[57] *See* International Association of Medical Equipment Remarketers and Servicers, "IAMERS Campaigning for Healthcare Providers Right to Choose," https://iamers.org/ (last visited Feb. 8, 2021).

[58] Proponents offer a few isolated and undocumented incidents where delays allegedly occurred in obtaining OEM servicing. Philips, for its part, has no record of any reduction in service capabilities or customer inability to obtain service during the COVID crisis. *See* Declaration of James Salmons, attached hereto as Exhibit B, at ¶¶ 7-8. Medical device maintenance services were not materially delayed even with customers' reporting an overall increase in volume of service. *Id.* at ¶ 8. Notably, the handful of incidents identified by Proponents does not establish any *systemic* problem of access to OEM servicing in the marketplace – the only relevant issue for the Copyright Office. Finally, unlike Proponents, the FDA has looked at the marketplace and did not find any systemic evidence of inadequate servicing or repairs for medical devices.

[59] 21 C.F.R. § 1020.30(g).

[60] Declaration of Jacqueline Dickson, Ex. A, at ¶ 7.

14

**JA1640**

LOC_AR_00005539

needed to permit basic repair and servicing of Philips medical devices because Philips already provides independent servicers with all the information they need to conduct such servicing—and will continue to do so, as required by FDA regulations. In fact, Philips routinely acts as a third-party servicer in repairing and servicing non-Philips medical devices—and has always managed to do so perfectly well with the materials made available to all independent servicers, without the circumvention Proponents insist is necessary for third-party servicers to do their jobs.[61] Accordingly, what proponents really seek through this exemption is the ability to go *beyond* essential repair and servicing of the devices and to access additional, copyright-protected options and features for commercial gain.

To that end, the pending litigation against Summit and Transtate revolves around their modification of files on Philips systems to gain unauthorized access to Philips' proprietary service software and files that they cannot access with their legitimate CSIP Level 0 accounts. They exploit this heightened access for commercial gain by utilizing Philips' proprietary documents and software to provide services that only Philips and its authorized licensees are permitted to provide. Proponents' attempt to use the need for repair and servicing as a vehicle to pursue their commercial interests provides no justification for granting this exemption and should not be entertained.

In support of their position, Proponents offer a handful of declarations that existing servicing options cause increased cost and delay. But this meager showing—a handful of declarants claiming that the exemption would lower costs—cannot compete with the clear evidence described above, including FDA conclusions and regulations, that demonstrates otherwise. This is especially true given the heavy burden Proponents bear to establish the appropriateness of the exemption, *see* Part I(A), *supra*. Simply put, there is no market vacuum or crisis requiring this exemption. For these reasons, it is clear that the medical devices at issue here differ fundamentally from other categories of devices that the Registrar previously has found lack adequate servicing through manufacturer-approved channels—such as vehicle telematics systems[62] and smartphones.[63] Proponents have failed to demonstrate that Philips' copyrighted works will be unavailable to medical device owners unless proponents obtain an exemption allowing them to access Philips' protected intellectual property. In reality, the opposite is true.

Finally, Proponents press the argument that an exemption is necessary to permit servicing of older equipment that has reached the end of its commercial life and thus does not receive servicing from OEMs.[64] But Proponents misrepresent the status of this equipment and omit the substantial risks inherent in their proposed exemption.

First of all, there is no reason why "older" and "newer" equipment should be treated differently when it comes to the need to protect proprietary software contained in the devices. As discussed above and below, Philips medical devices contain proprietary software protected by copyright, and Proponents' attempts to gain access to that software for their own commercial gain (and to the detriment of public safety) through this exemption process is flatly

---

[61] Declaration of James Salmons, Ex. B, at ¶¶ 3-4.
[62] 2018 Recommendation at 213-14.
[63] 2018 Recommendation at 216.
[64] Summit Class 12 Comments at 2; Transtate Class 12 Comments at 6.

15

JA1641

LOC_AR_00005540

inappropriate. This remains just as true for "older" devices as it does for "newer" devices, and Proponents cannot show otherwise.

As for certain medical devices that have received an End of Service (EOS) designation from the OEMs, Proponents argue that an exemption is needed to permit independent servicers to repair and service these devices because OEMs will phase out their servicing. But Proponents fail to point out that servicing can be phased out for a variety of reasons, specifically including that the equipment is no longer safe and effective to operate. Apart from that prevalent safety concern, the Proponents' hypothesized claim of purported service inadequacies related to EOS equipment certainly does not support the categorical exemption Proponents demand for all devices under all circumstances. Finally, Proponents do not provide support for any market-wide problem as related to older equipment either. Without that substantiation, there is no basis to even consider the exemption.

### B.    The Availability for Use of Works for Nonprofit Archival, Preservation, and Educational Purposes

Proponents advance no argument whatsoever that independent servicers must be permitted to circumvent Philips' protective measures for purposes of nonprofit archival, preservation, or educational purposes; to the contrary, they seek to use Philips' software in a commercial setting. Because Proponents bear the burden to establish the propriety of an exemption, their failure to do so here must weigh against them.

The Electronic Frontier Foundation does advance an argument on this factor, claiming that "tinkering is itself educational and is a common path for young people to become interested in studying science and engineering."[65] But the Foundation's arguments are aimed at its desired (and overbroad) exemption for virtually all software-enabled devices.[66] Whatever the persuasiveness of such arguments in the context of a "smart litterbox,"[67] they clearly have no application to Philips' FDA-regulated medical devices. It should go without saying that the "educational" benefits of tinkering with expensive, life-sustaining medical devices cannot justify the enormous accordant risks to human life. This factor therefore does not support the proposed exemption.

### C.    The Impact that the Prohibition on the Circumvention of Technological Measures Applied to Copyrighted Works Has on Criticism, Comment, News Reporting, Teaching, Scholarship, or Research

Proponents do not argue that prohibiting unauthorized parties from obtaining the copyrighted software in medical devices such as Philips' unduly hinders free speech, criticism, news reporting, teaching, or research. Again, the Electronic Frontier Foundation advances such an argument for software-enabled devices generally.[68] But no such argument is made or can

---

[65] Electronic Frontier Foundation Class 12 Comments at 16.
[66] *Id.* at 1-2.
[67] *Id.* at 22.
[68] *Id.* at 16.

16

JA1642

LOC_AR_00005541

seriously be made for medical devices. Therefore, this factor weighs against the proposed exemption as well.

### D.    The Effect of Circumvention of Technological Measures on the Market for or Value of Copyrighted Works

This factor does not support an exemption because the proposed exemption would severely harm the value of Philips' (and other manufacturers') copyrighted works or harm the market for those works. As explained in Part I(B)(iii), *supra*, the access requested by the Proponents is extensive. They seek to give independent servicers full access to the entire copyrighted works and other proprietary information contained within the medical devices. This wholesale invasion of intellectual property rights would destroy the value of those copyrighted works and undermine the incentive for Philips and other OEMs to produce medical devices with their related software in the first instance—an endeavor that requires substantial time and expense as OEMs develop and secure regulatory clearance for medical devices.

The fact that this access is being requested for purely commercial purposes—meaning that the likelihood of market harm "may be presumed,"[69] Part I(B)(iv), *supra*—further demonstrates that the effect (and perhaps the intention) of the exemption would be to devalue OEMs' intellectual property interests and increase the economic prospects of those seeking to exploit that intellectual property for their own gain. Once again, Proponents cannot demonstrate that this factor supports an exemption; the opposite is true.

### E.    Such Other Factors as the Librarian Considers Appropriate

Proponents argue that an exemption is warranted—indeed, required—for reasons of public and health and safety. But there is reason to pause on their unsupported assertion. As explained above, *see* Part II(A), Philips already provides enough information and resources to allow independent servicers to repair and service Philips medical devices. The proposed exemption, therefore, cannot be justified by appealing to the health and safety benefits of the servicing activities Proponents are perfectly capable of conducting. Beyond that, permitting this additional access would jeopardize, not protect, health and safety.

Philips, as a manufacturer of medical imaging equipment, is acutely aware of the impact that the proper—or improper—use of sensitive medical equipment has on public health and safety. So is the FDA, which has recognized the serious ramifications for health and safety that this area poses, and which for that reason extensively regulates the medical-device arena. Medical equipment manufacturers, like Philips, are subject to an extensive array of regulations designed to ensure that medical devices consistently meet safety and quality requirements. They are, for instance, subject to registration, listing, premarket notification and approval, quality system, labeling, and reporting requirements.[70] By comparison, independent servicers are not

---

[69] *Leadsinger*, 512 F.3d at 531.

[70] *See* 21 C.F.R. §§ 801 (labeling), 803 (incident reporting), 807 (registration, listing, and premarket notification), 814 (premarket approval), 820 (quality system regulation). These regulations also extend to the provision of information by OEMs to customers on assembly, installation and adjustment of certain devices to protect their functionality, integrity and availability. The FDA can intervene if the information provided is inadequate. *See* 21

17

JA1643

LOC_AR_00005542

registered, not obligated to make reports, and not subject to regulated quality management systems or product training. Nor are they obligated to keep up with changes in equipment specifications, to use customized diagnostic tools, or to stay up to date on device history.

In addition, approved servicers are extensively regulated and must comply with a host of requirements; independent servicers are not. Approved servicers are trained to service and repair the specific medical device at issue and possess the latest diagnostic tools and device records and histories; independent servicers are not and do not. And approved servicers have up-to-date knowledge of device specifications and compatible products and parts, while independent servicers do not. Proponents' attempts to paint approved servicers—regulated, trained, and licensed to deal with the specific machinery at issue—as equivalent to independent servicers who are not subject to reporting, quality management, or other requirements, and who do not have the latest product knowledge, training, and tools, is wrong.

Beyond that, the profound difference between approved and independent servicers relates directly to the quality of the repairs and the proper functioning of the medical equipment. These concerns are magnified as one moves from the more basic repairs and servicing that independent servicers already conduct to the more advanced modifications and alterations—possible only by using Philips' proprietary tools—that Proponents seek an exemption to conduct. Permitting unapproved servicers to perform these advanced alterations on medical devices could lead to, for example, incomplete equipment records (which OEMs are required to maintain), assembly of the device without the proper tools or parts, a lack of up-to-date product calibration, a lack of ongoing market surveillance (which OEMs conduct), and a failure to report adverse events (which OEMs are required to report). There is no guarantee that the modified medical device will function as originally intended.

Finally, these potential malfunctions have serious ramifications for public health and safety. Improperly modifying life-saving medical equipment could cost human lives. Improper repair of diagnostic and treatment devices could lead to misdiagnoses of patients' conditions, ineffective or counterproductive treatment, and a host of other problems seriously jeopardizing patient health and safety. And circumvention of the access controls that Philips and other OEMs install on their medical devices also renders the devices susceptible to cybersecurity threats that OEMs and several federal agencies already work to protect against.  Indeed, the FDA already "works aggressively to reduce cybersecurity risks [to medical devices]," a responsibility it shares with "device manufacturers, hospitals, health care providers, patients, security researchers, and other government agencies, including the U.S. Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) and U.S. Department of Commerce."[71] These concerns, which threaten the safety and security of the medical devices upon which human

---

U.S.C. § 337(a); 21 C.F.R. §§ 10.30(g), (h). These regulations do not require the disclosure of trade secrets and they permit OEMs to provide their own employees with more advanced software.
[71] U.S. Food and Drug Administration, "Medical Device Cybersecurity: What You Need to Know," https://www.fda.gov/consumers/consumer-updates/medical-device-cybersecurity-what-you-need-know (last visited Feb. 5, 2021); *see also* U.S. Food and Drug Administration, "FDA Fact Sheet: The FDA's Role in Medical Device Cybersecurity," https://www.fda.gov/media/103696/download (last visited Feb. 5, 2021).

JA1644

LOC_AR_00005543

lives depend, cannot be justified by the exemption's alleged benefit of saving money on repairs.[72]

This is precisely why Proponents are wrong to equate the exemptions recommended in the Registrar's 2018 Recommendation with their proposed exemption here.[73] Modifying a medical imaging machine used to diagnose patients in need is not the same as repairing someone's smartphone. These devices do not exist in the "do it yourself" space, where modification and tinkering carry no collateral consequences except to the device's owner. The Registrar has emphasized the need to follow an incremental approach that considers each class of device on its own terms, precluding such a comparison between highly different classes of devices.[74] There is no reason to abandon that approach now. The FDA has considered and analyzed the servicing issues and will continue to do so.[75] Congress has taken up right-to-repair exemptions, and a comprehensive public debate can be held in that forum. The copyright exemption process should not be used to supplant either the regulatory oversight or broader public debate. There is no "lawful" right to modify the medical devices implicated in this analysis. By statute and under existing case law, the unlicensed copying of OEMs' proprietary works to perform repairs as championed by Proponents is unlawful, and absent action by Congress it should stay that way.

DOCUMENTARY EVIDENCE

*Commenters are encouraged to submit documentary evidence to support their arguments or illustrate pertinent points concerning the proposed exemption. Any such documentary evidence should be attached to this form and uploaded as one document through regulations.gov.*

---

[72] *See* Transtate Class 12 Comments at 9-10 (requesting the exemption because it would supposedly lower the cost of repairs and protect the income of independent servicers); Summit Class 12 Comments at 3 (urging the exemption out of concern that manufacturers may charge higher prices for servicing).

[73] *See* Transtate Class 12 Comments at 7.

[74] 2018 Recommendation at 191-92.

[75] The FDA's regulatory oversight is pervasive where medical devices are involved. This includes with respect to Proponents' rewriting of code (to bypass TPMs) that would be facilitated by the grant of the blanket exemption Proponents seek. The FDA does not directly regulate third-party servicers, which, as noted, creates its own set of security and safety risks in this context. But the FDA does regulate those who, like certain of the Proponents, would seek to rewrite code and place an adulterated system into the stream of commerce. *See* 21 C.F.R. § 820.3(o), (w) (subjecting to FDA quality-system-regulation requirements those who "significantly change[] the finished device's performance or safety specifications, or intended use"). These considerations are ignored by Proponents in urging that the exemption purportedly is needed to promote public health and safety. The FDA is unlikely to hold that view.

19

LOC_AR_00005544

**EXHIBIT A**

**Declaration of Jacqueline Dickson**

LOC_AR_00005545

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## DECLARATION OF JACQUELINE DICKSON

I, Jacqueline Dickson, hereby declare as follows based on my personal knowledge:

1.    I have held the position of Program Manager for Customer Service Intellectual Property Governance with Philips North America, LLC since 2016. In that position, I work with Philips' businesses and markets to ensure that Philips operates in compliance with its customer service intellectual property ("CSIP") policies and strategies. My work also involves CSIP enforcement, including coordinating with security groups to ensure the business takes appropriate actions to secure CSIP and supporting investigations and lawsuits when third parties breach Philips' security to gain unauthorized access to Philips' restricted CSIP materials.

2.    Philips' CSIP includes service software, service documentation, training materials, and other proprietary materials that Philips creates for servicing Philips medical imaging systems. Philips assigns CSIP "levels" to these materials to specify those authorized to access the materials.

3.    Philips makes its CSIP Level 0 materials available to equipment owners, Independent Service Organizations ("ISOs"), and any other individuals in the United States who request such access. These CSIP materials include materials and service tools that Philips makes available to comply with regulatory requirements (such as 21 CFR 1020.30), as well as other documentation and software for performing basic maintenance and servicing on Philips imaging systems, including manufacturer's specifications for what planned maintenance activities need to be conducted at various intervals.

4.    Philips restricts access to its proprietary CSIP Level 1 materials to certain customers who contract for such access, subject to terms and conditions for the use of such materials. Those customers purchase a limited license to use Philips' CSIP materials to service their own Philips imaging systems. CSIP Level 1 materials include certain training materials as well as additional documentation and software to support planned maintenance activities and to execute common corrective maintenance activities.

5.    Philips reserves its proprietary CSIP Level 2 materials and tools for only its own employees and limited trade partners, such as subcontractors and manufacturing partners,

US_ACTIVE-158092444.1

JA1647

LOC_AR_00005546

pursuant to contractual terms. CSIP Level 2 materials include Philips' internal information about changes to medical imaging systems (some of which may be part of campaigns required by regulatory bodies), as well as advanced training materials, documents, and software for advanced troubleshooting and advanced configuration of imaging systems (such as changes that may impact x-ray dosage).

6.      Philips developed its Integrated Security Tool ("IST") solution to secure its CSIP materials. Philips' IST solution provides a mechanism to manage entitlements to access CSIP materials and tools. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns to each user entitlements that specify the CSIP Materials the user can access, based on the CSIP rules as described above and subject to any pertinent contractual terms. Philips creates an encrypted IST certificate for each user containing various information, including the user's CSIP entitlements. Philips also offers, at cost, IST smartcards that can be used to access CSIP materials on its medical imaging systems in accordance with user entitlements.

7.      The default CSIP access level for IST accounts in the United States is CSIP Level 0 access. This includes individuals employed by ISOs, like petitioners Summit Imaging, Inc. and Transtate Equipment Co., Inc. I searched our IST records and observed that individuals from Transtate in fact have created IST accounts with Philips that provide them with CSIP Level 0 entitlements. They can use their existing accounts to access Philips' CSIP Level 0 materials. Summit does not have IST accounts and it appears they have not requested Level 0 access.

8.      Philips assigns CSIP Level 1 entitlements to accounts for employees of licensed customers once those employees have satisfied the prerequisites for such access, such as entering into confidentiality agreements and completing any training necessary to safely and effectively use the materials.

9.      Philips assigns CSIP Level 2 entitlements primarily to its own employees once they complete necessary training.

10.      Philips' IST solution includes an IST client application for installation on a field service engineer's computer. The IST client application requires a user to enter his or her IST certificate password. If the password is entered correctly and the individual has a valid IST certificate on their computer, IST will allow the user to access CSIP materials according to the user's entitlements in the IST certificate. A user with CSIP Level 0 access will be able to read Philips' CSIP Level 0 documents and run Philips CSIP Level 0 software, but would be restricted from accessing any CSIP Level 1 or 2 materials. A user with CSIP Level 1 access will be able to decrypt Philips' CSIP Level 1 documents and run Philips' CSIP level 1 software as well. Both the CSIP Level 0 and 1 users would be unable to decrypt or read Philips' CSIP Level 2 documents or to execute software requiring CSIP Level 2 entitlements. A Philips employee with CSIP Level 2 access would be able to access CSIP Level 0 and 1 materials.

11.      Philips' IST solution also includes an IST application that runs on Philips medical imaging systems, including ultrasound systems, computed tomography scanners, positron emission tomography scanners, X-ray machines, magnetic resonance scanners, and nuclear medicine scanners. When started, Philips medical imaging systems load software for clinical use

- 2 -

**JA1648**

LOC_AR_00005547

of the system. To access Philips' field service software and information, a field service engineer may plug an IST smartcard charged with his or her IST certificate into a USB drive on the imaging system, provide his or her certificate password, and then choose to run field service software or access other field service information. The imaging system will then provide the user with access to software and information according to his or her entitlements. A CSIP Level 0 user, such as an ISO employee, would get access to various programs and information that allow them to set up and service Philips medical imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities. Philips' licensees and employees in turn receive higher levels of access based on their entitlements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on February 5, 2021 in Northfield, Ohio.

Jacqueline Dickson

JA1649

LOC_AR_00005548

**EXHIBIT B**

**Declaration of James Salmons**

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## <u>DECLARATION OF JAMES SALMONS</u>

I, James Salmons, hereby declare as follows based on my personal knowledge:

1.      I have held the position of Head, Global Multivendor Services at Philips North America, LLC since 2019.  This includes overseeing Philips' companies AllParts Medical and AGITO Medical.

2.      Philips' multivendor services provide vendor-agnostic, multi-modality solutions for maintenance, lifecycle, and performance services for imaging systems and other biomedical assets.  Philips multivendor services range from traditional maintenance services to comprehensive solutions that incorporate a portfolio of added capabilities, such as data driven tools to identify equipment usage and replacement opportunities.

3.      Philips' multivendor group services medical imaging systems from a variety of Original Equipment Manufacturers ("OEMs"), including systems from GE and Siemens.

4.      Philips' multivendor group accesses software and information on systems according to OEM specifications.  OEMs typically make service specifications available to Independent Service Organizations ("ISOs"), such as Philips' multivendor group, to enable ISOs to perform authorized services.  For example, Siemens makes service documentation and information available through an "Online Library."  GE similarly provides a "Customer Documentation Portal" where ISOs can access service documentation and other information.

5.      If a medical imaging system that Philips' multivendor group is servicing lacks necessary system software or if there is an issue that Philips cannot resolve with its level of access to the OEM's service documentation and software, the customer or Philips will contract the appropriate OEM to acquire the necessary software or access.

6.      If Philips cannot acquire authorized access to OEM software or information necessary to perform a particular service on a medical imaging system, then the customer or Philips can contact the appropriate OEM to provide the necessary service.

7.      Philips saw no extended reduction in service capabilities or reduction in customers' ability to access maintenance services due to COVID.

US_ACTIVE-158093220.2

**JA1651**

LOC_AR_00005550

8.      From the perspective of Philips' multivendor services, medical device maintenance services were not materially delayed due to the COVID crisis.  Service companies that we materially supported reported an overall increase in volume of service in 2020.  This includes increased activity from Siemens, GE, and major ISOs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected.  Executed on February 8, 2021 in Tennessee.

James Salmons

- 2 -

**JA1652**

LOC_AR_00005551

 U.S. FOOD & DRUG
ADMINISTRATION

August 13, 2021

Kevin R. Amer
Acting General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Sent via email: kamer@copyright.gov

Re: Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Amer:

On May 4, 2021, Regan A. Smith, General Counsel and Associate Register of Copyrights for the United States Copyright Office, sent a letter to FDA's Acting Chief Counsel to inform FDA of a rulemaking proceeding pending before the Copyright Office that relates to, among other things, medical devices. We understand that this proceeding pertains to 17 U.S.C. § 1201 and potential exemptions to the general prohibition on the circumvention of technological protection measures (TPMs) that control access to copyrighted works, including software. Ms. Smith stated that participants in the rulemaking process had referenced FDA's regulatory authority in this area as relates to the safety and effectiveness of medical devices, and the Copyright Office therefore sought to make FDA aware of the rulemaking proceeding.

Ms. Smith drew FDA's attention to two proposed exemptions being considered in this proceeding. The first of these proposed exemptions, designated the "Class 9" proposal, seeks to expand an existing exemption under 37 C.F.R. § 201.40(b)(4), pursuant to which the prohibition on circumventing TPMs does not apply to a patient who accesses compilations of data generated by the patient's own medical device or corresponding personal monitoring system, provided that the device is wholly or partially implanted in the patient's body; the circumvention is undertaken by the patient; the access is accomplished through the passive monitoring of wireless transmissions already being produced by the device or monitoring system; and the circumvention does not constitute a violation of applicable law. The Class 9 proposal would remove these four limitations.

Under the second proposed exemption, designated the "Class 12" proposal, the prohibition on circumventing TPMs would not apply to circumvention that is conducted to access computer programs and data files that are contained in and control the functioning of medical devices (among other things) for the purpose of diagnosis, maintenance, or repair of such devices. Ms. Smith stated that opponents of both proposals have expressed concerns regarding potential impacts to health and safety should the exemptions be granted.

FDA would like to thank the Copyright Office for informing FDA of this proceeding. The following are

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

(Page 275 of Total)    JA1653

LOC_AR_00008203

**U.S. FOOD & DRUG**
ADMINISTRATION

our views with respect to both the Class 9 and Class 12 proposals, as they relate to devices within the meaning of section 201(h) of the Federal Food, Drug, and Cosmetic Act (referred to as "medical devices" herein). We offer no opinion at this time on any existing exemptions or proposed exemptions to the general prohibition on the circumvention of TPMs that control access to copyrighted works other than as specifically discussed below.

<u>Class 9</u>

It is FDA's understanding that the proposed expansion of the current exemption under 37 C.F.R. § 201.40(b)(4) would broaden opportunities for patients to access data generated by their own medical devices without potential liability under 17 U.S.C. § 1201, but would impose no requirements on, or in any way limit the actions of, the manufacturers of those devices. FDA does not believe that further exempting patients (or those acting on their behalf) from potential liability in this fashion is likely to significantly impact the safety or effectiveness of medical devices, or to impair the ability of medical device manufacturers to comply with applicable regulatory requirements enforced by FDA. We are aware that opponents of the proposed expansion have raised concerns that the expansion may jeopardize the cybersecurity of affected devices, and may require greater effort from manufacturers to ensure that their devices remain secure. FDA believes that an exemption from liability expressly limited to circumvention conducted for the sole purpose of lawfully accessing data generated by a patient's own device or associated monitoring system, whether or not such device is implanted and/or such access is accomplished through the passive monitoring of existing wireless transmissions, is unlikely to undermine the cybersecurity of affected devices, other than as intentionally undertaken by the patient and as may impact only such patient's own device. FDA further believes that the proposed expansion of the exemption under 37 C.F.R. § 201.40(b)(4) is broadly consistent with the existing exemption for good-faith security research under 37 C.F.R. § 201.40(b)(11). FDA therefore does not view the proposed expansion of the exemption at 37 C.F.R. § 201.40(b)(4) as likely to undermine or impede efforts to ensure an appropriate degree of cybersecurity for medical devices.

FDA notes that the Class 9 proposal includes modifications to 37 C.F.R. § 201.40(b)(4) that would remove the current regulatory language expressly limiting the exemption to circumvention that "does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration." To the extent this language is removed from the regulation, FDA recommends that the final rule clarify that nothing in the rule affects the application of other federal laws and regulations, and remind interested parties that the exemption continues to apply only where circumvention is undertaken "for the sole purpose of *lawfully* accessing the data generated by [the patient's] own device or monitoring system" (emphasis added).

<u>Class 12</u>

As a preliminary matter, FDA understands that the proposed exemption would apply to circumvention that is conducted solely to obtain data access for the purpose of diagnosis,

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

2

JA1654

LOC_AR_00008204

![U.S. Food & Drug Administration logo]

maintenance, or repair of medical devices, and not for the purpose of device modification that may significantly change the performance or safety specifications of the device or its intended use.[1] FDA further understands that opponents of the Class 12 proposal have expressed concerns that the exemption may facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers.

In May 2018, FDA issued a report that evaluated the available evidence pertaining to the quality, safety, and effectiveness of medical device servicing in the United States.[2] Based on an assessment of complaints, peer-reviewed published literature, medical device reports describing suspected device-associated deaths, serious injuries, and malfunctions, and research and analysis provided by third parties, the report concluded that many entities that perform or participate in the servicing of medical devices – including both original equipment manufacturers (OEMs) and independent service organization (ISOs) – provide high quality, safe, and effective medical device servicing.[3] The report determined that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing, and therefore concluded that the evidence did not justify imposing additional regulatory requirements on ISOs.[4] The report further concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States.[5]

With respect to cybersecurity concerns in particular, FDA recently issued a discussion paper that is intended to guide future assessment of both the challenges and opportunities related to cybersecurity and the servicing of medical devices.[6] The discussion paper acknowledges the cybersecurity challenges related to ISO servicing of medical devices, but also notes that device servicing entities may be well positioned to help identify and address security vulnerabilities, and observes that ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices. FDA therefore does not share the view that an exemption from liability under 17 U.S.C. § 1201 for circumvention conducted solely for the purpose of diagnosis, maintenance, or repair of medical devices would necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity; however, FDA has sought stakeholder input on this topic and is evaluating FDA's approach to cybersecurity and medical device servicing.

---

[1] FDA notes that if the proposed exemption were to cover device modification that may significantly change the performance or safety specifications of the device or its intended use, such exemption could raise safety and effectiveness concerns not addressed in this letter, and may have implications with respect to the application of FDA regulatory requirements pertaining to device marketing authorization, registration/listing, quality system regulations, and medical device reporting, among other requirements.

[2] "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices," available at https://www.fda.gov/media/113431/download.

[3] *See id.* at 23.

[4] *Id.*

[5] *Id.*

[6] "Strengthening Cybersecurity Practices Associated with Servicing of Medical Devices: Challenges and Opportunities," available at https://www.fda.gov/media/150144/download.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

3

JA1655

LOC_AR_00008205

U.S. FOOD & DRUG
ADMINISTRATION

Please let us know if you have any questions regarding these comments, or if FDA can be of any further assistance to the Copyright Office in connection with this rulemaking proceeding.

Sincerely,

Suzanne B. Schwartz -S

Digitally signed by Suzanne B. Schwartz -S
Date: 2021.08.13 11:12:55 -04'00'

Suzanne B. Schwartz, MD, MBA
Director, Office of Strategic Partnerships and Technology Innovation
Center for Devices and Radiological Health
U.S. Food and Drug Administration

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

4

(Page 278 of Total)

JA1656

LOC_AR_00008206

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, *et al.*, | |
| Plaintiffs, | Civil Action No. 22-499 (BAH) |
| v. | Judge Beryl A. Howell |
| LIBRARY OF CONGRESS, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Pending before this Court, for the second time, are challenges to the Library of Congress's rule exempting parties accessing copyrighted software for the purpose of diagnosis, maintenance, and repair of medical devices from the proscription in the Digital Millennium Copyright Act of 1998 ("DMCA") barring the circumvention of technological protection measures ("TPMs") limiting access to copyrighted works. *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 89 Fed. Reg. 85,437, 85,441 (Oct. 28, 2024); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 86 Fed. Reg. 59,627, 59,628 (Oct. 28, 2021), codified at 37 C.F.R. § 201.40(b)(17) (hereinafter "Medical Device Exemption"). After the D.C. Circuit determined that the Library of Congress's rulemaking is subject to the Administrative Procedure Act ("APA") and remanded this dispute, *see Medical Imaging & Technology Alliance v. Library of Congress* ("*MITA II*"), 103 F.4th 830, 841-42 (D.C. Cir. 2024), the parties filed cross motions for summary judgment on plaintiffs' APA claims. *See* Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 33; Defs.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 35. For the reasons explained below, plaintiffs Medical Imaging & Technology Alliance

and Advanced Medical Technology Association's motion for summary judgment is denied, and

the Library and Librarian of Congress' motion for summary judgment is granted.

## I.    BACKGROUND

The statutory scheme, facts, and procedural history relevant to the pending motion are

described below.

### A.    Statutory and Regulatory Background

The Copyright Act of 1976 prohibits the unauthorized reproduction of "original works of

authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  Such original

works include computer programs and software.  *See id.* §§ 102(a)(1), 109(b)(1)(A).  While

generally prohibiting the reproduction of original works, the Copyright Act also codifies the fair

use doctrine, which allows reproduction of works for certain purposes such as "criticism,

comment, news reporting, teaching . . ., scholarship, or research" upon "consider[ation]" of four

factors:

> (1) the purpose and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes; (2) the nature of the
> copyrighted work; (3) the amount and substantiality of the portion used in relation
> to the copyrighted work as a whole; and (4) the effect of the use upon the
> potential market for or value of the copyrighted work.

*Id.* § 107.  "When those factors favor a finding of fair use, that use is 'not an infringement of

copyright,'" so any party sued for a copyright violation based on that use will have a complete

defense.  *Green v. U.S. Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (quoting 17 U.S.C.

§ 107).

"In the 1990s, Congress anticipated that 'the movies, music, software, and literary works

that are the fruit of American creative genius' could soon be accessed 'quickly and conveniently

via the Internet.'"  *Id.* (quoting S. Rep. No. 105-190, at 8 (1998)).  Copyright owners would be

reluctant to make their works available in digital form "without reasonable assurance" of

protection "against massive piracy." *Id.* (quoting S. Rep. No. 105-190, at 8).  To address

concerns about copyright protection in such an environment and to implement two World

Intellectual Property Organization treaties, Congress in 1998 enacted the DMCA, which allows

copyright owners to enforce "digital walls" used to protect their works from piracy.  *Microsoft*

*Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007); *see MITA II*, 103 F.4th at 834; *Green*, 111 F.4th

at 89.  The DMCA provides a private right of action against anyone who "circumvent[s]" such

digital walls, or "technological measure[s,] that effectively control[] access to a work protected"

by copyright law.  17 U.S.C. § 1201(a)(1)(A) (the "anticircumvention provision"); *MITA II*, 103

F.4th at 833; *see also id.* § 1201(a)(3)(A) (defining "to circumvent a technological measure" as

"to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass,

remove, deactivate, or impair a technological measure, without the authority of the copyright

owner").  For example, a subscription-based streaming service might require a log-on code to

access videos and encrypt the media to prevent copying as forms of "digital walls."  *See Green*,

111 F.4th at 89.  In this way, the DMCA "operate[s] as a prohibition against digital trespass."  *Id.*

The DMCA includes, however, several exceptions to the anticircumvention provision

within the statute itself for uses that promote public safety and security and productive,

noninfringing uses.  *See* H.R. Rep. No. 105-796, at 65-67 (1998).  Circumvention of a

technological protective measure ("TPM") is permitted for a school or library to determine

whether to acquire a copyrighted product, for law enforcement purposes, to identify and analyze

elements necessary to achieve interoperability of law enforcement purposes, to engage in

encryption research and security testing of a computer, computer system or computer network,

and, as necessary, both to limit minors' Internet access and to protect personally identifying

information.  17 U.S.C. § 1201(d)-(j).  In addition, the DMCA instructs the Librarian of

(Page 281 of Total)

Congress, upon recommendation of the Register of Copyrights (in consultation with the

Assistant Secretary for Communications and Information of the Department of Commerce), to

engage in a triennial rulemaking process to identify additional exceptions. *Id.* § 1201(a)(1)(C)-

(D).[1]  Such a process allows the rules around digital access to copyrighted materials to reflect

evolving "marketplace realities," preventing "diminution in the availability" of certain materials

as necessary during limited periods of time.  H.R. Rep. No. 105-551, pt. II, at 36 (1998).

Pursuant to that rulemaking process, the Librarian of Congress is instructed to determine

whether users' ability to make noninfringing uses of copyrighted materials "are or are likely to

be in the succeeding 3-year period, adversely affected by" the anticircumvention provision based

on four described factors, plus leeway for other "appropriate" factors:

> (i) the availability for use of copyrighted works;
> (ii) the availability for use of works for nonprofit archival, preservation, and
> educational purposes;
> (iii) the impact that the prohibition on the circumvention of technological
> measures applied to copyrighted works has on criticism, comment, news
> reporting, teaching, scholarship, or research;
> (iv) the effect of circumvention of technological measures on the market for or
> value of copyrighted works; and
> (v) such other factors as the Librarian considers appropriate.

17 U.S.C. § 1201(a)(1)(C).  Upon making that determination, the Librarian may waive the

anticircumvention provision for that class of works.  *Id.* § 1201(a)(1)(D).

"Although the DMCA entrusts the Librarian with the ultimate decision, as a practical

matter, the Register performs most of the rulemaking functions," *MITA II*, 103 F.4th at 834; H.R.

Rep. 105-796, at 64, including soliciting proposed rules, providing notice of such rules, and

---

[1]    The U.S. Office of Copyright, headed by the Register of Copyrights, is housed within the Library of Congress.  *MITA II*, 103 F.4th at 833; 17 U.S.C. § 701(a) ("All administrative functions and duties under this title, except as otherwise specified, are the responsibility of the Register of Copyrights as director of the Copyright Office of the Library of Congress.  The Register of Copyrights, together with the subordinate officers and employees of the Copyright Office, shall be appointed by the Librarian of Congress, and shall act under the Librarian's general direction and supervision.").

4

**JA1660**

opening the rules to public comment, and in doing so, develops a comprehensive administrative

record.  *See, e.g.*, 86 Fed. Reg. at 59,628.  Proponents seeking an exemption must demonstrate

"(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing;

and (2) that as a result of [a TPM], the prohibition is causing, or in the next three years is likely

to cause, an adverse impact on those uses."  *Id.*  The Register is to recommend granting an

exemption only when such a showing has been made by a preponderance of the evidence.  *Id.*

This rulemaking process was intended as a "'fail-safe' to ensure that the

anticircumvention provision leaves breathing room for noninfringing uses, including fair use, of

copyrighted content."  *Green*, 111 F.4th at 90 (quoting H.R. Rep. No. 105-551, at 36).  During

"the drafting of the DMCA," many voiced concerns that "if not carefully crafted," the DMCA

"might 'create a "pay-per use" society' without adequate protection for noninfringing

expression."  *Id.* (quoting H.R. Rep. No. 105-551, at 26).  Accordingly, "the statutory standard

for triennial rulemaking borrows liberally from the doctrine of fair use."  *Id.* at 101.  The final

rules "resemble a series of *ex ante* determinations as to which activities are likely to qualify as

fair uses that would be adversely affected by the anticircumvention provision if not exempted."

*Id.*  While copyright infringement is closely related to circumvention of TPMs and the

rulemaking process is intended to free from DMCA liability uses that would not be violations of

copyrights, copyright infringement and circumvention of TPMs nonetheless remain distinct

illegal acts with independent legal inquiries.  *See Green*, 111 F.4th at 91; 17 U.S.C. § 1201(c)

(DMCA provision clarifying that "[n]othing in this section shall affect rights, remedies,

limitations, or defenses to copyright infringement, including fair use, under this title."); *see also*

*id.* § 1201(a)(1)(E) (DMCA provision providing that "Neither the exception under subparagraph

(B) from the applicability of the prohibition contained in subparagraph (A) [*i.e.*, the

anticircumvention provision,] nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph."); *see also* David Nimmer, *A Riff on Fair Use in the Digital Millenium Copyright Act*, 148 U. PA. L. REV. 673, 698-99 & nn. 130-31 (2000) (noting that § 1201(a)(1)(E) and § 1201(c)(1) are redundant in this respect and summarizing that "a defendant whose usage wins exemption in pertinent rulemaking does not thereby gain any mileage in urging a fair use defense to copyright infringement").

### B.    Factual Background

The Medical Device Exemption at issue here was adopted as part of the Eighth Triennial Rulemaking in 2021 and subsequently renewed in 2024.

#### 1.    *Eighth Triennial Rulemaking*

In 2020, the Register of Copyrights published a notice of inquiry in the Federal Register, soliciting proposals for new exemptions. Notice of Inquiry and Request for Petitions, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 Fed. Reg. 37,399 (June 22, 2020), AR at 45-49. After organizing those proposals into particular classes, the Register provided notice of the proposed rules and requested comment. Notice of Proposed Rulemaking, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 Fed. Reg. 65,293, 65,302 (Oct. 15, 2020), AR at 50-67, ECF No. 24-1.

Two petitions were submitted by independent service-organizations ("ISOs") with memberships comprised of non-manufacturer, third-party service operators hired to repair equipment, seeking to expand existing exceptions "relating to diagnosis, repair, and modification of software-enabled devices." *See id.* at 65,306-07, AR at 63-64. The existing exemptions protected ISOs from DMCA liability when accessing computer programs operating "lawfully acquired motorized land vehicle[s]" when "circumvention is a necessary step to allow the

6

diagnosis, repair, or lawful modification of a vehicle function," and when accessing computer programs operating "lawfully acquired smartphone[s] or home appliance[s] or home system[s]," again when such "circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." *Id.*

The petitions sought an "exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices." *Id.* at 65,307, AR at 64. Many complex medical devices, such as MRI machines, are operated by computer software designed by original equipment manufacturers ("OEMs"). *See* Pls.' MSJ, Ex. D, Philips Long Comment Regarding Proposed Exemption ("Philips 2021 Cmt.") at 2-3, ECF No. 33-6, AR at 4132-33. The devices' software, in addition to performing their imaging or other basic functions, enables them to store and relay confidential patient information electronically. *See* Pls.' MSJ, Ex. B, Med. Imaging & Tech. All. Long Comment Regarding Proposed Exemption ("MITA 2021 Cmt.") at 5, 10, ECF No. 33-4, AR at 4099, 4104. Given the importance of these devices and their safety to patients and the healthcare community, the devices and their manufacturers are regulated by the FDA. *See, e.g.*, 21 C.F.R. pts. 801, 814 (requiring approvals before distribution); *id.* pt. 803 (requiring reports of serious malfunctions); *id.* pt. 820 (regarding quality system regulation). The devices' operating software is copyrighted, *see* 17 U.S.C. §§ 101, 102(a), and OEMs employ TPMs to guard against unauthorized access to both the original code and the confidential patient information generated by the device. *See* MITA 2021 Cmt. at 2, AR at 4096.

Hospitals and other owners of the devices may diagnose, repair, and maintain the devices themselves or hire outside services from the OEM or an ISO to do so. Although sometimes OEMs provide support to ISOs or allow limited licensing of their copyrighted documents and software, other times ISOs act without authorization from OEMs and must circumvent TPMs to

7

**JA1663**

access the software and related data files in order to conduct maintenance or repairs.  Pls.' MSJ, Ex. C, AdvaMed Long Comment Regarding Proposed Exemption ("AdvaMed 2021 Cmt.") at 8, ECF No. 33-5, AR 4017; *id.*, Ex. A, Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights (Oct. 2021) ("2021 Reg. Rec.") at 225, ECF No. 33-3, AR at 1925.  In the ISOs' view, the ability of healthcare providers easily and affordably to access repair services when needed is essential to their public health missions.  *See* 2021 Reg. Rec. at 224, AR at 1924 ("[P]roponents point to instances where medical facilities have been unable to use equipment due to inadequate repair options, particularly during the COVID-19 pandemic." (citing submissions in the record)).  In the OEMs' view, ISOs take advantage of the massive investment in research and development made by OEMs in developing the software and circumvent TPMs simply to benefit the ISOs' own commercial interests.  *See, e.g.*, MITA 2021 Cmt. at 3, AR at 4097; Philips 2021 Cmt. at 6, AR at 4136.

The Register solicited three rounds of comment: one from proponents of the petitions or neutral parties, another from opponents, and a final reply round from the proponents or neutral parties.  *See* 85 Fed. Reg. at 65,302, AR at 59.  Medical Imaging & Technology Alliance ("MITA") and Advanced Medical Technology Association ("AdvaMed"), collectively "plaintiffs," participated in the second round, filing comments in opposition to the petitions.  *See* MITA 2021 Cmt., AR at 4095-130; AdvaMed 2021 Cmt., AR at 4010-24.  Both plaintiffs are non-profit member-based trade associations representing manufacturers of medical devices that advocate for policies and regulations to support their industry and promote patient care.  Am. Compl. ¶¶ 21-22, ECF No. 32.  As relevant here, their members manufacture software-enabled medical devices and rely on TPMs to protect their intellectual property.  *Id.* ¶¶ 23-24.

8

Plaintiffs expressed their view during the rulemaking that the uses in the proposed medical device exemption for ISOs to conduct maintenance and repairs are not "fair uses."  As support for this position, they first contended that the maintenance and repair uses were purely commercial and simply competed with OEMs also offering such services, not transforming the computer code in any way.  *See* MITA 2021 Cmt. at 7-9, AR at 4101-03; AdvaMed 2021 Cmt. at 7-8, AR at 4016-17; *see also* Philips 2021 Cmt. at 7-8, AR at 4137-38.  Second, they expressed concern about ISOs free riding on the investment of OEMs in developing the innovative equipment, which would discourage further creations.  *See* MITA 2021 Cmt. at 9, AR at 4103; AdvaMed 2021 Cmt. at 8-9, AR at 4017-18.  Third, plaintiffs pointed out that the proposed exemption could decrease the value of the devices and their copyrighted software on the market, especially given the cybersecurity risks at stake with circumvention of TPMs.  *See* MITA 2021 Cmt. at 10-11, AR at 4104-05; AdvaMed 2021 Cmt. at 3, 8-9, 11-15, AR at 4012, 4017-18. 4020-24; *see also* Philips 2021 Cmt. at 9-10, 17, AR at 4139-40, 4147.  Lastly, plaintiffs argued that the exemption would jeopardize patient safety and privacy given that ISOs are not carefully regulated and the devices, if not employed using the appropriate standards, could cause harm to patients through mechanical failure or burns.  *See* MITA 2021 Cmt. at 3-5, AR at 4097-99; AdvaMed 2021 Cmt. at 3, 11-15, AR at 4012, 4020-24; Philips 2021 Cmt. at 17-19, AR at 4147-49.

The Register subsequently held a hearing regarding the proposed exemption, including participants expressing opposition.  *See* Notice of Public Hearings, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 86 Fed. Reg. 8560, 8561 (Feb. 8, 2021), AR at 68-69, 5627-5763; Section 1201 Rulemaking Hearing Tr. at 730 (Apr. 20, 2021),

9

**JA1665**

AR 5628, ECF No. 24-6 (listing participants, including other representatives of opponents, though not plaintiffs).

### 2.    *Final Rule Adopted*

Upon considering all of the viewpoints expressed, the Register recommended adopting the Medical Device Exemption in October 2021, concluding that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." 2021 Reg. Rec. at 229, AR 1929.

The Register determined that the Medical Device Exemption targeted noninfringing uses by examining the four statutory factors for "fair use," 17 U.S.C. § 107. *See* 2021 Reg. Rec. at 208-12, AR 1908-12. All four, in the Register's view, favored fair use. First, regarding "the purpose and character of the use," the Register determined that ISOs' services should be considered more transformative than commercial, given that they were not *commercializing* the embedded copyright software but rather restoring the device's functionality, and that diagnosis, maintenance and repair was considered "likely to be transformative," citing prior conclusions to that effect in other contexts. *See* 2021 Reg. Rec. at 209, AR at 1909. Second, regarding the nature of the copyrighted work, the Register observed that the copyrighted software was used for its "functional and informational" character, *i.e.*, operating medical equipment, not its expressive qualities. *See id.* at 2010, AR at 1910. Third, the amount and substantiality of the copyrighted work used was as much as "necessary to accomplish" the purpose of diagnosis, maintenance, or repair, which was "reasonable." *Id.* at 211, AR at 1911. Fourth, the Register considered the "effect of the use on the market for or value of the copyrighted work" and determined the effect of the use of the copyrighted software by ISOs for diagnosis, repair, and maintenance on the market for the software would be minimal because the device and system software was sold with

<center>10</center>

the equipment and has "no independent value separate from the devices." *Id.*  The Register

nonetheless acknowledged that reproduction of "copyrighted materials for use with other

devices, or enabl[ing] permanent access to subscription-only services" could injure the market

for the devices, but such uses were not covered by the exemption and thus "would remain

prohibited." *Id.* at 212, AR at 1912.

The Register then turned to the statutory criteria for an exemption set out in 17 U.S.C.

§ 1201(a)(1)(C), leading to the conclusion that such noninfringing uses would be adversely

affected by the DMCA anti-circumvention provision.  *See* 2021 Reg. Rec. at 229, AR at 1929.

As to the first factor, the availability for use of copyrighted works, the Register considered the

proponents' concern about the inadequate availability of timely, cost-effective repair services

during the COVID pandemic given the anticircumvention provision's restriction of the use of the

device software and manuals, countered by the plaintiffs' assertions that OEMs offered robust

service and repair options and that owners and lessees of devices can become authorized to

conduct repairs, too, through particular programs.  *See id.* at 224-226, AR at 1924-26.  She

concluded that the "factor favors an exemption because the prohibition on circumvention" does

make "medical equipment software and manuals less available for use in noninfringing

diagnosis, maintenance, and repair." *Id.* at 226, AR at 1926.

The Register determined that the second and third factors—the "availability for use of

works for nonprofit archival, preservation, and educational purposes" and "the impact that the

prohibition on the circumvention of technological measures . . . has on criticism, comment, news

reporting, teaching, scholarship, or research," 17 U.S.C. § 1201(a)(1)(C)(ii)-(iii)—were not

"especially relevant to the determination," though MITA argued that the commercial nature of

the proponents' interest undercut the nonprofit purposes in these factors, 2021 Reg. Rec. at 226,

**JA1667**

AR at 1926.  The Register noted, however, the unaddressed gap in MITA's argument that "repair of medical devices and systems that are no longer supported by OEMs arguably preserves the availability for use of the equipment's software and servicing materials."  *Id.*

Regarding the "effect of circumvention . . . on the market for or value of copyrighted works," 17 U.S.C. § 1201(a)(1)(C)(iv), the Register determined that this fourth factor did not "disfavor an exemption."  2021 Reg. Rec. at 227, AR at 1927.  She reasoned that the "narrow proposed uses" by ISOs "and additional limitations on the scope of these activities limit any potential market harm" because repairs "support rather than displace the embedded computer programs" and the software and manuals have "no independent value separate from the equipment they operate or explain."  *Id.*

Finally, the Register considered the public interest as a consideration under the fifth statutory factor, which gives the Librarian discretion to consider additional factors as deemed appropriate.  *See* 2021 Reg. Rec. at 227-28, AR at 1927-28.  She credited proponents' point that, without an exemption, OEMs could control the repair market and charge high prices and that an exemption "could help to address the[se] broader competitive concerns[,] recently highlighted by the Executive Branch."  *Id.* (citing Exec. Order No. 14,036, Promoting Competition in the American Economy, 86 Fed. Reg. 36987, 36992 (July 14, 2021)).  She also addressed plaintiffs' concerns about patient safety, given that ISOs do not adhere to "FDA Quality System Regulation (QSR) requirements."  *Id.* at 228, AR at 1928.  The FDA had submitted its own comment in the proceeding concluding that concerns about safety related to medical device servicing did not justify additional regulatory requirements on ISOs, and the Register emphasized that the Exemption requires no changes be made to the firmware.  *See id.* at 229, AR at 1929.  The

Register, therefore, recommended that the Librarian grant the requested Medical Device Exemption.  *See id.* at 229, 232, AR at 1929, 1932.

The Librarian adopted the Medical Device Exemption in October 2021 based on the Register's reasoning.  *See* 86 Fed. Reg. at 59,627, AR at 7-84.  The final rule exempts from the anticircumvention provision "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device of system."  37 C.F.R. § 201.40(b)(17).  The Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system," *id.* § 201.40(b)(17)(i), and "repair" as "the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system," *id.* § 201.40(b)(17)(ii).  The Medical Device Exemption does not protect ISOs from liability for conduct violative of other provisions of the DMCA.  *See id.* § 201.40(b).

### 3.    *Ninth Triennial Rulemaking*

While this suit has been pending, the Librarian renewed the Medical Device Exemption in the next triennial rulemaking proceeding in 2024.  The Register received petitions to renew the Exemption, *see, e.g.*, Petition to Renew a Current Exemption Under 17 U.S.C. § 1201, AR at 2623-31, ECF No. 46-5, and plaintiffs and others submitted comments in opposition, *see* Pls.' MSJ, Ex. F, MITA Comments in Response to Section 1201 Renewal Petition Regarding Medical Devices ("MITA 2024 Cmt."), ECF No. 33-8, AR at 2821-26; *id.*, Ex. G, AdvaMed Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201 ("AdvaMed 2024 Cmt."), ECF No. 33-9, AR at 2830-38; *id.*, Ex. H, Comments by Philips North America, LLC In

13

Response to Petitions to Renew DMCA Exemption Relating to Medical Devices ("Philips 2024 Cmt."), ECF No. 33-10, AR at 2782-820.

Plaintiffs and other opponents argued once again that the Exemption undermined FDA repair standards in a way that threatened patient safety and contradicted FDA policies on medical device cybersecurity. *See* MITA 2024 Cmt. at 6, AR at 2826, AR; AdvaMed 2024 Cmt. at 5-6, AR at 2834-35; Philips 2024 Cmt. at 8-9, AR at 2789-90. The Register pointed to her earlier analysis in the 2021 recommendation and further noted that the Exemption from DMCA liability does not absolve any user from compliance with other laws and regulations. *See* Pls.' MSJ, Ex. E, Register Recommendation for Section 1201 Rulemaking Oct. 2024 ("2024 Reg. Rec.") at 37, ECF No. 33-7, AR at 2093. This time, the opponents also argued that the Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), undermined the Register's prior fair use analysis. *See* MITA 2024 Cmt. at 2-6, AR at 2822-26; AdvaMed 2024 Cmt. at 6-8, AR at 2835-37; Philips 2024 Cmt. at 5-7, AR at 2787-89. The Register was not persuaded that *Warhol* changed the fair use analysis in this context and instead found this case reinforced that the first factor focuses on whether the use adds something new with a new purpose or character beyond the copyrighted work. *See* 2024 Reg. Rec. at 38, AR at 2094. The Register, determining that the analysis in the 2021 Recommendation was sound, likewise recommended renewal of the Medical Device Exemption, and the Librarian adopted that recommendation. *See* 89 Fed. Reg. at 85,437.[2]

---

[2]     Given that the Librarian adopted the Register's reasoning in both rulemakings, *see* 86 Fed. Reg. at 59,627; 89 Fed. Reg. 85,445, the reasoning and conclusions in the Register's Recommendation are considered those of the Librarian of Congress. *See* Pls.' Mem. in Supp. of Pls.' MSJ ("Pls.' Mem.") at 16 n.1, ECF No. 33-1 ("Because the Librarian effectively adopted the Register's reasoning as her own in granting . . . and renewing the Exemption, we attribute the Register's analysis to the Librarian."); *see generally* Defs.' Mem. in Supp. of Defs.' MSJ & Defs.' Opp'n to Pls.' MSJ ("Defs.' Opp'n"), ECF No. 35-1.

**JA1670**

### C.    Procedural Background

Plaintiffs filed a complaint in 2022 alleging that the Librarian's adoption of the

Exemption in 2021 violated the APA, as arbitrary and capricious and not in accordance with the

law, as well as contrary to the APA's procedural requirements because the Librarian failed to

respond to critical comments.  *See* Compl. ¶¶ 78-91, ECF No. 1.  Given D.C. Circuit precedent at

the time holding, however, that "the Library of Congress is not an 'agency' under the APA,"

*MITA II*, 103 F.4th at 842 (Childs, J., dissenting) (citing *Clark v. Libr. of Cong.*, 750 F.2d 89,

102-03 (D.C. Cir. 1984); *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15

(D.C. Cir. 1985); *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir.

1994)), plaintiffs alternatively claimed that, if review under the APA were not available, the

challenged exemption should be deemed *ultra vires* as outside the scope of her statutory

authority and in violation of the separation of powers.  *Id.* ¶¶ 92-101.  Plaintiffs then sought

summary judgment, Pls.' Mot. Summ. J., ECF No. 10, and the Library of Congress, as well as

the Librarian herself ("defendants"), cross moved to dismiss, under Federal Rule of Civil

Procedure 12(b)(6), Defs.' Mot. Dismiss, ECF No. 17.  This Court resolved those motions by

holding that plaintiffs' APA claims were barred by sovereign immunity because, based on

binding precedent in this Circuit, the Library of Congress was not an "agency" under that statute,

*see Medical Imaging & Technology Alliance v. Library of Cong.* ("*MITA I*"), No. 22-cv-499

(BAH), 2023 WL 2387760, *9-10 (D.D.C. 2023) (citing 5 U.S.C. §§ 701(b)(1), 551(1) (defining

"agency" and excluding Congress); *Clark*, 750 F.3d. at 102-03; *Ethnic Emps.*, 751 F.2d at 1416

n.15; *Wash. Legal Found.*, 17 F.3d at 1449), and that plaintiffs failed to plead plausible *ultra*

*vires* and constitutional claims in the alternative, *id.* at *11-15.  On appeal, a split panel of the

D.C. Circuit vacated that opinion, concluding that the DMCA and the Copyright Act provided

for APA review of the triennial DMCA rules, despite the Library not being an "agency" for

15

which the APA itself provided review.  *See MITA II*, 103 F.4th at 841-42; *see also id.* at 842-43

(Childs, J., dissenting) (reasoning that the Copyright Act could not waive sovereign immunity

over the Librarian, even if it did intend to provide judicial review).  On remand, this Court was

instructed to consider the merits of the APA claims in the first instance.  *See id.*

       The D.C. Circuit issued its mandate just months before the Ninth Triennial Rulemaking,

so the parties agreed that defendants could proceed with that rulemaking and plaintiffs could

thereafter amend their complaint.  *See* Joint Status Report at 3, ECF No. 31.  Plaintiffs filed an

amended complaint in November 2024, asserting three claims only under the APA (*i.e.*, that the

Medical Device Exemption was contrary to statute, arbitrary and capricious, and procedurally

flawed in failing to respond to critical comments).  *See* Am. Compl. ¶¶ 86-107, ECF 32.  Both

parties subsequently cross-moved for summary judgment, which, after full briefing, are now ripe

for consideration.  *See* Pls.' Mem. in Supp. of Pls.' MSJ ("Pls.' Mem."), ECF No. 33-1; Defs.'

Mem. in Supp. of Defs.' MSJ & Defs.' Opp'n to Pls.' MSJ ("Defs.' Opp'n"), ECF No. 35-1;

Pls.' Opp'n to Defs.' MSJ and Pls.' Reply in Supp. of Pls.' MSJ ("Pls.' Opp'n"), ECF No. 41;

Defs.' Reply in Supp. of Defs.' MSJ ("Defs.' Reply"), ECF No. 43.  Plaintiffs challenge both the

adoption of the Medical Device Exemption in the Eighth Rulemaking, as well as the renewal in

the Ninth Rulemaking, which relied largely on the same reasoning as the original adoption.  *See*

Pls.' MSJ at 2.

## II.    LEGAL STANDARD

       The APA provides for judicial review of "final agency action for which there is no other

adequate remedy in a court."  5 U.S.C. § 704.  The Act "instructs a reviewing court to set aside

agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.'"  *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5

<div align="center">16</div>

**JA1672**

U.S.C. § 706(2)(A)).  This standard "'requires agencies to engage in reasoned decisionmaking'

and . . . to reasonably explain to reviewing courts the bases for the actions they take and the

conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d

83, 115 (D.C. Cir. 2020) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*

("*Regents*"), 591 U.S. 1, 16 (2020)).  The scope of arbitrary and capricious review is "narrow,"

such that "a court is not to substitute its judgment for that of the agency." *Judulang v. Holder*,

565 U.S. 42, 52-53 (2011) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983)).  Rather, the court determines "whether the [agency's] decision was

based on a consideration of the relevant factors and whether there has been a clear error of

judgment." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Indian River Cnty. v.*

*U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) ("Agency action is arbitrary and

capricious 'if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, [or] offered an explanation for its

decision that runs counter to the evidence before the agency.'" (quoting *Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43)).  Judicial review is "limited to 'the grounds that the agency invoked when

it took the action," *Regents*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758

(2015)), and the agency likewise "must defend its actions based on the reasons it gave when it

acted," *id.* at 24.

    A "party is entitled to summary judgment only if there is no genuine issue of material fact

and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*,

888 F.3d 1261, 1267 (D.C. Cir. 2018); FED. R. CIV. P. 56(a).  In APA cases involving cross-

motions for summary judgment, such as this one, "the district judge sits as an appellate tribunal,"

*Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v.*

**JA1673**

*Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)), because the "entire case on review is a question of law," *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  The complaint "presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action."  *Id.* (quoting *Marshall Cnty.*, 988 F.2d at 1226); *see also Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting that in an APA case, "determining the facts is generally the agency's responsibility, not" the court's).  The review is limited to the administrative record as a result. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[A] reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" (quoting *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)).

## III.    DISCUSSION

Plaintiffs challenge the Medical Device Exemption's adoption as contrary to law, arbitrary and capricious, and procedurally flawed, but all these APA claims fail.  The Exemption addresses a class of users that are "adversely affected by the" anticircumvention provision "in their ability to make noninfringing uses under [Title 17] of a particular class of copyrighted works," as prescribed by the statute.  17 U.S.C. § 1201(a)(1)(C).  The Librarian applied the law to the evidence in the record in a fair and principled way in adopting the Exemption and fully addressed all key points raised by opponents in the rulemaking process.  While plaintiffs may perceive competitive harms resulting from the Exemption, they identify no violation of the APA to justify granting their desired relief.  For those reasons, as further explained below, defendants' motion for summary judgment is granted and plaintiffs' motion is denied.

**JA1674**

A.    **The Medical Device Exemption is Consistent with the Law and Justified by Reasoned Analysis.**

Plaintiffs argue that the Medical Device Exemption is contrary to law by permitting uses of copyrighted materials that are not "fair uses," under 17 U.S.C. § 107, when the DMCA allows exemptions only for "noninfringing" uses. *See* Pls.' Mem. at 15-28. They assert that the Librarian erred in conducting the four-factor fair use inquiry by misapplying applicable precedent and legal principles, and that her analysis was arbitrary and capricious and unsupported by the evidence. *See id.* at 15, 28-30. Defendants respond that the Librarian's determination that "accessing copyrighted works in order to repair medical devices is likely noninfringing is consistent with the Copyright Act and based on reasoned decisionmaking." Defs.' Opp'n at 15. Defendants are correct: The Librarian's conclusion that the exempted uses are likely noninfringing, under 17 U.S.C. § 1201(a)(1)(C), is consistent with both the fair use doctrine, codified at § 107, as well as the DMCA, and her analysis in reaching that conclusion is well-reasoned and grounded in record evidence.

At the outset, before turning to review of the fair use component of the Librarian's decision, two clarifications are helpful regarding what is not at issue in the challenged action. First, as described *supra* Part I.A, any TPM exemption under § 1201(a)(1)(C) requires a determination by the Librarian that the exempted uses are or are likely to be noninfringing. *See* 86 Fed. Reg. at 59,628; 17 U.S.C. § 1201(a)(1)(C) (allowing exemptions for users of copyrighted works "who are . . . , or are likely to be . . . adversely affected" by the anticircumvention provision "in their ability to make noninfringing uses under this title of a particular class of copyrighted works"). The Librarian here deemed that use of embedded computer programs and related data files for diagnosis, maintenance, and repair of medical devices was noninfringing because they were fair uses under 17 U.S.C. § 107. *See supra* Parts I.A-I.B. The DMCA also

19

**JA1675**

required the Librarian to conclude that the users would be adversely affected by the anticircumvention provision to warrant an exception, *see* 17 U.S.C. § 1201(a)(1)(C), and she did so, *see* 2021 Reg. Rec. at 229, AR at 1929; *supra* I.B.  Plaintiffs do not challenge the latter part of the Librarian's analysis, which is consequently not at issue, with plaintiffs' critiques focused solely on her application of the four fair use factors.  *See* Defs.' Opp'n at 15 n.5 ("Because Plaintiffs argue only that the uses contemplated by the Repair Exemption are not likely to be noninfringing because they are not a fair use of the copyrighted software, the Librarian's adverse effects analysis is not addressed here.").

Second, an APA review of the Librarian's fair use analysis is not *de novo* in the same manner as if a copyright claim and fair use defense were being presented in the first instance. "[F]air use is a mixed question of law and fact," involving the "determination of subsidiary factual questions" as part of the four factors, such as "how much of the copyrighted work was copied." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021) (first passage quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985), and third passage quoting *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1196 (Fed. Cir. 2018)).  In the APA review context, a level of deference is given to the Librarian's factual findings to the extent those findings are supported by substantial evidence, which "requires more than a scintilla, but . . . something less than a preponderance of the evidence.  If that threshold is met, we must uphold the agency's judgment regarding the relevant facts,'" *Bloomberg L.P. v. SEC*, 45 F.4th 462, 475 (D.C. Cir. 2022) (quoting *Epsilon Elecs., Inc. v. Dep't of Treasury*, 857 F.3d 913, 925 (D.C. Cir. 2017) (internal quotations and citations omitted)), "even if we think the evidence tends to weigh against the agency's finding," *Epsilon Elecs., Inc.,* 857 F.3d at 925 (internal quotation and citation omitted).  Due to this deference, the substantial evidence inquiry asks not "whether

20

**JA1676**

record evidence could support the petitioner's view of the issue, but whether it supports the [Librarian's] ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010). Plaintiffs nowhere dispute that this deferential standard applies to the Librarian's factual findings nor that this Court reviews the Librarian's analysis under the arbitrary and capricious standard.[3] Thus, these review standards are not at issue. Accordingly, in applying the arbitrary and capricious standard, the Court examines whether the Librarian "relie[d] on inappropriate factors, fail[ed] to consider important aspects of the problem, or ignore[d] relevant evidence." *Int'l Dark-Sky Ass'n, Inc. v. Fed. Commc'ns Comm'n*, 106 F.4th 1206, 1213 (D.C. Cir. 2024). "Within an agency's lawful authority, courts will uphold agency action that is 'reasonable and reasonably explained.'" *Id.* (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021)).

Close examination of the Librarian's challenged action shows that she was well cognizant of the role of the fair use doctrine to mediate the trade-offs in copyright law of providing "the benefits of incentives to create against the costs of restrictions on copying," based on "judicial balancing" according to the "relevant circumstances." *Warhol*, 598 U.S. at (2023) (last two passages quoting *Google LLC v. Oracle Am.*, 593 U.S. 1, 19 (2021)). The four factors in § 107 guide this "equitable rule of reason," though these factors are "not exhaustive" and "indicate[], rather than dictate[] how" the doctrine should be applied. *Google*, 593 U.S. at 18-19. The Librarian's fair use analysis addressed each of the four factors, as discussed *seriatim*.

### 1.    First Factor Under § 107: Purpose and Character of the Use

---

[3]    Plaintiffs omit a "legal standard" section in their brief, but they do not contest defendants' framing of the question for the Court as "whether the Librarian (1) arbitrarily and capriciously made the relevant findings (2) and, in turn, whether her conclusion that the Repair Exemption was fair use was itself arbitrary and capricious." Defs.' Opp'n at 17.

The Librarian determined that the first statutory factor—"the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1)—favored a finding of fair use. She considered the commercial nature of ISOs' diagnostic, maintenance, and repair activities but concluded they were outweighed by the transformative nature of those uses, which pursued a novel function going beyond the original purpose of the copyrighted materials. *See* 2021 Reg. Rec. at 209, AR at 1909. Plaintiffs argue that this conclusion was "dead wrong" because the ISOs' uses are "entirely commercial" and "not transformative," considering that ISOs are not permitted to make changes to the copyrighted work. Pls.' Mem. at 17-19. Defendants respond that because the use of copyrighted works for diagnosis, maintenance, or repair serves "a different function" than the original code does—by expanding its usefulness rather than replacing it—the Medical Device Exemption's uses are indeed transformative. Defs.' Opp'n at 19. Defendants are correct: The Librarian's conclusion that the first factor weighed in favor of fair use was both consistent with the law and fairly reasoned.

The first fair use factor inquires "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). Given how slippery that standard has often seemed, the Supreme Court has distilled this factor into a balancing test considering the degree to which "the use of a copyrighted work has a further purpose or different character"—thereby making it "transformative"—and the commercial nature of the use. *See Warhol*, 598 U.S. at 529, 532; *id.* at 549-50 ("Fair use instead strikes a balance between original works and secondary uses based in part on objective indicia of the use's purpose and character, including whether the use is

22

commercial and, importantly, the reasons for copying.").  As the balancing test suggests, commerciality, while relevant, "is not dispositive of the first factor."  *Google*, 593 U.S. at 32. Noncommercial use "tips the scales in favor of fair use," but the "inverse is not necessarily true, as many common fair uses are indisputably commercial," such as news reporting.  *Id.*  Further, transformation is considered a matter of degree, but to qualify as a "transformative use" at all, the use of the original must "go beyond that required to qualify as a derivative" because the owner of a copyright still has a "right to derivative transformation of her work."  *Warhol*, 598 U.S. at 529.

Regarding the transformative nature of the uses permitted by the Medical Device Exemption, the Librarian reasonably concluded that restoration of medical devices supports rather than supplants the underlying copyrighted material and thus that diagnosis, maintenance, and repair are transformative in nature.  *See* 2021 Reg. Rec. at 209, AR at 1909 ("Here, the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials.").  The original embedded copyrighted computer programs and their related files make the medical devices run, instructing them on how to operate.  When an ISO references the computer programs to conduct diagnosis, maintenance, or repair, the user does so to protect or fix those same devices; the ISO does not reproduce the code with a purpose to run other devices.  Repair and maintenance of a device thus has a "different character," *Warhol*, 598 U.S. at 528 (quoting *Campbell*, 510 U.S. at 579), and "employ the [code] in a different manner," Pierre N. Leval, Commentary, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990), from how the code is originally used by the machine to operate the device.  Far from superseding the latter, the former uses are essential to and completely supportive of the original copyrighted software's ability to operate

23

**JA1679**

the medical devices. *See id.* As the Librarian observed, *see* 2021 Reg. Rec. at 209, AR at 1909, diagnosis, repair, and maintenance in no way "obviate[s] any need" for the original copyrighted software to operate the medical devices, *Midlevel-U, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1222 (11th Cir. 2021) (explaining that an index of full-length blog articles was not transformative because the index "obviate[d] any need for an Index subscriber to visit [the] website [containing the original posts] directly").

To be sure, the Librarian credited plaintiffs' argument that the uses contemplated by the Medical Device Exemption are, in most cases, commercial, since ISOs generally conduct maintenance and repairs in order to make money. 2021 Reg. Rec. at 208-09, AR at 1908-09. Yet commercial use is not dispositive. "[S]uch uses must be addressed through a 'sensitive balancing of interests.'" *Id.* (quoting *Campbell*, 510 U.S. at 584-85). The Librarian reasonably determined that the transformative purpose of the uses contemplated by the Exemption—*i.e.*, to restore functionality of the device—outweighed the commercialized nature of the use, particularly because the commercialized nature of diagnosis, maintenance, and repairs does not actually threaten the commercial value of the underlying copyrighted software itself. *See id.* ("[T]he proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyright software and other servicing materials.").[4]  She therefore fairly concluded that the first factor leans in favor of fair use.

---

[4]   Defendants make the astute point that although ISOs and OEMs both make money by repairing medical devices, engaging in diagnosis, maintenance, and repairs are not inherently commercial activities: The Medical Device Exemption applies just as much to ISOs seeking to earn a profit as "persons and non-profit medical facilities that own their own devices and repair them for their own personal or institutional use." Defs.' Opp'n at 20. Plaintiffs' only response is that the possibility of non-commercial uses under the Exemption is not a reason "the Librarian offered in the rulemaking, and it is therefore not a basis upon which the Court may uphold the Exemption." Pls.' Opp'n at 5 ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (quoting *EchoStar Satellite LLC v. FCC*, 457 F.3d 31, 36 (D.C. Cir. 2006))). This response mischaracterizes the record. As defendants point out, the Librarian did cite "declarations from non-ISO medical facility personnel discussing in-house repair services," indicating she considered this fact, which provides further support for her conclusion. Defs.' Reply at 6 (citing 2021 Reg. Rec. at 209 n.1154). In any event, whether

24

Plaintiffs point to several supposed flaws in the Librarian's reasoning and conclusion. To start, plaintiffs argue that the Librarian overlooked the commercial nature of the Medical Device Exemption uses and failed to balance the commercial nature against the transformative purposes—resting solely on the transformative aspect of the Exemption uses. *See* Pls.' Mem. at 18-19 (criticizing what they describe boldly as "outright disregard for the commercial nature of ISOs' use"); Pls.' Opp'n at 4-5. Contrary to plaintiffs' hyperbolic characterization, as just explained, the Librarian *did* acknowledge the commercial nature of the exempted uses but rightly recognized that commercial use is not dispositive and that "such uses must be addressed through a 'sensitive balancing of interests.'" 2021 Reg. Rec. at 208-09, AR at 1908-09 (quoting *Campbell*, 510 U.S. at 584-85)). She then explained how the Exemption's uses were also transformative, which controlled her conclusion. *Id.*

Plaintiffs go on to criticize the Librarian's transformative-use analysis, asserting, as their second argument, that because the Exemption's uses do not actually change or alter the copyrighted software in any way, such uses cannot be transformative. *See* Pls.' Mem. at 19. In plaintiffs' words: "ISOs—by their own admission—do not modify the copyrighted software *at all*. That is because modifying the software would likely lead to the system being considered remanufactured, which is to be avoided because it would then subject ISOs to a raft of burdensome FDA regulations." *Id.* (emphasis in original) (internal quotation marks and citation omitted); *see also* Pls.' Opp'n at 7. Plaintiffs insist that a use is only transformative when the copyrighted work is used "in a different context such that" the work "is transformed into a new

---

this non-commercial use point was sufficiently considered in evaluating the first factor ultimately makes no difference. Even if the uses targeted in the Exemption are considered purely commercial, the Librarian garnered substantial evidence to support the determination that they were transformative and thus concluding that the first factor weighs in favor of fair use.

creation."  Pls.' Opp'n at 9 (quoting *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006)).

While the general, colloquial understanding of the term "transformative" urged by plaintiffs may certainly be correct in some contexts, the legal meaning when "consider[ing]" the first fair use factor—*i.e.*, "the purpose and character of the use," under 17 U.S.C. § 107(1)—is more nuanced.  The caselaw makes clear that the inquiry looks to the use's *purpose* when assessing the transformative quality, not merely the *content* of the copyrighted material copied. Thus, "even making an exact copy of a work may be transformative so long as the copy serves a different function than the original work."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (determining that Google's reproduction of copyrighted images as thumbnails in search results was a transformative use); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) ("[A] transformative work is one that serves a new and different function from the original work and is not a substitute for it."); *A.V. ex. rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) ("The use of a copyrighted work need not alter or augment the work to be transformative in nature.  Rather, it can be transformative in function or purpose without altering or actually adding to the original work.").

Two examples illustrate how a use can be transformative without making any changes to the content of the copyrighted work itself.  News reporters, for instance, "must 'faithfully reproduce an original work without alteration.'"  *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (No. IV)* ("*ASTM IV*"), 82 F.4th 1262, 1268 (D.C. Cir. 2023) (quoting *Am. Soc'y for Testing & Materials v. Public.Resource.Org., Inc. (No. II)* ("*ASTM II*"), 896 F.3d 437, 450 (D.C. Cir. 2018)).  Despite their verbatim reproduction of other ideas, news reports are a paradigmatic example of fair use because they are "transformative in function or purpose."  *Id.*

**JA1682**

(quoting *ASTM II*, 896 F.3d at 450); *see also* 17 U.S.C. § 107 (listing "news reporting" as an example of fair use).  "[A] reporter's message ('this is what they said') is very different from the original message ('this is what you should believe')."  *ASTM IV*, 82 F.4th at 1268.  As a second example, the D.C. Circuit considered an analogous situation in *ASTM IV*, where standard-developing private organizations (such as the American Society for Testing and Materials and the American Society of Heating, Refrigerating, and Air-Conditioning Engineers) brought a copyright infringement suit against a non-profit organization that disseminated the "copyrighted standards, as incorporated into law" by posting them on its freely accessible website.  *See id.* at 1265-66.  In evaluating the defendant non-profit website owner's fair use defense, the court noted that while the plaintiff standard-developing organizations sought to advance the "industry by producing standards reflecting . . . best practices," the defendant's mission differed, seeking rather "to provide the public with a free and comprehensive repository of the law."  *Id.* at 1268.  In other words, defendant's "message ('this is the law') [wa]s very different from the plaintiffs' message ('these are the current best practices for the engineering of buildings and products')."  *Id.*  That the exempted uses do not contemplate modification of any copyrighted materials therefore in no way precludes the Librarian's conclusion of a transformative purpose.

Plaintiffs nonetheless insist, in their third argument, that the Medical Device Exemption allows for the copyrighted software to be used "for the very purpose for which, and precisely the manner in which, it was designed to be used."  Pls.' Mem. at 22 (quoting *Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995)).  In plaintiffs' view, the general operating system software and related files are used under the Exemption just as they were originally intended: "[t]o operate the machine being serviced."  *Id.*  Plaintiffs' view of the Exempted uses' purpose is, however, too general.  The previous examples cited are again helpful

27

**JA1683**

here.  In a broad sense, both the system software's original use in the device and its secondary

use by ISOs to repair the device further the goal of operating the machine to take medical

images.  The same was true in *ASTM IV*; in a broad sense, both the standard-developing

organizations in developing standards and the non-profit website in disseminating those

standards intended to advance knowledge in the industry.  Yet, a narrower sense of the purpose

controlled the legal analysis.  While the original copyrighted software operates the medical

device, conveying the message "do this" (much like "these are the best practices" in *ASTM IV* or

"this is what you should believe" in the news reporting example), ISOs engaging in diagnosis,

maintenance, and repair use the operating code to understand what the machine was told to do,

interpreting the message as "this is the instruction" or "this is what the machine was told to do"

(much like "this is the law" in *ASTM IV* or "this is what was said" in the news reporting

example).  The ISOs or other providers employ those instructions to determine what problem

exists in the device or to fix the device so that the device can operate or execute the code as

intended.[5]

Plaintiffs contest such a narrower approach to the transformative-use inquiry, relying on

*Warhol* to argue that the inquiry is "not satisfied by only marginal shifts in the purposes to which

copied works are put."  Pls.' Opp'n at 9-10; *see also id.* at 14.  The Court in *Warhol* indeed

observed that "an overbroad concept of transformative use, one that includes any further

---

[5]    Plaintiffs separately argue that the Librarian's analysis was flawed because she "ignored" comments made by OEMs explaining how "all of the copyrighted works at issue . . . have as an original purpose the diagnosis, maintenance, and repair of a machine when its functionality becomes impaired," and instead "adopted the opposite conclusion by pure *ipse dixit*" without addressing those comments.  Pls.' Opp'n at 13.  Although not every such comment was explicitly called out, the Librarian plainly engaged with the specific reasoning.  When later addressing the fourth fair use factor, for instance, the Librarian noted that the proposed uses are intended "merely to restore functionality so the equipment performs as intended," recognizing a distinction between the original purpose of getting the device to operate—take images or store data, etc.—and the secondary one of fixing the device to improve or maintain its operation, as the above discussion also demonstrates.  2021 Reg. Rec. at 212; *see also id.* at 209 ("Here, the proposed activities are intended to restore a medical device or system's functionality.").

28

**JA1684**

purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make "'transformative' use of an original must go beyond that required to qualify as a derivative." 598 U.S. at 529. At the same time, however, the inquiry is context-specific and functional, looking specifically at "the reasons for copying." *Id.* at 550. As a result, even a derivative work "borrowing heavily from an original," *id.* at 538, can still be a fair use "if, among other things, the use has a purpose and character that is sufficiently distinct from the original," *id.* at 550. Thus, while copying part of a code to repair a device may be "derivative" of its use to operate that device, its purpose is sufficiently distinct to qualify as a fair use. Indeed, copying a portion of software code as contemplated in the Medical Device Exemption in no way provides "the public with a substantial substitute" for the original software in the device. *Warhol*, 598 U.S. at 531-32 (quoting *Authors Guild*, 804 F.3d at 207).

Plaintiffs then shift to contend that the main dispute here is not about the copying of the device's operating code but rather about the use of ancillary copyrighted materials like electronic manuals, machine specifications, error logs generated by the software, etc., all of which ancillary material may be encompassed by the Exemption's reference to "and related data files," 37 C.F.R. § 201.40(b)(17). Pls.' Mem. at 22 (quoting 2021 Reg. Rec. at 211, AR at 1911). In plaintiffs' view, these "other" materials "exist[] precisely for the purpose of performing service and maintenance" and have no other function. *Id.*; Pls.' Opp'n at 12 ("[T]his case is really only about ISOs' unauthorized use of operating manuals and machine specifications, diagnostic software and service tools, data reports and error logs, and the like."). According to plaintiffs, OEMs created such items for use in performing their own repairs. *See* Pls.' Mem. at 22.

29

JA1685

ISOs' use of those materials still may be considered transformative.  Regardless of whether OEMs created these items or developed code to generate these items with an ultimate goal of facilitating repairs in mind, their immediate original purpose was to help operate the device or to provide information about the general operation of the device.  Use of those materials by ISOs or owners to achieve a secondary purpose to carry out repairs on specific, individual machines requires input of their own knowledge, creative and analytical thinking, and mechanical skills.  That secondary function transforms the basic knowledge conveyed in the copyrighted materials into a distinct and meaningful output, which is considered transformative. *See Warhol*, 598 U.S. at 529 ("A use that has a further purpose or different character is said to be 'transformative.'" (quoting *Campbell*, 510 U.S. at 579)); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) ("If . . . the secondary use adds value to the original—if the quoted matter is used as raw material, transformed in the creation of new information, . . . new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect." (quoting Leval, *supra*, at 1111)).[6]

Another way to understand how ISOs, when using a medical device's operating software, manuals, or other "related data files," employ a purpose different from those items' original function is by recognizing that diagnosis, maintenance, and repair has a concrete "transformative" effect on the device by changing some aspect of how it works—or more accurately, in this context, from not working as intended and advertised, to doing so.  Plaintiffs point out that the inquiry under the first fair use factor is whether the use transforms the copyrighted material itself—not some separate related object.  *See* Pls.' Opp'n at 8.  Plaintiffs'

---

[6]    Indeed, in this respect, the uses permitted by the Medical Device Exemption are akin to "research," a fair use explicitly contemplated by § 107.  Users use the error logs, manuals, or other materials to inform their thinking and then add their own ingenuity to achieve a novel product—a diagnosis or a repaired device.

effort, however, to separate the medical device from the copyright-protected operating software and other material embedded in or generated by the device is elusive.  Although technically the hardware and software may be distinct, the device is simply a vessel for, or a reader of, the copyrighted material.  Neither is operational or commercially valuable without the other.  Given that the software has no use or value apart from the device, maintenance and repairs to device components (either physical or software) facilitate use of the software and thus has a transformative effect on the *use* of the software—the commercially valuable, overall product.[7] The Librarian's conclusion that all of the uses contemplated by the Exemption are transformative was thus not, as plaintiffs suggest, ill reasoned or legally infirm.

As their fourth critique, plaintiffs challenge the Librarian's reliance on a comparison to a prior rulemaking for her conclusion that the exempted uses are transformative here.  At the outset, plaintiffs assert that "the Librarian gave no explanation—*none at all*—for her view that an ISO's use of software for maintenance services can be understood in any way to serve 'a further purpose or different character' than that for which the software was originally created." Pls.' Mem. at 20 (emphasis in original) (quoting *Warhol*, 598 U.S. at 532).  They then ironically go on to protest a point she offered explicitly as an explanation for her view: her previous conclusion in a 2015 rulemaking that "diagnosis and repair are likely to be transformative uses,"

---

[7]      Plaintiffs argue that the Librarian's reasoning was illogical because this point—that the fair use inquiry turns on whether the copyrighted material itself, not a separate object, is altered—was raised in the rulemaking process "but the Librarian proceeded (AR2094) as if it never had been raised." Pls.' Opp'n at 8.  The Librarian never, however, explicitly reasoned that the medical device was altered, as plaintiffs concede.  *Id.* ("The Librarian also *appeared to conclude* that an ISO's use of an OEM's copyrighted works for diagnosis, maintenance, and repair is transformative because to maintain or repair a machine is transformative *of the machine*." (first emphasis added; second emphasis in original)).  The Librarian thus did not need to explicitly respond to plaintiffs' counterargument.  In any case, to the extent the Librarian employed this reasoning, her later recognition that "most medical device and system software and data files generally have no independent value separate from being used with the equipment," 2021 Reg. Rec. at 212, responds to plaintiffs' point: The copyrighted material and the devices are, from functional and commercial perspectives, one in the same.

2021 Reg. Rec. at 209, AR 1909.  *See* Pls.' Mem. at 20, 29.  Plaintiffs raise two purported

problems with relying on this previous determination: (1) that fair-use doctrine requires a case-

by-case analysis, so extrapolation from other contexts is inappropriate; (2) that the cited prior

rulemaking concerned "admittedly transformative uses" because it concerned 'diagnosis, repair,

and *modification*' of electronic control units (ECUs) in automobiles."  Pls.' Mem. at 21

(emphasis in original) (quoting Register of Copyrights, *Section 1201 Rulemaking: Sixth*

*Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention*,

Recommendation of the Register of Copyrights, at 234 (Oct. 8, 2015) ("2015 Reg. Rec."),

available at https://cdn.loc.gov/copyright/1201/2015/registers-recommendation.pdf); *see also*

Pls.' Opp'n at 7-8.

        Neither contention demonstrates a flaw in the Librarian's reasoning.  First, though the

fair use inquiry is context-specific, as plaintiffs correctly note, the Librarian's task here was not

to conduct a fair-use analysis for a particular ISO's use of a specific copyrighted work associated

with a unique device.  Rather, the Librarian was making an "*ex ante* determination[] as to which

activities are likely to qualify as fair uses that would be adversely affected by the

anticircumvention provision if not exempted."  *Green*, 111 F.4th at 101.  Such a categorical

approach requires some degree of generalization.  Moreover, for DMCA-authorized TPM

exemptions to be principled and reasoned rather than arbitrary and capricious, the Librarian

helpfully demonstrated consistency across exemptions with similar uses in different industries

incorporating copyrighted software.  Analogizing therefore to another context involving TPM

exemptions for use in diagnosis, maintenance, and repair was therefore not only acceptable but

showed exemplary thoroughness.[8]

---

[8]        The Librarian reached the conclusion that using copyrighted materials for diagnosis, maintenance, and
repair is a transformative purpose on several other occasions as well, undermining plaintiffs' argument that her

Second, although modification sometimes occurred with ECUs and modification is not

contemplated with the Medical Device Exemption, the Librarian's reasoning in the cited 2015

rulemaking did not rest on that fact, nor did it need to, so that distinction does not undermine its

relevance here.  In the cited 2015 rulemaking, the Librarian separately addressed the

transformative nature of modifications and the transformative nature of diagnosis and repair.  *See*

2015 Reg. Rec. at 234-35.  After addressing modifications, she noted that although the new uses

may "coincide[] generally with the original use," which would normally weigh against fair use,

2015 Reg. Rec. at 234, "the proposed uses for *diagnosis and repair* would presumably *enhance*

*the intended use* of the ECU computer programs," so the first factor favored fair use, *id.* at 235

(emphasis added).  Thus, the Librarian "singled out diagnosis and repair separately" from

modifications.  Defs.' Reply at 10.  Her reasoning there—that a use that does not substitute for

the original but rather enhances and enables it—is equally appliable in the medical device

context and provides a rational basis for the Librarian's conclusion here.  Additionally, as

previously explained, *see supra*, that a new use does not alter or change the original in any way

does not foreclose a finding of a transformative purpose.  The Librarian made no error in

drawing this comparison.

Finally, plaintiffs argue that in the 2024 Ninth Triennial rulemaking, the Register rested

on flawed reasoning and "disregarded the significance of [*Warhol* as] intervening precedent"

since the prior 2021 rulemaking.  Pls.' Mem. at 22.  In *Warhol*, the Supreme Court considered a

copyright claim brought by a photographer, who took an iconic photo of Prince in the 1980s,

---

conclusion was arbitrary and capricious.  *See* Defs.' Reply at 9 (citing Section *1201 Rulemaking: Seventh Triennial Rulemaking to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Acting Register of Copyrights*, at 202-03 (Oct. 2018), AR 1560-61 (regarding diagnosis, repair, and maintenance of home appliances, smartphones, video game consoles, computers, etc.); *Section 1201 Rulemaking: Eighth Triennial Rulemaking to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights*, at 201-02 (Oct. 2021), AR 1901-02 (regarding software-enabled computer devices)).

against the Andy Warhol Foundation, for Warhol's use of that photo to develop silkscreen portraits of Prince, including one appearing in Vanity Fair in 1984.  *See* 598 U.S. at 515.  The Court held that the first fair use factor favored the photographer, not Warhol, because the derivative images were commercial and did not serve a "purpose distinct from the original" so they were not transformative.  *Id.* at 542.  Both the original photograph and the silkscreen, as used in the magazine, intended to illustrate the piece about Prince, and any differences in artistic depiction did not change that purpose.  *See id.* at 545-46.  The Court applied principles from *Campbell* and *Google*, and while clarifying certain points, *see id.* at 541 ("*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message."), did not purport to change the inquiry or overturn any precedent.  In plaintiffs' view, *Warhol* reinforced that there is "nothing transformative" about copying software and "putting it 'to the identical purpose as the original software.'"  Pls.' Mem. at 22 (quoting *Oracle Int'l Corp. v. Rimini St., Inc.*, No. 14-cv-1699, 2023 WL 4706127, at *76 (D. Nev. July 24, 2023)).

This is not a situation, however, where relevant legal precedent was ignored or mistakenly overlooked but instead plaintiffs simply disagree with the Librarian's interpretation and application of *Warhol*.  The Librarian explicitly addressed *Warhol* and explained how its "holding that uses which 'share the same or highly similar purposes' as the copyrighted work weigh against fair use" was consistent with, not a departure from, prior caselaw like *Campbell* and *Google* that she had relied upon in the prior rulemaking.  2024 Reg. Rec. at 38, AR at 2094.  The Librarian even observed that the Eleventh Circuit declined to hear a case involving fair use decided by the district court prior to *Warhol*, intimating that the case did not necessarily require a different analysis.  *See id.* n.178.  As a result, the Librarian concluded that the prior analysis

34

remained valid, and because "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed," the Exemption targeted fair uses. *Id.* That conclusion is fairly reasoned and consistent with *Warhol*.

Relatedly, plaintiffs contend that the Librarian applied *Warhol* in an arbitrary way because she credited the commercial nature of reproduction in another context—for-profit educational materials—and denied them an exemption as a result but did not appropriately consider the commercial nature of the Exemption uses here. *See* Pls.' Mem. at 29-30. In both cases, however, the Librarian appropriately weighed the commercial use against the transformative purpose. The materials at issue in the proposed educational exemption were short clips from movies for the purpose of teaching learners in for-profit classes requiring "close analysis of film and media excerpts." 2024 Reg. Rec. at 52, AR at 2108. In doing that balancing, the Librarian commented that "the nature of this entity's uses . . . [wa]s unclear based on the evidence submitted" and cited concern that the movie clips were used not for criticism and comment but merely for explanation—"to show things that are shown in the movie." *Id.* at 60. In other words, she expressed concern that the use was not sufficiently transformative. Despite the similarly commercial nature of the Exemption uses here, the Librarian explained that the proposed activities had a different purpose: "intend[ing] to restore a medical device or system's functionality, not to commercialize the embedded copyright software." 2021 Reg. Rec. at 209, AR at 1909. The Librarian therefore weighed the two factors (commerciality and transformative purpose), applying the same framework in both cases, and simply came to two different conclusions based on the different factual scenarios. Such well-reasoned and fact-sensitive reasoning is not arbitrary and capricious.

In sum, the Librarian's conclusion that all of the uses contemplated by the Exemption are transformative—and that the transformative quality was more significant than the commercial, for-profit nature of most diagnosis, maintenance, and repair services—was consistent with fair use law, including precedent such as *Warhol*, and supported by well-reasoned analysis.

## 2. Second Factor Under § 107: Nature of the Copyrighted Work

The Librarian concluded that the second factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), also favored fair use. *See* 2021 Reg. Rec. at 210, AR at 1910. She noted that "the computer programs and data embedded in medical devices and systems are not used for their expressive qualities, but rather for their functional and informational aspects that enable users to control and understand the operation of the equipment." *Id.* Plaintiffs argue that she "misses the point entirely" because although "used for a functional purpose," the software is "essentially a creative work." Pls.' Mem. at 27 (quoting *Advanced Comput. Servs. of Mich., Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 365 (E.D. Va. 1994)). Despite nearly always being functional, computer programs are still awarded copyright protection, plaintiffs point out. *Id.*

Plaintiffs' defense of software used in medical devices as "creative work[s]" and critique of the Librarian's decision as somehow "miss[ing]" this important point are entirely misplaced in considering the second fair use factor. The proper question here is not whether a work should be covered by copyright—the whole fair use inquiry presumes the work is copyrightable and copyrighted—but rather how "close" the work is "to the core of intended copyright protection." *Campbell*, 510 U.S. at 586. Creative, artistic expressions like fictional short stories, memoirs, and movies are closer to the core of copyright and thus less amenable to fair use. *See id.* By contrast, "[t]he law generally recognizes a greater need to disseminate" factual works like news broadcasts and published speeches. *Harper & Row*, 471 U.S. at 563; *see also ASTM II*, 896 F.3d at 451 ("All of the works at issue here fall at the factual end of the fact-fiction spectrum, which

36

counsels in favor of finding fair use.").  As the Librarian rightly recognized, 2021 Reg. Rec. at

210, AR at 1910, computer programs are generally "functional in nature," though that does not

mean that this factor will automatically weigh in favor of fair use.  *Google*, 593 U.S. at 27-28;

*Teradyne, Inc. v. Astronics Test Sys., Inc.*, No. 20-cv-2713, 2023 WL 9284863, at *22 (C.D. Cal.

Dec. 6, 2023) (recognizing that computer code involves creativity but is generally considered

"functional and/or utilitarian"); *see, e.g.*, *Advanced Comput. Servs.*, 845 F. Supp. at 365

(describing a particular software as "a specially designed and crafted work which represents a

substantial investment of time and labor" and concluding that the "software's nature . . . militates

against a fair use finding").  The Librarian nonetheless reasonably concluded that in this case, the

software code itself and the ancillary materials are informative, factual, and functional rather

than expressive in nature, favoring fair use.  *See* 2021 Reg. Rec. at 209, AR at 1909.  Although

the code may be innovative and "represent[] a substantial investment of time and labor," as

plaintiffs assert, Pls.' Mem. at 27 (quoting *Advanced Comput. Servs.*, 845 F. Supp. at 365), the

materials overall are not as close as other forms of copyrighted works to the core of copyright.[9]

Plaintiffs urge that the Librarian also went off-course when crediting "competitive

concerns" with OEMs having exclusive control over—and thus an ability to charge exorbitant

prices for—maintenance and repair of their devices.  *See* Pls.' Mem. at 27 (citing 2021 Reg. Rec.

at 228, AR at 1928).  Plaintiffs explain that only public benefits that further the purposes of

---

[9]     Plaintiffs suggest an unintended adverse consequence if the second factor is always interpreted to weigh in favor of fair use for computer programs just because they are "functional" in their purpose, cautioning that such an approach would undermine and even "eviscerate copyright protections for *all* software."  Pls.' Opp'n at 19 (emphasis in original).  Just like Chicken Little overreacted by mistakenly thinking the sky was falling after being hit on the head by an acorn, plaintiffs' concern is predicated on at least two incorrect assumptions: First, contrary to plaintiffs' suggestion, the second factor is not dispositive of the whole fair use inquiry and thus not every use of a copyrighted computer program would be justified by application of the fair use inquiry as a whole.  Second, also contrary to plaintiffs' suggestion, the second factor as applied to any copyrighted software does not always weigh in the direction of fair use, and the Librarian made no such blanket statement otherwise.  *See* 2021 Reg. Rec. at 210 (asserting merely that the copyrighted material at issue here is used for its "functional and informational aspects").

37

copyright, such as the development of art and science, are relevant to the fair use inquiry, not the

financial interests of consumers. *See id.* at 27-28. This argument is entirely misplaced. While

the Librarian did consider "competitive concerns" as part of its rulemaking process, she did not

do so as part of the analysis for the second fair use factor or as part of the fair use analysis at all.

Rather, she addressed these competitive concerns as part of the fifth factor of the "adverse

effects" inquiry under the DMCA's § 1201(a)(1)(C)(v), which instructs the Librarian to take into

account "other factors as the Librarian considers appropriate." *See* 2021 Reg. Rec. at 227-28,

AR at 1927-28. The Librarian thus did not err in her analysis of the second factor or

inappropriately set aside the principles and purpose of copyright law in favor of other

considerations.

### 3.     Third Factor Under § 107: Amount and Substantiality of Portions Used

The third statutory factor looks to "the amount and substantiality of the portion used in

relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Librarian concluded that

this factor weighed in favor of fair use but ultimately "should be given little weight." 2021 Reg.

Rec. at 211, AR at 1911. She reasoned that the amount of copyrighted material used under the

Medical Device Exemption was "reasonable relative to the purpose" because sometimes repairs

would only require a portion of the copyrighted works and where the entire versions were

necessary, such use would be justified "to achieve a transformative purpose." *Id.* at 210-11, AR

at 1910-11. Plaintiffs contend that the Librarian erred because the third factor should not have

been given short shrift and copying works in their entirety "weighs strongly against fair use."

Pls.' Mem. at 23 (citing *Triad Sys.*, 64 F.3d at 1337).

Contrary to plaintiffs' critique, "[c]opying a large[] amount of material" is not inherently

problematic. *Google*, 593 U.S. at 33. As the Court in *Google* explained, "where the material

38

copied captures little of the material's creative expression or is central to a copier's valid purpose," that does not weigh against fair use. *Id.* The factor "will generally weigh in favor of fair use where . . . the amount of copying [i]s tethered to valid, and transformative, purpose." *Id.* at 34.

The Librarian's conclusion here was well-reasoned and consistent with this law. Sometimes diagnosis, repair, and maintenance will require copying large portions of the software code or other materials in their entirety, but because its purpose is transformative, this factor does not weigh against fair use. *See* 2021 Reg. Rec. at 210-11, AR 1910-11. Given that the Medical Device Exemption only allows copying as necessary to carry out the transformative purposes, any concern about ISOs copying "too much" is misplaced. Such copying would not only fall outside of the Exemption, subjecting the user to liability under the DMCA, but could also trigger the risk of separate liability for copyright infringement. *See* 2021 Reg. Rec. at 212, AR at 1912 (observing that if a "user were to reproduce and retain additional copies of any copyrighted materials" beyond the limited purposes set out, they would remain prohibited). The Librarian's decision to give this factor "little weight" was also reasonable, considering that the amount of material necessary to copy will vary with any particular use, and consistent with precedent advising that not every factor will be equally important. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003) ("If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her."); *Google*, 593 U.S. at 19 ("[S]ome factors may prove more important in some contexts than in others.").

**4.    Fourth Factor Under § 107: Effect on the Market for or Value of Copyrighted Work**

**JA1695**

The fourth and final factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  The Librarian concluded that "diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software and this factor favors fair use."  2021 Reg. Rec. at 212, AR at 1912.  In particular, the Librarian reasoned that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." *Id.*  As a result, replication of those files—because they have no use without the device—will not harm the market for their sale, which is dependent on purchases of the actual devices.  Plaintiffs argue that the Librarian erred because she failed to take into account that the Medical Device Exemption will (1) harm the "the service-and-repair market," (2) diminish the incentive for derivative innovations, and (3) "increase the potential for device malfunction and cybersecurity attacks, which undermines the value for medical devices and their software."  Pls.' Mem. at 24-26.  To the contrary, the Librarian considered all relevant facts, including these three considerations referenced by plaintiffs, and came to a conclusion consistent with those facts and the law.

The fourth factor examines "whether the secondary use 'usurps the market of the original work.'"  *Authors Guild*, 755 F.3d at 99 (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004)).  The law instructs courts "to consider" not only "the amount of money that the copyright owner might lose" but also the "source of the loss," taking into account the "public benefits the copying will likely produce."  *Google*, 593 U.S. at 35.  For instance, while a critical review panning a copyrighted work may reduce demand for the original, such harm is not cognizable under copyright law.  *See id.*  Courts should also consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether

40

**JA1696**

unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *ASTM II*, 896 F.3d at 452 (quoting *Campbell*, 510 U.S. at 590).  In addition to the market for the original, the "enquiry 'must take account . . . of the harm to the market for derivative works.'" *Campbell*, 510 U.S. at 590 (quoting *Harper & Row*, 471 U.S. at 568).

Although the first and fourth fair use factors are distinct, there is "a positive association between the two." *Warhol*, 598 U.S. at 536 n.12.  "A secondary use that is more different in purpose and character is less likely to usurp demand for the original work or its derivatives." *Id.* "In other words, under [the fourth factor,] any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work" and thus do not impact its market. *Authors Guild*, 755 F.3d at 99.

Here, the proper inquiry is whether the market for the "copyrighted work," 17 U.S.C. § 107(4), which encompasses the embedded operating software and the related materials like electronic manuals, error logs, design specification documents, will be harmed by copying those materials for diagnosis, maintenance and repairs.  *See* Pls.' Opp'n at 15-16 (agreeing these are the copyrighted works at issue).  As the Librarian found, however, the software and related data files have no value apart from the device themselves.  *See* 2021 Reg. Rec. at 212, AR at 1912. These materials cannot be put into other equipment to operate those devices or uploaded to a computer to carry out other functions.  Although the physical equipment is not the subject of the OEMs' copyrights, the software cannot be used without the equipment, and the equipment cannot be used without the software, so the market for the equipment and the software is one in the same.  Given that the Medical Device Exemption does not allow ISOs in any way to replace the need for the equipment, the Librarian fairly concluded that ISOs' use of the software and

(Page 319 of Total)                                                                                           **JA1697**

related data files does not harm the original market for the purchase of the devices—*i.e.*, the package of the equipment and software.[10]

Plaintiffs first argue that the software and related data files *do* actually have commercial value apart from the equipment because they have independent value in the market for services and repairs. *See* Pls.' Mem. at 24. In this market, ISOs make a profit from using the software and manuals without any sale of equipment. According to plaintiffs, the Exemption harms the OEMs' position in this market by depriving them of direct services contracts or licensing fees they would otherwise receive. *See* Pls.' Opp'n at 15-17. Taking all of these premises as true, plaintiffs' conclusion that therefore the fourth factor must weigh against fair use does not follow.

Plaintiffs conflate the original market of devices—including their embedded software and programs and any files they generate—with the separate market for diagnosis, maintenance, and repairs. Yet, the commercial value of the copyrighted materials in the latter market comes not from the copyrighted materials alone but rather relies on the application of labor, creative analytics and expertise—the transformative process conducted by ISOs. That process does not compete with or replace the use of the copyrighted materials as they were originally provided in the initial sale, which is the market that the fourth factor instructs courts to consider. As defendants put it, "[p]laintiffs' focus on the market for the *repair* of the underlying software is . . . misplaced, because the market at issue here is the market for the software itself, a market that there is no indication that potential users of the exemption—ISOs and medical facilities—seek to enter," Defs.' Opp'n at 26 (emphasis in original), and the fourth factor only concerns itself with

---

[10]    Plaintiffs point to *Campbell*, 510 U.S. at 591, as establishing a presumption of market harm in the case of a non-transformative commercial use of a copyrighted work. Pls.' Opp'n at 16. As covered *supra* Part III.A.1, however, the Exemption allows *transformative* commercial uses, so any presumption contemplated in *Campbell* would not apply.

"the harm that results because the secondary use serves as a substitute for the original work," *i.e.*, "market substitution," *Authors Guild*, 755 F.3d at 99 (second passage quoting *Campbell*, 510 U.S. at 591).[11]

Where, as here, the users in question are "not simply 'creating a market substitute,' but at least arguably" are "creating a market" by adding their own skill and expertise to provide a service using the copyrighted materials, the fourth factor favors fair use. *Teradyne*, 2023 WL 9284863, at *27-28 (holding that a defendant's use of plaintiff's code to develop new software compatible with existing computer programs used by the military was fair use); *see SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1280 (9th Cir. 2013) (observing that "[w]here the secondary use is not a substitute for the original and does not deprive the copyright holder of a derivative use" but is rather a complementary use, "the fourth factor weighs in favor of fair use"). The Librarian's distinction between the original device market and the service-and-repair market and her subsequent conclusion that the Exemption did not harm the original market was therefore reasonable. *See* 2021 Reg. Rec. at 212, AR at 1912 (recognizing that although some of software or materials could have independent value and thus may be accessible for instance via a

---

[11]    Plaintiffs respond that defendants have "confused a copyrighted work with its use or performance." Pls.' Opp'n at 15. They explain that copyrighted works are often only marketable through a particular product or service that communicates the copyrighted work, such as a performance of the play—or in this case, repair of a device. While a script of the play (or the original copyrighted software) is also marketable itself, the fact of the performance does not mean the use is different enough to be fair use, *i.e.*, that the producing theatre need not pay licensing fees for the show. *See id.* Plaintiffs' analogy falls apart, though, because plaintiffs fail to acknowledge the transformative purpose in the repair context. Here, the relevant "use or performance" of the copyrighted software is the operation of the medical device—its originally intended purpose to take medical images—not the repair of the device. The use of the software to conduct a repair is less like performing the play and instead more akin to the use of a script for research to better understand the playwright: a transformative fair use with a different purpose. Understanding the playwright better could aid the performance of the play, just as repairing the device may aid the device's operation, but using the script for research—just like using the software and error logs to diagnose and repair problems—is a task fundamentally different from performing the script or operating the medical imaging device, which are the originally intended uses of the copyrighted material.

separate subscription service, where access is necessary to engage in repair, "it is not likely to harm the market for the software" (citation omitted)).

The implication of plaintiffs' argument here is that even in the secondary service-and-repair market, OEMs are entitled, by virtue of their copyright over their software, to a monopoly. Only OEMs, in plaintiffs' view, should be able to utilize their materials to support the functioning of their machines. "The copyright law, however, does not confer such a monopoly." *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000). In *Sony*, the video game manufacturer Sony sued the developer of a conversion software that allowed Sony's games to be played on computers rather than solely on Sony game consoles. *Id.* at 598. The Ninth Circuit recognized that "Sony understandably s[ought] control over the market for devices that play games Sony produces or licenses" but concluded that the "attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Id.* at 607-08 (second passage quoting *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1992)). The court thus held that the fourth factor favored the defendant. *Id.* Similarly, in *Gulfstream Aerospace Corp. v. Camp Systems International, Inc.*, 428 F. Supp. 2d 1369 (S.D. Ga. 2006), a court held that an aircraft manufacturer could not monopolize maintenance services for its aircraft by enforcing the copyright for its maintenance manuals against third-party maintenance service providers (whose customers had purchased the manuals). *See id.* at 1379-80 ("[W]hat Gulfstream seeks here is to use its claimed copyright in its manuals to gain a judicially-enforced monopoly in maintenance-tracking services for Gulfstream aircraft."). The court deemed the manufacturer's effort so "injurious to the free-market public policy advanced through antitrust and restraint-of-trade

44

**JA1700**

laws" and contrary to the "purpose of copyright law" of "promot[ing] the progress of science and the useful arts" that the fourth factor weighed strongly in favor of the defendants and warranted a finding of fair use. *Id.* (last passage quoting U.S. CONST. art. I, § 8, cl. 8). Given the similar policy concerns at issue here (*i.e.*, OEMs monopolizing the market for repairs and extorting high prices out of essential services providers), plaintiffs cannot demonstrate a different outcome is so compelled.

Plaintiffs next argue that the Exemption will have a "chilling effect on further innovations, including that for derivative works" because it will be more difficult for manufacturers to recoup their cost of investment. Pls.' Mem. at 25. Yet, creators of the copyrighted software recoup their costs through sale of the medical devices containing the software. Plaintiffs do not explain why recouping costs through ongoing licensing or repairs is essential to protect the incentive to innovate. Moreover, reproduction of the copyrighted materials beyond that necessary to conduct diagnosis, repair, and maintenance would not fall within the scope of the Exemption and would further be subject to additional liability for copyright infringement, as the Librarian explained, so concerns about pervasive leakage of their innovative code without remedy appear to be unfounded. *See* 2021 Reg. Rec. at 212, AR at 1912.

Third, plaintiffs contend that the Medical Device Exemption diminishes the value of the devices and the software themselves because the circumvention of TPMs "creates unnecessary technical vulnerabilities that put patient safety in jeopardy" and "increase the potential for device malfunction and cybersecurity attacks." Pls.' Mem. at 24-25. The Librarian took these concerns seriously and requested the FDA's position in the rulemaking process. The FDA expressed in the 2021 cycle that the "available evidence was insufficient to conclude whether or not there is a

**JA1701**

widespread public health concern relating to medical device servicing" and thus "did not justify imposing additional regulatory requirements on ISOs."  2021 Reg. Rec. at 229, AR at 1929; Letter from Suzanne Schwartz, Director of Office of Strategic Partnerships and Technology for FDA (Aug. 13, 2021) ("2021 FDA Letter"), AR at 8203, 8205, ECF No. 46-5.  The FDA, in fact, noted that both OEMs and ISOs "provide high quality, safe, and effective medical device servicing" and "that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States."  2021 FDA Letter, AR at 8205.  During the Ninth Triennial Rulemaking in 2024, FDA reiterated the same position.  *See* Letter from Suzanne Schwartz (June 21, 2024) ("2024 FDA Letter"), AR at 4594, ECF No. 46-5 ("FDA's view is that . . . [the Exemption] would not necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity. The ability to conduct maintenance and repair of devices to restore them or ensure they work in accordance with their original specifications and any changes to those specifications authorized for such devices or systems is critical to the continued safe and effective use of devices postmarket.").  Contrary to plaintiffs' assertions, the Exemption's enabling of repairs by ISOs may actually increase the value of medical devices on the market because ISOs may be able to help "identify and address security vulnerabilities," as the FDA recognized, and they will be more easily maintained and repaired by a wider variety of users.  2021 FDA Letter, AR at 8205; 2021 Reg. Rec. at 229 n.1272, AR at 1929.  The Librarian's consideration of input from the FDA demonstrates a careful and logic-driven, rather than biased or arbitrary, approach to all of the concerns raised during the rulemaking process.

Plaintiffs lodge a final attack on the Librarian's reasoning, criticizing her analogy to "simple consumer electronics" for the conclusion that broader access to software and manuals

**JA1702**

will "'support rather than [undercut the value of] the embedded computer programs,' in effect helping rather than hurting the market.'"  Pls.' Mem. at 26 (alteration in original) (quoting 2021 Reg. Rec. at 227, AR at 1927).  Plaintiffs perceive the Librarian as failing to conduct a context-specific analysis, lumping medical devices together with dissimilar products.  *See id.*  Plaintiffs seize on a single sentence to mischaracterize the record. The Librarian simply noted when considering the fourth statutory factor, *see* 17 U.S.C. § 1201(a)(1)(C)(iv) ("the effect of circumvention of technological measures on the market for or value of copyrighted works"), following her thorough fair use analysis, that "[a]s with other software enabled devices, the functional software and manuals for medical devices and systems have no independent value separate from the equipment they operate or explain."  2021 Reg. Rec. at 227, AR at 1927.  As explained, this observation is both relevant and accurate, and the analogy to other contexts is appropriate for consistent and sound rulemaking.  *See supra* Part III.A.1.  As a result, the Librarian reasonably concluded that the Exemption supports ongoing use of the devices and does not invite a threatening substitute to the medical imaging device market.[12]

\*      \*      \*

The fair use doctrine has been referred to as "billowing white goo," "so flexible as virtually to defy definition," *Monge v. Maya Magazines*, 688 F.3d 1164, 1171 (9th Cir. 2012) (first passage quoting Jessica Litman, *Billowing White Goo*, 31 COLUM. J. L. & ARTS 587, 596

---

[12]    Defendants raise an additional point in support of the Librarian's analysis for the fourth factor—her attention to the public benefits of the Exemption, in particular the benefits to consumers of increased competition for repair and maintenance services.  *See* Defs.' Opp'n at 29.  Plaintiffs retort that the only "public benefit" that may be considered as part of a fair use analysis is the promotion of the objectives of copyright (*e.g.*, innovation and creation).  *See* Pls.' Opp'n at 17-18.  As already discussed in connection with the second fair use factor, *see supra* Part III.A.2, the Librarian, however, did not consider the public benefits as part of her fair use analysis at all.  She rather noted the public benefit as part of the fifth statutory factor under the adverse effects analysis, § 1201(a)(1)(C)(v), instructing the Librarian to consider other factors as appropriate.  Whether the public benefit of a more competitive market is appropriately considered in a fair use analysis is thus of no matter here.

(2008), and second passage quoting *Princeton Univ. Press v. Mich. Doc. Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996)), and more charitably, as an "equitable rule of reason," *Google*, 593 U.S. at 18 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  This flexibility gave the Librarian ample leeway to exercise discretion in conducting a predictive analysis regarding whether uses of copyrighted materials would likely be noninfringing while still falling within the bounds of the law and reasoned decision making.  Indeed, as the above discussion illustrates, plaintiffs' efforts to show that her analysis was such an unreasonable interpretation of the law, erroneous application of the facts, or irrational weighing of the equities to warrant judicial intervention all fail.  In short, the Librarian appropriately applied the four fair use factors, as set out in 17 U.S.C. § 107 and relevant precedent, to the facts in the record to conclude that the diagnostic, maintenance, and repair uses permitted by the Medical Device Exemption are likely to be noninfringing.  This conclusion is consistent with copyright law and supported by her reasoned explanation.

### B.    Librarian's Decision Is Fully Consistent with DMCA's Text and Purpose

In focusing narrowly on the specifics of the Librarian's fair use analysis, plaintiffs sidestep the Librarian's broader rulemaking context.  As previously explained, however, the Librarian's task here was not to conduct a straightforward fair use analysis for a particular instance of reproduction but rather, pursuant to the DMCA's § 1201(a)(1)(C) rulemaking provision, to make a nuanced "*ex ante* determination[] as to which activities are" likely to be noninfringing, *Green*, 111 F.4th at 101, borrowing principles from the fair use doctrine.  *See supra* Parts I.A, III.A.  The context of the DMCA, then, including its significant reshaping of copyright law in the late 1990s, is important to understanding what should qualify as likely "noninfringing" activities.  The text of the DMCA and the policies this law embodies provide further support for upholding the Librarian's conclusion.

48

As previously highlighted, § 1201(a)(1)(C) was enacted to ward off "the specter of moving our Nation towards a 'pay-per-use' society." Nimmer, *supra*, at 725 (quoting 144 CONG. REC. S1187 (Oct. 8, 1998) (remarks of Sen. Ashcroft)); *see also id.* n.282 (citing 144 CONG. REC. H7101 (Aug. 4, 1998) (remarks of Rep. Stearns) (noting the inclusion of language to "protect consumers from a 'pay-per-view' world in the digital area"); 144 CONG. REC. E2144 (Oct. 13, 1998) (remarks of Rep. Tauzin)). The House Commerce Committee expressed concern about an ironic "monopoly stranglehold on information" in the Information Age and intended for the DMCA to strike the right balance among the interests of content creators and information users with the fair use doctrine as a stalwart principle protecting the latter. *Id.* at 719 (quoting H.R. Rep. No. 105-551, pt. 2, at 25-26); H.R. Rep. 105-551, pt. 2, at 25 ("A computer revolution that has increased access to information also creates opportunities for the holders of copyrights to impose fees for, among other things, research and the use of excerpts from published works. And digital technology—whatever that means—could be exploited to erode fair use."). As the D.C. Circuit in *Green* observed, if the DMCA "entitled owners of information to 'lock up' all access—as it might in a fully digitized environment—would-be fair-users of information could be relegated to negotiating access on terms set by the monopoly rights-holders. . . . The Act's drafters sought to avoid such threat to fair uses by balancing the right against circumvention with access protections for certain non-infringing uses." 111 F.4th at 90.

Accordingly, courts have warned against an overbroad reading of the DMCA's anticircumvention provision and suggested a robust role for the Librarian's creation of exemptions. In *Philips Medical Systems Nederland B.V. v. TEC Holdings, Inc.*, No. 20-cv-21, 2023 WL 2064201 (W.D.N.C. Feb. 16, 2023), the court held that an ISO doing medical device maintenance and repairs was liable for circumvention of TPMs under the DMCA. *See id.* at *15-

49

**JA1705**

17.  The Medical Device Exemption had not yet been promulgated during the time of the

challenged conduct in that case, and all parties agreed that this Exemption was not retroactive.

*Id.* at *15.  The court explained the concern in an environment without the Exemption: "Whereas

the DMCA was originally enacted to protect copyright owners from digital piracy . . ., powerful

corporations are now putting digital locks on their products as a tool to capture and retain a huge

market share over the repair industry, reducing consumer choice and raising repair costs."  *Id.* at

*14.  This could be "extremely problematic" for "consumers."  *Id.*  "Imagine the company you

bought your vehicle from telling you that you may only get your vehicle repaired at the

dealership.  This cannot be what Congress intended when it passed the DMCA."  *Id.*  Indeed,

Congress intended for the Librarian to use the "fail-safe" mechanism, H.R. Rep. No. 105-551, pt.

2, at 36, as she has, to protect important noninfringing users from circumvention liability.

Congress' particular intent to ensure that maintenance and repairs were not monopolized

by copyright owners of computer programs is evinced by another provision of the DMCA

exempting from copyright liability owners and lessees of machines making copies of computer

programs for the purposes of maintenance and repair.  *See* 17 U.S.C. § 117(c); DMCA, Pub. L.

105-304, 112 Stat. 2860, sec. 302 (1998).  Specifically, that provision states:

> [I]t is not an infringement for the owner or lessee of a machine to make or
> authorize the making of a copy of a computer program if such copy is made solely
> by virtue of the activation of a machine that lawfully contains an authorized copy
> of the computer program, for purposes only of maintenance or repair of that
> machine, if—
> (1) such new copy is used in no other manner and is destroyed immediately after
>     the maintenance or repair is completed; and
> (2) with respect to any computer program or part thereof that is not necessary for
>     that machine to be activated, such program or part thereof is not accessed or
>     used other than to make such new copy by virtue of the activation of the
>     machine.

*Id.*  This exemption, like others in the DMCA, "limit[s] copyright owners' rights in order to

preserve copyright law's delicate balance."  Nimmer, *supra*, at 704.

50

The Medical Device Exemption goes beyond the statutory provision. As the Librarian explained, "section 117(c) covers a narrower range of activities than those proposed here; any uses that involve loading or accessing software that are not necessary to activate the machine likely would not be protected under the statute." 2021 Reg. Rec. at 207, AR at 1907 (explaining in the context of consumer devices); *see also id.* at 212, AR at 1912 (concluding the same in the context of medical devices). At the same time, the Exemption is consistent with the intent expressed in § 117(c), which was enacted as Title III of the DMCA, titled "Computer Maintenance or Repair Copyright Exemption," to ensure that owners and lessees can maintain and repair their devices without being beholden to OEMs. *See* 144 CONG. REC. S11891 (Oct. 8, 1998) (statement of Sen. Leahy, original sponsor of DMCA and Member of DMCA Conference Committee remarking on DMCA Conference Report, that "Title III will provide a minor, yet important, clarification in section 117 of the Copyright Act to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider, a person unaffiliated with either the owner or lessee of the machine, to activate the machine for the sole purpose of servicing its hardware components."). That Congress did not anticipate the need for a broader statutory exemption to avoid potential adverse effects at the time of enactment in 1998 in no way suggests that Congress intended to set the boundaries of fair use or exemption from circumvention or copyright liability there. Congress simply addressed what it saw, at a minimum, as a then-present threat leering towards a pay-per-use society, where even owners and lessees of machines operating with copyrighted software would have to pay OEMs to obtain repairs of those machines. Despite depriving OEMs of licensing fees they would otherwise receive from repair services, Congress made the determination that such repair uses should be a

**JA1707**

non-infringing use and, now, nearly thirty years later, the Medical Device Exemption is consistent with the policy expressed in § 117(c).

The specific context of DMCA rulemaking also helps explain why plaintiffs' heavy reliance on two cases from the 1990s—one from the district court in the Eastern District of Virginia and the other from the Ninth Circuit—that rejected fair use defenses by ISOs for repairs of computer equipment in traditional copyright infringement suits is unavailing. *See, e.g.*, Pls.' Mem. at 2, 24-25, 28-29; Pls.' Opp'n at 2 (discussing *Advanced Comput. Servs.*, 845 F. Supp. 356 and *Triad Sys.*, 64 F.3d 1330). As a general matter, as previously explained, whether a use is "likely noninfringing" so as to support an exemption to the DMCA under § 1201(a)(1)(C) and whether a particular use constitutes a "fair use" as a defense to a copyright infringement suit are two distinct questions. *See supra* Part I.A. Though both questions rely on the general fair use principles in copyright law, the first is a general predictive analysis conducted in the context of the DMCA, with its own unique purpose and priorities, and the second is a more narrowly focused fact-specific inquiry. Moreover, these decisions cited by plaintiffs predate not only the DMCA's § 117(c) but also several key fair use decisions from the Supreme Court that clarified certain aspects of the analysis, rendering plaintiffs' cases not only non-binding but also unpersuasive.

Looking first to *Advanced Computer Services*, while the facts there closely mirror the uses contemplated by the Medical Device Exemption here—use of operating and diagnostic computer software to conduct repairs—the district court's analysis is obsolete in light of newer caselaw. The court in *Advanced Computer Services* determined that the first factor "weigh[ed] substantially against a finding of fair use" because the contemplated uses were commercial, without considering the transformative property of the use. 846 F. Supp. at 365. As *Campbell*

and *Warhol* have since made clear, however, the commercial nature of a use is not dispositive of the first factor; the commercial quality must simply be weighed against the transformative nature. *See Warhol*, 598 U.S. at 532. That oversight also infected the court's analysis of the fourth factor since the court presumed the future harm to the market simply because the use was commercial. *See Advanced Comput. Servs.*, 846 F. Supp. at 366.

Considering next the Ninth Circuit's decision in *Triad Systems*, the facts are also analogous to situations covered by the Medical Device Exemption, but the court's analysis is sparse and thus hardly instructive. The dispute there involved an ISO that serviced computers made by plaintiff Triad using its licensed operating software and utilities, diagnostic, and auxiliary software. *See* 64 F.3d at 1333. The Ninth Circuit concluded that the ISOs were using the software "for the very purpose for which, and in precisely the manner in which, it was designed to be used," such that the copies "diminished the value of [its] copyright." *Id.* at 1337. The Ninth Circuit rejected the argument that the copyright did "not extend to the service market" because Triad "invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers"—not third parties. *Id.* That the Librarian made a different factual finding here—the operating software and related data files for medical devices were *not* originally invented and developed for the primary purpose of having OEMs service those devices—leading to the opposite conclusion, is not, however, arbitrary or irrational since the Librarian's factual finding is supported by substantial evidence, *see supra* Part III.A, with concomitant deference owed. These two cases, occurring in different factual and legal contexts,

do not bind the Librarian in her rulemaking or in her evaluation of the flexible, equitable inquiry that is the fair use doctrine.[13]

<p style="text-align:center">*    *    *</p>

In sum, plaintiffs have identified no legitimate inconsistency between copyright law and the Medical Device Exemption, nor have they identified an error in reasoning or other shortcoming in the Librarian's analysis. They are not entitled to any relief from the rulemaking on any substantive ground claimed under the APA.

### C.     The Exemption's Promulgation was Procedurally Valid.

Plaintiffs additionally challenge the Librarian's rulemaking procedure, arguing that she failed to address significant comments of "central relevance to the Exemption," offering an independent basis for setting aside the exemption. Pls.' Mem. at 31. "A regulation will be deemed arbitrary and capricious, if the issuing agency failed to address significant comments raised during the rulemaking." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012). "An agency's obligation to respond, however, is not 'particularly demanding.'" *Id.* (quoting *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993)). The agency "need not address every comment,'" but rather "must respond in a reasoned manner to those that raise significant problems.'" *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Reg. Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)). "Nevertheless, '[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Id.* (quoting *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996)).

---

[13]      Of course, other non-binding cases have come to the opposite conclusion on the fair use question in equally applicable contexts. *See Gulfstream Aerospace Corp.*, 428 F. Supp. 2d at 1380-81; *supra* Part III.A.4 (discussing *Gulfstream*). None of these cases mandates a particular outcome here.

The record here demonstrates that the Librarian explicitly addressed all of the topics of concern in the comments raised by plaintiffs.

### 1.    *Comments Requesting Device-Specific Analysis*

Plaintiffs first contend that the Librarian "did not address comments calling for a device-specific analysis of the fair-use doctrine," instead grouping all medical devices together into a categorical analysis and comparing them to disparate products like consumer devices.  Pls.' Mem. at 31-32.  The Librarian did, though, consider the appropriate scope of a class, noting Congress's warning not to draw the boundaries of classes "too narrowly."  2021 Reg. Rec. at 9, AR at 1709.  She explained that determining the appropriate scope for a class of items subject to an exemption may "involve consideration of the adverse effects an exemption may have on the market for or value of copyrighted works."  *Id.*  Classes may be refined by reference to the access controls put on them or the particular type of use or user.  The Librarian subsequently explained why "medical devices and systems" was an appropriate scope for a class and should be evaluated separately from consumer devices, noting that they differ from consumer devices in terms of their function, TPMs, and software licenses.  *Id.* at 199, AR at 1899.  The data files and servicing materials to which the ISOs sought access were specific to medical devices and systems, and the record materials, including FDA reports, bearing on the adverse effects of the anticircumvention provision were specific to medical devices.  *Id.*  The Librarian then evaluated fair use for medical devices specifically.  *See id.* at 209, AR at 1909.  While she may have analogized to other forms of devices, she did not indiscriminately lump them together; she rather noted the particular ways in which they were similar as relevant to the analysis.  *See id.* at 209, 211, AR at 1909, 1911 (comparing to other devices in particular contexts, such as observing that repair often has a transformative purpose).  The Librarian thus did not ignore the comments plaintiffs identified.

**JA1711**

       2.      *Comments Regarding Commercial Nature of Exemption Uses and Application of* **Warhol**

Plaintiffs next argue that the Librarian "disregarded commenters' observation that the purpose of the ISOs' proposed uses" was financial gain of for-profit companies—offering only "the *ipse dixit* that maintenance and repair of medical devices is somehow transformative." Pls.' Mem. at 32. To the contrary, the Librarian explicitly addressed the commercial interests of ISOs and concluded with careful reasoning—not *ipse dixit*—that this was outweighed by the transformative purpose. "Commerciality is not fatal to a fair use determination," she observed, rather "such uses must be addressed through a 'sensitive balancing of interests.'" 2021 Reg. Rec. at 209, AR at 1909 (quoting *Campbell*, 510 U.S. at 584-85). She then reasoned that the ISOs were not commercializing the embedded software itself and diagnosis and repair were likely transformative uses, invoking prior analysis in an analogous context for further support. *Id.* Nothing is arbitrary or deficient about that analysis.

Plaintiffs again insist that her analysis was insufficient because she did not change her position in the 2024 Rulemaking based on *Warhol*, which several commenters brought to her attention. Pls.' Mem. at 32-33, 34-35. As previously explained, the Librarian certainly considered *Warhol* and concluded that the Supreme Court in this decision did not change the framework for the first factor. *See supra* Part III.A.1. The Librarian then weighed the uses permitted by the Exemption's transformative purpose against their commercial nature, consistent with the long-standing framework that was also applied in *Warhol*. *See* 2021 Reg. Rec. at 209, AR at 1909; 2024 Reg. Rec. at 38, AR at 2094 ("[T]he purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed."). Plaintiffs simply disagree with which way the Librarian came out, describing her response to *Warhol* as a "cursory brush-off." Pls.' Opp'n at

                                                      **JA1712**

21.  Not so.  The Librarian applied the caselaw in a principled way, citing to prior holdings that were consistent with *Warhol* and circuit courts' analysis of all of the precedents to show that the analysis under *Warhol* did not fundamentally differ.  *See* 2024 Reg. Rec. at 38, AR at 2094.

Plaintiffs further take issue with the Librarian's analysis of the DMCA statutory factors, contending that she did not respond adequately to opponents' arguments that the Medical Device Exemption did not service "nonprofit archival, preservation, and educational purposes," or "impact 'criticism, comment, news reporting, teaching, scholarship, or research," as enumerated considerations in the second and third factors in 17 U.S.C. § 1201(a)(1)(C)(ii)-(iii).  Pls.' Mem. at 33.  Again, plaintiffs' disagreement with the Librarian's conclusion does not exhibit her failure to consider the arguments.  The Librarian explicitly noted this argument—*e.g.*, "MITA asserts that the 'commercial nature' of petitioners' interest runs contrary to the nonprofit nature of the purposes outlined in these factors."  2021 Reg. Rec. at 226, AR at 1926.  She noted that those factors promote the nonprofit nature of services and that "repair of medical devices and systems that are no longer supported by OEMs arguably preserves the availability for use of the equipment's software and servicing materials," reflecting an archival and preservation purpose as contemplated in the statute.  *Id.* at 226-27, AR at 1926-27.  She concluded that, in any case, "these factors [were] not especially relevant to the determination."  *Id.* at 227, AR at 1927.  Not every statutory factor needs to weigh in favor of an exemption for the Librarian to grant one.  *See* 17 U.S.C. § 1201(a)(1)(C) (merely instructing the Librarian to "examine" the four factors plus any "other factors" she "considers appropriate").  The Librarian's analysis here was therefore neither neglectful of plaintiffs' concerns nor otherwise flawed.

JA1713

**3.    Comments About Chilling Effect on Innovation or Negative Impact on Value of Copyrighted Software**

Third, plaintiffs purport that the Librarian "did not address opponents' concern for the Exemption's chilling effect on innovation or its negative impact on the value of the copyrighted software and medical devices," as relevant to the fourth fair use factor. Pls.' Mem. at 33. Commenters had expressed concerns that replication would diminish the value of copyrighted works by making the intellectual property public. *Id.* The Librarian clearly explained, however, that the Exemption would not chill any incentive to innovate because the Exemption would only allow uses of the software for the narrow purpose of maintenance, diagnosis, and repair, and additional reproductions for other purposes would "remain prohibited." 2021 Reg. Rec. at 212, AR at 1912. Plaintiffs dislike that response because "the point was that supposedly permissible uses will lead to impermissible ones, thus affecting the market for medical devices and their software," but the Librarian explicitly addressed that such uses would be illegal. Pls.' Mem. at 33-34. She need not have ventured further to speculate about how to reduce illegal activity when the DMCA and copyright law already provide ample protections.

Plaintiffs also take issue with the Librarian's response to concerns about the creation of unnecessary cybersecurity vulnerabilities through circumvention of TPMs and about the lack of regulation for ISOs working with medical devices. Pls.' Mem. at 34. Plaintiffs seem to have missed, however, the Librarian's acknowledgment of FDA comments addressing the safety of devices in light of ISO repairs, which did not express concern warranting additional regulation on ISOs. 2021 Reg. Rec. at 229, AR at 1929; *see also* 2021 FDA Letter; 2024 FDA Letter.

**4.    Comments About New Congressional and FDA Cybersecurity Policies**

Lastly, plaintiffs contend that in the Ninth Triennial Rulemaking in 2024, the Librarian "disregarded comments showing that Congress and the FDA . . . set forth *new* cybersecurity

58

**JA1714**

policies squarely at odds with the Exemption." Pls.' Mem. at 35 (emphasis added). They point

to MITA's comment calling attention to new provisions enacted by Congress requiring OEMs to

monitor, identify, and address post-market cybersecurity vulnerabilities, which must include

circumvention of TPMs. *See id.* (citing MITA 2024 Cmt. at 6, AR at 4100, and Consolidated

Appropriations Act, 2023, Pub. L. No. 117-328, § 3305, 136 Stat. 5832-34 (2022)). Moreover,

the comments explained that the FDA had issued new guidance to OEMs to use TPMs to identify

and mitigate cybersecurity vulnerabilities. *See id.* (citing MITA 2024 Cmt. at 6, AR at 4100,

FDA, *Cybersecurity in Medical Devices: Quality System Considerations and Content of*

*Premarket Submissions, Guidance for Industry and FDA Staff* (Sept. 27, 2023), available at

perma.cc/2YZR-XX55).

The Librarian did not ignore these new concerns. She sought updated guidance from the

FDA, which concluded that despite the evolved cybersecurity landscape, the Exemption would

not jeopardize the safety of medical devices. *See* 2024 FDA Letter, AR at 4594. These concerns

were thus addressed and rejected clearly in the record.

The Librarian's 2021 and 2024 Rulemakings were thorough and procedurally sound,

addressing all significant comments in a substantive and principled way.

## IV.    CONCLUSION

The Exemption for medical devices and systems is consistent with copyright law and the

DMCA and supported by the Librarian's thorough and well-reasoned explanations from the

Eighth and Ninth Triennial Rulemaking procedures. The plaintiffs' arguments to the contrary,

challenging both the substance of the Librarian's reasoning and her procedural thoroughness, all

**JA1715**

fail.  Consequently, plaintiffs' motion for summary judgment is denied, and defendants' cross-motion is granted.[14]

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  July 21, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[14]      Given that plaintiffs are not entitled to any relief, defendants' arguments about the appropriate scope of that relief, *see* Defs.' Opp'n at 36-38, are not addressed.

60

AO 450 (Rev. 01/09; DC-03/10) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

FILED
JUL 22 2025
Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

ADVANCED MEDICAL TECHNOLOGY ASSOC. et al
*Plaintiff*
v.
LIBRARY OF CONGRESS, et al
*Defendant*

Civil Action No. 22-499 (BAH)

**JUDGMENT IN A CIVIL ACTION**

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* ______ recover from the defendant *(name)* ______ the amount of ______ dollars ($ ______ ), which includes prejudgment interest at the rate of ______ %, plus postjudgment interest at the rate of ______ %, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* ______ recover costs from the plaintiff *(name)* ______ .

☑ other: judgment be entered in favor of defendants;

This action was *(check one)*:

☐ tried by a jury with Judge ______ presiding, and the jury has rendered a verdict.

☐ tried by Judge ______ without a jury and the above decision was reached.

☑ decided by Judge BERYL A. HOWELL on a motion for

summary judgemnt by the plaintiff and defendant's cross motion for summary judgment.

Date: 07/22/2025

*ANGELA D. CAESAR, CLERK OF COURT*

[signature]
*Signature of Clerk or Deputy Clerk*

## CERTIFICATE OF SERVICE

Undersigned counsel for appellant certifies that on this date, the foregoing document was served electronically via the Court's CM/ECF system upon all counsel of record.

Dated: November 7, 2025                              /s/ *Michael B. Kimberly*