**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5328**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

MEDICAL IMAGING & TECHNOLOGY ALLIANCE, et al.,
*Plaintiffs-Appellants,*

v.

LIBRARY OF CONGRESS, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-00499, Honorable Beryl A. Howell)

_____

**BRIEF FOR APPELLEES**

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
LAURA E. MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4819*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), I certify as follows:

### A.    Parties and Amici

Plaintiffs in district court, and appellants here, are Medical Imaging & Technology Alliance and Advanced Medical Technology Association. Defendants in the district court, and appellees here, are the Library of Congress and the Acting Librarian of Congress. There were no amici in the district court nor, at the time of filing, before this Court.

### B.    Rulings Under Review

The rulings under review are the opinion and order entered on July 21, 2025. *See Medical Imaging & Technology Alliance v. Library of Congress*, No. 1:22-cv-0499 (D.D.C.), 2025 WL 2029804 (Howell, J.).

### C.    Related Cases

This case has been before this Court once previously. *See Medical Imaging & Technology Alliance, et al. v. Library of Congress*, 103 F.4th 830 (D.C. Cir. 2024) (reversing district court's prior jurisdictional dismissal). The undersigned counsel is unaware of any related cases currently pending in any court.

*/s/ Laura E. Myron*
Laure E. Myron

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ....................................... 2

STATEMENT OF THE ISSUE ............................................ 3

STATEMENT OF THE CASE ............................................. 3

    A.    Statutory Background: The Copyright Act and the Digital Millennium Copyright Act ................................................. 3

    B.    Factual Background ........................................................ 8

    C.    Prior Proceedings ........................................................ 14

SUMMARY OF ARGUMENT ............................................ 16

STANDARD OF REVIEW ................................................. 20

ARGUMENT ................................................................... 20

The District Court Correctly Concluded That The Librarian's Fair Use Determination Was Based on Reasoned Decisionmaking and Consistent with the Copyright Act. ....................................... 20

    A.    The Purpose and Character of the Use Weighs in Favor of Fair Use. ..................................................... 23

    B.    The Nature of the Work and Amount Used Favor Fair Use. ........................................................................ 35

    C.    The Effect on the Market for or Value of the Copyrighted Work Favors Fair Use. ............................... 37

CONCLUSION ................................................................................................ 44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*2Die4Kourt v. Hillair Cap. Mgmt., LLC,*
   692 F. Appx. 366 (9th Cir. 2017) ...................................................... 32

*A.V. ex rel. Vanderhye v. iParadigms LLC,*
   562 F.3d 630 (4th Cir. 2009) ............................................................ 24

*American Soc'y for Testing & Materials v. Public.Resource.Org., Inc.,*
   82 F.4th 1262 (D.C. Cir. 2023) ........................................................ 24

*American Soc'y for Testing & Materials v. Public.Resource.Org., Inc.,*
   896 F.3d 437 (D.C. Cir. 2018) .......................................................... 24

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
   598 U.S. 508 (2023) ........................................... 13, 22, 23, 33, 37, 38

*Authors Guild, Inc. v. HathiTrust,*
   755 F.3d 87 (2d Cir. 2014) ......................................................... 24, 31

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) ....................................... 11, 18, 19, 24, 36, 38, 41

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.,*
   381 F.3d 1178 (Fed. Cir. 2004) ......................................................... 4

*Google LLC v. Oracle Am., Inc.,*
   593 U.S. 1 (2021) .................................. 22, 23, 25, 26, 31, 36, 41, 43

*Green v. U.S. Dep't of Justice,*
   54 F.4th 738 (D.C. Cir. 2022) ........................................................... 4

*Green v. U.S. Dep't of Justice,*
   111 F.4th 81 (D.C. Cir. 2024) ...................................................... 5, 16

*Grossmont Hosp. Corp. v. Burwell,*
   797 F.3d 1079 (D.C. Cir. 2015) ....................................................... 20

*Medical Imaging & Technology Alliance, et al. v. Library of Congress*,
103 F.4th 830 (D.C. Cir. 2024) .................................................. 2, 14

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) ...................................................................... 5

*MidlevelU, Inc. v. ACI Info. Grp.*,
989 F.3d 1205 (11th Cir. 2021) .................................................. 30

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .................................................... 24

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .................................................... 42

*Sony Computer Entertainment, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ...................................................... 42

*Triad Systems Corp. v. Southeastern Express Co.*,
64 F.3d 1330 (9th Cir. 1995) ................................................ 31-32

**Statutes:**

5 U.S.C. § 706(2) .......................................................................... 20

The Copyright Act of 1976
17 U.S.C. § 101 *et seq.* ...................................................................3
17 U.S.C. § 101 ..............................................................................3
17 U.S.C. § 102 ..............................................................................3
17 U.S.C. § 102(a)(1) ......................................................................3
17 U.S.C § 106................................................................................34
17 U.S.C. § 109(b)(1)(A) ..................................................................3
17 U.S.C. § 107 .................................................. 3, 4, 22, 23, 33, 37

17 U.S.C. § 117(c) ................................................ 19, 32, 33, 34

17 U.S.C. § 1201(a)(1) ................................................................. 5

17 U.S.C. § 1201(a)(1)(A) ...................................................... 5, 21

17 U.S.C. § 1201(a)(1)(B) .............................................................11

17 U.S.C. § 1201(a)(1)(C) ............................................................. 6, 12, 21

17 U.S.C. § 1201(a)(1)(D) ...................................................................... 21

17 U.S.C. § 1201(d)-(j) ............................................................................ 5

28 U.S.C. § 1291 .................................................................................... 3

28 U.S.C. § 1331 .................................................................................... 2

**Rules and Regulations:**

37 C.F.R. § 201.40 (2021) ...................................................................... 12

Fed. R. App. P. 4 .................................................................................... 3

**Other:**

65 Fed. Reg. 64,556 (Oct. 27, 2000) ...................................................... 7

68 Fed. Reg. 62,011 (Oct. 31, 2003) ...................................................... 7

71 Fed. Reg. 68,472 (Nov. 27, 2006) ...................................................... 7

75 Fed. Reg. 43,825 (July 27, 2010) ...................................................... 7

77 Fed. Reg. 65,260 (Oct. 26, 2012) ...................................................... 7

80 Fed. Reg. 65,944 (Oct. 28, 2015) ...................................................... 7

83 Fed. Reg. 54,010 (Oct. 26, 2018) ...................................................... 7

86 Fed. Reg. 59,627 (Oct. 28, 2021) .............................................. 7, 12, 16

88 Fed. Reg. 42,891 (July 5, 2023) ...................................................... 13

89 Fed. Reg. 85,437 (Oct. 28, 2024) .............................................. 7, 8, 14

H.R. Rep. No. 105-551 (1998) ............................................................... 6

S. Rep. No. 105-190 (1998) .................................................................. 4

U.S. Copyright Office, Section 1201 of Title 17 (2017) ......................... 7

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FDA | Food and Drug Administration |
| DMCA | Digital Millenium Copyright Act |
| Librarian | Librarian of Congress |
| Register | Register of Copyrights |

## INTRODUCTION

Certain complex medical devices include software, and in order to repair those devices it is often necessary to access that software. Such access—to diagnose and repair problems with the machines—is often restricted by device manufacturers, thereby impeding technicians, including hospital staff and independent servicing organizations, from performing repairs to restore device functionality. While technicians could attempt to bypass these access restrictions, doing so is prohibited by copyright law, particularly the Digital Millenium Copyright Act (DMCA). Although many applications of the DMCA involve works like movies and songs that might have a wide audience, the statute also applies to the software and data files that are used to operate complex computer-controlled medical equipment, like MRI machines.

The Librarian of Congress (Librarian), upon the recommendation of the Register of Copyrights, granted an exemption to liability under the DMCA in 2021—renewed in 2024—to permit users to circumvent these technological restrictions on medical device software and data files for the purpose of diagnosing, maintaining, and repairing complex medical equipment. As relevant here, the Librarian concluded that accessing and

using such software for these targeted purposes, without retaining or selling copies, was likely a noninfringing fair use of the copyrighted works.

Plaintiffs have challenged the exemption, on the theory that they are entitled to a monopoly on repair services because any access is copyright infringement that cannot be considered fair use. But copyright law does not confer an exclusive right to every use of copyrighted materials, particularly downstream or transformative uses. This is especially true given that the repairer here does not retain any copies or sell them to anyone. The district court correctly rejected plaintiffs' challenge, holding that the Librarian's fair-use analysis was not arbitrary and capricious. This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. This Court previously determined that invocation of jurisdiction was proper. *See Medical Imaging & Tech. All. v. Library of Congress*, 103 F.4th 830 (D.C. Cir. 2024) (reversing district court's prior jurisdictional dismissal). On July 21, 2025, the district court entered its order granting the government's motion for summary judgment. *See* 1-JA-8; 5-JA-1657-1716. Plaintiffs filed a timely notice of appeal on September 12, 2025. 1-JA-8; *see*

2

Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C.

§ 1291.

## STATEMENT OF THE ISSUE

This case concerns a challenge brought under the Administrative

Procedure Act (APA) to a rulemaking conducted by the Librarian of

Congress to establish an exemption to the anti-circumvention provisions of

the DMCA. The question presented is whether the district court correctly

held that the exemption for diagnosis, maintenance, and repair of medical

devices and systems is consistent with copyright law and supported by

thorough and well-reasoned explanation.

## STATEMENT OF THE CASE

### A.    Statutory Background: The Copyright Act and the Digital Millennium Copyright Act

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, prohibits the

unauthorized reproduction of "original works of authorship fixed in any

tangible medium of expression," *id.* § 102(a), including "computer

program[s]," *see id.* §§ 101, 102(a)(1), 109(b)(1)(A). The Copyright Act also

provides that "fair use of a copyrighted work, . . . for purposes such as

criticism, comment, news reporting, teaching . . . , scholarship, or research,

is not an infringement of copyright." *Id.* § 107. Whether a use of

3

copyrighted material constitutes a fair use involves a case-by-case inquiry in which courts must examine, at a minimum, four statutory factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

In 1998, Congress enacted the Digital Millennium Copyright Act in order to address, *inter alia*, the "ease with which digital works can be copied and distributed" and the concern that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." *See* S. Rep. No. 105-190, at 8 (1998); *see generally Green v. U.S. Dep't of Justice*, 54 F.4th 738 (D.C. Cir. 2022). Prior to the DMCA, "a copyright owner would have had no cause of action against anyone who circumvented any sort of technological control, but did not infringe" a copyright. *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1195-96 (Fed. Cir. 2004).

The DMCA "allows copyright owners to enforce 'digital walls' used to protect their works from piracy." 5-JA-1659 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007)). For example, "a subscription-based streaming service might require a log-on code to access videos and encrypt the media to prevent copying." 5-JA-1659; *see also Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024). Congress expressly prohibited, *inter alia*, "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act, 17 U.S.C. § 1201(a)(1)(A), but also enacted specific exemptions to this prohibition, *see id.* § 1201(d)-(j). For example, a school or library may circumvent a technological protection measure to determine whether to acquire a copyrighted product and law enforcement officers may engage in "lawfully authorized investigative, protective, information security, or intelligence activity" without running afoul of the statute. *See*, *e.g.*, *id.* § 1201(d)-(e).

In addition to these permanent exemptions, Congress also directed the Librarian to determine, through triennial rulemaking proceedings, whether any additional noninfringing uses of copyrighted materials are adversely affected by the restrictions and should be temporarily exempted from the anti-circumvention provision. *See* 17 U.S.C. § 1201(a)(1). The

triennial rulemaking is intended to serve as a "'fail-safe' mechanism" that accounts for possible changes in the online marketplace after the DMCA's enactment that threaten to "dimin[ish] . . . otherwise lawful access to works and information." *See* H.R. Rep. No. 105-551, pt. 2, at 36 (1998).

For proposed exemptions to Section 1201, the Librarian makes a determination "upon the recommendation of the Register of Copyrights [(Register)]." 17 U.S.C. § 1201(a)(1)(C). The statute requires the Librarian to consider five factors when assessing whether a particular noninfringing use of a class of copyrighted works is being adversely affected by the anticircumvention provision: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of [access controls] has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.* § 1201(a)(1)(C)(i)-(v). In order to grant an exemption, the Librarian must conclude "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result

of . . . technological [protection] measure[s] . . . , the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses." 86 Fed. Reg. 59,627, 59,628 (Oct. 28, 2021). These requirements must be established by a preponderance of the evidence. *See* 89 Fed. Reg. 85,437, 85,438 (Oct. 28, 2024); U.S. Copyright Office, Section 1201 of Title 17 111-12 (2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

The Librarian has issued nine final rules pursuant to this procedure. *See* 65 Fed. Reg. 64,556 (Oct. 27, 2000); 68 Fed. Reg. 62,011 (Oct. 31, 2003); 71 Fed. Reg. 68,472 (Nov. 27, 2006); 75 Fed. Reg. 43,825 (July 27, 2010); 77 Fed. Reg. 65,260 (Oct. 26, 2012); 80 Fed. Reg. 65,944 (Oct. 28, 2015); 83 Fed. Reg. 54,010 (Oct. 26, 2018); 86 Fed. Reg. 59,627 (2021 rulemaking); 89 Fed. Reg. 85,437 (2024 rulemaking).

Examples of classes of copyrighted works that have been granted exemptions through this process include allowing users to access computer programs in consumer devices for the purposes of diagnosis, maintenance, or repair, 89 Fed. Reg. at 85,441, 85,445, 85,448; excerpts of audiovisual works for criticism and comment, *id.* at 85,439, 85-445-85,446; and books to

enable their use with assistive technologies for blind, visually impaired, and print-disabled individuals, *id.* at 85,440, 85,445, 85,448.

### B.    Factual Background

This case presents a challenge to a specific exemption granted in the Librarian's eighth and ninth triennial rulemaking that allows users to repair medical devices and systems. Many complex medical devices, such as MRI machines, "are operated by computer software designed by original equipment manufacturers." 5-JA-1663. The devices' software, in addition to performing imaging and other basic functions, enables them to store and relay patient information electronically, 5-JA-1663, and often controls access to manuals and servicing materials, 2-JA-612. The device software and data files are protected by copyright, and the devices and their manufacturers are regulated by the Food and Drug Administration (FDA). *See* 5-JA-1663. Access to the copyrighted software is necessary in order to diagnose, repair, and maintain the devices. *See* 5-JA-1663-1664.

As relevant here, in the eighth rulemaking, two independent servicing organizations petitioned the Librarian for an exemption to allow circumvention of technological protection measures, and thus access to device software and data files, for the purposes of diagnosing, maintaining,

8

and repairing certain complex, computer-controlled medical equipment. *See* 3-JA-1016 (Summit Imaging, Inc. Petition); 3-JA-1019 (Transtate Equipment Company Petition). These companies explained that there is a strong public health interest in "maintain[ing] and repair[ing] lifesaving equipment," particularly in light of the COVID-19 pandemic. 3-JA-1017. Although "some manufacturers provide access to device software and servicing materials," independent servicing organizations "assert[ed] that the materials provided vary and in many cases are inadequate to execute repairs." 2-JA-612.

Plaintiffs filed comments opposing the medical device repair petitions. *See* 4-JA-1354; 4-JA-1369. The FDA also provided input on the proposed medical-device repair exemption, explaining that it had previously declined to impose additional regulation on third-party independent servicing organizations. *See* 2-JA-648. The FDA commented that independent servicing organizations "may be well positioned to help identify and address security vulnerabilities" and allowing circumvention for repair-related purposes would not "necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States." 2-JA-648 n.1272 (quoting Letter from Suzanne B. Schwartz, Dir.,

9

Off. of Strategic P'ships & Tech. Innovation, Ctr. For Devices &
Radiological Health, U.S. FDA, to Kevin R. Amer, Acting Gen. Couns. &
Assoc. Reg. of Copyrights, U.S. Copyright Off., Libr. of Cong. 3 (Aug. 13,
2021)); *see also* 5-JA-1653-1656 (Letter).

　　　In her recommendation to the Librarian, the Register concluded that
the "prohibition on circumvention of [technological protection measures] is
causing, or is likely to cause, an adverse impact on the noninfringing
diagnosis, repair, and maintenance of medical devices and systems." 2-JA-
648. The Register analyzed the statutory fair-use factors and concluded that
the activities covered by the proposed exemption would likely constitute a
fair use and thus be noninfringing. Specifically, the Register rejected
opponents' argument that commercial uses are presumptively unfair,
noting that "[c]ommerciality is not fatal to a fair use determination" and
that here "the proposed activities are intended to restore a medical device
or system's functionality, not to commercialize the embedded copyrighted
software and other servicing materials." 2-JA-628. The Register also
explained that diagnosis and repair are likely to be considered
"transformative" uses, 2-JA-628, a term that refers to whether the use has

"a further purpose or different character" from the original, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

The Register found the other factors also favored fair use, including that the "computer programs and data files are 'functional works,'" rather than "creative [works]," that are "not used for their expressive qualities," 2-JA-628-629 (second factor), and that the amount "use[d] is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair," 2-JA-530 (third factor). On the fourth factor, the Register concluded that "most medical device and system software and data files generally have no independent value separate from being used with the equipment," and that "diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software." 2-JA-631. The Register also specifically noted that any uses in which a user reproduced or retained copies of the copyrighted materials for use with other devices would continue to be prohibited because they would be outside the exemption's scope. 2-JA-631.

Finally, the Register explained that the anti-circumvention provision was "adversely affect[ing]" these noninfringing uses, 17 U.S.C. § 1201(a)(1)(B), and that the statutory factors in Section 1201, *see id.*

11

§ 1201(a)(1)(C), on balance supported granting an exemption. First, the Register concluded that the prohibition against circumvention "makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair." 2-JA-643-649. The Register further concluded that "the narrow proposed uses and additional limitations on the scope of these activities limit any potential market harm" that might arise from allowing users servicing medical equipment to access the software. 2-JA-646. In addition, the Register considered the anticompetitive impact of the anti-circumvention provision on the market for repair services as well as plaintiffs' concerns about unauthorized circumvention potentially compromising patient safety and device security. 2-JA-646-648.

In the final rule, the Librarian adopted the Register's recommendation, *see* 86 Fed. Reg. at 59,635, exempting from the anti-circumvention provision "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system," 37 C.F.R. § 201.40(b)(15) (2021). The medical device repair exemption only permits

12

circumvention of technological protection measures to access software and data files; the exemption does not cover a user who "reproduce[s] and retain[s] additional copies of any copyrighted materials for use with other devices," nor does it allow a user to "enable permanent access to subscription-only services." 2-JA-631.

The Copyright Office commenced the ninth triennial rulemaking proceeding on July 5, 2023. *See* 88 Fed. Reg. 42,891 (July 5, 2023). The Register received multiple petitions to renew the medical device repair exemption, and three comments opposing renewal. *See* 3-JA-809. The Register recommended continuing the exemption for the next three-year period, noting that "the [Copyright] Office's analysis from the 2021 cycle remains sound." 3-JA-811. The Register rejected the argument that the Supreme Court's decision in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), should compel a different outcome, explaining that it did "not substantially change how the [Copyright] Office would analyze the uses at issue in this exemption." 3-JA-812. The Register also considered opponents' consumer safety arguments but explained that "opponents' comments do not take into account the FDA's statements regarding the safety of circumvention in this context or the fact that

13

granting an exemption under section 1201 does not absolve any user from compliance with other relevant laws and regulations." 3-JA-811. The Librarian adopted the Register's 2024 recommendation in its entirety. 89 Fed. Reg. 85,437.

### C.    Prior Proceedings

In February 2022, plaintiffs—two trade associations that represent medical device manufacturers—filed this suit in the United States District Court for the District of Columbia challenging the eighth triennial rulemaking. The complaint raised claims challenging the medical device repair exemption under the APA and the constitutional separation of powers. The district court dismissed the claims for lack of subject-matter jurisdiction on the ground that the Library is not an agency subject to suit under the APA, and this Court reversed. *See Medical Imaging & Tech. All. v. Library of Congress*, 103 F.4th 830 (D.C. Cir. 2024).

On remand, the district court allowed plaintiffs to amend their complaint to include challenges to the renewal of the medical device repair exemption in the ninth triennial rulemaking. *See* 5-JA-1672. The court then considered cross-motions for summary judgment and concluded that summary judgment for defendants was appropriate. *See* 5-JA-1657-1658.

14

The court explained that the Librarian "applied the law to the evidence in the record in a fair and principled way in adopting the [medical device repair e]xemption and fully addressed all key points raised by opponents in the rulemaking process." 5-JA-1674. Although "plaintiffs may perceive competitive harms resulting from the [e]xemption, they identify no violation of the APA." 5-JA-1674.

With respect to the fair-use analysis, the district court began by explaining that "APA review of the Librarian's fair use analysis is not *de novo* in the same manner as if a copyright claim and fair use defense were being presented in the first instance." 5-JA-1676. Because "fair use" is a mixed question of law and fact, "a level of deference is given to the Librarian's factual findings." 5-JA-1676. "Close examination of the Librarian's challenged action shows that she was well cognizant of the role of the fair use doctrine . . . ." 5-JA-1677. The court further held that the Librarian's conclusion that the factors favored fair use was well-reasoned and consistent with copyright law. *See, e.g.*, 5-JA-1691-1692 (first factor conclusion is "consistent with fair use law, including precedent such as *Warhol*, and supported by well-reasoned analysis"); *see also* 5-JA-1694 ("The Librarian . . . did not err in her analysis of the second factor . . . ."); 5-JA-

15

1695 (third factor); 5-JA-1703 (fourth factor). The court further reasoned that the Librarian's decision is "fully consistent with [the] DMCA's text and purpose" because the Librarian's statutory task "was not to conduct a straightforward fair use analysis for a particular instance of reproduction but rather, . . . to make a nuanced '*ex ante* determination[] as to which activities are' likely to be noninfringing." 5-JA-1704 (third alteration in original) (quoting *Green*, 111 F.4th at 101). Finally, the court concluded that the Librarian's analysis addressed all relevant comments and was not procedurally flawed. *See* 5-JA-1710-1715.

## SUMMARY OF ARGUMENT

As relevant to this appeal, in order to grant an exemption to the anti-circumvention provisions of the Digital Millennium Copyright Act, the Librarian of Congress must conclude "that uses affected by the prohibition on circumvention are or are likely to be noninfringing." 86 Fed. Reg. at 59,628. The question faced by the Librarian was therefore whether an action for copyright infringement would be likely to lie if a user seeking to repair a piece of medical equipment made incidental copies of software and data files stored on the equipment that needed to be accessed in order to conduct the repair and then deleted all of those incidental copies and did

16

not develop any software of its own based on those copies. As the district court properly held, the Librarian reasonably answered that question in the negative.

In so doing, the Librarian properly analyzed the four fair-use factors—the purpose and character of the use, the nature of the work, the amount and substantiality of the portion used, and the effect of the use on the market for the copyrighted work—and concluded they all likely favored the proposed uses—diagnosis, maintenance, and repair—covered by the exemption.

The Librarian correctly concluded that the proposed uses were transformative in function and purpose. As the Register stated in the 2024 recommendation to renew the exemption, the "purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." 3-JA-812. Any copies made in the course of repair-related activities covered by the exemption are generated incidentally and only where necessary to accomplish a device repair. The exemption does not cover circumstances in which additional copies are retained or sold, or in which a user exploits access to create their own competing software.

17

Even granting that repair can be commercialized, a point that plaintiffs stress, not all uses under the exemption will be. And the transformative purpose of these uses outweighs any commerciality because repair activities restore functional use of—rather than substitute and usurp the market for—the original software installed on the device. 5-JA-1680.

The Librarian's conclusion that the second and third factors—the nature of the work and amount used—also favor fair use was likewise not arbitrary and capricious. Computer software and data files are more functional than expressive in nature. And the amount of copied material is reasonable relative to the transformative purpose, given that the exemption only permits access to the software and files to the extent necessary to perform repairs and no copies of those works are retained or made available to others.

The Librarian's conclusion on the fourth fair-use factor is likewise well-reasoned and supported by the record. The Supreme Court has made clear that the fourth fair use factor considers the "adverse impact on the potential market for the original" work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (quotation marks omitted). The degree to which a use is transformative under the first factor can inform the fourth factor

18

analysis: where, as here, a use is transformative in purpose, it is less likely to serve as a market substitute for the original work. *Id.* at 591. Here, allowing access to software for purposes of repair, diagnosis, and maintenance does not adversely impact the market for that software, which is originally created and sold with a medical device.

Plaintiffs' reliance on the purported harm to the secondary market for repair services is misplaced. Copyright law does not confer a monopoly over every use of copyrighted materials, particularly downstream or transformative uses. The exemption here rests on the Librarian's reasonable conclusion that while accessing medical device software and data files for purposes of repair may affect downstream, post-sale revenue for manufacturers who also provide repair services, it does not affect any cognizable market for the original works that is relevant to the fourth fair use factor analysis.

Finally, nothing in 17 U.S.C. § 117(c), which creates an exception to copyright infringement in certain circumstances involving the maintenance or repair of machines, precludes the Librarian's analysis here. That provision, which was generally designed to facilitate machine maintenance and repair, does not carry the negative implication that other uses of

19

copyrighted works that are necessary to perform equipment maintenance or repair cannot be justified under ordinary principles of fair use.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision granting a motion for summary judgment. *See Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1082 (D.C. Cir. 2015). A court "may set aside [an agency] decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence in the administrative record.'" *Id.* (quoting 5 U.S.C. § 706(2)(A), (E)).

## ARGUMENT

## THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE LIBRARIAN'S FAIR USE DETERMINATION WAS BASED ON REASONED DECISIONMAKING AND CONSISTENT WITH THE COPYRIGHT ACT.

In this case, the Librarian of Congress exercised express statutory authority to create an exemption from a provision of the Digital Millennium Copyright Act that would otherwise prohibit accessing the software and data files embedded in certain medical equipment for purposes of diagnostics, repair, or maintenance of the machine. Plaintiffs have not disputed the Librarian's determination that, without an

20

exemption, the DMCA's prohibition would have an adverse effect on the relevant uses of the copyrighted material for diagnostics, repair, or maintenance. The only dispute in this Court is therefore whether the Librarian reasonably concluded that if a medical equipment manufacturer filed a copyright-infringement suit against a user of the equipment's software and data files based on incidental copies that were created, and then destroyed, in the course of diagnosis, maintenance, or repair of the equipment, the user would be likely to successfully maintain a fair-use defense.[1] The district court correctly held that the "Librarian's conclusion that the exempted uses are likely noninfringing, under 17 U.S.C. § 1201(a)(1)(C), is consistent with both the fair use doctrine . . . [and] the DMCA, and her analysis in reaching that conclusion is well-reasoned and grounded in record evidence." 5-JA-1675. This Court should affirm.

---

[1] Exemptions issued by the Librarian pursuant to Section 1201 only apply to liability for circumvention of technological protection measures to access copyrighted works; they do not exempt users from liability for copyright infringement. *See* 17 U.S.C. § 1201(a)(1)(D); *id.* § 1201(a)(1)(A). Although a court might consider the Librarian's fair-use analysis persuasive in an infringement action, the Librarian's conclusion reflects only an *ex ante* determination that the particular uses are *likely* to be considered fair use. An infringement action could still lie, and a court would not be bound by that determination in a subsequent action for copyright infringement.

The "fair use" doctrine is an "equitable rule of reason that permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quotation marks omitted). The Copyright Act provides a non-exhaustive list of factors for courts to consider when applying this doctrine. *See id.* at 19. The four statutory factors are (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and, (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(1)-(4). "[F]air use is a 'flexible' concept, and 'its application may well vary depending on context.'" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023) (quoting *Google*, 593 U.S. at 20). For example, "in applying the fair use provision, 'copyright's protection may be stronger where the

copyrighted material . . . serves an artistic rather than a utilitarian function.'" *Id.* (alteration in original) (quoting *Google*, 593 U.S. at 20).[2]

The Librarian considered each of the four factors and explained why together they weighed in favor of a conclusion that accessing and using copyrighted software and data files in order to diagnose, maintain, or repair complex medical equipment was likely to be a fair use.

## A.    The Purpose and Character of the Use Weighs in Favor of Fair Use.

1. The first fair-use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The Register explained in 2021, in reasoning re-adopted in 2024 after considering *Warhol*, that the primary purpose of the proposed activities was to "restore a medical device or system's functionality, not to commercialize the embedded copyrighted

---

[2] Because whether an application involves fair use of copyrighted materials is "a mixed question of law and fact," with a number of "subsidiary factual questions," *Google*, 593 U.S. at 24 (quotation marks omitted), the Librarian's factual findings—regarding the purpose of the use, the nature of the copyrighted works, the amount of work used, and the effect upon the potential market(s) for the works (and what markets are relevant)—are entitled to deference if they are supported by substantial evidence.

software and other servicing materials." 2-JA-628. In evaluating the

purpose and character of the use, the central question is whether the use

merely supersedes the objects of the original creation or adds something

new, with a further purpose or different character, and is thus

"transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

A use can be "transformative in function or purpose without altering or

actually adding to the original work." *American Soc'y for Testing & Materials*

*v. Public.Resource.Org., Inc.*, 82 F.4th 1262, 1268 (D.C. Cir. 2023) (quoting

*American Soc'y for Testing & Materials v. Public.Resource.Org., Inc.*, 896 F.3d

437, 450 (D.C. Cir. 2018)); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d

87, 96 (2d Cir. 2014) ("[A] transformative work is one that serves a new and

different function from the original work and is not a substitute for it.");

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)

("The use of a copyrighted work need not alter or augment the work to be

transformative in nature. Rather, it can be transformative in function or

purpose without altering or actually adding to the original work."); *Perfect*

*10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (explaining

"an exact copy of a work" may be transformative "so long as the copy

serves a different function than the original work").

It is hard to see how the uses at issue here could plausibly substitute for the original work. By its own language, the exemption only applies to software and data files that are contained in the device or system. As a general matter, such software is sold together with the equipment to ensure that the equipment can function and that, if it does not function properly, any issues can be diagnosed and addressed. Entities that engage in the repair activities permitted by the exemption are neither creating nor marketing software of that kind. A hospital or other medical provider that needs the device-specific software for an MRI machine will always need to obtain an authorized copy for medical staff to operate the machine, and nothing about the repair-related uses will change that fundamental fact. By repairing the machine, the technician "seeks to expand the use and usefulness" of the medical equipment in which the software is embedded, rather than replacing the software that operates such equipment or using it to operate competing equipment. *See Google*, 593 U.S. at 30; *see also* 3-JA-811-812 (2024 recommendation explaining that "repair supports—rather than displaces—the purpose of the embedded programs that control the device" (quotation marks omitted)).

25

The Register also properly rejected plaintiffs' suggestion that the first factor necessarily disfavored fair use because medical device repair is commercial in nature. As the Register explained, the Supreme Court has made clear that "[c]ommerciality is not fatal to a fair use determination." 2-JA-628. Many "common fair uses are indisputably commercial." *Google*, 593 U.S. at 32; *see also id.* ("[E]ven though Google's use was a commercial endeavor[,] . . . that is not dispositive of the first factor, particularly in light of the inherently transformative role that [the use] played. . . ." (citation omitted)). Here, the commerciality of the use does not counsel against fair use because "the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials." 2-JA-628; *see also* 2-JA-628 n.1154 ("Servicing the medical equipment owned by lawful possessors is primarily for public benefit, as access to materials required for servicing is imperative in treating patients, and is especially critical during a pandemic such as the current COVID-19 crisis." (quoting Transtate Class 12 Reply 11)). Moreover, the medical device repair exemption extends to all users of medical devices seeking to diagnose or repair them, including persons and non-profit medical facilities that own their own devices and

26

repair them for their own personal or institutional use. *See* 5-JA-1680-1681

n.4. Thus, as the district court correctly held, "the Librarian's conclusion

that all of the uses contemplated by the [medical device repair e]xemption

are transformative—and that the transformative quality was more

significant than the commercial, for-profit nature of most diagnosis,

maintenance, and repair services—was consistent with fair use law . . . and

supported by well-reasoned analysis." 5-JA-1692.

2. Plaintiffs' contrary arguments are unpersuasive. As an initial

matter, plaintiffs' arguments must be considered in the context of the

narrow scope of the medical device repair exemption adopted by the

Librarian. Any user that retains copies of the software, reproduces those

copies, or creates competing works using those copies engages in activity

that falls outside the scope of the exemption. *See* 2-JA-631. Thus, to the

extent that plaintiffs are concerned about any of those activities, which

were not considered as part of the Register's fair use analysis and "remain

prohibited," 2-JA-631, their arguments have no bearing on the

appropriateness of the exemption.

Plaintiffs contend that the uses permitted by the medical device

repair exemption are not transformative because the exemption is not

27

about accessing devices' operating software, but rather "only about software tools, manuals, documentation and similar files used in maintenance and repair," Br. 37-38, and maintenance and repair are the very purposes for which those materials were created. But as the district court recognized, the copyrighted materials contained in medical devices do not actually maintain or repair the machine. Instead, those materials generally make it possible for technicians to locate the relevant information to accurately diagnose technical issues with the device, and then apply their own knowledge and skills to conduct the appropriate maintenance or repair, such as by replacing damaged parts or making other physical device adjustments, while using the device software to ensure that the system is properly configured for staff to resume use for medical procedures. *See* 5-JA-1686. And, as noted above, a hospital could not forgo the copy of the software included with its MRI machine, and almost certainly could not do without any device-specific data files that may indicate system errors and allow technicians to properly calibrate the machine, in favor of incidental copies made by repair technicians during servicing. Indeed, as proponents of the exemption explained, "the devices are integrated to such a degree that the devices will not function without

28

the software, and servicing of the devices often is not possible without use of the installed software and data files." 3-JA-1034. Accordingly, the repair activities permitted under the exemption do not supersede the purpose of the device software and data files.

Moreover, by suggesting that the works at issue are "only" (Br. 30) those used for diagnosis and repair, plaintiffs attempt to elide the fact that the primary purpose of copyrighted works identified in the language of the exemption—namely, "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files"—is to enable medical personnel to operate the devices to perform medical procedures. The district court correctly explained that the "original embedded copyrighted computer programs and their related files make the medical devices run, instructing them on how to operate. When [an independent servicing organization] references the computer programs to conduct diagnosis, maintenance, or repair, the user does so to protect or fix those same devices . . . not [in order to] run other devices." 5-JA-1679.

Nor is the court's analysis limited to just the Windows or Linux operating code (*see* Br. 30); indeed, the language of the exemption is

intentionally broader than "operating software." The court instead relied on the Librarian's finding that the primary purpose of the device software, as well as the data files and manuals, is to allow users to operate the device to perform medical procedures, and that enabling device repair is a subsidiary or ancillary function of the software. As outlined above, this finding is supported by substantial evidence in the record and is not clearly erroneous. For example, the rulemaking record demonstrates that even users with "some access to . . . servicing materials" were unable to perform repairs because they needed additional access to certain functions of proprietary software and data files installed on the devices. *See* 2-JA-643-645. Diagnosis, maintenance, and repair "in no way 'obviate[] any need' for the original copyrighted software to operate the medical device." 5-JA-1680 (quoting *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1222 (11th Cir. 2021)).

Recent Supreme Court precedent underscores the error in plaintiffs' analysis. In *Google*, the Supreme Court explained that "Google copied portions of the Sun Java [application programming interface] precisely, and it did so in part for the same reason that Sun created those portions. . . . But since virtually any unauthorized use of a copyrighted computer program

30

(say, for teaching or research) would do the same, to stop here would severely limit the scope of fair use in the functional context of computer programs." 593 U.S. at 30. If anything, *Google* was a more difficult case for fair use than this one. Google had developed and was marketing its own software that included some elements that had been copied from Oracle. Here, any repair technician engaged in circumvention pursuant to the exemption is not creating or selling copies of a competing work, but instead enabling the primary use of the original copy of the device software as intended to perform medical procedures. The Librarian was correct in distinguishing between the purpose of the copyrighted software, which is to control the operation or functions of the machine, and access to the software for the purposes of diagnosis, maintenance, and repair, which is "something more than repackag[ing] or republish[ing] the original copyrighted work." *HathiTrust*, 755 F.3d at 96; *see* 3-JA-812 ("[T]he purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed."). To the extent that the Ninth Circuit suggested otherwise in *Triad Systems Corp. v. Southeastern Express Co.*, 64

F.3d 1330 (9th Cir. 1995), it did so without the benefit of the Supreme

Court's decision in *Google* and other modern fair-use precedents.[3]

    For similar reasons, plaintiffs' reliance on *Warhol* is misplaced. *See* 5-

JA-1685. There, again, the use involved licensing a secondary work that

was derived from a copyrighted photograph. The photograph was

originally licensed to publications to illustrate magazine articles about the

subject or to facilitate the creation of magazine illustrations. The user's

purpose was similar and substitutive: licensing a secondary work based on

the original photograph for publication in a magazine. This case might be

analogous if repair technicians were copying device manufacturers'

software to create their own version and then licensing that derivative

software to medical facilities to operate, as well as diagnose, maintain, and

repair, their medical devices and thereby allow those device owners to

forgo obtaining an authorized copy of the original device software. But that

is not remotely what repair technicians are doing, and even if they were,

---

[3] The Ninth Circuit has also subsequently recognized that its analysis in *Triad Systems* was superseded by the enactment of 17 U.S.C. § 117(c), which was added to the Copyright Act in the DMCA. *See 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. Appx. 366, 369 (9th Cir. 2017) (unpublished opinion).

those uses would be well outside the scope of the exemption. In addition, plaintiffs' reliance on general statements like the Supreme Court's caution against "an overbroad concept of transformative use," ignores the Court's explicit acknowledgment in *Warhol* itself that the inquiry is context-specific and functional, 598 U.S. at 529, and its invocation of *Google* as an example of an instance in which the "use was justified," *id.* at 533 n.8.

It is unclear what plaintiffs mean to accomplish through their observation that "[a]n exemption for copying operating software would not be necessary in light of [17 U.S.C.] § 117(c)." Br. 38. The cited provision creates an exemption to copyright infringement in certain limited circumstances in which copyrighted software that is installed on a machine is copied (or authorized to be copied) by the owner or lessee of equipment "solely by virtue of the activation of [the] machine." 17 U.S.C. § 117(c). To the extent that plaintiffs suggest (Br. 55-56) that the Librarian's fair-use analysis was superfluous, at least in part, because Section 117(c) provides that certain maintenance and repair uses of machine software are noninfringing, that suggestion would not change the Librarian's bottom line conclusion that in the specific context presented by the exemption, repair is likely noninfringing under 17 U.S.C. § 107. And to the extent that

33

the exemption applies to activities that are beyond the scope of what Congress addressed in 17 U.S.C. § 117(c), that provision is beside the point. Nothing in Section 117, which on its face provides a limitation on copyright owners' exclusive rights in certain circumstances, suggests that the provision carries the negative implication that ordinary fair-use analysis cannot render other uses noninfringing in circumstances that Congress did not expressly address in Section 117(c), as plaintiffs appear to suggest, *see* Br. 56-57. And the Librarian did not, of course, "purport to amend" Section 117(c). Br. 55. Section 117(c) creates a limited exception to infringement of an exclusive right under section 106, while the Librarian exercised her statutory authority to create an exemption from the separate liability created by Section 1201 of the DMCA for circumventing technological protection measures. To the extent that plaintiffs believe that some conduct—either that covered by the exemption or actions that clearly fall outside the scope of the exemption—constitutes copyright infringement, they remain free to institute an infringement action regardless of whether the Librarian has created a DMCA exemption.

Plaintiffs likewise misunderstand the import of the Librarian's reliance on the Register's recognition in 2015 that diagnosis and repair are

34

likely to constitute fair use. Even though the uses that were at issue in 2015 may in some or all cases have involved modification of the software, the relevant point was that the uses served a purpose distinct from that of the original work: the Register concluded then that the "proposed uses for diagnosis and repair would presumably enhance the intended use of [vehicle electronic control units] computer programs." 1-JA-248; *see also* 1-JA-233 (explaining that electronic control units "are programmed to fulfill specific vehicular functions, such as engine control, fuel efficiency and braking"). In any event, it is perfectly clear, regardless of what was said in 2015, that in this proceeding the Register regarded use of software and data files to repair and restore functionality to medical equipment as distinct from the use of those works to operate the equipment to perform medical procedures, and that conclusion is correct for the reasons stated above.

### B.    The Nature of the Work and Amount Used Favor Fair Use.

The district court correctly upheld the Librarian's determinations that the second and third factors likely also favor fair use, concluding those determinations were not arbitrary and capricious. 5-JA-1693. The second factor—the nature of the copyrighted work—addresses how "'close' the

work is 'to the core of intended copyright protection.'" 5-JA-1692 (quoting

*Campbell*, 510 U.S. at 586). Citing *Campbell*, the Register explained that "the

computer programs and data embedded in medical devices and systems

are not used for their expressive qualities, but rather for their functional

and informational aspects that enable users to control and understand the

operation of the equipment," and thus, the second favor favors fair use. 2-

JA-629; *see also Google*, 593 U.S. at 28-29, 40.

The Librarian also correctly concluded that the third factor—the

amount of the work used—likely favored fair use but "should be given

little weight." 5-JA-1694 (quoting 2-JA-630). As the Register reasoned, the

amount of copyrighted material used was "reasonable relative to the

purpose" of the use at issue because sometimes repairs would only require

a portion of the copyrighted works, but even assuming a large portion of

the works were used, it would be "permissible where necessary to achieve

a transformative purpose." 2-JA-630.

Plaintiffs' arguments on these factors (*see* Br. 52-55) simply rehash

their prior arguments that the use in question is commercial and not

transformative, but those arguments are misplaced for the reasons outlined

above. Plaintiffs are also wrong to suggest (Br. 52) that, under *Warhol*,

36

factors two and three must present a "particularly compelling justification" for the use. *Warhol*, 598 U.S. at 547. *Warhol* did not address the second and third fair use factors, and certainly did not set such a standard for their consideration. *See id.* at 525 ("[T]he only question before this Court is whether the court below correctly held that the first factor . . . weighs in Goldsmith's favor." (citation omitted)); *see also id.* at 547 (explaining that "a particularly compelling justification is needed . . . for the first factor to favor fair use"). Finally, to the extent plaintiffs argue that the second factor cannot favor fair use because the proposed uses affect the "established market for medical machine maintenance-and-repair services," Br. 54, that argument is more properly considered under the fourth factor—the effect on the market for or value of the works.

## C. The Effect on the Market for or Value of the Copyrighted Work Favors Fair Use.

The fourth and final statutory factor in the fair-use analysis considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In considering the fourth factor, the relevant question is whether the proposed uses of the materials "would result in a substantially adverse impact on the potential market *for the*

*original*." *Campbell*, 510 U.S. at 590 (emphasis added) (quotation marks omitted). As the Supreme Court recognized in *Warhol*, there is "a positive association" between the first and fourth fair-use factors: "[a] secondary use that is more different in purpose and character is less likely to usurp demand for the original work or its derivatives." 598 U.S. at 536 n.12. When, as here, "the second use is transformative, market substitution is at least less certain." *Campbell*, 510 U.S. at 591.

Here, the "proper inquiry is whether the market for the 'copyrighted work,' which encompasses the embedded operating software and the related materials like electronic manuals, error logs, design specification documents, will be harmed by copying those materials for diagnosis, maintenance, and repairs." 5-JA-1697 (citation omitted). But, as the district court recognized, "the software and related data files have no value apart from the device[s] themselves"; they "cannot be put into other equipment to operate those devices or uploaded to a computer to carry out other functions." 5-JA-1697.

Because the medical device repair exemption "does not allow [independent servicing organizations] in any way to replace the need for the equipment [or the embedded software itself], the Librarian fairly

38

concluded that [their] use of the software and related data files does not harm the original market for the purchase of the devices—*i.e.*, the package of the equipment and software." 5-JA-1697-1698. The Register explained that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." 2-JA-631. The Register noted that even if "some system features on certain devices may be separately licensed through a subscription service, the purpose of the proposed uses is not to enable ongoing unauthorized access to enhanced features, but merely to restore functionality so the equipment performs as intended." 2-JA-631. The Register also noted rulemaking comments that "electronic manuals merely provide technical information" and had been "provided freely" in the past, "suggesting that their use has a demonstrated neutral effect on the market." 2-JA-630 (alteration and quotation marks omitted); *see also* 2-JA-643-644. Moreover, there is no basis to think that the proposed uses would impinge on the original market for the copyrighted software because "if a user were to reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities

would remain prohibited because they fall outside the scope of the proposed exemption." 2-JA-631.

Based on the rulemaking record, it was reasonable to conclude that medical device software and data files generally have no independent value separate from the device. *See* 2-JA-631. Even allowing that some software may separately licensed, the use of a particular copy of that software installed on a device to restore that device's functionality does not harm the market for the software. Taking all of this into account, the district court properly upheld the Librarian's conclusion that "diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software and this factor favors fair use." 2-JA-631; *see also* 5-JA-1696 (quotation marks omitted).

Plaintiffs' primary argument is that the medical device repair exemption affects the separate market for diagnosis, maintenance, and repair of medical equipment by device manufacturers by enabling independent servicing organization to participate in that market. But, as the district court recognized, the commercial value of the copyrighted materials in the repair market relies on the "transformative process conducted by [independent servicing organizations]." 5-JA-1698. That

40

process "does not compete with or replace the use of the copyrighted materials as they were originally provided in the initial sale, which is the market that the fourth factor instructs courts to consider." 5-JA-1698. A "potential loss of revenue is not the whole story. [The court] must consider not just the amount but also the source of the loss." *Google*, 593 U.S. at 35. The Supreme Court has recognized that, for example, "a 'lethal parody, like a scathing theatre review,' may 'kill demand for the original,'" but "this kind of harm, even if directly translated into foregone dollars, is not 'cognizable under the Copyright Act.'" *Id.* (alteration omitted) (quoting *Campbell*, 510 U.S. at 591-92).

Plaintiffs' theory of market harm is essentially that, if they can generate ancillary revenue from providing aftermarket services for devices that require the use of copyrighted works installed on the devices, anyone else who provides services that use the installed copies harms the market for the works. Under plaintiffs' expansive view of market harm, this is true even if the device owner or lessee engages in self-help, rather than relying on a third-party independent servicing organization, and even where no additional copies are retained or distributed. That has never been the law, and merely underscores the connection between the first and fourth factors

41

and the importance of transformative use. Here, even if the manufacturers are losing revenue in the service-and-repair market, the Librarian's "distinction between the original device market and the service-and-repair market and her subsequent conclusion that the [medical device repair e]xemption did not harm the original market was . . . reasonable." 5-JA-1699. Similarly, the Ninth Circuit in *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), recognized that "some economic loss by Sony as a result of [the] competition [in the secondary market] does not compel a finding of no fair use," because "copyright law . . . does not confer . . . a monopoly" over the "market for devices that play games Sony produces or licenses," *id.* at 607. Moreover, as that court has long held, "an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1992).

Finally, to the extent plaintiffs also suggest that the Librarian and district court improperly considered competitive concerns as part of the fair-use analysis, *see* Br. 6-7, 24, that suggestion is wrong. As the court

42

correctly explained, the Librarian did not consider increasing competition for repair services, much less pricing, to be a benefit as part of the fair-use analysis and instead, properly considered competition as part of the fifth factor of the Section 1201 "adverse effects" inquiry. *See* 5-JA-1693-1694; *see also* 2-JA-643-648. Plaintiffs have not challenged the Librarian's conclusion that absent the medical device repair exemption, the anti-circumvention provision would adversely affect the repair of those devices and systems. And in any event, such competition might properly be considered to the extent public benefits are relevant to the fourth factor. *See Google*, 593 U.S. at 35-40. The rulemaking supports the conclusion that there are significant public benefits to allowing independent servicing organization to access medical device software in order to repair, diagnose, and maintain complex medical equipment. For example, the Register noted that it would result in shorter equipment downtime and increased access to care where a manufacturer repair technician is not available for days or weeks or where a manufacturer has decided to render an older model obsolete. *See* 2-JA-643-644; *see also, e.g.*, 3-JA-1025-1026. In other words, broader access to repair enables productive use of the device software by restoring equipment functionality.

43

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL TENNY
*/s/ Laura E. Myron*

LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4819*
*Laura.e.myron@usdoj.gov*

January 2026

44

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,453 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit by using the appellate

CM/ECF system.  Service will be accomplished by the appellate CM/ECF

system.

*/s/ Laura E. Myron*
LAURA E. MYRON