No. 25-5328

*In the*

# United States Court of Appeals

### *for the*

## District of Columbia Circuit

_____

ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

– v. –

LIBRARY OF CONGRESS, *et al.*,

*Defendants-Appellees.*

_____

On appeal from a final judgment of the
United States District Court for the District of Columbia
Case No. 1:22-cv-499 (U.S. District Judge Beryl Howell)

_____

## APPELLANTS' REPLY BRIEF

_____

MICHAEL ELKIN
  *Winston & Strawn LLP*
  *200 Park Avenue*
  *New York, NY 10166*
  *(212) 294-6729*

THOMAS KEARNEY
  *Winston & Strawn LLP*
  *101 California Street, 21st Floor*
  *San Francisco, CA 94111*
  *(415) 591-6894*

MICHAEL B. KIMBERLY
  *Winston & Strawn LLP*
  *1901 L Street NW*
  *Washington, DC 20036*
  *(202) 282-5096*
  *mkimberly@winston.com*

*Counsel for Appellants*

# TABLE OF CONTENTS

Introduction ................................................................................... 1

Argument ...................................................................................... 3

   A. The government's brief rests on two mistaken factual assertions ......... 3

      1. There is a separate market for the works at issue here .................... 4

      2. The works at issue were created to facilitate maintenance-
and-repair services, not to operate the machines ........................... 7

   B. The uses permitted by the Exemption are commercial and
substitutive, not transformative ........................................................ 10

      1. Third-party servicers do not put the protected works at issue
here to a "transformative" use ..................................................... 10

      2. The Exemption authorizes commercial substitution .................... 14

   C. Unauthorized copying harms the market in which manufacturers
license the works at issue ................................................................. 17

   D. The second and third factors cannot overcome clear commercial
substitution ..................................................................................... 22

   E. The Court should vacate the Exemption............................................. 23

Conclusion..................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ..................................................... 16

*Andy Warhol Foundation for the Visual Arts, Inc. v.*
    *Goldsmith*, 598 U.S. 508 (2023) ........................6, 10, 12, 13, 17, 20

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ...................................................... 22

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ..................................................... 12, 14, 17

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ........................................................................11

*Google LLC v. Oracle America, Inc.*,
    593 U.S. 1 (2021) ........................................................... 3, 6, 19-22

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985) ..........................................................14, 15, 23

*Michigan v. EPA*,
    576 U.S. 743 (2015) ...................................................................11

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ....................................................11

*Solondz v. FAA*,
    141 F.4th 268 (D.C. Cir. 2025) ............................................... 6, 10

*Sony Computer Entertainment, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000)....................................................... 19

*Storage Technology Corp. v.*
    *Custom Hardware Engineering & Consulting, Inc.*,
    421 F.3d 1307 (Fed. Cir. 2005) ..................................................... 8

*Triad Systems v. Southeastern Express*,
  64 F.3d 1330 (9th Cir. 1995) ............................................ 11, 19-21

*United States v.*
  *American Society of Composers, Authors & Publishers*,
  599 F. Supp. 2d 415 (S.D.N.Y. 2009) .......................................... 16

*Zomba Enterprises, Inc. v. Panorama Records Inc.*,
  491 F.3d 574 (6th Cir. 2007) ....................................................... 12

**Statutes & Regulations**

17 U.S.C.
  § 107 .................................................................................. 2, 22
  § 117(c) ........................................................................ 3, 7-9, 21

5 U.S.C.
  § 706(2) ................................................................................... 23
  § 706(2)(A) ............................................................................... 2

37 C.F.R. § 201.40(b)(17) .......................................................... 9, 24

## GLOSSARY

DMCA:    Digital Millennium Copyright Act

FDA:    Food and Drug Administration

ISO:    independent service operator

MITA:    Medical Imaging & Technology Alliance

OEM:    original equipment manufacturer

R&D:    research and development

## INTRODUCTION

The Librarian has the facts wrong. The copyrighted works at issue here are diagnostic programs, machine servicing tools, and maintenance-related documents. These works are created by AdvaMed's and MITA's members for the singular purpose of facilitating maintenance, diagnosis, and repair of the sophisticated medical devices for which they are written.

Although these works are typically stored on the devices that they are used to service, access to these works is not ordinarily sold with the machines as a bundle. Rather, manufacturers market their diagnostic programs, machine servicing tools, and maintenance-related documents separately from the machines—either as part of a service contract between the manufacturer and machine owner or through a license sold to owners or authorized servicers, who must undertake rigorous training.

Unauthorized third-party servicers—referred to in the record as "independent service organizations" or ISOs—gain unsanctioned access to these programs and documents (that is, they illegally copy them) without paying a licensing fee. They do so to put them to the exact use for which they were created: diagnosing and servicing advanced medical devices for a fee, in direct economic competition with the works' authors, in the exact market in which the authors themselves license and use the works. This is copyright infringement by any definition.

Against this background, this appeal really is not so complicated. The Librarian of Congress granted a DMCA exemption that allows the copying of these works by unauthorized third-party servicers on the theory that the works are being put to "fair use" within the meaning of 17 U.S.C. § 107. That conclusion disregards the evidentiary record and spurns the Supreme Court's fair-use precedents, old and new. It is, in other words, arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

The Librarian's clearly, consistently blindered presentation of the facts suggests something ulterior. As we noted in the opening brief (at 18, 50), the Librarian has frankly admitted that the decision to grant the Exemption was motivated by a concern that "OEMs charge higher prices" than third-party servicers. 2-JA-647. Thus, "medical service providers must spend more" on either OEM service contracts or personal licenses, compared with a scenario in which "they [are] able to engage in self-repair or have an ISO perform repairs on their behalf." *Id*. This, the Librarian saw as a problem to solve, rather than as the natural consequence of copyright protection. *See id*.

Even now on appeal, the Librarian argues (Br. 43) that aiming to reduce the cost of service contracts by denying copyright protection to manufacturers is appropriate "as part of the fifth factor of the Section 1201 'adverse effects' inquiry." But that provision directs the Librarian to consider whether the anti-circumvention rule will cause users to be "adversely affected . . . in their

ability to make *noninfringing* uses" of the copyrighted works. 17 U.S.C.
§ 1201(a)(1)(C) (emphasis added). It does not authorize the Librarian to en-
gage in economic policymaking by permitting *infringing* uses.

The argument that a DMCA exemption is warranted simply because
consumers prefer cheaper services is not defensible in a case about copyright.
Curtailing copyright owners' exclusive rights for the express purpose of re-
ducing the value of the copyrights and enabling non-owners to compete
directly with the copyright owners may (or may not) serve a justifiable policy
goal—but if it does, it is for Congress to determine, not the Librarian. The
history of 17 U.S.C. § 117(c) shows how revisions to copyright law are sup-
posed to work. This is not the way.

## ARGUMENT

### A. The government's brief rests on two mistaken factual assertions

It is evident from both the Librarian's reasoning and the district court's
decision upholding the Exemption that each misapprehended the facts. In the
opening brief, we were direct about identifying the relevant misimpressions
and citing to the administrative record to correct them. The Librarian's
answering brief sails past these clarifications like a ship in the night, declining
to address them head on and perpetuating the same errors as before. Because
these errors are central to the appeal, we begin by restating them—providing
(unlike the Librarian) citations to the administrative record for support.

### 1.    There is a separate market for the works at issue here

**a.** Take first the market in which the works at issue are sold. The Librarian asserted in the Eighth Rulemaking that the "software and data files" at issue here "are sold with the equipment and have no independent value separate from the devices." 2-JA-630. The district court echoed that reasoning (5-JA-1696-1697), concluding that there is no standalone market for diagnostic programs, machine servicing tools, and maintenance-related documents because anyone who might need access to those works already receives it as a part of a "package of the equipment and software" at the time the machine is purchased. 5-JA-1697-1698.

Before this Court, the Librarian continues the theme: "Based on the rulemaking record, it was reasonable to conclude that medical device software and data files generally have no independent value separate from the device." Br. 40 (citing no evidence).

As we explained in the opening brief (at 48-49), that is simply wrong. In fact, evidence submitted by the Exemption's own proponents demonstrated that there *is* a separate—indeed, robust—market for the works at issue, apart from the devices they are used to support. *See* 4-JA-1132-1135. The Exemption's objectors agreed, explaining that "there is a market for some medical device software modules as standalone works," which are "activated and maintained through a subscription model." 4-JA-1361; 5-JA-1583. That is to

say, manufacturers use encryption to "limit access to software and data files necessary to service [medical] equipment" (4-JA-1119), in turn selling "licenses to use the software" to machine owners and authorized third-party technicians (4-JA-1079). *See also* 5-JA-1580 (manufacturers sell and license software "functionalities" individually, apart from the machines). Access to the software and documentation is also furnished indirectly when an owner engages "an OEM technician," who has his own access to the works and uses it to provide maintenance-and-repair services to end users. 4-JA-1079. *Accord* 4-JA-1067-1068; 4-JA-1361.

**b.** We have made this point repeatedly: Although the diagnostic programs, machine servicing tools, and maintenance-related documents at issue here are *stored* on the machines they are used to service, access to the works (that is, the right to copy and use them) is *sold* in separate markets, distinct from the markets for the machines themselves. *See, e.g.*, Opening Br. 48-49; D. Ct. Dkt. 42, at 15-16. Unauthorized third-party servicers, in turn, make unauthorized copies of the works at issue, so they can compete in the market for maintenance-and-repair services without bearing the cost of producing or licensing the works that make the services possible.

The Librarian does not meaningfully confront this issue. To be sure, in both the rulemaking (2-JA-631) and his brief before this court (at 39), he acknowledges that the works "may be separately licensed [to end-users] through

a subscription service." But he dismisses (*id.*) that fact, reasoning that "the purpose of the proposed uses is not to enable ongoing unauthorized access," but rather "to restore functionality so the equipment performs as intended."

That makes no sense, factually or analytically. Factually, third-party servicers' purpose very plainly *is* to access and use the copied works on an ongoing basis, so they can provide the same for-profit services that manufacturers (and authorized, fee-paying third parties) provide, in direct competition with them.

Analytically, it makes no difference that a copyist's use of a protected work has the end result of restoring the functionality of the machine for which the work is written. "Fair use" turns, not on the utility of the result the copyist achieves, but on whether the copyist's use is commercially substitutive (and thus infringing) or creatively transformative of the work itself (and thus non-substitutive and non-infringing). *See Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508, 528-529 (2023); *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 29-30 (2021).

In all events, the Librarian's assertion that the relevant works "are sold with the equipment and have no independent value separate from the devices" (2-JA-630) was essential to the Librarian's decision below. Yet it runs "counter to the evidence before the agency" and is not "the product of agency expertise." *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025).

### 2. *The works at issue were created to facilitate maintenance-and-repair services, not to operate the machines*

The second factual error that the Librarian made in the rulemaking (3-JA-812)—and that the district court continued in its opinion below (5-JA-1679, 1683-1684 & n.5) and the Librarian now repeats before this Court—is the assertion that the "primary purpose" (Br. 29) or "primary use" (Br. 31) of the works at issue here is to *run* the devices by "instructing them on how to operate" (Br. 29 (quoting 5-JA-1679)). The implication appears to be that the Exemption authorizes the copying principally of the machines' "operating system software" (5-JA-1683), concerning which "device repair is [only] a subsidiary or ancillary function" (Br. 30).

As we explained in the opening brief (at 36-39), that is incorrect. The record is explicit that the Exemption was adopted to permit the copying of "medical equipment servicing materials" (3-JA-1031), including "diagnostic software and data files" (3-JA-1024) and electronically stored service manuals and similar documentation (*e.g.*, 3-JA-1031-32; 4-JA-1078-79; 5-JA-1432 n.3). Third-party servicers thus "seek to use copyrighted service software authored by [manufacturers] for the *exact same* purpose as it was created," which is "to service medical imaging systems." 5-JA-1510.

It could not be otherwise, because 17 U.S.C. § 117(c) already permits the copying of software necessary to activate the machine for the purpose of

performing "maintenance or repair of [the] machine." In this context, an exemption that only allowed users to copy "operating system software" (5-JA-1683) written "to operate [the] device" (3-JA-812) would have been superfluous. *See* Opening Br. 55-57. *See also Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307, 1311-1312 (Fed. Cir. 2005) (detailing the history and purpose of § 117(c)).

It follows that the Exemption is not (cannot be) about mere "incidental" copies (Br. 16, 21, 28) of software used "to operate [the] device" (3-JA-812). Rather, the only way the Exemption accomplishes something beyond what § 117(c) already allows is by authorizing the copying of freestanding programs and documents that are stored on the machine but are *not* "necessary for the machine to be activated" (*Storage Technology*, 421 F.3d at 1312)—which is to say, diagnostic and servicing programs, tools, and documents.

The Librarian was therefore clearly incorrect to find in the rulemaking proceedings (3-JA-812) that "the original purpose of the software is to operate [the] device," just as he is wrong to insist before this Court that "enabling device repair is [only] a subsidiary or ancillary function" of the works at issue (Br. 30), and that they are copied only "incidentally" (Br. 17). In fact, the record is crystal clear that the Exemption concerns diagnostic programs, servicing tools, and maintenance-related documents, which are created for the singular purpose of facilitating maintenance and repair.

The Librarian responds to this point with confusion, asserting (Br. 33) that "[i]t is unclear what plaintiffs mean to accomplish through their observation that" § 117(c) already permits copying operating software for maintenance and repair. To clarify the point (if such clarification truly is necessary): The Exemption cannot plausibly be read to authorize third-party servicers to copy software created "to operate [the] device" (3-JA-812), because that authorization is already furnished by § 117(c). The Exemption must instead be interpreted to accomplish something *more* than § 117(c), which it does by authorizing the copying of freestanding programs and documents that are created to facilitate, and are necessary to achieve, "diagnosis, maintenance, or repair." 37 C.F.R. § 201.40(b)(17).

Again, that is exactly what the proponents asked for in the rulemaking: an exemption allowing them to copy "medical equipment servicing materials" (3-JA-1031), including "diagnostic software and data files" (3-JA-1024) and electronic service manuals and documentation. *See also* 4-JA-1047-1048 ("servicing computer programs and data files" and "electronic manuals"); 4-JA-1078-1079 ("owner manuals" and "servicing software"); 5-JA-1432 n.3 ("medical device electronic servicing materials," including "computer programs" and "electronic manuals"); 5-JA-1444 ("documentation and software to support planned maintenance activities").

Because the Librarian and district court clearly mistook both of these core factual points, their respective fair-use analyses were grounded on mistaken factual premises. And because those mistaken premises ran "counter to the evidence before the agency," the Librarian's fair-use reasoning was necessarily arbitrary and capricious. *Solondz*, 141 F.4th at 276.

## B. The uses permitted by the Exemption are commercial and substitutive, not transformative

Those clarifications made, this appeal is easily resolved: The Exemption allows third-party servicers to use diagnostic programs, machine servicing tools, and maintenance-related documents for their exact intended purpose (to facilitate maintenance-and-repair services) for a profit, in direct competition with the authors of the works. That is a purely substitutive commercial use, which is "copyright's bête noire." *Warhol*, 598 U.S. at 528.

### 1. Third-party servicers do not put the protected works at issue here to a "transformative" use

We showed in the opening brief (at 28-31) that third-party servicers are not putting the protected works at issue here to a "transformative" use. That is to say, they do not imbue the works with a "new expression, meaning, or message," as might be said of a satirist or scholar who must copy their subjects' works to produce something new and independently creative. *Warhol*, 598 U.S. at 541.

All third-party servicers do is put the works at issue to their intended uses in a commercial application. As the Ninth Circuit held in respect to just this scenario, a third-party servicer's use of a manufacturer's maintenance programs and manuals is "neither creative nor transformative and does not provide the marketplace with new creative works." *Triad Systems v. Southeastern Express*, 64 F.3d 1330, 1336 (9th Cir. 1995) (quoting *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992)).

The Librarian offers two responses to this essential point, but neither is persuasive. ***First,*** he says (at 25) that "the copyrighted materials contained in medical devices do not actually maintain or repair the machine" on their own; they instead require technicians to "apply their own knowledge and skills to conduct the appropriate maintenance or repair, such as by replacing damaged parts or making other physical device adjustments."

That is unhelpful to the Librarian for a host of reasons. To begin with, and as we noted in the opening brief (at 49-50), it is not an explanation that the Librarian gave in the rulemaking. It was, instead, a rationale devised by the district court *sua sponte*. Of course, "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the University of California*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The Librarian does not acknowledge, let alone attempt to refute, this fatal point.

Beyond that, transformation of a separate "physical device" is irrelevant to the transformative use analysis. The fair-use inquiry asks whether the *copied works* are transformed into a new expression, not whether they are put to their intended use of accomplishing the repair or maintenance of some distinct physical object like a medical device. *See Zomba Enterprises v. Panorama Records*, 491 F.3d 574, 582 (6th Cir. 2007). This is a matter of first principles: the downstream alteration of a separate physical device (the accomplishment of which is the work's original purpose) says nothing about whether the copied work *itself* is being used to "supersede[]" or "supplant[]" the original work in the marketplace. *Warhol*, 598 U.S. at 528 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). We made this point previously (Opening Br. 39-40), but again the Librarian does not acknowledge or respond to the argument.

Finally, the district court's post hoc rationale simply misunderstands copyright law. All the time, copyrighted works must be applied by their users to achieve their intended objectives. A song, written to inspire dance, must be played by a band. A stage play, written to entertain an audience, must be performed by a troupe. And a device manual, written to inform and guide maintenance-and-repair services, must be applied by a service technician. A work is not "transformed" simply by the act of performing it or applying it in the manner the author intended. That is so even when the performance or

application involves some degree of creative interpretation, which machine maintenance and repair assuredly does not. *Warhol* itself makes this clear. It involved a derivative work (one requiring "appl[ied] . . . knowledge and skills" (Br. 25)) rather than a perfect reproduction, and yet the Court held that the derivative work was substitutive and thus not a fair use.

***Second,*** the Librarian attempts (at 35) to defend his illogical extrapolation from the Sixth Rulemaking in 2015, which determined that maintenance and repair of automobile electronic control units may be transformative. As we explained (Opening Br. 34-36), the 2015 exemption for maintenance and repair of automobile electronic control units *does* extend to transformative uses—but only because it expressly covers creative modification and alteration of the software contained within the units. Here, in contrast, the Exemption's proponents openly disavowed modifying the software at issue (2-JA-627), and the Librarian thus stated expressly that the Exemption does not extend to creative alterations (2-JA-648).

Before this Court, the Librarian finally admits (at 35) that "the uses that were at issue in 2015 may in some or all cases have involved modification of the software." But he waves (*id.*) that distinction away, insisting that the Register found the 2015 exemption was transformative because it would "enhance the intended use of . . . computer programs" on vehicle computers. But that's exactly the point—when a user modifies a program, it may

"enhance its intended use." When a user merely copies a program without alteration and puts it to its precise intended use, it does not. The Librarian recognized as much in the 2015 rulemaking, admitting (1-JA-247), with great understatement, that it weighs against fair use "when [a] new use coincides generally with the original use of a work." That is this case.

### 2. The Exemption authorizes commercial substitution

As the opening brief explained (at 31-33), the uses covered by the Exemption are not only non-transformative, but also commercially substitutive.

Commerciality is self-evident: Third-party servicers use the copied materials to provide for-profit maintenance-and-repair services. They thus "stand[] to profit from exploitation of the copyrighted material without paying the customary [licensing fee]." *Harper & Row, Publishers v. Nation Enterprises*, 471 U.S. 539, 562 (1985). The proponents and Librarian acknowledged as much in the rulemaking. *See* 2-JA-628.

Substitutability also is clear: The Exemption was touted by proponents as a boon to the market because it would allow machine owners "to get faster and more affordable services from ISOs" rather than from manufacturers. 5-JA-1439.

**a.** Concerning commerciality, the Librarian offers the same puzzling explanation as before: "[T]he commerciality of the use does not counsel against fair use," he says (at 25), "because 'the proposed activities are in-

tended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials.'" We addressed this contention in the opening brief (at 33-34), explaining that (1) the works at issue were written to facilitate maintenance-and-repair services, meaning that third-party servicers are putting the works to their intended *commercial* use; and (2) it makes no sense to say that third-party servicers do not "intend" to "commercialize" the works. Third-party servicers are for-profit businesses, and collecting fees for their services is not some unintended side effect that they would rather avoid.

Either way, the question "is not whether the *sole* motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562 (emphasis added). Here, the answer is clear: Third-party servicers *do* stand to profit from exploitation of the copyrighted material.

The Librarian does not improve his position by noting (at 26-27) that the Exemption may be utilized by "non-profit medical facilities that own their own devices and repair them for their own personal or institutional use." To be sure, use of the works at issue here by a non-profit hospital system may not generate positive cash flow for the system. But "[d]irect economic benefit is not required to demonstrate a commercial use." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001). Unauthorized copying by a hospital

system, which participates in a competitive market for healthcare services, saves the system from having to pay to retain an authorized service technician or acquire a license of its own. "[E]ven if the copies are not offered for sale," engaging in "repeated and exploitative copying" to "get for free something they would ordinarily have to buy" generally "constitute[s] a commercial use." *Id.*; *see also United States v. American Society of Composers, Authors & Publishers*, 599 F. Supp. 2d 415, 429 n.13 (S.D.N.Y. 2009).

**b.** Concerning substitution, the Librarian insists (at 25) that "the uses at issue here could [not] plausibly substitute for the original work" because third-party servicers are not "marketing software" used to diagnose and repair medical devices. That is wrong. Third-party servicers use the copied software to provide their maintenance-and-repair services. Regardless of whether they include on their invoices a separate line-item for access to that software, they are marketing access by selling services that depend upon it.

Again, manufacturers market their diagnostic programs, machine servicing tools, and maintenance-related documents in two ways: First, they sell licenses to end users and authorized technicians; second, they sell contracts for maintenance-and-repair services, performed by OEM technicians who indirectly provide access to the works. *See supra* 4-5. The maintenance-and-repair services that third-parties sell to machine owners "supersede[]" and "supplant[]" (*Warhol*, 598 U.S. at 528) the sales of the original works by both

means: Many machine owners will not pay for licenses if they instead can obtain access indirectly, and at a lower cost, through an unauthorized third-party servicer who circumvents manufacturers' protective measures pursuant to the Exemption. Nor will many pay for authorized OEM servicers, whose pricing includes recoupment of R&D and training costs.

The substitutive nature of these services was acknowledged in the rulemaking record: Machine manufacturers "compete with ISOs for the post warranty servicing [contracts]" through which the works are monetized, but "ISOs often charge much less." 4-JA-1055. Of course, they charge less only because they avoid the cost of their own R&D and refuse to pay a licensing fee to cover the cost of manufacturers' R&D.

## C. Unauthorized copying harms the market in which manufacturers license the works at issue

The Librarian does not deny that an "inference of market harm" arises in cases "involving . . . mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591. Such a presumption is "common sense," because "when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it." *Id.* (cleaned up).

That is precisely the case here, as we have shown. Indeed, market harm was acknowledged as the Exemption's point: The proponents complained that

17

manufacturers' maintenance-and-repair services are "unnecessarily expensive" (4-JA-1044) and come at "undue expense" (4-JA-1042; 5-JA-1437). The Librarian was told repeatedly that "ISOs often charge much less than OEMs." 4-JA-1055; *accord* 3-JA-1022; 4-JA-1039; 4-JA-1057; 4-JA-1079. That is because manufacturers require licensing fees for the "medical equipment software required for servicing of the medical equipment." 4-JA-1062; *accord* 3-JA-1024; 4-JA-1079; 5-JA-1434. The Exemption thus ensures that the third-party servicers can compete with OEM technicians and other authorized servicers at lower cost. *E.g.*, 5-JA-1439 (the point of the Exemption is to allow machine owners "to get faster and more affordable services from ISOs" rather than from manufacturers).

**1.** The Librarian's principal response (Br. 37-40) is to deny that there is a market to harm in the first place. But as we have shown (Opening Br. 47-52; *supra* 4-6), that is incorrect.

Beyond that, the Librarian offers only conclusory statements. For example: "[T]he use of a particular copy of [a] software [program] installed on a device to restore that device's functionality does not harm the market for the software" and thus, "the district court properly upheld the Librarian's conclusion that 'diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software.'" Br. 40. But that

assertion stands naked and unexplained. In fact, the evidence shows it to be flat wrong. *See* Opening Br. 47-52; *supra* 14-17.

The cases cited by the Librarian do not suggest otherwise. Take first *Sony Computer Entertainment v. Connectix*, 203 F.3d 596 (9th Cir. 2000), cited at page 42 of the Librarian's brief. That case did not concern "competition [in the secondary market]" as the Librarian suggests (Br. 42), but rather a third party's attempt to make Sony-licensed video games playable on machines other than Sony's own PlayStation consoles. The Exemption does not concern third-party servicers' efforts to achieve compatibility, interoperability, or anything like it. Unlike the defendant in *Connectix*, third-party servicers are not copying the works at issue here as a necessary step in the development of their own compatible copyrighted works. They are merely free-riding on manufacturers' creative labors.

The same goes for *Google*, citing at page 41. There, access to Java declarations was necessary to create Google's Android computing environment. Here, in contrast, the copying allowed by the Exemption is not a prerequisite to the creation of any new works—all it does it facilitate substitutive services. And we do not claim that the copying at issue here harms OEM revenues in the same indirect manner as parody or criticism.

This case is, instead, just like *Triad Systems*. As we explained in the opening brief (at 51), "Triad invented, developed, and marketed its software

to enable its customers and its own technicians to service Triad computers."
64 F.3d at 1337. The Ninth Circuit recognized that the third-party servicer in
that case was "getting a free ride when it use[d] that software to perform
precisely the same service" in competition with Triad itself, without paying a
licensing fee. *Id.* The court concluded that "a finding of fair use is unwar-
ranted" given the substitutive effect. *Id.* Because the defendant's "use of
Triad's software [was] entirely commercial in nature" and substituted for
Triad's own services, it was an infringing use, not a fair use. *Id.*

The Librarian appears to acknowledge that a ruling in his favor would
conflict with *Triad Systems* but attempts (at 31-32) to dodge the problem,
asserting that *Triad Systems* was decided "without the benefit of the Supreme
Court's decision in *Google* and other modern fair-use precedents." That is the
same brush-off that the district court gave. *See* 5-JA-1708-1709. But as we
noted (Opening Br. 51-52)—again without a substantive rejoinder—there is
nothing inconsistent between *Triad Systems* and any intervening Supreme
Court cases. The Ninth Circuit there addressed all the same considerations
under current fair-use doctrine that we have addressed here: transformative-
ness, substitution, commerciality, and market harm. 64 F.3d at 1336-38.
There is simply nothing in *Google* or *Warhol* suggesting the Ninth Circuit
would decide *Triad Systems* any differently today—and that case involved
analytically identical facts as those here.

It also does not matter that *Triad Systems* predates 17 U.S.C. § 117(c). The whole point is that the Exemption extends to the copying of software programs *other than* those needed to activate the machine. *See* Opening Br. 17, 30, 37-39; *supra* 7-9.

**2.** The Librarian, citing *Google*, asserts in closing (at 43) that an admitted increase in "competition" from free-riding third-party servicers "might properly be considered" a public benefit, "to the extent public benefits are relevant to the fourth factor."

*Google* did not authorize consideration of nebulous "public benefits" under the fourth factor or any other. Nor did it suggest that general public policy considerations can override copyright protection. It said only that *copyright-related* benefits may be relevant under the fourth factor—that is, added incentives to create and innovate. It explained that copyright protection "should not grant anyone more economic power than is necessary to achieve the incentive to create" (593 U.S. at 21) and cautioned against overly strict constructions of "fair use" that would hinder "future creativity" and thus lead to "creativity-related harms to the public" (*id*. at 39-40).

That is not what this case is about. The supposed public benefit that the Librarian cites—namely, "restoring equipment functionality" and "shorter equipment downtime" (Br. 43), which are benefits supposedly amplified by stale references to the COVID-19 pandemic (Br. 9, 26)—have nothing to do

with creativity. Rather, they come at a *cost* to creativity, by denying copyright protection that makes creative investments economically worthwhile.

**D.    The second and third factors cannot overcome clear commercial substitution**

We demonstrated (Opening Br. 52-55) that the second and third fair use factors are insufficient to overcome the problem of substitution in this case.

First, we showed (at 52-54) that the cases on which the district court relied—cases not relied upon by the Librarian—do not support affirmance based on the second factor. In his brief before this Court, the Librarian does not contend otherwise. Instead, he merely parrots back (at 36) his unsupported reasoning from the rulemaking, that the works at issue lack "expressive qualities" and are used only for their "functional and informational" utility. But at the same time, he does not deny that "Congress chose to place [computer code] within the copyright regime." *Google*, 593 U.S. at 23. And "unless a persuasive fair use justification is involved, authors of factual works, like authors of fiction" are entitled to copyright protection. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015). Here, there is no fair-use justification at all.

Concerning "the amount and substantiality of the portion" of the protected works "used in relation to the [works] as a whole" (17 U.S.C. § 107(3)), we explained (at 55) that, when a copier takes all or a substantial portion of

the original, fair use is less likely. *See Harper & Row*, 471 U.S. at 565. The Librarian suggests (at 36) that copying entire works is all right—even that it counterintuitively *supports* fair use—when it is done for a transformative purpose. It's hard to see how copying a work in its entirety could possibly count in *favor* of fair use. But, in any event, the uses to which the works here are being put here are their original, intended ones; they are not transformative in any way. The second and third factors are thus further evidence that the uses at issue here are not "fair."

### E.      The Court should vacate the Exemption

In the rulemakings and his brief to this Court, the Librarian has turned a blind eye to the actual facts, asserting as a matter of unsupported, free-floating policy that "device repair is generally noninfringing." 3-JA-918. *That is wrong.* Device repair is a for-profit, commercial service that often depends on copyrighted works like diagnostic programs, machine servicing tools, and maintenance-related documents, as it does here. Those works are not deprived of copyright protection simply because they facilitate the practical objective of maintaining and repairing a physical device. Because the copying authorized by the Exemption is not transformative, but rather commercially substitutive, it is not fair use, and the Exemption must be set aside.

As we argued in the opening brief (at 57-58), the requirement under 5 U.S.C. § 706(2) that the Exemption be "set aside" calls for vacatur and

nothing less. The Librarian no longer disputes this point, which the Court may take as conceded.

## CONCLUSION

The Court should reverse the decision below and remand with instructions to set aside the Medical Devices Exemption, 37 C.F.R. § 201.40(b)(17).

Respectfully submitted,

/s/ *Michael B. Kimberly*

MICHAEL ELKIN
    *Winston & Strawn LLP*
    *200 Park Avenue*
    *New York, NY 10166*
    *(212) 294-6729*

THOMAS KEARNEY
    *Winston & Strawn LLP*
    *101 California Street, 21st Floor*
    *San Francisco, CA 94111*
    *(415) 591-6894*

MICHAEL B. KIMBERLY
    *Winston & Strawn LLP*
    *1901 L Street NW*
    *Washington, DC 20036*
    *(202) 282-5096*
    *mkimberly@winston.com*

Dated: February 13, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel for appellant certifies that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 5,316 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface and type style requirements of Rule 32(a) because it is typeset in Century Supra font in 14 points.

Dated: February 13, 2025                    /s/ *Michael B. Kimberly*

## CERTIFICATE OF SERVICE

Undersigned counsel for appellant certifies that on this date, the foregoing document was served electronically via the Court's CM/ECF system upon all counsel of record.

Dated: February 13, 2025                    /s/ *Michael B. Kimberly*